**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-Civ-24354-COOKE/TORRES**

TAIWAN SMART,

      Plaintiff,

vs.

THE CITY OF MIAMI,

      Defendant.

_____/

**ORDER ON DEFENDANT'S SUPPLEMENTAL**
**MOTION FOR SUMMARY JUDGMENT**

      Plaintiff, Taiwan Smart ("Smart"), brought this three-Count action against Defendant, the City of Miami (the "City"), for (1) false arrest, (2) false imprisonment, and (3) deprivation of civil rights pursuant to 42 U.S.C. Section 1983. (ECF No. 4). The City moved for final summary judgment (the "Motion") (ECF No. 29), and the Motion has been fully briefed (ECF Nos. 53 and 56). For the reasons set forth herein, the City's Motion is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

      This case springs from the tragic deaths of fourteen year old Raynathan Ray ("Ray") and eighteen year old Jonathan Volcy ("Volcy"), who were murdered execution-style in an apartment (the "Apartment") on November 13, 2009. The investigation of the murders of these two young men was captured by film crew for the television show, "The First 48." A few days after the shootings, Plaintiff, Taiwan Smart, contacted the City of Miami Police and told them that he was in the Apartment on the night of the shootings, and that he ran from the Apartment when the shooter approached a window in the Apartment and started firing shots into the Apartment. Smart said he had hidden for several days for fear that the shooter was coming after him, too.

      Smart quickly became the police's prime suspect and the unwilling antagonist of an episode of the First 48. After fifteen hours of interrogating Smart, all filmed by the First 48

1

crew, the police charged Smart with several crimes, including two counts of second degree murder. Smart maintained that he was innocent, and his story remained consistent throughout his interrogation. Based on the second degree murder charges, and testimony presented to a judge at a probable cause hearing, Smart was held without bond while he awaited trial. During that time, Smart continued to maintain his innocence. Smart alleges that during his incarceration, he learned that another inmate confessed to the murders. When this confession was brought to the police's attention, Smart was permitted to take a lie detector test, which he had been requesting from the beginning, and he passed. Ultimately, the charges against Smart were *nolle prossed*, and Smart was released from jail nineteen months after his initial arrest.

Smart alleges that Defendant, the City of Miami, falsely arrested and falsely imprisoned him for the two counts of second degree murder. Smart also alleges that the City violated 42 U.S.C. Section 1983 by allowing its police force to be involved in the production of the First 48, without adequately training the police on the proper manner of dealing with the First 48 while investigating the serious crimes featured on the show.

The City has moved for final summary judgment on the grounds that (1) there was probable cause to arrest Smart for a crime, thus there was no false arrest or false imprisonment, and (2) there was no Section 1983 violation because no government employee committed a Constitutional violation, and even if such a violation existed, the City is not vicariously liable for its employees' actions absent an official policy or custom of the City that resulted in the violation.

## II.    MATERIAL UNDISPUTED FACTS

The following facts are undisputed, unless otherwise noted.

On November 14, 2009, City police went to the Apartment after receiving calls of two men shot inside. (ECF. No. 30-1).  The police found Ray and Volcy dead inside the Apartment. (ECF. No. 30-1 at 2). They had each been shot at close range, one to the back of the neck, the other to the top of the head. (ECF No. 52-24 at 8, ln. 12-13). The First 48 met the police at the scene and filmed inside of the Apartment. (ECF No. 52-7). The police

found individually packed baggies containing marijuana and crack cocaine in the Apartment. (Def. SOF ¶ 29).[1]

## A.   Armbrister's Statement

The night of the murders, City detectives Cepero and Sanchez interviewed a friend of Volcy, Ciara Armbrister ("Armbrister"), who lived in the same apartment complex and had discovered Ray and Volcy dead in the Apartment. (ECF No. 30-7). Armbrister had spent some time with Volcy in the Apartment on the night of the murders. (*Id.*). She was outside the Apartment speaking to Volcy sometime around 8:00 p.m. (*Id.* at 35:8-18, 159:6-21). Armbrister told the police that Volcy and Smart sold "weed and crack" from the Apartment. (*Id.* at 22:3–7). She said Smart lived in the Apartment. (*Id.* at 34:1-10; 78:24 – 79:3). She also told them that there was always a gun on the table in the Apartment. (*Id.* at 22:15–24:21, 162:22-164:16). Armbrister said the gun was handled by Volcy in her presence. (*Id.* at 24:2-21, 163:19-164:8). Towards the end of her five hour questioning, Armbrister stated that she saw Smart playing with the gun a couple times. (*Id.* at 164:9-16). Armbister told the police that while she and Volcy were in the bedroom of the Apartment, she heard Smart and Ray arguing with an older Spanish man in the Apartment, whom Armbrister believed was a drug customer. (*Id.* at 16:16 – 18:5, 26:8 – 27:10; 53:24 - 54:23; 56:11-20; 62:16 – 65:22, 153:20 – 155:7). Armbrister said the argument was not between Smart, Volcy and Ray, but with the "Spanish guy." (*Id.* at 156:1-17; Pl. SOF ¶ 92).

Armbrister told police that around 10:43 p.m., she left the Apartment to go lock up the back door of her own apartment, (*Id.* at 27:28 – 28:5, 34:19-24), and about ten minutes later, she heard 5 or 6 gunshots (*Id.* at 29:16-20, 31:20 – 32:7, 35:8-18). Armbrister described the gunshots as three successive shots, a five second pause, and then two or three more shots. (*Id.* at 32:14-24, 148:6-14). Armbrister believed that the shots might have come from the Apartment, but she thought Volcy, Ray and Smart were "back there playing with a gun; probably shooting in the air or whatever." (*Id.* at 11:1-6). Sometime around 11:30 p.m. or so, Armbrister returned to the Apartment, finding the back door wide open, something she found unusual. (*Id.* at 37:1-20, 40:8-12, 150:8-9). Armbrister also said she saw the living room window wide open, whereas typically it was only cracked open. (*Id.* at 37:23 – 38:9,

---

[1] Defendant's Statement of Material Facts (ECF No. 30) shall be referred to as "Def. SOF ¶ ___."

150:12-25). In the living room, Armbrister saw Volcy and Ray lying in a pool of blood (*Id.* at 38:20-25; 44:12-16). Armbrister ran to a neighboring apartment and told them to call 9-1-1. (*Id.* at 38:25 – 39:1).

**B.    Smart's Interrogation**

On November 17, 2009, Smart contacted the police. (Def. SOF ¶ 60; Pl. SOF ¶ 60).[2] Detective Sanchez met Smart at a convenience store with the First 48 film crew. (Pl. SOF ¶ 100). Smart claims that he did not want television cameras to show his face. (*Id.*). Detective Sanchez placed Smart in handcuffs and asked him questions while the First 48 crew was filming. (*Id.* at ¶ 101). Smart was taken back to the police station, where he was interrogated for 15 hours by Detectives Cepero and Sanchez. (*Id.* at ¶ 103). First 48 was recording (audio and visual) the interrogation with equipment they had installed in the interrogation room. (*Id.* at ¶ 85).

During the interrogation, Smart told Detective Sanchez that just before the shootings, a man came to an open window of the Apartment and asked to buy marijuana. (Pl. SOF ¶ 37). Smart said the window was open a foot or less, had venetian blinds that were pulled up, and had a heavy, dark blue bed sheet made into a curtain, which was moved to the side when customers were there. (ECF No. 30-4 at 66:19, 77:14-15). Smart went to the window and asked the man for the money. (*Id.* at 53:19-23). Smart demanded the money several times, while the man demanded to see the drugs. (Def. SOF ¶ 41; ECF No. 30-4 at 53:19-24). At that point, Smart said, a second man jumped up and immediately began shooting through the window opening. (Def. SOF ¶ 43; Pl. SOF ¶ 43). The shooter fired several shots. (Def. SOF ¶ 43; Pl. SOF ¶ 49). Smart fell to the floor. (*Id.*). Smart then ran out of the Apartment. (Def. SOF ¶ 52; Pl. SOF ¶ 49). Smart told the police that the shooting had stopped by the time he got to the door. (Def. SOF ¶ 51). Smart said that he thought his friends were running behind him as he ran out. (Pl. SOF ¶ 56).

Smart then hid nearby. (Def. SOF ¶ 57; Pl. SOF ¶ 57). Within the hour, he heard the sound of police sirens arriving at the scene. (Def. SOF ¶ 58; Pl. SOF ¶ 57). Smart did not call the police or approach them when they arrived at the scene. (Def. SOF ¶ 59; Pl. SOF ¶ 59). Smart stayed with a friend from November 14, 2009 through November 17, 2009. (Def.

---

[2] Plaintiff's Statement of Material Facts in Opposition to the City of Miami's Motion for Summary Judgment (ECF No. 52) shall be referred to as "Pl. SOF ¶ ___."

SOF ¶ 60; Pl. SOF. ¶ 60). During his interrogation, Smart requested a polygraph examination to verify his statements in excess of 85 times. (Pl. SOF ¶ 104).

**C.    Arrest Affidavit**

Smart was arrested after his interrogation and charged with: (1) two counts of murder in the second degree; (2) possession of cocaine with intention to sell; (3) possession of marijuana with intent to sell; (4) possession of a firearm by a convicted felon. (ECF. No. 30-1 at 1; Pl. SOF ¶ 107). Detective Sanchez wrote in the arrest affidavit that, "According to witness number 1, the defendant was involved in a violent argument with the victims over money and narcotics. The witness further stated that the defendant and the victims were the only occupants in the apartment…." (ECF. No. 30-1 at 1; Pl. SOF ¶ 108). The arrest affidavit further stated, "The physical evidence collected is not consistent with the defendant's statement." (ECF. No. 30-1 at 2; Pl. SOF ¶ 108). Forensic data revealed that Ray and Volcy were shot and murdered inside the Apartment. (Def. SOF ¶ 64; ECF. No. 30-1 at 2). As of the time of Smart's arrest, Smart already had a prior felony conviction. (ECF. No. 30-1 at 2).

**D.    Physical Evidence**

A cursory visual search for bullet casings was conducted outside of the Apartment. (Pl. SOF ¶ 95). No casings were found, but a metal detector was not used. (*Id.*). A crime scene investigator reported that the window of the Apartment opened upwards six inches. (*Id.* at ¶ 96). Four bullet casings were found inside the Apartment. (*Id.* at 98). Five bullet holes were found inside of the Apartment, not including the bullet holes on the victims. (ECF No. 52-21 at 23:22 - 24:3). The investigator testified that it was possible for some of the bullet holes and strike marks inside the Apartment to result from shots fired through the window. (Pl. SOF ¶ 98).

**E.    Probable Cause Hearing**

At the first appearance hearing, the circuit court judge concluded that the arrest form did not, on its face, demonstrate probable cause. (Pl. SOF ¶ 109; ECF No. 52-23). The circuit court held an independent probable cause evidentiary hearing the next day, November 19, 2009. During the November 19, 2009 hearing, Detective Sanchez testified that a witness placed Smart, Volcy and Ray in the Apartment prior to the shootings, and that they were "arguing over drugs and money." (ECF No. 52-24 at 7, ln. 12). On cross-

examination, Detective Sanchez stated that the witness, "overheard the defendants, and one of the victims that were in the living room, arguing over some money, over drugs and money. And she says that the defendant, I believe – I believe it was the defendant, was asking for additional money. One of the deceased was claiming that he wasn't going to give any additional money." (*Id.* at 11, ln. 10 – 16).

When asked by the Court what was meant by the arrest affidavit's statement that Smart's statement to the police had been inconsistent with the physical evidence, Detective Sanchez testified that Smart said, "the shooter shot through the window, killing both victims." (*Id.* at 8, ln. 25 – 9, ln. 1). Detective Sanchez stated that the physical evidence was inconsistent with Smart's statement because, "There's no evidence that the shooting occurred outside. The evidence that we have places the shooter inside the crime scene." (*Id.* at 9, ln. 1 – 3). When asked, "What evidence is that?" Detective Sanchez stated, "Body placement, along with the casings and the actual window, where he claimed that the shooting happened through, was not shattered in any way. There's a curtain that was hanging over it. There's no evidence – the absence of evidence was also very, very loud and clear." Based on this testimony, the Court determined that there was probable cause as to the two counts of murder in the second degree, and held that Smart could be held without bond on those two counts. (Def. SOF ¶ 77; Pl. SOF ¶¶ 109-10; ECF No. 52-24).

## F.    Smart's Case is *Nolle Prosed*

On June 15, 2011, nineteen months after his arrest, the charges against Smart were *nolle prosed*. (ECF No. 52-20). The Closeout Memo stated that:

> [T]here was a strike mark on the refrigerator door in the apartment which could have resulted from the shooter being outside that apartment window initially. This strike mark does support the defendant's claim that the shooting began outside. Hence, the physical evidence does not completely contradict the defendant's statement as it is possible that the shooter started shooting from outside and made his way into the apartment after the defendant ran out.

(*Id.*). The Closeout Memo further stated that during Smart's incarceration, an inmate, Arsenio Carter ("Carter"), had confessed to another inmate, Earnest Evans, that Carter had committed the murders. (*Id.*). On June 6, 2011, Smart submitted to a polygraph examination, and denied any participation in the murders. The polygraph examiner believed Smart was being truthful. (*Id.*). The prosecutor on Smart's case discussed these

developments with Detective Sanchez, and he agreed that the case against Smart could not be proven, and that it appeared "Taiwan Smart was not the shooter." (*Id.*).

**G.    Additional Facts Raised by Smart in Opposition to Summary Judgment[3]**

The First 48 is a documentary filmed in various cities that offers an insider's look at homicide investigations. (Pl. SOF ¶ 78). The premise of the show is to have cases solved within the First 48 hours, and the show builds drama by questioning whether the case will be solved by that deadline. (*Id.*). From 2004 through 2013, Miami was featured on the First 48. (*Id.* at ¶ 80). Negotiations between the First 48 and the City were conducted by high-level City officials and did not involve low-level employees. The agreements between the City and the producers of First 48 were signed by the City Manager, with the express approval and countersignature of the City Attorney and the City Director of Risk Management. (*Id.* at ¶ 81).

Detectives cooperated with film crews and allowed them to follow them to document their investigations. (*Id.* at ¶ 82). Detectives were not briefed on the terms of the contracts, nor trained on how to act with First 48 crew members. (*Id.*). The film crew was given unfettered access to the police station, crime scenes, and witness interviews, as if they were members of the department. (*Id.*). First 48 was very popular among detectives, who were often recognized when they travelled. (*Id.* at ¶ 83). Some detectives were chosen by the First 48 to participate in paid promotions for the show. (*Id.* at ¶ 84). First 48 producers provided the detectives with microphones and transmitters that recorded their conversations, often for long periods of time. (*Id.* at ¶ 85). First 48 also installed audio visual equipment in the police interrogation rooms to record suspects as they were interrogated. (*Id.*).

The City was provided with a "review" copy of the episode prior to airing. (*Id.* at ¶ 86). This was reviewed by the supervising lieutenant or designee for accuracy and to protect

---

[3] The City argues that Plaintiff is improperly attempting to create an issue of fact with inadmissible hearsay. I agree with the City that newspaper articles and web pages are not proper summary judgment evidence because they constitute hearsay and it is not apparent how these printouts could be "reduced to admissible evidence at trial." *See Hetherington v. Wal-Mart, Inc.*, 511 Fed. Appx. 909, 911 (11th Cir. 2013). Accordingly, I will not consider Plaintiff's Exhibit I (New Times Article), Q (web page printout), R (web page printout), or S (summary chart without reference to underlying evidence). However, I will consider Plaintiff's Exhibit H (transcript of a hearing in another proceeding) because this exhibit does not contain hearsay. *See* Fed. R. Evid. 801(d)(2)(D).

witnesses. (*Id.*). If requested, the producers would change the program. (*Id.*). There was no record maintained as to whether comments or changes were requested, or any scenes modified. (*Id.*). The final cut of a First 48 episode is not entirely accurate and does not show the complete true depiction of the actual case. (*Id.* at ¶ 87). Producers sometimes get detectives to act out scenes, and change timing to fit within the First 48 framework. (*Id.*).

Suspects were not told they were participating in a television production. (*Id.* at ¶ 88). First 48 obtained permission from all persons filmed, except persons arrested, and would air the interrogation video without a release. (*Id.*). The First 48 episode depicting Smart and his arrest, *Deadly Gamble / Inside Job*, aired on July 15, 2010. (*Id.* at ¶ 91).

### III.    LEGAL STANDARDS

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial . . . [o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Thus, the nonmoving party "'may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court, however, must view the evidence in the light most favorable to the nonmoving party, and summary judgment is inappropriate where a genuine issue of material fact remains. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

### IV.    ANALYSIS

**A.    False Arrest (Count I) and False Imprisonment (Count II)**

The City argues that it is entitled to summary judgment on the claims for False Arrest (Count I) and False Imprisonment (Count II) because those two claims are really the

8

same claim under Florida law, and there was probable cause to arrest Smart for a crime on November 18, 2009.

### 1.     Whether False Arrest and False Imprisonment are the Same Causes of Action

Probable cause is an affirmative defense to a claim of false arrest. *Gomez v. Lozano*, 839 F.Supp.2d 1309, 1317 (S.D. Fla. 2012) (citation omitted). "Where the claim is based on an officer's arrest and detention of the plaintiff, probable cause negates a claim for false-imprisonment too." *Id.* Generally, "false arrest and false imprisonment are different labels for the same cause of action." *Weissman v. K-Mart Corp.*, 396 So. 2d 1164, 1164 n.1 (Fla. 3d DCA 1981); *see also Washington County Kennel Club, Inc. v. Edge*, 216 So. 2d 512, 516 (Fla. 1st DCA 1968); *Rankin v. Evans*, 133 F.3d 1425, 1430 n.5 (11th Cir. 1998) (citing *Weissman*); *Hernandez v. Metro-Dade County*, 992 F.Supp. 1365, 1368 n.2 (11th Cir. 1997). Some courts have, however, found situations where the two claims were not treated identically. *See Mathis v. Coats*, 24 So. 3d 1284, 1288 (Fla. 2d DCA 2010) ("False arrest and false imprisonment are closely related, but false imprisonment is a broader common law tort; false arrest is only one of several methods of committing false imprisonment."); *see also Ortega v. Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996) ("under certain circumstances, a detention following a valid arrest may present a viable section 1983 claim where the detainee protests the detention on the basis of misidentification"); *Soucre v. City of Tampa*, No. 14-cv-2815-T-30TBM, 2015 WL 144275 (M.D. Fla. Jan. 12, 2015) (holding that false arrest and false imprisonment claim were not duplicative); 24A Fla. Jur. 2d *False Imprisonment* § 3 (2015). I find that this case presents circumstances where the false arrest and false imprisonment claims are not identical.

In *Weissman v. K-Mart Corp.*, the arrest and imprisonment related to a single charge of shoplifting that resulted in the plaintiff being detained at a store for a period of thirty minutes. 396 So. 2d 1164. Similarly, *Washington County Kennel Club* dealt with individuals who had been detained in the defendant's offices and then arrested after being accused by the defendant's agents of swindling the defendant out of proceeds from a greyhound race. 216 So. 2d 512. In both cases, the arrest and subsequent imprisonment were coterminous. That is, an individual was detained for a period of time that was commensurate with the arrest for a particular offense. In such a circumstance, probable cause to believe the

individual committed the offense would render the arrest, and the concomitant period of detention (*i.e.*, the imprisonment) flowing directly from that arrest, lawful.

By contrast, in *Mathis v. Coats*, 24 So. 3d 1284, 1289 (Fla. 2d DCA 2010), the Court recognized that false imprisonment is a broader common law tort than false arrest, and that "false arrest is only one of several methods of committing false imprisonment." In *Mathis*, the plaintiff was arrested one afternoon at the scene of a traffic stop for driving under the influence. *Id.* at 1287. The plaintiff was taken to Central Breath Testing (CBT), given a number of field sobriety tests, and taken to the jail's booking area. *Id.* She was released from jail at noon the next day. *Id.* The Court affirmed the trial court's grant of final summary judgment on the plaintiff's false arrest claim because it held that there was probable cause to arrest the plaintiff at the time of the traffic stop. *Id.* at 1288-89. The Court, however, reversed the trial court's denial of the plaintiff's motion to amend her complaint to add a claim for false imprisonment based on her continued detention for an unreasonable length of time. *Id.* at 1289. "[A] person improperly detained pursuant to a lawful arrest may have the right to bring an action for false imprisonment." *Id.* The Court further stated:

> Although probable cause existed at the time Ms. Mathis was arrested at the scene, she may be able to demonstrate that probable cause evaporated at some point after she was transported to CBT and jailed. After transport to CBT, Ms. Mathis's breathalyzer test showed a .000 reading. A subsequent urinalysis indicated no level of drug or other intoxicants.

*Id.* at 1290. Thus, in *Mathis*, the Court recognized that there are instances where the initial arrest was lawful, but the unreasonableness of the subsequent detention made a claim for false imprisonment plausible.

In this case, Plaintiff argues that he was falsely imprisoned when he was incarcerated *without bond* for nineteen months for charges of murder in the second degree. Defendant argues that the incarceration was lawful because there was probable cause to arrest Plaintiff for some offense, even if probable cause did not exist for the murder charges in particular. I disagree with Defendant. The nineteen-month imprisonment that flowed from the initial arrest was directly the result of a Florida state court's determination that probable cause existed to believe that Smart had committed the *non-bondable* offenses of second degree murder. Thus, Smart's incarceration is only reasonable if there was probable cause to arrest Plaintiff for a *non-bondable* offense. I now turn to whether Defendant has established, as a

10

matter of law, the requisite probable cause to defeat Plaintiff's separate false arrest and false imprisonment claims.

### 2.    The False Arrest Claim

With respect to the false arrest claim, Plaintiff concedes that there was probable cause to arrest him for the charge of possession with intent to sell marijuana. (ECF No. 53 at 15). Because of this concession, which is supported by the record, I find that the City is entitled to summary judgment on Plaintiff's false arrest claim.

Accordingly, the City's motion for summary judgment on Count I for false arrest is granted.

### 3.    The False Imprisonment Claim

Plaintiff was incarcerated for nineteen months without bond. As previously stated, if probable cause existed to detain Plaintiff on charges for a non-bondable offense, then the nineteen-month incarceration is lawful. Otherwise, the incarceration is unlawful. I now turn to the analysis of whether, as a matter of law, such probable cause existed.

Florida Rule of Criminal Procedure 3.131(a) provides, "Unless charged with a capital offense or an offense punishable by life imprisonment and the proof of guilt is evident or the presumption is great, every person charged with a crime or violation of municipal or county ordinance shall be entitled to pretrial release on reasonable conditions." Therefore, in order for an offense to be non-bondable, it must be either a capital offense or an offense punishable by life imprisonment.

There is no requirement that the police establish probable cause to arrest for the specific charge announced at the time of the arrest, or for the charge cited in the arrest report. All that is required is probable cause to arrest for *any* criminal offense. *See Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (holding that officer had probable cause to arrest for violation of ordinance, and that officer's failure to cite ordinance, either orally or in his arrest report, was irrelevant); *Jeanty v. City of Miami*, 876 F.Supp.2d 1334, 1342 (S.D. Fla. 2012) (finding that false arrest claim failed as a matter of law where there was probable cause to arrest for a traffic violation, notwithstanding fact that traffic violation was not the stated reason for the arrest). In this case, the City need only establish that probable cause existed to detain Smart on charges which would warrant holding him *without bond*.

Defendant does not move for summary judgment on the grounds that there was probable cause to arrest Plaintiff for second degree murder, the non-bondable offense for which he was actually charged. The City does, however, state in its statement of facts that the circuit court conducted an independent probable cause hearing on November 19, 2009, and that the trial judge made a determination that there was probable cause as to the two counts of murder in the second degree. (Def. SOF ¶¶ 76, 77). The record, however, shows that the trial judge relied on the testimony of a detective, which was, at best, a gross misrepresentation of the facts. Detective Sanchez testified that a witness had told him that Smart and the victims were arguing over money and drugs. In reality, Armbrister had told the detective that Smart, Volcy and Ray were arguing with a "Spanish man," whom Armbrister believed was inside of the Apartment. Detective Sanchez further testified that Smart's story was inconsistent with the physical evidence. But, when prompted to explain how, Detective Sanchez took gross liberties in misconstruing the facts known to him. He stated that Smart told him that someone shot through the window and killed Volcy and Ray. In fact, Smart stated again and again that he did not see his friends get shot, or any blood, as he ran out of the Apartment. Sanchez further stated that Smart's story was inconsistent because the window had not been shattered, but he left out the critical fact that the window was found open.

Instead of arguing that there was probable cause to detain Smart for the charges of second-degree murder, the City argues that there was probable cause to arrest Plaintiff for the crimes of (1) possession of a firearm by a convicted felon; (2) possession with intent to distribute marijuana; (3) possession with intent to distribute cocaine; and (4) felony murder. (ECF No. 29 at 5 - 8). The question is whether any of these offenses are non-bondable. If any are, and if probable cause is established as to that offense, then Smart's nineteen-month incarceration without bond would be lawful.

Possession of a firearm by a convicted felon is a crime governed by Section 790.23, Florida Statutes. Any person who violates Section 790.23, Florida Statutes, "commits a felony of the second degree." § 790.23(3), Fla. Stat. Possession with intent to distribute cocaine is a crime governed by Section 893.13, Florida Statutes. A person committing this crime "commits a felony of the second degree." § 893.13(1)(a)1., Fla. Stat. A felony of the second degree is punishable by "a term of imprisonment not exceeding 15 years." §

775.082(3)(d), Fla. Stat.  Accordingly, even if the City had probable cause to arrest Smart for the crime of possession of a firearm by a convicted felon or possession with intent to distribute cocaine, such a charge would not have justified a nineteen-month incarceration without bond because only capital offenses or offenses punishable by life imprisonment are non-bondable. Fla. R. Crim. P. 3.131(a)

Possession with intent to distribute marijuana is a crime governed by Section 893.13, Florida Statutes. A person committing this crime "commits a felony of the third degree." § 893.13(1)(a)2., Fla. Stat. A felony of the third degree is punishable by "a term of imprisonment not exceeding 5 years." § 775.082(3)(e), Fla. Stat. Accordingly, even though the City has established that it had probable cause to arrest Smart for the crime of possession with intent to distribute marijuana, such a charge would not have justified a nineteen-month incarceration without bond.

Felony murder is a crime governed by Section 782.04, Florida Statutes. To establish probable cause for the charge of felony murder, the City relies on Plaintiff's admission that he was conducting a marijuana sale in the Apartment at the time of the shooting where Volcy and Ray were murdered, and the fact that Plaintiff did not reach out to the police for days after the shootings. (*Id.* at 8). In its Opening Brief (ECF No. 29), the City seems to be relying on Section 782.04(1)(a)3, which is first degree felony murder and constitutes a capital felony. Section 782.04(1)(a)3 is commonly referred to as "first-degree murder by drug distribution." *See Pena v. State*, 901 So. 2d 781, 785 (Fla. 2005). If the City can establish that there was probable cause to arrest Smart for first degree murder by drug distribution, a capital offense, then it would be entitled to summary judgment on Smart's false imprisonment claim because capital offenses are non-bondable. I find, however, that the City cannot establish probable cause.

Section 782.04(1)(a)3. provides:

(1)(a) The unlawful killing of a human being:

…

3. Which resulted from the unlawful distribution of any substance controlled under s. 893.03(1), cocaine as described in s. 893.03(2)(a)4., opium or any synthetic or natural salt, compound, derivative, or preparation of opium, or

methadone by a person 18 years of age or older, **when such drug is proven to be the proximate cause of the death of the user**,[4]

is murder in the first degree and constitutes a capital felony, punishable as provided in s. 775.082.

As the plain language of Section 782.04(1)(a)3. makes clear, the offense of first-degree murder by drug distribution requires that the victim be a user of the drug distributed by the defendant, and that the victim's death was proximately caused by the distributed drug. *See, e.g.*, *Pena v. State*, 901 So. 2d 781; *State v. Ingleton*, 653 So. 2d 443 (Fla. 5th DCA 1995); *Aumuller v. State*, 944 So. 2d 1137 (Fla. 2d DCA 2006). Here, there is a dispute as to whether Plaintiff actually "distributed" marijuana,[5] and the City has not pointed to any evidence in the record demonstrating that the officers believed the victims' deaths were proximately caused by the use of marijuana, as opposed to close-range gunshot wounds to the head.

In its Reply Brief (ECF No. 56), the City seems to change its theory to be that probable cause existed to arrest Smart for a different form of felony murder – that governed by Section 782.04(4), Florida Statutes. That Section states:

(4) The unlawful killing of a human being, when perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate, **any felony** other than any:
…

is murder in the third degree and constitutes a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Even if the City could establish that, as a matter of law, probable cause existed to arrest Smart for the charge of felony murder pursuant to Section 784.04(4), that crime "constitutes a felony of the second degree." As such, it is punishable by "a term of imprisonment not exceeding 15 years." § 775.082(3)(d), Fla. Stat. Thus, it is not a non-bondable offense that would justify holding Smart in jail for nineteen months without bond.

---

[4] This bolded language was omitted from the City's brief.

[5] *See* Pl. SOF at ¶ 37.

Accordingly, as the City has not established that it is entitled to summary judgment on the affirmative defense of probable cause, the City's motion for summary judgment as to Count II for false imprisonment is denied.

**B.     Deprivation of Civil Rights in Violation of Section 1983 (Count III)**

42 U.S.C. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State …, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…

A municipality may be liable for a Section 1983 violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 700 (1978). However, for a municipality to be liable under Section 1983, it must have itself caused the constitutional violation; it cannot be liable on a vicarious liability theory. *Id.* at 694-95. A municipality's policy or custom can subject it to Section 1983 liability. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985). The municipal policy or custom must be "the moving force of the constitutional violation." *Id.* at 820 (citation omitted). To establish Section 1983 liability against a municipality based on custom, "a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001). "[A] municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the misconduct." *Id.* To impose Section 1983 liability on a municipality, therefore, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.

The City argues that it is entitled to summary judgment on Plaintiff's Section 1983 claim (Count III) because (1) the City can have no liability since its employees have not committed a constitutional violation, and (2) local governments are not vicariously liable for

their employees' actions, and Plaintiff has failed to identify any official policy of the City that resulted in a denial of Plaintiff's Constitutional rights.[6]

### 1.   Whether There Is a Triable Issue as to a Constitutional Violation

The City argues that it is entitled to summary judgment because the undisputed facts demonstrate that its employees have not violated Smart's constitutional rights. The City relies on its argument that probable cause to arrest Plaintiff for any offense vitiates the false arrest and false imprisonment claims. As previously stated, I find that the probable cause to arrest Plaintiff for the charge of possession with intent to sell marijuana entitles the City to summary judgment on the false arrest claim, but the subsequent nineteen-month incarceration without bond can only be rendered lawful if the City demonstrates probable cause to arrest for a *non-bondable* offense. The City has not demonstrated, at this juncture, that there was probable cause to arrest Smart for a non-bondable offense.

Moreover, Plaintiff's Section 1983 claim is based on the theory that Smart was deprived of his civil rights as a result of the City's policy or custom of allowing its police force to be involved in the production of a television show simultaneously with its investigation of serious crimes, without adequately training the police on the proper manner of dealing with the First 48 while investigating the crimes featured on the show. Plaintiff claims that the involvement of the First 48 in the murder investigation caused the police officers to violate his civil rights in numerous ways, including: by allowing the First 48 to invade Plaintiff's home, by allowing the First 48 to film Plaintiff in handcuffs even when he was considered a witness; by improperly using police interrogation recordings; by committing perjury; by fabricating an arrest affidavit; and by refusing to consider exonerating evidence. I will now address whether the City is entitled to summary judgment on the grounds that Plaintiff has failed to demonstrate that his constitutional rights were violated.

### a.   Allowing the First 48 to Enter Plaintiff's Home to Film

Plaintiff argues that his constitutional rights were violated when the police permitted the First 48 to film the murder scene inside the Apartment where he lived. In *Wilson v.*

---

[6] The City also argues that Plaintiff has attempted to improperly change its section 1983 claim from a purely false arrest by media pressure claim to a broader claim based on a media ride along. I disagree. (ECF No. 56 at 4 – 5). Plaintiff's Complaint adequately placed the City on notice of its theory of liability. *See, e.g.,* Compl. (ECF No. 4) at ¶¶ 7, 27, 54.

*Layne*, 526 U.S. 603 (1999), officers entered the petitioners' dwelling to execute an arrest warrant for the petitioners' son. The officers were accompanied by media representatives, *i.e.*, a photographer and a print reporter, who took photographs and observed the confrontation.[7] *Id.* at 608. Petitioners brought a Section 1983 claim based on the theory that the media presence exceeded the permissible scope of the search. The Court agreed, stating that, "the Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion." 526 U.S. at 611. The Court further stated:

> Certainly the presence of reporters inside the home was not related to the objectives of the authorized intrusion. Respondents concede that the reporters did not engage in the execution of the warrant, and did not assist the police in their task. The reporters therefore were not present for any reason related to the justification for police entry into the home-the apprehension of Dominic Wilson.

*Id.* Plaintiff's Section 1983 claim similarly relies, in part, on the theory that the unauthorized presence of the *First 48* in his home, the scene of the murders, violated his Fourth Amendment rights because the film crew did not further the purpose of the police's investigative search of the home. The City attempts to provide a justification for the First 48's presence throughout the investigation, including at the Apartment, by stating:

> The totality of the facts in this case indicate the actions of the First 48 videoed not just the legitimate law enforcement activity, but actually served a purpose of letting the public and the defendant's themselves understand the process and analysis that goes into the most important investigations conducted by law enforcement. In paragraphs 6 and 7 of the Complaint, Plaintiff actually quotes statements of police officers filmed in this investigation. Plaintiff tries to use these quotes to assist his false arrest and false imprisonment claims by using statements they made shortly after Smart was located. These are statements that are only preserved because of the filming by the First 48.

(ECF No. 56 at 6). This type of argument was also made by the respondents in *Wilson*, and rejected by the Court:

> Finally, respondents argue that the presence of third parties could serve in some situations to minimize police abuses and protect suspects, and also to protect the safety of the officers. While it might be reasonable for police officers to themselves videotape home entries as part of a "quality control" effort to ensure that the rights of homeowners are being respected, or even to

---

[7] The photographs were never published. *Id.*

> preserve evidence, such a situation is significantly different from the media presence in this case. The Washington Post reporters in the Wilsons' home were working on a story for their own purposes. They were not present for the purpose of protecting the officers, much less the Wilsons. A private photographer was acting for private purposes, as evidenced in part by the fact that the newspaper and not the police retained the photographs.

526 U.S. at 613. In light of *Wilson*, Plaintiff's theory that his constitutional rights were violated when the police invited the First 48 to film the murder scene in the Apartment where Smart lived is sound.

### b.     Allowing First 48 to Film "Perp Walks"

Plaintiff also claims that his Constitutional rights were violated when the police permitted the First 48 to film him in handcuffs as they were placing him in a police car for questioning; as he was taken to an elevator at the police station after being placed under arrest; and as he was placed in a police car after being arrested. In support of this claim, Plaintiff cites to *Lauro v. Charles*, 219 F.3d 202 (2d Cir. 2000). In *Lauro*, the Second Circuit addressed the question of whether a staged "perp walk" constitutes a violation of the suspect's Fourth Amendment rights. A "perp walk" is where a "suspected perpetrator of a crime, after being arrested, is 'walked' in front of the press so that he can be photographed or filmed." 219 F.3d at 203. In *Lauro*, the plaintiff, after being arrested, and at the request of the media, was taken from the station house in handcuffs, placed in an unmarked police car, taken around the block, removed form the car, and walked back into the station house. *Id.* at 204-05. The only purpose for the perp walk was so that the media could capture the plaintiff's image on videotape for broadcasting on the news. *Id.* at 205. The *Lauro* Court held that such a staged perp walk "intruded upon the privacy protected by the Fourth Amendment,…lacked any legitimate law enforcement purpose, and hence was unreasonable." *Id.* at 213.

Defendant argues that *Lauro* is distinguishable because it dealt with a "staged" perp walk, whereas the images of Smart in handcuffs filmed and aired by the First 48 were taken as they actually occurred. Defendant cites to *Caldarola v. County of Westchester*, 343 F.3d 570 (2d Cir. 2003), for support of its position that a perp walk that is not staged is lawful. In *Caldarola*, the plaintiffs, who were corrections officers suspected of receiving disability benefits on the basis of fraudulent job injury claims, were summoned by the police to report

to the Department of Corrections ("DOC"). *Id.* at 572. Upon arrival, the plaintiffs were arrested, handcuffed, and transported to the police station. *Id.* County employees were waiting in the parking lot of the DOC to film the plaintiffs as they were escorted from the building to the cars that were transporting them to the police station for booking. *Id.* The video of the plaintiffs was then aired at a press conference. *Id.* The *Caldarola* Court held that this "choreographed" perp walk did not violate the plaintiffs' Fourth Amendment rights because the minimal privacy interests the plaintiffs had in the parking lot of the DOC did not outweigh the legitimate law enforcement justification for transporting plaintiffs from DOC grounds to the police station. *Id.* at 576. For the *Caldarola* Court, the distinguishing fact was that the DOC was actually arresting the plaintiffs at the time the video was taken. *Id.*

Whether or not Smart's Fourth Amendment rights were violated by virtue of the First 48 filming him in handcuffs at various times will depend primarily on whether the First 48 filmed those scenes as they were actually occurring, or whether those scenes were staged. With respect to whether the filmed "perp walks" were staged or just choreographed, Plaintiff cites to evidence that producers sometimes get detectives to act out scenes. *Id.* at ¶ 87. Defendant has not provided record evidence to demonstrate that perp walks were not staged. *See generally* Def. SOF. Defendant has not met its burden on summary judgment of demonstrating that the undisputed facts show that Smart was only filmed in handcuffs as he was actually being transported by the police for legitimate law enforcement purposes.

### c.    Allowing the First 48 to Film Smart's Interrogation

Plaintiff also claims that his Constitutional rights were violated when the police permitted the First 48 to film and broadcast images from his interrogation. In *Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004), the Court held that pre-trial detainees' Fourteenth Amendment due process rights to be free from punishment prior to being convicted of a crime were violated when the county installed video cameras and disseminated images of the pre-trial detainees over the internet for the public's viewing. In *Frederick v. Biography Channel*, 683 F.Supp.2d 798 (N.D. Ill. 2010), the Court denied defendants' motion to dismiss a Section 1983 claim based on unauthorized filming of a lawful arrest and detention in a holding cell. The *Frederick* Court likened the facts of the case to the facts presented in *Wilson* and *Lauro*, and held that the plaintiffs had adequately alleged an unreasonable

seizure in violation of the Fourth Amendment. Similarly, in *Conradt v. NBC Universal, Inc.*, 536 F.Supp.2d 380 (S.D.N.Y. 2008), the Court denied the defendant's motion to dismiss a Section 1983 claim premised on the media's involvement in an arrest which resulted in the suspect's suicide. The *Conradt* Court relied on *Wilson*, its companion case, *Hanlon v. Berger*, 526 U.S. 808, 809-10 (1999), and *Lauro*, in holding that the plaintiff had sufficiently alleged a Fourth Amendment violation based on the media overly intruding into a law enforcement operation.

I find that the City has failed to demonstrate that Smart has not adequately supported his claim that his Fourth Amendment rights were violated when the City permitted the First 48 to film and broadcast Smart's interrogation. The First 48's involvement did not further the legitimate law enforcement activities of the police, and thus constituted an unreasonable seizure.

### d. Perjury, Fabricated Arrest Affidavit, and Refusal to Consider Exonerating Evidence

Plaintiff further claims that his Constitutional rights were violated when the police committed perjury, fabricated an arrest affidavit, and refused to consider exonerating evidence. An officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," but he also "may not choose to ignore information that has been offered to him," nor may he "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts…." *Kingland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004). Moreover, "falsifying facts to establish probable cause is patently unconstitutional…." *Id.* at 1232.

Plaintiff has cited record evidence in support of his claim that Detective Sanchez falsified information in the arrest affidavit and during the probable cause hearing. *See* Section IV.A.3., *supra*. Accordingly, I cannot find that, as a matter of law, the City has established that no Constitutional violation existed.

### 2. Whether There Is a Triable Issue as to a Policy or Custom Constituting Deliberate Indifference to Smart's Constitutional Rights

Even though the City cannot establish, as a matter of law, that Smart did not suffer any constitutional violation, it would still be entitled to summary judgment if it can establish

that no policy or custom of the City existed which was the driving force behind the constitutional violation. The City tries to do just that.

There is no dispute that the City Manager entered into an agreement allowing the First 48 to film investigations. (ECF No. 52-13). The City points to terms of its contract with The First 48 that specifically required the production company to "adhere to rules precluding staging of scenes and ensuring that there be no improper filming." (ECF No. 56 at 8). The City states that, "The contract between the City and first 48 contains clear terms stating that there shall be 'NO': staging of scenes or phone calls, reenactments whatsoever, compensation to police employees, initial accessibility to crime scenes until after the scene is deemed safe and until a walk-through of the scene can be conducted, entering upon private property without prior consent of the property owner….Furthermore, the contract between the City and first 48 clearly states that First 48 must receive the consent of the homeowner before they capture it on film." (ECF No. 56 at 5).

A municipality's written policy itself need not be unconstitutional in order for Section 1983 liability to lie. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). A municipality can be liable under Section 1983 for failing to train its police on a constitutional policy, "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.*

Plaintiff has not cited evidence supporting a finding that the City had a custom of permitting its officers to falsify evidence in order to support probable cause. Even if, in this particular case, City police officers were enamored with the possibility of being portrayed as masterful detectives on the First 48, or felt pressured by the First 48's artificial premise that murder mysteries had to be solved within 48 hours, that would not support a finding that the City was deliberately indifferent to suspects' rights to be free from false, incriminating evidence. Therefore, the City is entitled to summary judgment on Plaintiff's theory that the City violated section 1983 by creating a custom of allowing its officers to perjure themselves, fabricate arrest affidavits, and refuse to consider exonerating evidence.

Plaintiff, however, does point to record evidence that detectives were not briefed on the terms of the contracts, nor trained on how to act with First 48 crew members. Pl. SOF at ¶ 82. Plaintiff cites to evidence that First 48 crew members were given unfettered access to the police station, crime scenes, and witness interviews, as if they were members of the

21

department, and that the First 48 was permitted to install audio visual equipment in the police interrogation rooms to record suspects as they were interrogated. *Id.* Plaintiff has sufficiently shown a dispute as to facts which, if proven, could show that the City had a custom of allowing the First 48 to violate suspects' Fourth Amendment constitutional rights to be free from unreasonable searches and seizures, and/or that the City failed to properly train its police officers so that their participation on the television program would not result in Fourth Amendment constitutional violations of those suspects featured on the show.

## V.   CONCLUSION

For the reasons provided in this Order, Defendant City of Miami's Supplemental Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      Defendant's Motion is **GRANTED** as to Plaintiff's false arrest claim. That claim is dismissed.

2.      Defendant's Motion is **DENIED** as to Plaintiff's false imprisonment claim.

3.      Defendant's Motion is **DENIED** as to Plaintiff's section 1983 claim, except that Plaintiff may not pursue its claim that the City violated section 1983 by adopting a custom or policy of deliberate indifference to suspects' rights to be from officers' perjury, fabrication of arrest affidavits, and refusal to consider exonerating evidence.

**DONE and ORDERED** in chambers, at Miami, Florida, this 27th day of May 2015.

_Marcia G. Cooke_
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of record*

22