UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-24354-CIV-COOKE/TORRES

TAIWAN SMART Miami, Florida

June 4, 2015
vs. Thursday

THE CITY OF MIAMI Scheduled 9:30 a.m.
9:57 a.m. to 5:00 p.m.

---

**JURY TRIAL**
**VOLUME 1 OF 8**
**PAGES 1 - 221**

BEFORE THE HONORABLE MARCIA G. COOKE
UNITED STATES DISTRICT JUDGE
WILKIE D. FERGUSON COURTHOUSE COURTROOM 11-2

APPEARANCES:

FOR THE PLAINTIFF: JOSEPH P. KLOCK, JR., ESQ.
HILTON NAPOLEON, II, ESQ.
Rasco Klock Perez Nieto, PL
2555 Ponce de Leon Boulevard
Suite 600
Coral Gables, Florida 33134

FOR THE DEFENDANT: HENRY J. HUNNEFELD, ESQ.
NICHOLAS PETER BASCO, ESQ.
Office of City Attorney, City of Miami
444 S.W. 2nd Avenue, Suite 945
Miami, Florida 33130-1910

STENOGRAPHICALLY
REPORTED BY: GLENDA M. POWERS, RPR, CRR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue, Room 08S33
Miami, Florida 33128

2

```
 1                       I N D E X

 2                                                    PAGE

 3    PROSPECTIVE JURORS SWORN                         16

 4    JURY VOIR DIRE                                   19

 5       By The Court                                  25

 6       By Mr. Klock                                  54

 7       By Mr. Basco                                  74

 8    FOR CAUSE CHALLENGES                             97

 9    PEREMPTORY CHALLENGES                           105

10    JURY PANEL SEATED                               109

11    JURY PANEL SWORN                                117

12    PRELIMINARY INSTRUCTIONS BY THE COURT           118

13    PLAINTIFF'S OPENING STATEMENT

14       By Mr. Napoleon                              122

15    DEFENDANT'S OPENING STATEMENT

16       By Mr. Hunnefeld                             142

17

18

19

20

21

22

23

24

25
```

```
1                    (Call to the order of the Court:)

2              COURTROOM DEPUTY:  All rise.  United States

3    District Court, Southern District of Florida; the Honorable

4    Judge Marcia G. Cooke presiding.

5              Your Honor, this is day one of our jury trial, Taiwan

6    Smart versus City of Miami, Case Number 13-24354.

7              Court is in session.

8              THE COURT:  All right.  Good morning, everyone.

9              MR. KLOCK:  Good morning, Judge.

10             MR. HUNNEFELD:  Good morning.

11             THE COURT:  They will be lining up the jury outside in

12   just a moment.

13             Are there any questions before we bring the jury up?

14             MR. HUNNEFELD:  Yes, Your Honor.

15             THE COURT:  Sir, just identify yourself for the record,

16   please.

17             MR. HUNNEFELD:  Yes, Your Honor.  Henry Hunnefeld from

18   the City of Miami.

19             I think we've worked it out, but I want to make sure we

20   get the Court's approval on an issue relating to one of the

21   witnesses.

22             There was some -- one of our witnesses, who's also

23   going to be called by plaintiff, his sister is getting married

24   in Mexico at the end of next week and he was going to be flying

25   down.  We wanted to make sure that he got called by Friday so
```

```
 1   he could have next week to spend with his sister.
 2         THE COURT:  However you all want to call your witnesses
 3   is fine with me.
 4         MR. HUNNEFELD:  And we just agreed --
 5         THE COURT:  As long as we have them here, ready to go,
 6   so we can use the jurors' time as best as possible.
 7         MR. HUNNEFELD:  And there was a concomitant issue on
 8   the other side that they had raised to me.
 9         THE COURT:  Mr. Klock?
10         MR. KLOCK:  Yes, good morning, Your Honor.
11         So we were going to call Dr. Brannon on Friday, but
12   because of Detective Sanchez's problem, with the Court's
13   permission, we will call him next Thursday.  He's going to be
14   in North California next Monday and Tuesday.
15         THE COURT:  How long do you anticipate this case to
16   last?
17         MR. KLOCK:  Four days, five days.
18         THE COURT:  Okay.
19         MR. KLOCK:  The problem we have, Judge, is that
20   Dr. Brannon and -- Dr. Brannon and Detective Sanchez both are
21   sort of out during the same period of time, except Dr. Brannon
22   can be back on Thursday or Wednesday, but the Court isn't in
23   session on Wednesday.
24         THE COURT:  No.  I'm in session; I just don't have
25   trials on Wednesday.
```

```
 1          MR. KLOCK:  I'm sorry.  We're not in session.
 2          THE COURT:  All right.  Anything else before
 3   Mr. Blanford and Mr. Marchena start lining up the jurors?
 4          MR. KLOCK:  One last thing.
 5          If I can introduce, Judge, my partner J.C. Antorcha,
 6   who's in the back, who's not wearing a tie.  He was
 7   demonstrating how to not disengage an anchor chain and messed
 8   up one of his hands and, therefore, can't tie a tie.
 9          THE COURT:  We know.  We're glad he's even here and
10   functioning, so we're giving him the permission to not wear a
11   tie for the duration of his rehab.  A jacket will suffice.
12          MR. KLOCK:  Thank you.
13          MR. HUNNEFELD:  And, Your Honor, before the jury comes,
14   in order to expedite things through voir dire and opening, if I
15   could just confirm a few issues that are -- the motion in
16   limine, but I just don't want to waive an issue at this point.
17          THE COURT:  Okay.  Bring it out.
18          What are the issues left?  Go ahead, I have it.
19          MR. HUNNEFELD:  Your Honor, you've ruled that -- you've
20   ruled pretrial that confessions under certain circumstances
21   might be able to get in -- under limited circumstances might be
22   able to get in.  During opening, before --
23          THE COURT:  I suggest you not go there.
24          MR. HUNNEFELD:  Wonderful.
25          Number two, likewise, there's an issue with the
```

1    polygraph information.  The Court ruled that you can't get into

2    the fact they took one or the results of one or anything like

3    that.  But, Your Honor, it's going to be -- I think it might

4    end up being a central focus that he said 80 times or

5    something, "I want a polygraph."

6              Your Honor, we think it's irrelevant and, at the very

7    least, it shouldn't become the focus of the case.  If it comes

8    out in the course of testimony, that's one thing; but to hammer

9    it home throughout the case will change the dynamic.

10             THE COURT:  Well, let me ask this question.  And maybe

11   I understand the facts wrong in getting the -- I understand the

12   results of a polygraph are usually inadmissible, except in some

13   very specific circumstances.  And I think that's what my order

14   talked about.

15             MR. KLOCK:  Yes, Your Honor.

16             MR. HUNNEFELD:  Yes.

17             THE COURT:  But in this case, the plaintiff asked for

18   one.

19             MR. HUNNEFELD:  He did.

20             THE COURT:  Now, I know a lot of times, in custody,

21   people say, you know, give me a polygraph, give me a polygraph,

22   give me a polygraph.  But there were some very specific things

23   here about him asking for the polygraph, which we then have

24   followed up, I believe I say -- I have to find that portion in

25   the motion in limine -- followed up by what the testimony is of

```
 1    the officer in the probable cause hearing before the Judge.

 2              So, some of those things kind of become compul.

 3              MR. HUNNEFELD:  Your Honor, if I may, on that point.

 4         The polygraph -- him asking for a polygraph, is

 5    insinuating into the case evidence that would otherwise be

 6    totally inadmissible and prejudicial.

 7              The bottom line is, polygraph is not evidence.  Those

 8    limited circumstances, under which the Court has addressed, is

 9    where the parties stipulate.  That is the only circumstance

10    where it can be used.  And that, otherwise, the 50 states agree

11    that, it can never be used because it's not sufficiently

12    reliable and --

13              THE COURT:  And it's not being used and should not ever

14    be used or insinuated in this case that what the results are.

15              The issue here is -- and maybe I'm misunderstanding the

16    plaintiff's theory -- is this particular plaintiff asked for

17    this examination numerous times because he said it will point

18    to certain things and why certain things happened in this case.

19    I mean --

20              MR. HUNNEFELD:  Polygraphs --

21              THE COURT:  -- I'm kind of -- Mr. Klock is nodding; so

22    if I'm not in the right pew, at least I'm in the right church.

23              MR. HUNNEFELD:  In fact --

24              THE COURT:  Wait.  Let me get there.

25              And then he says certain things, but if I recall what
```

8

```
 1    I've read, the investigating officers do not follow up on any

 2    of the things that he says.

 3              He says, X, Y, give me a polygraph on it.

 4              A, B, C, D, give me a polygraph.

 5              So even if they don't want to give him a polygraph,

 6    his -- "his" meaning the plaintiff's side of the room -- theory

 7    is, why didn't you do some investigation?  Why didn't you go

 8    out and talk to certain witnesses?  Why didn't you do certain

 9    things so I don't end up in custody for 19 months?

10              MR. HUNNEFELD:  Your Honor, multiple points there.

11              Number one, what does the polygraph add?  If he says, I

12    know for a fact that this is the person who did it, or, this is

13    where the evidence -- which, by the way, wasn't what he said.

14    He just repeatedly said, "Give me a polygraph.  I didn't do it.

15    Give me a polygraph."

16              But what does it add to bring in a question of a test,

17    which is inadmissible because of its lack of reliability in

18    every Federal and State court in the United States.

19              THE COURT:  Let me ask this question.  It was after the

20    plaintiff's -- I believe his own attorney pays for and

21    administers the first polygraph, correct?

22              There are two polygraph in this case, right?  Am I

23    wrong?

24              MR. KLOCK:  I believe you're correct, Your Honor.

25              THE COURT:  Pays for and administers polygraph number
```

```
 1   one while he's incarcerated.  I could be wrong on this part and
 2   maybe someone can correct me for the record.
 3          And then, after some months, your client -- meaning not
 4   necessarily your client, but people on your side of the room --
 5   give him a polygraph?
 6          MR. HUNNEFELD:  No.  I have to clarify that.  Maybe
 7   that's the basis for the whole problem.
 8          THE COURT:  There was never another polygraph; am I
 9   wrong?
10          MR. HUNNEFELD:  Your Honor, there were two -- there was
11   a second polygraph.  But let me clarify.
12          Once this -- very often many individuals conflate the
13   law enforcement agency -- the City of Miami in this case --
14   with the State Attorney's Office separately.
15          Once we turn over -- once the Miami Police
16   Department --
17          THE COURT:  Just tell me, who gave him a polygraph?
18          MR. HUNNEFELD:  The State Attorney's office.
19          THE COURT:  Mr. Klock, can I hear from you on this
20   issue?
21          MR. KLOCK:  Yes.  Two points, Your Honor.
22          First, the first issue with respect to a polygraph test
23   was raised by Detective Sanchez during the interrogation, not
24   by Mr. Smart.
25          He said, "Do you want to take a polygraph test?  Do you
```

```
 1    want a GSR?"  Everything that they suggested he do, he said he
 2    would do.
 3              And then when he continued to press on their
 4    suggestion, they weren't interested in having a polygraph.
 5    That's number one.
 6              Number two, Your Honor --
 7              THE COURT:  Does that portion of the conversation
 8    between your client and Detective Sanchez, is that at all in
 9    the --
10              MR. KLOCK:  Yes, it's on the interrogation tape.  Yes,
11    Your Honor.
12              THE COURT:  Okay.  Continue.
13              MR. KLOCK:  And then, Your Honor, of course there's the
14    matter of the close-out memo and the fact that Detective
15    Sanchez took him for the polygraph test, was consulted by the
16    State before the charges were dropped.
17              So here's the point we have:
18              I understand that for certain purposes polygraph
19    results can't be admitted, but we all know there are statutes
20    in any number of states including this one -- I don't know if
21    there's a Federal one like it -- with respect to sex offenders
22    and other kinds of things, where they're required to take
23    polygraph tests and those things are admissible.
24              The issue here, Judge, is not whether or not
25    necessarily it proves truth; but if, Judge -- like, for
```

```
1    instance, I have no problem -- you've indicated that we're not

2    to indicate what the result of the polygraph test is, fine.

3    But one thing I assume that we are permitted to do is to say

4    that on such and such a date at the State's request, a

5    polygraph was taken and eight days later the charges are

6    dropped, without any other connection, other than those two

7    things, because that's what happened.

8         And then also in the close-out memo, which I think

9    Your Honor is probably familiar with, there's consultations

10   between the State and Detective Sanchez where it says that

11   Detective Sanchez agreed that Mr. Smart had not committed the

12   crimes, and agreed to having the -- number one, agreed that he

13   hadn't committed the crimes; and, number two, agreed that they

14   couldn't prove it anyway and agreed to have the charges

15   dismissed.

16         THE COURT:  You're shaking your head.  The close-out

17   memo doesn't say that?

18         MR. HUNNEFELD:  That Detective Sanchez agreed to that

19   is not correct.

20         THE COURT:  Well, isn't Detective Sanchez quoted in the

21   close-out memo?

22         MR. HUNNEFELD:  He said he understood.

23         If I may, Your Honor, on the second page of the

24   close-out memo, on June 14th --

25         MR. KLOCK:  On page -- I'm sorry, ma'am.
```

```
 1              THE COURT:  One at a time.

 2          I'm just saying one speaking one at a time.

 3          MR. KLOCK:  Okay.  "On June 14, 2011, I" -- this is

 4   Ms. Matos -- "met with Lead Detective Fabio Sanchez of the

 5   City of Miami Police Department.  After discussing the case

 6   with him, he agreed that we could not prove this case and it

 7   appeared that Taiwan Smart was not the shooter."

 8          "In Detective Sanchez's presence, I spoke with the next

 9   of kin of both victims.  I telephoned Maria Volce, sister of

10   Jonathan Volce, who's in New York, and advised her of the

11   latest developments in the case and explained to her that I had

12   no choice but to dismiss the charges."

13          Now, this indicates that Detective Sanchez agreed that

14   he hadn't done it and concurred that the charges should be

15   dropped.

16          I don't understand Mr. Hunnefeld's point to the

17   contrary.  It's written in English.

18          MR. HUNNEFELD:  Detective Sanchez has testified that he

19   did not agree.

20          THE COURT:  So that's a lie?

21          MR. HUNNEFELD:  So, so --

22          THE COURT:  No, so you're saying the close-out --

23          MR. HUNNEFELD:  The close-out memo --

24          THE COURT:  -- is a lie?

25          MR. HUNNEFELD:  Is -- doesn't correctly capture the
```

1    communication.  He understood that the State Attorney was

2    taking the position that she couldn't prove the case beyond and

3    to the exclusion of a reasonable doubt, and he did not believe

4    that he was innocent.

5         THE COURT:  All right.  I'm looking back at my -- at

6    paragraph 10.  My ruling stands.

7         MR. HUNNEFELD:  But, just --

8         MR. KLOCK:  Thank you, Your Honor.

9         THE COURT:  My ruling stands, Counsel.  We're moving

10   on.

11        MR. HUNNEFELD:  But there was a clarification that was

12   added by Mr. Klock.

13        Can he say that a polygraph was administered and, days

14   later, he was -- the individual was released?  That would

15   absolutely give the jury the understanding that he passed the

16   polygraph, which is an indirect way of doing the same thing;

17   that would be prejudicial -- even more prejudicial.

18        THE COURT:  What I did not say in paragraph 10, which I

19   should have said -- and, Counsel, while we're doing the

20   voir dire maybe one of your associates can talk amongst

21   yourselves -- and, that is, we should give a limiting

22   instruction on why the polygraph is being used.  It's not

23   offered for the truth of whether or not X happened, but merely

24   to show -- and we know what it is in this case.

25        MR. KLOCK:  I agree, Your Honor.

 1          THE COURT:  So start from there.  And while in your

 2    opening statement, Mr. Klock, you're not to say that the

 3    polygraph led to the dismissal at this time.

 4          MR. KLOCK:  Thank you.

 5          THE COURT:  I may come to a different thing after I

 6    read the limiting instructions, but for now that's where it

 7    stands.

 8          MR. KLOCK:  And, Your Honor, also with respect to this

 9    last point, you don't indicate whether he passed or didn't

10    pass.  Mr. Hunnefeld says that it indicates that he passed, not

11    necessarily.  But --

12          THE COURT:  No, it doesn't, but I understand where he's

13    going.  That brick may end up making a wall for which he

14    doesn't want his clients surrounded.

15          MR. KLOCK:  Can I raise another matter, Your Honor, if

16    you're ready to pass to another matter?

17          THE COURT:  I am.

18          MR. KLOCK:  Okay.  In the last set of jury instructions

19    that came over, the proposed jury instructions for

20    Mr. Hunnefeld, there's a mitigation instruction.

21          THE COURT:  We can talk about jury instructions later.

22    We don't need to talk about those this morning.

23          MR. KLOCK:  About the opening statement, that there

24    be -- because their mitigation is not raised in any of the

25    pleadings.  And what I'm concerned about is they would be

```
 1    raised in opening statement.  I agree with you, we will deal
 2    with it later.  But if it's raised in opening statement --
 3             THE COURT:  Let's leave mitigation off the table for
 4    now.
 5             MR. KLOCK:  Thank you, Judge.
 6             THE COURT:  All right, anything else?  The jurors are
 7    outside.
 8             MR. HUNNEFELD:  One final point.  I think I understand
 9    what the Court's ruling's going to be, but just whether in
10    opening statements --
11             THE COURT:  Mr. Klock is allowed to say his client
12    either responded to, based upon Detective Sanchez's questions,
13    about a polygraph, but no discussions about any results will be
14    allowed.
15             All right, Mr. Marchena, can you line up our jury for
16    us, please.
17             MR. KLOCK:  And, Judge, can we move during the
18    voir dire so we can keep an eye --
19             THE COURT:  Everybody's going to be sitting right
20    there.
21             MR. KLOCK:  But the people behind us aren't.
22             THE COURT:  No, you can turn around.  They'll be right
23    behind you.  It's pretty easy.
24             MR. KLOCK:  Got it.  Thanks, Judge.
25             (Prospective jurors entered courtroom at 10:15 a.m.)
```

```
 1              THE COURT:  Good morning, everyone.
 2              COURTROOM DEPUTY:  Jurors, before you sit down, I'm
 3     going to ask you to please raise your right hands to be sworn.
 4              Do each of you swear or affirm that you will answer
 5     truthfully all questions asked of you touching upon your
 6     qualifications to serve as jurors in this case before this
 7     Court, so help you God?
 8              (All prospective jurors answered in the affirmative.)
 9              COURTROOM DEPUTY:  Thank you.  You may be seated.
10              THE COURT:  The case set for trial this morning is
11     Smart versus City of Miami.
12              For the record, appearing on behalf of Mr. Smart, would
13     you introduce yourselves as well as those seated with you at
14     counsel table.
15              MR. KLOCK:  Good morning, Your Honor.
16              Joe Klock.  Hilton Napoleon and Miguel Morel on behalf
17     of Taiwan Smart, who's sitting to my right, Your Honor.
18              THE COURT:  And appearing on behalf of the
19     City of Miami?
20              MR. HUNNEFELD:  Your Honor, Henry Hunnefeld, Assistant
21     City Attorney, along with Nicholas Basco, also Assistant City
22     Attorney.
23              THE COURT:  Thank you very much.
24              Good morning, ladies and gentlemen.  I'm the United
25     States District Judge Marcia Cooke, and I will be presiding
```

```
 1    over this trial.
 2            This is a civil case.
 3            Ladies and gentlemen, the jury is one of our most
 4    cherished and protected rights here in our country, and I
 5    understand, or you should all understand, without you, our jury
 6    system simply could not function.
 7            I am aware that for some of you this is the first time
 8    you've ever been called to jury service.  Hopefully, through
 9    the course of this morning we will be able to answer any
10    questions or procedures that are unfamiliar to you.  So,
11    please, don't be frightened or apprehensive.  It's going to be
12    fine.
13            The attorneys and I will make every effort to acquaint
14    you with the procedures.
15            Now, I know that for most of you, you would rather be
16    someplace else.  So on behalf of the Court and the parties, I
17    want to thank you for showing up this morning.
18            Now, before we begin, I'm going to have an opportunity
19    to acquaint you with certain members of the court staff who
20    you'll be working with if you're selected as jurors in this
21    case.
22            You've already had the opportunity to meet my courtroom
23    deputy, Ivan Marchena.  He makes sure that our trains run on
24    time.  You will be talking to him if you ever have any
25    questions concerning your service, parking, anything like that.
```

 1          Seated in front of me with this very fancy computer is

 2   Ms. Glenda Powers.  She's our court reporter.  She makes sure

 3   that everything that we're saying in court is taken down

 4   accurately, which is why, when you're called upon to speak, I'm

 5   going to ask that you speak up clearly so that we can all hear

 6   you.

 7          We also have two court reporters to make sure that

 8   we're safe whenever we're on court -- court security officers.

 9          Up front is Mr. Blanford.  In the back is Mr. Marchena.

10          Now, if ever you have any questions concerning your

11   safety or security while you're here on court premises, when

12   you're in the courtroom, there's always a court security

13   officer.  If you're ever on courthouse property, if you see

14   anybody in these snappy blue blazers, please bring it to their

15   attention and they'll make sure.  Whenever you're in

16   deliberations, also, there's always a court security officer

17   seated outside the door.

18          Now, ladies and gentlemen, we're about to begin the

19   jury selection process in this case.  And we use a fancy word

20   called "voir dire."  Don't worry about it.  It just means jury

21   selection.  It's where we will ask you certain questions

22   concerning your qualifications to sit as jurors.

23          Now, ladies and gentlemen, we're not trying to

24   embarrass you, harasses you or intimidate you in any way.  It

25   is our opportunity to seat the fairest jury we can in this

```
1    trial.

2          Now, the fact that you're not seated in this case

3    doesn't mean that there won't be other cases that you will be

4    called on to serve as jurors.

5          Now, once again, for the record, I'm going to ask

6    counsel to introduce themselves, as well as those seated with

7    them at counsel table.  And if you could read your witness list

8    to me for the ladies and gentlemen of the jury.

9          MR. KLOCK:  Good morning, Your Honor.

10         My name is Joe Klock.  Seated next to me on my right is

11   Taiwan Smart, who's the plaintiff in this case.  My partner,

12   Hilton Napoleon; next to him, Miguel Morel.  And the folks

13   sitting in the next row are just support staff from our office.

14                             VOIR DIRE

15         THE COURT:  Now, before you proceed to your witness

16   list, Mr. Klock.

17         Ladies and gentlemen, do any of you recognize any of

18   the individuals seated at counsel table?

19         Before we begin, Mr. Hogan, you and I know each other,

20   don't we?

21         PROSPECTIVE JUROR:  That's correct.

22         THE COURT:  So I'm going to let you tell the other

23   members of the court how you know the parties seated at counsel

24   table?

25         PROSPECTIVE JUROR:  I know of Mr. Klock.  I've met him
```

```
 1    before.  I haven't talked to him over a decade but I do know

 2    him.

 3            THE COURT:  I know you are a trial lawyer, Mr. Klock is

 4    a trial lawyer.  Have you or he ever had matters together at

 5    all?

 6            PROSPECTIVE JUROR:  Not that I recall.

 7            THE COURT:  Ever been co-counsel or opposing counsel,

 8    to your knowledge?

 9            PROSPECTIVE JUROR:  No.

10            THE COURT:  All right.  Thank you very much.

11            Now, Mr. Klock, if you could proceed with your witness

12    list, please.

13            MR. KLOCK:  Thank you, Your Honor.

14            We will be calling Mr. Smart as a witness.  In

15    addition, Detective Fabio Sanchez of the City of Miami Police

16    Department; Detective Eutimio Cepero of the City of Miami;

17    Mr. Arnold Yen, the City of Miami Police Department Crime Scene

18    Investigator; Sergeant Altarr Williams, City of Miami Police

19    Department Sergeant; Commander Eunice Cooper, City of Miami

20    Police Department, Homicide Commander; Detective Fernando

21    Bosch, City of Miami of Police Department Detective;

22    Dr. Michael Brannon, Psy.D, he's a psychologist; Ms. Marlene C.

23    Montaner, she is an attorney.

24            Now Lieutenant John Buhrmaster of the Miami Police

25    Department.  I'm sorry, he's the deputy of police now.  At the
```

1  time of these matters he was Miami Beach -- I'm sorry, the

2  City of Miami Police Department; Ruppert Butcher, City of Miami

3  Police Department, latent print examiner; Dr. Mark Shuman, who

4  is the Miami-Dade County medical examiner; Ms. Marie Mato, who

5  is an Assistant State Attorney in Dade County.

6          That's the list of witnesses we intend to perhaps call.

7          THE COURT:  Thank you, Mr. Klock.

8          Mr. Hogan, do you recognize any of the names on that

9  list?

10         PROSPECTIVE JUROR:  Yes, Your Honor.

11         THE COURT:  You've had professional associations with

12 some of those people?

13         PROSPECTIVE JUROR:  With a lot of them.

14         THE COURT:  Other than the professional associations,

15 which name did you recognize?

16         PROSPECTIVE JUROR:  John Buhrmaster.

17         THE COURT:  Have you had any personal relationships

18 with any of the individuals on that list.

19         PROSPECTIVE JUROR:  I have not.

20         THE COURT:  Thank you very much, Mr. Hogan.

21         Any other members of our jury panel recognize the

22 individuals read by Mr. Klock?

23         Thank you very much.

24         Mr. Hunnefeld, will you introduce yourselves as well as

25 those seated with you at counsel table.

```
 1              MR. HUNNEFELD:  Yes.  Thank you, Your Honor.
 2         Henry Hunnefeld, Senior Assistant City Attorney for the
 3    City of Miami.  With me is Nicholas Basco, Assistant City
 4    Attorney for the City of Miami.
 5         We have numerous overlapping witnesses, I won't go
 6    through those.  The only witness that isn't overlapping is an
 7    individual by the name of Santiago Aroca, an Assistant U.S. --
 8    Assistant City Attorney for Miami-Dade -- State Attorney for
 9    Miami-Dade County.
10              THE COURT:  Thank you very much, Mr. Hunnefeld.
11         Does that name ring a bell with anyone, if you've had a
12    business, personal or professional relationship with that
13    individual?
14         All right.  Thank you very much.
15         Now, ladies and gentlemen, I expect that this case
16    should conclude -- and remember this date because I will get
17    back to you on it in a minute -- by June 11th, that's a week
18    from today.
19         The plaintiff in this case is Mr. Taiwan Smart.  The
20    defendant is the City of Miami.
21         Mr. Smart brought this case pursuant to 14 U.S.C.
22    Section 1983, against the defendant, the City of Miami,
23    alleging that they violated his Fourth Amendment right to
24    privacy and against unreasonable searches and seizures, as well
25    as for false imprisonment and for false arrest in violation of
```

1    Florida and Federal law.

2          Mr. Smart argues that the city's action, including

3    policy-level decisions, to have the homicide unit of its police

4    department star in the "First 48" reality television program

5    led to the Federal and State claims at issue.

6          The City of Miami denies all of these claims.

7          MR. HUNNEFELD:  Your Honor, there was one housekeeping

8    matter.  The Court just read a claim that is no longer --

9          THE COURT:  Counsel, would you approach for just a

10   moment, please.

11         (Sidebar discussion held as follows:)

12         THE COURT:  What is it?

13         MR. HUNNEFELD:  You granted summary judgment --

14   remember, we did this before the ruling on the motion for

15   summary judgment, so you stipulated; we left that in there.

16         THE COURT:  For the false arrest claim, all right.

17         MR. HUNNEFELD:  That's the one.

18         THE COURT:  Thank you very much.

19         MR. KLOCK:  Thanks, Judge.

20         (Sidebar discussion concluded and the following

21   proceedings were held in open court:)

22         THE COURT:  Ladies and gentlemen, I misspoke.  The

23   false arrest claim is no longer an issue in this trial.  The

24   false arrest claim is no longer at issue in this trial.

25         Now I'm going to start, Mr. Blanford, with juror number

```
 1    one.  Now, I may ask some of you the same questions.  I may not

 2    ask any of you questions at all.  So as I go through, I'm going

 3    to ask that you speak up loudly and clearly so that we can all

 4    understand you and that the lawyers have an opportunity to hear

 5    you.

 6              Sir, would you tell us your name, please.  Is it

 7    Mr. Pereyra?

 8              PROSPECTIVE JUROR:  Stanley Pereyra.

 9              THE COURT:  Sir, you're a night auditor?

10              PROSPECTIVE JUROR:  I'm a night auditor for the Element

11    Miami Airport Hotel.

12              THE COURT:  Could you say that name a little slower for

13    us, please?

14              PROSPECTIVE JUROR:  Element Miami Airport Hotel.

15              THE COURT:  And how long have you been in that

16    capacity?

17              PROSPECTIVE JUROR:  One year.

18              THE COURT:  Now, you said in your answer to question

19    number 10 that you have a lawsuit.  Is it against State Farm?

20              PROSPECTIVE JUROR:  Yes.  State Farm is suing me for a

21    car accident I had in 2009.

22              THE COURT:  Are you represented by an attorney in that

23    case?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Do you know your attorney's name?
```

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Thank you very much.

 3              If you could pass the microphone to juror number two,

 4    Mr. Barreto.

 5              PROSPECTIVE JUROR:  Yes, good morning.

 6              THE COURT:  Mr. Barreto, you say in your answer to your

 7    question that your wife is presently a legal assistant?

 8              PROSPECTIVE JUROR:  That's correct.

 9              THE COURT:  Can you tell us the law firm or office

10    where she works?

11              PROSPECTIVE JUROR:  She works at Shutts & Bowen.

12              THE COURT:  And how long has she been working in that

13    capacity?

14              PROSPECTIVE JUROR:  Twenty years.

15              THE COURT:  Do you recognize any of the attorneys

16    seated here in court today?

17              PROSPECTIVE JUROR:  No.  She deals mostly with

18    international corporate law, so don't deal with anything like

19    that.

20              THE COURT:  Now you mentioned your answer to question

21    number seven that you have served in jury duty before?

22              PROSPECTIVE JUROR:  Yes, a very long time ago.

23              THE COURT:  Were you able -- without telling us what

24    that verdict was, were you able to reach a verdict?

25              PROSPECTIVE JUROR:  Yes.
```

```
 1              THE COURT:  Thank you very much.

 2              PROSPECTIVE JUROR:  You're welcome.

 3              THE COURT:  If you'd pass the microphone to juror

 4    number three.

 5              Good morning, sir.

 6              PROSPECTIVE JUROR:  Good morning.

 7              THE COURT:  Now, sir, in your answer to question number

 8    10, do you presently have a lawsuit against someone?

 9              PROSPECTIVE JUROR:  No.

10              THE COURT:  And you served on jury duty twice before?

11              PROSPECTIVE JUROR:  Yes, once with the County, once

12    with the State.

13              THE COURT:  Now, anything about those experiences that

14    you think would prevent you from being a fair juror here?

15              PROSPECTIVE JUROR:  No.

16              THE COURT:  Were you able to reach a verdict in those

17    cases?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Thank you very much.

20              If you'd pass the microphone to juror number four.

21              Good morning?

22              PROSPECTIVE JUROR:  Good morning.

23              THE COURT:  You said that you own your own business.

24    Can you tell us a little bit about the business that you own,

25    please?
```

```
 1              PROSPECTIVE JUROR:  Yes.  I work with nonprofits in

 2     Florida and in Massachusetts advising them on board relations,

 3     capital campaigns, strategic planning.

 4              THE COURT:  And when you served in State Court, was

 5     that in Florida or in another state?

 6              PROSPECTIVE JUROR:  Another state.

 7              THE COURT:  In that case, were you able to reach a

 8     verdict?

 9              PROSPECTIVE JUROR:  Yes.

10              THE COURT:  Anything about that experience that you

11     think would prevent you from being a fair juror here?

12              PROSPECTIVE JUROR:  No.

13              THE COURT:  Thank you very much.

14              If you'd pass the microphone to juror number five.

15              Good morning.

16              PROSPECTIVE JUROR:  Good morning.

17              THE COURT:  Now, you're also self-employed?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  Can you tell me the kind of work that you

20     do?

21              PROSPECTIVE JUROR:  Pretty much, as juror number four,

22     I'm a nonprofit consultant.

23              THE COURT:  And you've never served on a jury -- oh,

24     one time in Miami?

25              PROSPECTIVE JUROR:  Yes.
```

```
 1              THE COURT:  Was it a civil or criminal case?

 2              PROSPECTIVE JUROR:  It was civil, and they settled

 3       after lunch.

 4              THE COURT:  Thank you very much.

 5              If you'd pass the microphone to juror number 6 for me,

 6       please.

 7              Good morning, ma'am.

 8              PROSPECTIVE JUROR:  Good morning.

 9              THE COURT:  Now, what kind of work do you do for the

10       City of North Miami?

11              PROSPECTIVE JUROR:  I am the web master at the City of

12       North Miami, updating the city's website, the police department

13       website.  And also we do video and filming all the public

14       meetings at City Hall.

15              THE COURT:  Now, when you say you update the police

16       department website, do you have contact with sworn law

17       enforcement in your job?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  And when you update the police department

20       website, can you tell us what kind of things you're doing for

21       them?

22              PROSPECTIVE JUROR:  The only thing -- well, just

23       updating if they change the biographies, if they have -- I

24       mean, who's the police officer of the month, and if they have

25       any events with PAL, with the -- which is the Police Athletic
```

```
1    League; if they -- most likely it's the administrative.
2              THE COURT:  Thank you very much.
3              If you'd pass the microphone, please, to juror number
4    seven.
5              Good morning.
6              PROSPECTIVE JUROR:  Good morning.
7              My name is Maria Teresa Torrelles.  I am a music
8    teacher in Gateway, it's a school in Homestead, K-8.  And I
9    teach music from second to fifth grade.  I have been teaching
10   this, like, 15 years; in this position, like, four years; but
11   before in the school system I have been, like, 11 years.
12             THE COURT:  Now, you mentioned in your questionnaire
13   that you've served on jury duty three times?
14             PROSPECTIVE JUROR:  Yes.  I served three times.  And
15   one of the times that I was very close to the verdict, but I
16   was, like, serving in case that someone fails.  So this was the
17   closest to the verdict that it was.
18             THE COURT:  Okay.  Thank you very much.
19             If we could go all the way to the back row,
20   Mr. Blanford, to juror number eight, please.
21             It's Ms. Arias?
22             PROSPECTIVE JUROR:  Yes, good morning.
23             THE COURT:  Good morning.
24             Are you formally a substitute teacher?
25             PROSPECTIVE JUROR:  No, I'm a substitute teacher.  I'm
```

```
 1    a retired teacher of 35 years.
 2          THE COURT:  Now, you actually served in a criminal case
 3    in Federal Court or was it a civil case?
 4          PROSPECTIVE JUROR:  No, I think they were all civil
 5    cases.
 6          THE COURT:  And were you able to reach a verdict in all
 7    of your cases?
 8          PROSPECTIVE JUROR:  Yes.
 9          THE COURT:  Thank you very much.
10          If you'd pass the microphone to juror number nine.
11          Sir, you mentioned you're an assistant principal?
12          PROSPECTIVE JUROR:  That's correct.
13          THE COURT:  Dade County?
14          PROSPECTIVE JUROR:  Yes, ma'am.
15          THE COURT:  What's the name of your school?  Where is
16    it located?
17          PROSPECTIVE JUROR:  Coral Reef Senior High School.
18    It's by Metro Zoo.
19          THE COURT:  And you served on a jury once before?
20          PROSPECTIVE JUROR:  I have.
21          THE COURT:  And were you able to reach a verdict?
22          PROSPECTIVE JUROR:  Yes, we did.
23          THE COURT:  Thank you very much.
24          If you'd pass the microphone to juror number 10.
25          PROSPECTIVE JUROR:  Good morning.
```

```
 1              THE COURT:  Good morning, sir.

 2              You mentioned that you did have some lawsuits involving

 3     some landlord-tenant issues?

 4              PROSPECTIVE JUROR:  Right.  As a plaintiff.

 5              THE COURT:  Have those issues now been resolved?

 6              PROSPECTIVE JUROR:  That was a long time ago.

 7              THE COURT:  Anything about those experiences that you

 8     think would prevent you from being a fair juror here?

 9              PROSPECTIVE JUROR:  I don't think so.

10              THE COURT:  Thank you very much.

11              If you'd pass the microphone to juror number 11.

12              Good morning, Mr. Hogan.

13              PROSPECTIVE JUROR:  Good morning, Judge.

14              THE COURT:  Just for the record, you and I know each

15     other, correct?

16              PROSPECTIVE JUROR:  That's correct, Your Honor.

17              THE COURT:  And we know each other professionally as

18     attorneys here in Miami-Dade County?

19              PROSPECTIVE JUROR:  That's correct.

20              THE COURT:  Now, prior to your present position, you

21     were formerly a State Attorney, correct?

22              PROSPECTIVE JUROR:  Yes.

23              THE COURT:  So -- and served some time as in the

24     Justice Department?

25              PROSPECTIVE JUROR:  I spent five years at the
```

1    Department of Justice.

2            THE COURT:  So, would it be fair to say that you're

3    pretty acquainted with the law on both the civil and criminal

4    side?

5            PROSPECTIVE JUROR:  That's correct.

6            THE COURT:  Have you ever served on a jury before?

7            PROSPECTIVE JUROR:  I have not.

8            THE COURT:  Thank you very much.

9            If you'd pass the microphone to juror number 12.

10           PROSPECTIVE JUROR:  Good morning.

11           THE COURT:  Good morning, sir.

12           You presently work for an airline on a flight crew?

13           PROSPECTIVE JUROR:  I used to, yeah.  I just stopped

14   working for them.  I'm a writer now.

15           THE COURT:  Never served on a jury before?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  Thank you very much.

18           If you'd pass the microphone to juror number 13 for me,

19   please.

20           Good morning.  This is your first time ever coming for

21   jury service?

22           PROSPECTIVE JUROR:  Yes, this is the first time.

23           THE COURT:  Thank you very much.

24           If you'd pass the microphone to juror number 14.

25           Ms. Wilson.

```
 1              PROSPECTIVE JUROR:  Good morning.

 2              THE COURT:  Good morning.

 3              Ms. Wilson, you're a child protective investigator?

 4              PROSPECTIVE JUROR:  Yes.

 5              THE COURT:  Do you work with the State Attorney's

 6      office --

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  -- in terms of your duties?

 9              PROSPECTIVE JUROR:  Yes.

10              THE COURT:  Would you describe that as sort of an every

11      day thing?

12              PROSPECTIVE JUROR:  It's a case-by-case situation.  It

13      depends on the egregiousness of the case.  And basically if

14      there's any criminal, and I do work with the law enforcement

15      hand-in-hand in the community.

16              THE COURT:  And do you work in a specific area or

17      region?

18              PROSPECTIVE JUROR:  All Dade County; from 79th Street,

19      going back to Powerline Road, Okeechobee, and all of Sunny

20      Isles.

21              THE COURT:  So you're north of 79th Street?

22              PROSPECTIVE JUROR:  Correct.

23              THE COURT:  Do you ever have occasion to testify in

24      court?

25              PROSPECTIVE JUROR:  Yes.
```

1           THE COURT:  And when was the last time you would say

2   you testified in a courtroom?

3           PROSPECTIVE JUROR:  Last Thursday.

4           THE COURT:  And have you ever served on jury duty

5   before?

6           PROSPECTIVE JUROR:  No.  I was called but I never

7   served.

8           THE COURT:  Okay.  Thank you very much.

9           PROSPECTIVE JUROR:  You're welcome.

10          THE COURT:  Juror number 15, is it Ms. Madison?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Ms. Madison, you presently said you're not

13  working.  What kind of work did you do before?

14          PROSPECTIVE JUROR:  Recently I just finished a

15  temporary position at the Miami Foundation as a receptionist.

16          THE COURT:  No jury service before?

17          PROSPECTIVE JUROR:  No, my first time.

18          THE COURT:  All right, thank you very much.

19          If you'd pass the microphone to juror number 16.

20          PROSPECTIVE JUROR:  Good morning.

21          THE COURT:  Good morning.

22          You work at a law firm.

23          PROSPECTIVE JUROR:  I do.

24          THE COURT:  What law firm?

25          PROSPECTIVE JUROR:  Cole Scott & Kissane, P.A.

1          THE COURT:  And do you recognize any of the attorneys

2    in courtroom here today?

3          PROSPECTIVE JUROR:  I don't.

4          THE COURT:  Ever heard of their names or their firms in

5    the course of your work?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Have you ever served on jury duty before?

8          PROSPECTIVE JUROR:  I was called, but never served.

9          THE COURT:  Okay.  All right.  Thank you very much.

10          If you'd pass the microphone to Mr. Blanford, and we're

11    going to go to the rear of the courtroom to juror number 17, I

12    believe it's Ms. Wilson.

13          PROSPECTIVE JUROR:  Good morning.

14          THE COURT:  Ms. Wilson, you presently work in retail?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  You've never served on a jury before?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Thank you very much.

19          If you'd pass the microphone to juror number 18 for me,

20    please.

21          PROSPECTIVE JUROR:  Good morning.

22          THE COURT:  Good morning.  Ma'am, is it Ms. Nogueira?

23          PROSPECTIVE JUROR:  Nogueira.

24          THE COURT:  I'm probably going to mispronounce it

25    again, so I'm going to apologize right up front.

1        PROSPECTIVE JUROR:  That's fine.

2        THE COURT:  You've served on a jury twice before?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Do you remember, were they criminal or

5    civil cases?

6        PROSPECTIVE JUROR:  One was a robbery, and the other

7    one they called a mistrial right away.

8        THE COURT:  Now, anything about those experiences that

9    you think would prevent you from being a fair juror in this

10   case?

11       PROSPECTIVE JUROR:  No, I don't think so.

12       THE COURT:  All right.  Thank you very much.

13       If you could pass the microphone to juror number 19 for

14   me, please.

15       Ma'am, you're self-employed as a business consultant?

16       PROSPECTIVE JUROR:  Yes.

17       THE COURT:  Can you tell us the kind of businesses that

18   you consult with, please?

19       PROSPECTIVE JUROR:  I'm working for some

20   telecommunications companies in Latin America.

21       THE COURT:  And is most of the business that you

22   consult with, are they in Latin America?

23       PROSPECTIVE JUROR:  Yes.

24       THE COURT:  Never served on a jury before?

25       PROSPECTIVE JUROR:  No.

```
 1              THE COURT:  Thank you very much.

 2              If you'd pass the microphone, please, to juror

 3     number 20.

 4              Good morning.

 5              PROSPECTIVE JUROR:  Good morning.

 6              THE COURT:  Ma'am, you work at the V.A. Hospital or did

 7     you work at the V.A. Hospital?

 8              PROSPECTIVE JUROR:  I did.  I'm retired.

 9              THE COURT:  And what kind of work did you do when you

10     were working?

11              PROSPECTIVE JUROR:  I worked in the x-ray department.

12              THE COURT:  Now, you've served on juries in both

13     Federal Court and State Court?

14              PROSPECTIVE JUROR:  Yes, for Federal Court, two cases;

15     and State Court, I was dismissed because I'm a -- I was a

16     Federal employee.

17              THE COURT:  Now, anything about any of those

18     experiences that would prevent you from being a fair juror?

19              PROSPECTIVE JUROR:  No.

20              THE COURT:  Thank you very much.

21              If you'd pass the microphone to juror number 21.

22              PROSPECTIVE JUROR:  Hello.  Good morning.

23              THE COURT:  Good morning.

24              You work at customer service?

25              PROSPECTIVE JUROR:  Yes.
```

```
 1              THE COURT:  What kind of company?

 2              PROSPECTIVE JUROR:  Well, it's called Integra Health

 3    and we assist with the elderly.  We make sure they get

 4    recertified for their programs on time so the social security

 5    won't make any deductions from their social security check.

 6              THE COURT:  Now, at one time you were a military

 7    spouse?

 8              PROSPECTIVE JUROR:  Yes.

 9              THE COURT:  During that time, did you ever have any

10    contact with the military police or law enforcement, or

11    anything of that nature?

12              PROSPECTIVE JUROR:  No.

13              THE COURT:  All right.  Thank you very much.

14              If you'd pass the microphone to juror number 22 for me,

15    please.

16              PROSPECTIVE JUROR:  Good morning, Your Honor.

17              THE COURT:  Good morning.

18              Fusion Media Network, that's like a television station?

19              PROSPECTIVE JUROR:  It is.  It's a joint venture

20    between Univision, ABC and Disney.

21              THE COURT:  Now, your spouse works in the insurance

22    industry; correct?

23              PROSPECTIVE JUROR:  Correct.

24              THE COURT:  Are you acquainted with any of the lawyers

25    here?  Do you talk to him about the legal side of his or her
```

```
 1   work?

 2          PROSPECTIVE JUROR:  No.

 3          THE COURT:  Okay.  Thank you very much.

 4          If you'd pass the microphone to juror number 23 for me,

 5   please.

 6          Is it Mr. Patrick?

 7          PROSPECTIVE JUROR:  Yes, it is.

 8          THE COURT:  Mr. Patrick, are you presently in the

 9   landscaping business?

10          PROSPECTIVE JUROR:  Yes, ma'am.

11          THE COURT:  Now, you mentioned that one of your hobbies

12   is watching documentaries; is that correct?

13          PROSPECTIVE JUROR:  Yeah, I like to watch criminal

14   cases, anything in documentary.

15          THE COURT:  Now, when you say you like to watch

16   criminal cases, is there a particular program or issues that

17   you like to watch?

18          PROSPECTIVE JUROR:  Well, I watch forensic files a lot.

19   "48 Hours" a lot.

20          THE COURT:  Now, when you say you watch "48 Hours" a

21   lot, would you say you're a pretty regular viewer of "48

22   Hours"?

23          PROSPECTIVE JUROR:  Yes, ma'am.

24          THE COURT:  Okay.  Thank you very much.

25          Juror number 24.  You presently work for Miami-Dade
```

1    College?

2            PROSPECTIVE JUROR:  Yes, ma'am.

3            THE COURT:  Never served on a jury before?

4            PROSPECTIVE JUROR:  No.  No, ma'am.

5            THE COURT:  Thank you very much.

6            Juror number 25, is it Ms. Gonzalez?

7            PROSPECTIVE JUROR:  Yes, it is.

8            THE COURT:  You're presently a secretary for what kind

9    of company?

10           PROSPECTIVE JUROR:  A hospital, Westchester Hospital.

11           THE COURT:  And you served on jury duty in Federal

12   Court sometime ago?

13           PROSPECTIVE JUROR:  Yes, I did.

14           THE COURT:  Was it a civil or criminal case, if you

15   recall?

16           PROSPECTIVE JUROR:  Criminal.

17           THE COURT:  Now, you were involved or had an issue

18   where you, yourself, had a lawsuit, correct?

19           PROSPECTIVE JUROR:  Yes, ma'am.

20           THE COURT:  Has that matter now been resolved?

21           PROSPECTIVE JUROR:  Yes, ma'am.

22           THE COURT:  Anything about that experience that you

23   think would prevent you from being a fair juror in this case?

24           PROSPECTIVE JUROR:  They were unfair with me.

25           THE COURT:  Would that time, 15 years ago, affect your

```
 1    ability to be a fair juror in this case?

 2              PROSPECTIVE JUROR:  Probably.

 3              THE COURT:  Thank you very much.

 4              I'm going to ask for a show of hands.  How many of you

 5    have friends or family who presently work in law enforcement?

 6    If you have friends or family presently working in law

 7    enforcement.

 8              Mr. Blanford, we're going to start in the back and come

 9    up front so you can stay there.

10              And when you stand and tell me, just tell me your juror

11    name and number, the police agency and your relationship.

12              PROSPECTIVE JUROR:  Johanna Gonzalez, number 25.

13              They are my daughter-in-law's cousins.  They both --

14    the husband and wife, they work for the City of Miami.

15              THE COURT:  Thank you.

16              PROSPECTIVE JUROR:  Jose De Las Salas.

17              I have a friend from college who works within the Tampa

18    Bay Police Department.  But that's about it.

19              THE COURT:  Okay.

20              PROSPECTIVE JUROR:  My sister is -- she's a -- I forgot

21    what it was, but she works for Alachua County.  And my brother

22    is a probation officer for Ocala.

23              THE COURT:  Probation officer for what county?

24              PROSPECTIVE JUROR:  I think it's Ocala.  Yeah, it's

25    Ocala, Florida.
```

```
1              THE COURT:  Thank you.

2              MR. BASCO:  I'm sorry, Judge.  That was juror number

3    17, for the record.

4              THE COURT:  Let's come to the front row.  Your name

5    please, sir?

6              PROSPECTIVE JUROR:  Robert Barreto, juror number two.

7              I have a friend who's a member of SWAT for Metro-Dade.

8    And my brother had a best friend who was also a lieutenant for

9    the City of Miami.

10             THE COURT:  Thank you.

11             Anyone else in the front row?

12             Yes, sir.

13             PROSPECTIVE JUROR:  Samuel Brown.

14             My brother-in-law was a police officer.  And I have a

15   very good friend that works for the county as a police officer.

16             THE COURT:  And your friend is still a police officer

17   here for the Miami-Dade County?

18             PROSPECTIVE JUROR:  Yes, he is.  He's a sergeant in the

19   Perrine district.

20             THE COURT:  And your brother, is he still working as a

21   police officer?

22             PROSPECTIVE JUROR:  My brother-in-law is retired now.

23   He has his own law provided -- works a side.

24             THE COURT:  Thank you.

25             Anyone else in the front row?
```

```
 1              Can I go to the rear row, please, Mr. Blanford?

 2              PROSPECTIVE JUROR:  Good morning.  Juror number 15.

 3              A friend of the family is a West Palm Beach police

 4    officer.

 5              THE COURT:  Thank you.

 6              PROSPECTIVE JUROR:  Lakesha Wilson, number 14.

 7              I have a cousin, Metro-Dade, is on SWAT.  I have a

 8    cousin with Metro-Dade as an airport watch.

 9              THE COURT:  As a what?

10              PROSPECTIVE JUROR:  Airport watch in Miami Airport.

11              I have a cousin with the Fairview Investigators.  I

12    have my niece up in Gainesville right now is a PD.  And I have

13    a cousin with Miami Gardens PD.  And plus, I'm connected with a

14    lot of law enforcement officers.

15              THE COURT:  Thank you very much.  If you can pass the

16    microphone down.

17              Mr. Hogan.

18              PROSPECTIVE JUROR:  John Hogan, juror 11.

19              I know people -- when you say law enforcement, who are

20    in as prosecutors.  And so I know Kathy Fernandez Rundle very

21    well.  I know Willie Ferrier very well.  Obviously, I know a

22    number of other people who are in prosecution.

23              THE COURT:  Thank you very much.

24              Anyone else in that back row?

25              PROSPECTIVE JUROR:  I have a friend of the family,
```

```
 1   Your Honor.  I also work closely with a resource officer at my
 2   school.  That's it.
 3            THE COURT:  Thank you.
 4            Any of our jurors presently -- I don't think I heard
 5   any employed by the City of Miami?  Anyone presently
 6   employed --
 7            I'm sorry, ma'am, I didn't mean to miss you.
 8            PROSPECTIVE JUROR:  Mary Arias, juror number eight.
 9            And my niece works for Homeland Security and Customs.
10            THE COURT:  Thank you.
11            Anyone presently working for the City of Miami?  Anyone
12   presently working for the City of Miami, please raise your
13   hand.
14            If you've worked for the City of Miami in the past,
15   please raise your hand.
16            Mr. Hogan.
17            PROSPECTIVE JUROR:  I know my firm at one point
18   represented the City of Miami.  My best understanding is, as of
19   today, we do not.
20            THE COURT:  Okay.
21            MR. HUNNEFELD:  They represent the CRA.
22            THE COURT:  Oh, with Community Redevelopment District?
23            MR. HUNNEFELD:  That's correct.
24            THE COURT:  Thank you.
25            I believe I see Ms. Wilson's hand again.
```

```
 1            COURT SECURITY OFFICER:  Yes?

 2            PROSPECTIVE JUROR:  Once again, I worked directly close

 3     with about six of the detectives with the City of Miami on a

 4     case.

 5            THE COURT:  Now, I know with most of the individuals

 6     that we read this morning presently work or did recently work

 7     in homicide.  Did you ever have a relationship with them maybe

 8     when they were in another division?  Did you recognize any of

 9     the names?

10            PROSPECTIVE JUROR:  It's been about three years.  If I

11     see them, I'll be able to say.  I can't remember, because I

12     work with so many law enforcement officers.

13            I think there's one name I do recall, but I'd just have

14     to see the face.

15            THE COURT:  What was the name that you thought you

16     recognized?

17            PROSPECTIVE JUROR:  Bosch.

18            THE COURT:  Bosch.  Okay.  Thank you.

19            Anybody work or have friends or relatives that work in

20     the Miami-Dade County Medical Examiner's Office?

21            PROSPECTIVE JUROR:  My classmate from high school works

22     out at the Miami Medical Examiner's Office.

23            THE COURT:  Now I have to ask this question, and it's

24     sort of unfortunately sad:  Have you ever had to work with the

25     Miami-Dade Medical Examiner's Office in your child
```

```
 1   protection --
 2               PROSPECTIVE JUROR:  Yes.
 3               THE COURT:  So that means you have been involved in
 4   issues where a child has actually passed away?
 5               PROSPECTIVE JUROR:  Correct.
 6               THE COURT:  All right.  Now, have you been involved to
 7   the point where you had to either provide evidence or testimony
 8   in a criminal trial for someone where the allegations were that
 9   they were responsible for the death of the child?
10               PROSPECTIVE JUROR:  No.
11               THE COURT:  Thank you.
12               Now, are there any members of our jury who have any
13   family members who in the recent past or presently are
14   suffering with substance abuse issues?
15               PROSPECTIVE JUROR:  My name is Maria Torrelles, and my
16   son had a DUI.
17               THE COURT:  And has that matter now been resolved?
18               PROSPECTIVE JUROR:  Yes.
19               THE COURT:  I believe I saw a hand in the back row,
20   Mr. Blanford.
21               PROSPECTIVE JUROR:  My father, he's an alcoholic.
22               THE COURT:  And is your father presently in any sort of
23   treatment program?
24               PROSPECTIVE JUROR:  In and out.  Right how he's out.
25               THE COURT:  Thank you very much.
```

```
 1              Anyone else in the front?  All right.  Let's go to the
 2    back.
 3              PROSPECTIVE JUROR:  My cousin had an addiction of
 4    antidepressants.
 5              THE COURT:  And do you know right now what the status
 6    is of your cousin's addiction?  Are they in a program, out of a
 7    program, sober or not sober?
 8              PROSPECTIVE JUROR:  Completed a program, and thankfully
 9    sober.
10              THE COURT:  Thank you.
11              Anyone else in the rear?
12              Thank you.
13              How many members of our panel have ever been the victim
14    of a crime and they've contacted law enforcement?  So you've
15    been a victim of a crime and you've contacted law enforcement?
16              We can start up front, it seems to be the most hands.
17              Number two, right there, Mr. Blanford.
18              PROSPECTIVE JUROR:  I was a victim of a breaking and
19    entering of my house.
20              THE COURT:  How do you believe you were treated by law
21    enforcement: fairly, unfairly?
22              PROSPECTIVE JUROR:  Fairly.
23              THE COURT:  Thank you.  Can we just pass the microphone
24    to anyone else in the front row?
25              PROSPECTIVE JUROR:  Samuel Brown.
```

```
 1              Same, breaking and entering the house.

 2              THE COURT:  And how do you believe you were treated by

 3     law enforcement: fairly or unfairly?

 4              PROSPECTIVE JUROR:  I was treated fairly.

 5              THE COURT:  Anyone else in the front row?

 6              All the way down to the end, Mr. Blanford.

 7              PROSPECTIVE JUROR:  Breaking a home.

 8              THE COURT:  And how do you believe you were treated by

 9     law enforcement?

10              PROSPECTIVE JUROR:  Fairly.

11              THE COURT:  All right.

12              PROSPECTIVE JUROR:  Client stole my wallet right out of

13     the office.

14              THE COURT:  And did you contact law enforcement?

15              PROSPECTIVE JUROR:  Treated fairly.

16              THE COURT:  Thank you very much.

17              Mr. Hogan, I believe I saw your hand?

18              PROSPECTIVE JUROR:  Yes, Your Honor.  Around 1990 my

19     home was burglarized, and then around 1999 my car was stolen.

20              THE COURT:  And how do you believe you were treated by

21     law enforcement?

22              PROSPECTIVE JUROR:  I was treated fairly.

23              THE COURT:  Thank you very much.

24              Yes, sir?

25              PROSPECTIVE JUROR:  Juror number 10, Montanez.
```

```
 1              Breaking and entry, and a car was stolen, and I was
 2    treated fairly.
 3              THE COURT:  Thank you.
 4              Mr. Blanford --
 5              PROSPECTIVE JUROR:  I had a threatening phone call, and
 6    I was treated fairly.
 7              THE COURT:  Thank you.
 8              We're going in the back, Mr. Blanford.
 9              PROSPECTIVE JUROR:  Eight years ago my father-in-law
10    killed my mother-in-law and then killed himself.  The police
11    department were very gracious and they helped us a lot.
12              And then around 12 years ago, my husband's car was
13    broken into, and they stole everything that was in our safe
14    deposit box.  And that police department, that was Sweetwater,
15    they were not helpful at all.
16              THE COURT:  I want to go back to the situation with
17    your mother-in-law and father-in-law.  Was that here in
18    Miami-Dade County?
19              PROSPECTIVE JUROR:  Yes, ma'am.
20              THE COURT:  And do you recall the police department
21    that responded and assisted you during that time?
22              PROSPECTIVE JUROR:  Yes, ma'am.  Hialeah.
23              THE COURT:  Thank you very much.
24              Anyone else in the back?  All right.
25              Thank you very much.
```

```
 1              I know one of our jurors is a regular watcher of the
 2    television show "The First 48."  Are there any of our other
 3    potential jurors who have seen an episode of "The First 48"?
 4              So, Mr. Blanford, if we could -- oh, is the microphone
 5    back there or do you have it?
 6              COURT SECURITY OFFICER:  Yes, Your Honor.
 7              THE COURT:  Salas, juror number 24.
 8              PROSPECTIVE JUROR:  I maybe seen two episodes at most.
 9              THE COURT:  So you wouldn't describe yourself as a
10    regular watcher?
11              PROSPECTIVE JUROR:  No, ma'am.
12              THE COURT:  Thank you.
13              PROSPECTIVE JUROR:  I've watched a few, but I don't
14    watch it very often.
15              THE COURT:  All right.  Can I go back to our juror who
16    did talk about "The First 48" before?
17              Sir, you mentioned that this is probably one of your
18    favorite programs, correct?
19              PROSPECTIVE JUROR:  Yeah.  I watch it all the time,
20    almost every afternoon.
21              THE COURT:  Okay.  Now there's a lot of the episodes on
22    "The First 48" that deal with the City of Miami Police
23    Department.  Would you say that you've watched a lot of those
24    episodes?
25              PROSPECTIVE JUROR:  Yes.
```

```
1              THE COURT:  Now, there is going to be testimony in this
2    case probably from some of the individuals that you may have
3    seen on that television show.  Would the fact that you've seen
4    them on that television show cause you to believe him or her
5    more because you saw them on the television show?
6              PROSPECTIVE JUROR:  No.  No.
7              THE COURT:  Thank you very much.
8              Anyone else in the back who is a regular watcher of
9    "The First 48"?
10             All right.  Let's come to the front.
11             PROSPECTIVE JUROR:  Juror two.
12             I've seen quite a few episodes, but -- it's not
13   something habitual, but we do enjoy watching the "Criminal
14   Intent" shows and "Criminal Minds" and "Law & Order" and things
15   like that.
16             THE COURT:  Of the episode of "The First 48," do you
17   recall whether they involved the City of Miami Police
18   Department?
19             PROSPECTIVE JUROR:  There may have been one or another,
20   because it's always interesting to see something that happened
21   in your own back yard, but I wouldn't remember anything like
22   that.
23             THE COURT:  Thank you.
24             PROSPECTIVE JUROR:  Yes, I've watched a number of,
25   "Criminal Minds" and also "60 Minutes," but mostly from the
```

```
 1    law, Miami/N.Y. P.D., something like that.  But --
 2            THE COURT:  Do you have a specific memory about "The
 3    First 48"?
 4            PROSPECTIVE JUROR:  There was a few that was about
 5    Miami, but it's been a while.
 6            THE COURT:  Okay, thank you very much.
 7            Anyone else in the front row?
 8            We're going to go all the way down.
 9            PROSPECTIVE JUROR:  Juror number 6.
10            Maybe once in a blue moon, ten minutes, 15 minutes; but
11    I don't recall any specific episode.
12            THE COURT:  Thank you very much.
13            PROSPECTIVE JUROR:  I'm sorry.
14            THE COURT:  Can we -- I want to say something.
15            This is what jury selection is about.  This is what I
16    want any of you to do.
17            Please, I don't want any of you to not answer a
18    question because you think I've stood up too much, I've talked
19    to much.  This is what the lawyers and I want you to do.  So I
20    would rather have you speak than not speak.
21            So, go right ahead.
22            PROSPECTIVE JUROR:  I watch it all the time.  My
23    master's degree is in criminal justice with a specialty in
24    forensic technology and forensic psychology.  So I'm addicted
25    to the show "Criminal Minds," "Missing," everything.
```

```
 1              THE COURT:  So, there will probably be officers that
 2    you've seen on "The First 48" that will come into court and
 3    testify in this case.  Would the fact that you've seen them on
 4    that show cause you to believe them just because you've seen
 5    them on the show?
 6              PROSPECTIVE JUROR:  No, not at all.
 7              THE COURT:  So, would you be able to evaluate their
 8    testimony and determine, based upon the instructions I'm going
 9    to give you, whether or not you believe they're providing
10    truthful testimony?
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  All right.  Thank you very much.
13              All the way down on the end, Mr. Blanford.
14              PROSPECTIVE JUROR:  Juror number nine, Your Honor.
15              I may have seen the show once or twice, but don't
16    recall.
17              THE COURT:  Thank you very much.
18              PROSPECTIVE JUROR:  Juror number 8.
19              I have watched "The First 48" hours quite frequently,
20    but I don't recall any specific details of Miami shows.
21              THE COURT:  Okay.  Thank you.
22              Now, ladies and gentlemen, when we first started -- in
23    a moment the attorneys are going to have an opportunity to ask
24    you certain questions and I'm just going to ask you to be
25    truthful with them as you were with me this morning.
```

1          Now, as I said when we first started, this is a civil

2     case.  In a civil case, the plaintiff has what we call the

3     burden of proof.  That means the plaintiff must prove his case

4     by a preponderance of the evidence.  By a preponderance of the

5     evidence.

6          And when we lawyers speak about "preponderance of the

7     evidence," that means they must tip the evidentiary scale in

8     their favor.

9          So do you all understand that, in a civil case, the

10    plaintiff has the burden of proof?  Raise your right hand.

11    Raise any hand.

12         All right.  Thank you very much.

13         I did want to ask one juror a question before we go --

14    give me just a moment, please, Counsel.

15         My question is for juror number 16.  If you're provided

16    three hour breaks, will you be okay?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Thank you very much.  Counsel for the

19    plaintiff, inquiry for 15 minutes, please.

20         MR. KLOCK:  Thank you, Your Honor.

21         Your Honor, do you have any particular location where

22    you want me to --

23         THE COURT:  I'm going to suggest that location, because

24    I know the mic there.  And something tells me you don't keep

25    still.  And if you stand there, we're not going to get

```
 1    everything.  So go right to the lectern for me, please.
 2              MR. KLOCK:  Okay.  Thanks, Judge.
 3              Is it Ms. Sanzetenea, am I pronouncing it correctly,
 4    juror number 6?
 5              PROSPECTIVE JUROR:  Yes.
 6              MR. KLOCK:  Is that how I correctly pronounce it?
 7              PROSPECTIVE JUROR:  Sanzetenea.
 8              MR. KLOCK:  Ma'am, you work with police officers all
 9    the time.  Are you more inclined to believe a police officer
10    because they're a sworn law enforcement officer than somebody
11    else?
12              PROSPECTIVE JUROR:  Can you repeat the question again,
13    please?
14              THE COURT:  I'm sorry, I speak too quickly.  I
15    apologize.
16              Do you tend to believe a police officer more because
17    he's a police officer than you would someone else?
18              PROSPECTIVE JUROR:  It depends.
19              MR. KLOCK:  On what?
20              PROSPECTIVE JUROR:  Well, I guess, yes.  I am close,
21    he's a police officer and he's sworn.
22              THE COURT:  So, therefore, someone that's dressed in
23    the uniform of a police officer, you would perhaps be more
24    inclined to trust his testimony than perhaps someone who is not
25    a police officer?
```

1          PROSPECTIVE JUROR:  Well, I guess it depends.

2          THE COURT:  That's fair.

3          Is there anyone else here who tends to believe someone,

4   because they're a police officer -- that believes that a police

5   officer would be more inclined to tell the truth than someone

6   else would?  Anyone feel that way?

7          Does anyone feel that a police officer would be less

8   inclined to tell the truth than someone else?  Okay.

9          Ms. Arias, is it, juror number eight?  You served on a

10  jury six times?

11         PROSPECTIVE JUROR:  Yes.

12         MR. KLOCK:  Do you think that you've sort of done your

13  duty at this point in time?

14         PROSPECTIVE JUROR:  Well, I definitely feel that way,

15  yes.

16         MR. KLOCK:  But notwithstanding the fact you apparently

17  have had a lot of very bad luck, you're willing to serve on

18  this jury, too, if you're asked to?

19         PROSPECTIVE JUROR:  Yes.

20         MR. KLOCK:  Thank you.

21         Mr. Mejia.

22         PROSPECTIVE JUROR:  Yes.

23         MR. KLOCK:  You're an assistant principal?

24         PROSPECTIVE JUROR:  I am.

25         MR. KLOCK:  But different assistant principals have

1    different portfolios.  What is your portfolio?

2          PROSPECTIVE JUROR:  I oversee the custodial staff.  I

3    oversee the facilities to make sure it's clean; make sure that

4    the air handlers are in working condition.

5          I also oversee three of the academies of the six --

6    excuse me, two of the academies of the six that we have:  The

7    legal academy, as well as the IB, International Baccalaureate

8    Academy.

9          Within those academies, I deal with students that are

10   exceptional in what they do, but also sometimes they make

11   mistakes.

12

13         MR. KLOCK:  Do you have anything to do with discipline

14   of students.

15         PROSPECTIVE JUROR:  Yes.  That's what I meant.

16         MR. KLOCK:  So would you be considered the prefect of

17   discipline at your school?

18         PROSPECTIVE JUROR:  Please repeat?

19         MR. KLOCK:  The prefect of discipline, the dean of

20   discipline; is that your duty?

21         PROSPECTIVE JUROR:  One of four.

22         MR. KLOCK:  One of four.

23         What grades do you deal with?  Any particular grades or

24   is it the academy?

25         PROSPECTIVE JUROR:  It's based on the academy.  Anybody

1    in the legal academy as well as the IB academic, they go

2    through me.

3         MR. KLOCK:  And my understanding -- if I'm wrong,

4    please correct me -- is that the academy concept is sort of a

5    specialty in terms of certain kinds of courses that students

6    that indicate an interest in that area tend to group together,

7    and they're sort of like considered to be a school within a

8    school; is that fair?

9         PROSPECTIVE JUROR:  That is correct.

10        MR. KLOCK:  How many courses would a student take in

11   the academy that would be different than the regular curriculum

12   of a high school student?

13        PROSPECTIVE JUROR:  They would take one class every

14   year in order to satisfy that requirement.

15        MR. KLOCK:  Do you deal with law enforcement officers

16   on a regular basis?

17        PROSPECTIVE JUROR:  No, not on a regular basis; but

18   whenever a student violates the code of student conduct and it

19   requires a police officer present to a -- to pull the report,

20   the "SPAR," then, yes, I would.

21        MR. KLOCK:  So do you have situations where you have a

22   student sitting in the office and, say, a police officer

23   sitting in the office and you have to interview both of them to

24   find out what occurred?  Does that happen to you at all?

25        PROSPECTIVE JUROR:  No.  Typically, police officers do

```
 1   their own investigations privately, without me present.

 2        MR. KLOCK:  And so you don't get involved in that

 3   investigation?

 4        PROSPECTIVE JUROR:  I do get involved.  I have to

 5   determine whether it requires a police presence or not.

 6        MR. KLOCK:  Initially, before the police officer?

 7        PROSPECTIVE JUROR:  Yes, sir.

 8        MR. KLOCK:  Thank you.

 9        PROSPECTIVE JUROR:  You're welcome.

10        THE COURT:  Mr. Hogan, you indicated that you knew

11   prosecutors, but you sort of knew everybody in our business,

12   don't you:  lawyers, judges --

13        PROSPECTIVE JUROR:  Yes.

14        MR. KLOCK:  -- prosecutors?

15        PROSPECTIVE JUROR:  Yes.  Miami is a small town.  I

16   also was in law enforcement for a number of years.

17        MR. KLOCK:  Do you think that you have any particular

18   bias either for or against law enforcement?

19        PROSPECTIVE JUROR:  No.

20        MR. KLOCK:  Do you believe that police officers are

21   more inclined to tell the truth than someone else?

22        PROSPECTIVE JUROR:  No.  I have prosecuted police

23   officers.

24        MR. KLOCK:  And do you believe that police officers

25   would be more inclined to support what a colleague says than
```

```
 1    someone who is not in police work?

 2            PROSPECTIVE JUROR:  I think any person would tend to

 3    support their colleagues.  And I think that's, you know, all

 4    the facts.

 5            THE COURT:  So, like, for instance, lawyers in law

 6    firms, we'd be more inclined to support one of our partners if

 7    an issue came up than we would otherwise not?

 8            PROSPECTIVE JUROR:  I think there's always an issue.

 9            MR. KLOCK:  In your law firm, do you have any

10    responsibilities or duties with respect to being the ethics

11    officer or conducting any investigations for the firm?

12            PROSPECTIVE JUROR:  I'm the head of litigation

13    worldwide for my firm.  We have 23 offices.  I -- I'm the head

14    of litigation.  And so I deal with litigation issues, ethics

15    issues, that come up through that part.

16            We have full-time ethics people who I rely on for that;

17    but often I will get their input and then I ultimately make the

18    decision as to whether they have done something inappropriate

19    or not.

20            MR. KLOCK:  And in that experience, that's one of the

21    reasons that you would say that you find that people tend to

22    sort of support what their colleagues will say, if they can?

23            PROSPECTIVE JUROR:  Well, I just think that that's the

24    natural part of human nature.

25            MR. KLOCK:  Is there anything about this trial, the
```

```
 1   number of days it's going to go, that's going to inconvenience
 2   you or interfere with your professional activities?
 3           PROSPECTIVE JUROR:  I think for all of us it's an
 4   inconvenience, but I would certainly do it if asked to.
 5           MR. KLOCK:  Thank you, sir.
 6           Oh, I'm sorry, did you indicate that you'd seen
 7   "First 48"?
 8           PROSPECTIVE JUROR:  I have never even heard of the
 9   show.
10           MR. KLOCK:  Okay.  That's fair.
11           Ms. Rizo, juror 16.
12           THE COURT:  16 is Ms. Rizo.
13           MR. KLOCK:  You work -- I'm sorry, you have to wait for
14   the mic.
15           PROSPECTIVE JUROR:  Thank you.
16           COURT SECURITY OFFICER:  You're welcome.
17           MR. KLOCK:  I'm as bad with numbers as I am with names.
18   I apologize.
19           PROSPECTIVE JUROR:  No problem.
20           MR. KLOCK:  At Cole Kissane, do you work with any
21   particular attorney or you just work for a department?  What
22   are your duties there?
23           PROSPECTIVE JUROR:  I work -- actually, I'm
24   receptionist to the assistant for Ben Esco.
25           I forgot to mention also that one of the attorneys at
```

1    my job works for the City of Miami -- they represent the

2    City of Miami, and I have contact with police officers and

3    firefighters all the time.

4         MR. KLOCK:  Who is that?

5         PROSPECTIVE JUROR:  But nothing in particular; just

6    receive them and let them into the conference rooms and all

7    that.

8         MR. KLOCK:  Okay.

9         Ms. Spittler, juror 19.

10        THE COURT:  Just a moment, please, Mr. Klock.

11        Mr. Blanford, can you check the microphone?  It may

12   have gone into standby.

13        There it goes.  Thank you.

14        MR. KLOCK:  Judge, how am I doing on time?

15        THE COURT:  You have five minutes left.

16        MR. KLOCK:  Thank you.

17        Ms. Spittler, you indicated that your husband's a

18   litigation lawyer.

19        PROSPECTIVE JUROR:  Yes.

20        MR. KLOCK:  Does he have the same last name you do?

21        PROSPECTIVE JUROR:  Yes.

22        MR. KLOCK:  What firm does he work with?

23        PROSPECTIVE JUROR:  He had his own firm.

24        MR. KLOCK:  What was the nature of the practice?

25        PROSPECTIVE JUROR:  He worked as a litigator, and he

```
 1    handles major commercial litigation in foreclosure cases.

 2           MR. KLOCK:  Where's his office located?

 3           PROSPECTIVE JUROR:  Brickell Avenue.

 4           MR. KLOCK:  Okay.  Thank you.

 5           Mr. Patrick, as someone who watches law enforcement

 6    programs regularly, are you more or less inclined to believe

 7    what you hear police officers saying or not saying on a

 8    program?

 9           PROSPECTIVE JUROR:  Well, it depends.  Sometimes I

10    believe them and sometimes I don't.

11           MR. KLOCK:  Okay.  That's fair.  Thanks a lot.  That's

12    all I needed.

13           Is there anyone here who believes that if someone

14    engages in some sort of conduct that is illegal, that that

15    gives police officers a right not to attend properly to their

16    rights, that they have a right to treat them differently than

17    they would treat the rest of us?  Anyone feel that way?

18           How many people here feel, if somebody's arrested, they

19    must have done something wrong?

20           Yes, tell me why, ma'am.

21           PROSPECTIVE JUROR:  Well, if someone's arrested --

22           MR. KLOCK:  One second, my bad.  I was supposed to

23    wait?

24           PROSPECTIVE JUROR:  If someone's arrested --

25           MR. KLOCK:  You have to wait for the mic or the court
```

```
 1    reporter can't get it.
 2           PROSPECTIVE JUROR:  I think that when you don't do
 3    anything suspicious, you usually -- we live in America, so you
 4    usually don't get arrested.  So you have to do something
 5    that -- apparently you're violating something to be arrested.
 6           MR. KLOCK:  So, therefore --
 7           PROSPECTIVE JUROR:  That's what I think.
 8           MR. KLOCK:  Your belief would be that, if a police
 9    officer arrests somebody, they must have done something wrong?
10           PROSPECTIVE JUROR:  I think so.
11           MR. KLOCK:  Do you think that police officers treat
12    everybody the same, irrespective of their ethnic, religious or
13    racial background?
14           PROSPECTIVE JUROR:  When I think -- it depends, any
15    person has some feelings inside every person that you never
16    know.  Usually they have a code of ethics to follow to be --
17    even in similar situations through everybody, in spite of the
18    color or race or background or whatever.  They were supposed to
19    treat everybody equally; but they're going to react if someone
20    is violating the law, is what I think.  That's their job.
21           MR. KLOCK:  Thank you, ma'am.
22           As I was looking through this, I was --
23           PROSPECTIVE JUROR:  I'm sorry, I would agree with her.
24           COURT SECURITY OFFICER:  One minute.
25           PROSPECTIVE JUROR:  I think I would agree with her.
```

1           Like, if you don't do anything wrong, then there's

2     never a need for a police to come near you or arrest you.  But

3     once they made an arrest, there was something that tend to the

4     police to show up and arrest that person.

5           MR. KLOCK:  Have you ever received any type of traffic

6     citation?

7           PROSPECTIVE JUROR:  Yeah.

8           MR. KLOCK:  Had you always violated the law when you

9     received a traffic citation?  You were always wrong?

10          PROSPECTIVE JUROR:  I would think so.  Maybe one time

11    he said I didn't stop at the stop sign and I thought I did;

12    but, I mean, he was right there, so, I mean...

13          MR. KLOCK:  So, therefore, if you recall that you had

14    stopped at a stop sign and the street before you had stopped at

15    a stop sign, you have the right to dispute the police officer?

16          PROSPECTIVE JUROR:  No.  But maybe I was distracted.  I

17    feel like, if he was right there, he could have been right and

18    not -- so, I mean, there's a chance.

19          MR. KLOCK:  And one last question for the panel.

20    The -- at this point in time, you know, I look through the

21    birth dates and I'm always happy to see that there's some

22    people that are perhaps a little bit older than I am.  But

23    times have changed, okay, and recently, over the last year or

24    so, you see any number of situations where there are video

25    clips of interactions between police officers and citizens that

1    have raised criticism.

2          Does anybody here believe that there has been a change

3    in police conduct, or do you believe that perhaps this conduct

4    has always happened but never been caught on camera before?

5          MR. BASCO:  Objection, Your Honor.

6          THE COURT:  Overruled.  I'm going to allow it.

7          MR. KLOCK:  I wasn't going to ask you any questions,

8    Ms. Wilson.  I was trying to be good.

9          PROSPECTIVE JUROR:  I believe that a lot has been going

10   on, just like you said, it would be swept up under the rug,

11   because I had a particular case I had to deal with an officer

12   and I was asked to sweep it under the rug, and I refused to

13   sweep it under the rug.

14         You did child abuse and I'm going to get you for child

15   abuse.  Just because you're a law enforcement officer doesn't

16   excuse your behavior.  We have laws we have to follow.  When I

17   took my position, I was determined to follow that law, and I

18   will always honestly follow that law.  It doesn't matter who

19   you are, what you did; if it's wrong, I'm going to get you for

20   child abuse, because that's a passion of mine.

21         MR. KLOCK:  Ms. Wilson, I'm sorry, my question was a

22   little bit different.

23         My question was that today we've seen on TV and the

24   like video clips that people take on portable cameras or

25   cameras that are outside business establishments where they

1    track interactions between police officers and citizens that

2    have created criticisms of police departments.

3         Do you believe that the incidents of police misconduct,

4    if that's what it is, is on the increase now or it was just

5    never recorded before?

6         MR. HUNNEFELD:  Objection, relevance.

7         THE COURT:  Rephrase.  Counsel's objection is

8    sustained.  Rephrase.

9         MR. KLOCK:  The question, Your Honor?

10        THE COURT:  Your question, yes.

11        MR. KLOCK:  Again, my question is this, unless you

12   disagree with me:  It appears to me that there are repeated

13   instances where there are video clips of police officers

14   engaging in conduct which creates criticism of their

15   activities.

16        My question to you is, do you believe that there has

17   been a change in police conduct more recently or, in the past,

18   there might have been the same degree of police misconduct or

19   police activity, whether it's misconduct or not, but simply not

20   known about because it hadn't been recorded?

21        MR. BASCO:  Same objection, Your Honor.

22        THE COURT:  Overruled.

23        You may answer.

24        PROSPECTIVE JUROR:  I agree with you.  I agree that it

25   has been going on; it's just been overlooked.

1          MR. KLOCK:  Okay.  And then one final question, if I

2    could, and then I'd ask the panel the same question.

3          THE COURT:  This is your last question, Mr. Klock.

4          MR. KLOCK:  Yes, ma'am.

5          Do you believe that young African-American males are

6    treated differently by police officers than non-

7    African-American males would be?

8          MR. BASCO:  Objection, Your Honor.  Pretrial relevance.

9          THE COURT:  Can we approach, please?

10         Just hold that thought, Ms. Wilson.

11         (Sidebar discussion held as follows:)

12         THE COURT:  Is this based on the fact that wasn't

13   asked?

14         MR. BASCO:  What's been before the jury is allegation

15   of police misconduct, which is not a part of this case and the

16   situation of current news and affairs, like a pharmacy-type

17   shooting, or an officer has attacked somebody, that's the

18   conduct which is not relevant to this specific case.

19         Now the question becomes an emotionally based

20   misconduct question, which there's no allegations for this in

21   this case and no allegation of misconduct.  And to bring it up

22   is to taint this jury from their ability to see.

23         MR. KLOCK:  I don't believe I asked "misconduct."  I

24   believe they were --

25         MR. HUNNEFELD:  "Misconduct" is very specific; he did.

1    I objected to that.

2        THE COURT:  That's why I said "rephrase."

3        I think what you are trying to say, and I could

4    be wrong -- but I understand where he's coming from.  We don't

5    have an allegation in this case that Mr. Smart was physically

6    abused.

7        Your allegation is that the process was abused by the

8    law enforcement officers.

9        MR. KLOCK:  Let me just be clear about it because I do

10   a lot of criminal pro bono work, okay?  And my experience has

11   been that the number of black kids that are arrested in

12   Overtown -- and not necessarily beaten -- the number of black

13   kids arrested in Overtown is different than the white kids

14   arrested in my neighborhood for the same kind of crimes.

15       I don't believe that there's a higher number, a higher

16   percentage of kids smoking weed in Overtown than smoking weed

17   in my neighborhood, but I'm just talking --

18       THE COURT:  In other words, here, it's not necessarily

19   as visible, if I'm --

20       MR. KLOCK:  Well, it's not as visible if you don't have

21   the same concentration of people around looking for it, that's

22   true.

23       THE COURT:  I know where you're going, but it sounds as

24   if this may be a case about physical abuse.

25       MR. KLOCK:  No.  I haven't suggested that, no.

```
 1            THE COURT:  And if it's not, we can rephrase in some
 2    way.
 3            MR. BASCO:  Same objection.  What he's now elicited is
 4    racial bias of the criminal justice system.
 5            THE COURT:  I think that is an appropriate question for
 6    voir dire, which is where we are; what are our jurors'
 7    mindsets, how are they going to feel.
 8            Mr. Smart is an African-American plaintiff who was
 9    arrested by a policeman.
10            We now know at least one juror thinks when you get
11    arrested, you're wrong, period.
12            MR. BASCO:  I understand that, Judge.  It was not based
13    on a race answer; it was based on the authority.
14            THE COURT:  That's why we do voir dire follow-up, and
15    then let's move on.
16            MR. HUNNEFELD:  He was arrested and --
17            THE COURT:  Do you feel you can do your voir dire
18    before we take a recess?
19            MR. HUNNEFELD:  Excuse me?
20            THE COURT:  Do your 15 minutes of voir dire before a
21    recess.
22            (Sidebar discussion concluded and the following
23    proceedings were held in open court:)
24            MR. KLOCK:  The question I have --
25            THE COURT:  Mr. Klock, just for the record, because we
```

```
 1   have a request from one of our potential jurors, you're going

 2   to finish your question and then we're going to take a comfort

 3   break, okay?

 4           MR. KLOCK:  Yes, ma'am.

 5           THE COURT:  All right.

 6           MR. KLOCK:  This is my question.

 7           Does anyone here feel that African-American males are

 8   treated differently by police officers than

 9   non-African-American males?  Say, males between the age of 14

10   and 30 are treated differently by police officers than white

11   kids or black kids would be treated by police officers, anybody

12   feel that way?

13           Does anyone feel they're not treated differently?

14           The ones who feel that they're not treated differently.

15           PROSPECTIVE JUROR:  They're not treated differently.  I

16   don't think so.  As I told you before.  Unless there is a

17   suspicion for some action, it's what I think.  Even with the

18   Latins, because I am Latin.  I think that we are treated the

19   same.  I never have been stopped by a police for DUI because I

20   don't drink when I drive, so.  This is what I think.

21           MR. KLOCK:  Judge, thank you, ma'am.

22           THE COURT:  Thank you, ladies and gentlemen.  We're

23   going to take a 15-minute -- approximately a 15 minute break.

24           MR. KLOCK:  There was a question from one of the

25   jurors.
```

```
 1          THE COURT:  I'm sorry, ma'am, did you have something?
 2          COURT SECURITY OFFICER:  Stand up.
 3          THE COURT:  Can we get the microphone back there?
 4          PROSPECTIVE JUROR:  Now, when you made your first
 5   questions about whether the videos had -- you know, that the
 6   behavior of the police has been different or the behaviors are
 7   more popular nowadays, you said any in the panel think that's
 8   the way?  I agree with you.
 9          I think the misconduct probably existed always, but
10   only recently anybody have access to a video camera.
11          MR. KLOCK:  Thank you.
12          THE COURT:  All right.  Thank you very much.  We're
13   going to go for a 15-minute break.
14          I am going to allow all of our jurors -- except
15   Ms. Rizo, if you remain in the courtroom for me, please.
16          There are restrooms located outside.  Mr. Blanford and
17   Ms. Herrer will show you where they are.
18          All rise.  We will be back outside.
19          Ladies and gentlemen, before you go, please look around
20   you.  You may see the individuals seated here in court outside
21   the courtroom.  They're going to ignore you, and it's not
22   because they're rude or they were raised by wolves; they just
23   know that it's my admonition to them that they're not to talk
24   to you except in my presence.
25          All rise for the ladies and gentlemen of the jury.
```

```
 1              Ms. Rizo, just stay right there.

 2              PROSPECTIVE JUROR:  Okay.

 3              (Prospective jurors exited courtroom at 11:25 a.m.)

 4              (One prospective juror remained in courtroom.)

 5              THE COURT:  Counsel, for those of you who have had an

 6    opportunity to view Ms. Rizo's juror sheet, I am going to have

 7    Mr. Blanford escort her into our jury room for the next few

 8    minutes and then she will come back and join the rest of the

 9    jurors.  All right?

10              (Prospective juror entered jury room.)

11              MR. HUNNEFELD:  Thank you.

12              MR. KLOCK:  Yes, ma'am.

13              THE COURT:  We'll be back in 15 minutes.

14              MR. KLOCK:  Your Honor, we're free to leave?

15              THE COURT:  Just as an admonition, in case I forget, I

16    will ask that you use the restrooms on the floor above and the

17    floor below so the jurors can be on this floor and be secure.

18              MR. HUNNEFELD:  Thank you, Your Honor.

19              (Recess taken from 11:24 a.m. to 11:46 a.m.)

20              COURTROOM DEPUTY:  All rise.  Court is back in session.

21    Please come to forward.

22              THE COURT:  All right.  All of our jurors are ready.

23    Are you ready, Mr. Hunnefeld?

24              MR. HUNNEFELD:  I'm ready.

25              MR. BASCO:  There's one question -- I will wait for
```

1    Mr. Napoleon to come back.  I brought it up to him.

2            THE COURT:  Mr. Napoleon, there's an issue?

3            MR. BASCO:  Not so much an issue, Judge.

4            During my voir dire, I'm going to ask a question about

5    the possibility, if they see bloody photos and homicide

6    photos -- sometimes it's objected to as pre-trying -- but I

7    want to get it out there, that they're going to have to see

8    this, who's comfortable seeing these kind of things.

9            THE COURT:  I don't have a problem.

10           Do you have a problem with it, Counsel?

11           MR. KLOCK:  I don't see the relevance of it, but it's

12   up to them.

13           THE COURT:  Okay.

14           (Prospective jurors entered courtroom at 11:49 a.m.)

15           THE COURT:  Welcome back, ladies and gentlemen.  You

16   may be seated.

17           Counsel for the defendant, you may inquire.

18           MR. BASCO:  Thank you, Your Honor.

19           Once again, my name is Nick Basco and I'm an Assistant

20   City Attorney representing the City of Miami today.

21           The good news is that I'm the last person asking

22   questions and this should be the last round.

23           Let me start out by going back to your questionnaires,

24   you filled out a questionnaire that asked about your newspaper

25   or magazines that you read regularly, but I want to change that

```
 1    a little bit.
 2            With today's technology, a lot of newspapers, a lot of
 3    magazines, we don't read so much.  So, I want to ask people
 4    about news programs.
 5            By a show of hands, how many people watch regularly
 6    CNN?  I'm going to call this "the box."
 7            See, raise your hand again.  I'm sorry.
 8            This is juror number ten.  That's it?
 9            Juror number three, thank you, sir, Mr. Brown.
10            And in the back, we have jurors number 18 and 23.
11    Thank you.
12            How many --
13            PROSPECTIVE JUROR:  CNN, you say?
14            MR. BASCO:  Regularly.  That's juror number 19.
15            THE COURT:  Counsel, just for the record when you have
16    your back turned from the microphone, we can't hear you.
17            MR. BASCO:  Sorry, Judge.
18            Let me ask the question again.  MSNBC, who regularly
19    watches MSNBC.
20            Mr. Hogan, juror number ten; number 12; number two.
21    And in the back we have Ms. Spittler, number 19; and number 18.
22            How about Fox News, we'll start first in the box here.
23    That's jurors number 7, number 5, number 3, and number 1.
24    Juror number 9, 13.
25            Anybody else?  Going once, going twice.
```

```
 1            I got you, Mr. Montanez, number 10.  In the back,
 2     number 18.  Anybody else in the box?
 3            How many get predominantly from local news, normal news
 4     mostly?  Your local channels.
 5            That's jurors number 1, 12, perfect.  Number 3, 14, 15,
 6     16.  And in the back, jurors number 17, 25 and 23.
 7            Thank you very much for that.
 8            One of the other questions I had was not traditionally
 9     a newspaper, but how many people read the Miami New Times, or
10     any other kind of New Times for any other counties?
11            Start first in the box, first number 3.
12            And in the gallery we have number -- I'm sorry, grab my
13     cheat sheet again -- number 22, 18, 17 and 25.
14            Thank you very much.  Okay.
15            How many people -- let's first start in the box -- live
16     in the City of Miami, the boundaries of the City of Miami?  1,
17     4, 7, 10, that's it.
18            In the gallery, City of Miami?  A couple more there:
19     We've got 17, 18, 19.  Okay.
20            Does anybody, first in the box, when I say
21     "City of Miami," have a preconceived notion of whether it's a
22     good thing or a bad thing that you're going to hear from
23     witnesses from the City of Miami?
24            Anybody have a preconceived idea of what you expect
25     when you hear from somebody from the City of Miami?  Nobody?
```

1           Anybody in the gallery?  Nobody.

2           And that's a good thing.  What you do with any witness

3    that comes up here is, they're going to take an oath similar to

4    the one you took earlier, and they're going to say what their

5    story is, and it's your decision whether they're telling the

6    truth, some of the truth or none of the truth.  And the truth

7    is called credibility.  And these are the things you're going

8    to do as jurors, you're going to determine are they credible

9    and is what they're saying an actual fact?

10          So, it's a very good thing that everyone keeps

11   everybody on even keel.

12          Ms. Galler, juror number 4, you previously served on a

13   jury; is that correct?

14          PROSPECTIVE JUROR:  Yes.

15          MR. BASCO:  You said state.  Was that criminal or

16   civil?

17          PROSPECTIVE JUROR:  You'll have to tell me when I tell

18   you what the case was, okay?

19          MR. BASCO:  Was it kind of like a criminal charge: a

20   burglary, robbery theft?  No.  It was something to do with

21   money?

22          PROSPECTIVE JUROR:  It was a vehicular accident with

23   some special twists to it.

24          MR. BASCO:  So that could be a little bit of both.  So

25   this is actually a good thing.

1           There's different standards -- and you can put the mic

2    down.

3           There's different standards, and I want to get to those

4    because there's a lot of people that are on criminal juries and

5    a lot of people on civil juries.

6           So if you were on a civil jury, does anybody want to

7    volunteer what the standard was that you need to make findings

8    for in a criminal case?  Does anybody remember?

9           Mr. Hogan, you cheat so I'm not going to ask you, you

10   have too much experience.

11          Anybody in the back?  Nobody?

12          Okay.  I'll go ahead and tell you.

13          In a criminal case, you have to make a finding beyond

14   and to the exclusion of every reasonable doubt.  A very high

15   standard.

16          Here, as the Judge told you earlier, the standard is

17   preponderance, which she's going to tell you later is greater

18   weight.

19          So beyond a reasonable doubt and to the exclusion of

20   every reasonable doubt.  Lower than that, preponderance, the

21   greater weight of the evidence.

22          But there's also another phrase you're going to hear

23   and to know if anybody's heard this, first in the box:

24   Probable cause.  Other than Mr. Hogan, and juror number 14,

25   Ms. Wilson, who works a lot.

```
 1              Mr. Mejia, juror number 9.  Let me pass that mic over
 2    to you real quick.  When I say "probable cause," what does that
 3    mean to you?
 4              PROSPECTIVE JUROR:  That it probably happened.
 5              MR. BASCO:  Probable.  Probably.  That's kind of a nice
 6    way to say it, okay.
 7              Anybody else in the gallery.  We have a couple of hands
 8    in the back.  I'm sorry, I'm making the marshal run.
 9              Juror number 22, Ms. Axelson, what does "probable
10    cause" mean to you?
11              PROSPECTIVE JUROR:  Means that there is a suspicion or
12    an idea of something where action was required, either by a law
13    enforcement officer, so there was some sort of reasoning or
14    suspicion that caused him to take action.
15              MR. BASCO:  Okay.  I like that definition.  And the one
16    part I want to talk about is reason.
17              What we're going to talk about is reasonable.  Okay?
18    Reasonable belief is probable cause.  And the Judge will give
19    you instruction on that later.
20              So again, we have to prove beyond and to the exclusion
21    of every reasonable doubt; preponderance; and then, after that,
22    we have probable cause, so a reasonable belief.
23              Everybody understand when I say "reasonable belief"
24    that a crime has been committed?  Everyone understands that in
25    the box?  Everyone understands that in the gallery?  Okay.
```

```
 1              COURT SECURITY OFFICER:  Counsel I believe she had --
 2              MR. BASCO:  Do you have a question or a comment?
 3              No, we're good.
 4              One of the things I want to talk to you about is
 5    evidence.  I know a lot of people have seen crime shows.  Some
 6    real, some not so real.  Some people said they watch "Law &
 7    Order," "CSI," some people said they watch documentaries, the
 8    real crime shows.
 9              In this case you may see photographs of a crime scene.
10    You may see photographs of deceased victims.  You may see
11    photographs of blood and injuries.  And I want to go row by row
12    and make sure that, as a juror, you're willing to sit and look
13    at those photographs.
14              There are some people that say, "Do you know what?  I
15    can't look at them, it's too much for me.  I just -- I get
16    sick.  I get woozy.  I don't want to look at that stuff."  But
17    it will be imperative that you take in all the facts in this
18    case, including those photographs.
19              So in the box, in the first row, jurors one through
20    seven, is there anybody here that feels uncomfortable with
21    seeing that kind of graphic images?
22              Nobody on one through seven.
23              Let's go to the second row, 8 through 16 in the box:
24    Anybody, 8 through 16, say, "I don't want to do it, I can't
25    look at that kind of grotesque evidence?"
```

```
 1              Okay.  This is juror 12, Mr. Thakker?

 2        PROSPECTIVE JUROR:  Yes.

 3        MR. BASCO:  Mr. Thakker, what are you thinking of when

 4   I tell you those kinds of graphic images?

 5              What's the problem that you see coming up?

 6        PROSPECTIVE JUROR:  I have a very hard time looking at

 7   dead bodies or anything that has blood-related stuff.

 8        MR. BASCO:  In order to sit on this jury, you would

 9   have to look at that.  And the judge will give you an order to

10   look at all of the evidence.

11              Do you think that you could be a fair and impartial

12   juror and look at all the evidence, knowing that you're going

13   to see that kind of bloody stuff?

14        PROSPECTIVE JUROR:  Probably not.

15        MR. BASCO:  Next was juror number 15.  I'm sorry, my

16   handwriting's horrible.  Is that Ms. Madeira?

17              Madison.  I'm sorry.

18        PROSPECTIVE JUROR:  Madison, yes.

19        MR. BASCO:  Ms. Madison, if I showed you photographs

20   like that, what effect is it going to have on you?

21        PROSPECTIVE JUROR:  I will get queasy.

22        MR. BASCO:  You will get queasy?

23        PROSPECTIVE JUROR:  I will.

24        MR. BASCO:  Is that something that you would be able to

25   get over -- knowing that you're going to see it, does that help
```

1    you at all?

2         PROSPECTIVE JUROR:  When you said it, I automatically

3    knew that I was going to get queasy.  It just came to mind.

4         MR. BASCO:  So if you were selected as a juror, will

5    you be able to look at these photographs in order to make a

6    decision?

7         PROSPECTIVE JUROR:  I don't think I'd be able to look

8    at it too long; I think I will get sick.  I'm just being

9    honest.

10        MR. BASCO:  I appreciate that.  Thank you very much.

11        Ms. Rizo, did you raise your hand?

12        PROSPECTIVE JUROR:  No.

13        MR. BASCO:  Anybody else in the box or the gallery?

14   The hands have shot up real fast.

15        COURT SECURITY OFFICER:  One more.

16        MR. BASCO:  Juror number one, yes, sir?

17        PROSPECTIVE JUROR:  Depending on what I'm going to see,

18   I don't know exactly if I will be able to handle it or not.

19        MR. BASCO:  Is there a certain level that you can

20   handle or are you just saying blood alone is going to be a

21   problem for you?

22        PROSPECTIVE JUROR:  It depends on how much blood, if

23   they're deceased.  Depends how graphic it gets.

24        MR. BASCO:  I can't tell you how to describe it.

25        PROSPECTIVE JUROR:  I will probably get queasy and want

1       to throw up.

2               MR. BASCO:  You would probably throw up?

3               PROSPECTIVE JUROR:  Right.

4               MR. BASCO:  Well, we don't want you to throw up on her

5       shoes.  So thank you very much for your honesty of that.

6               Let's go back into the gallery now.

7               Juror number 17, Ms. Wilson?  What can you tell me,

8       Ms. Wilson?  You made your face already.  You're making me

9       nervous.  What would happen if you saw those kind of photos,

10      would you be able to look at those, as a juror?

11              PROSPECTIVE JUROR:  Not really.  It's like general dead

12      people, I get really scared.  Like, every time somebody dies, I

13      do this real quick and I have nightmares when I go to sleep.

14              MR. BASCO:  Have you had nightmares in the past over

15      homicides?

16              PROSPECTIVE JUROR:  Yes.

17              MR. BASCO:  Have you ever seen a dead body before.

18              PROSPECTIVE JUROR:  Yes, I have.

19              MR. BASCO:  If -- when I'm talking about dead bodies in

20      this case, is that at all going to bring up dead bodies in that

21      old case for you?

22              PROSPECTIVE JUROR:  It all depends on how my head goes

23      when I'm sleeping.  I don't know, like, everything like comes

24      back and I just try to shake it off, but I can't.

25              MR. BASCO:  How long ago did you have that incident

```
 1   when it messed with you?

 2           PROSPECTIVE JUROR:  Like three months ago.

 3           MR. BASCO:  Three months ago?

 4           PROSPECTIVE JUROR:  Yes.

 5           MR. BASCO:  Thank you very much.  You can pass it on to

 6   the next juror, juror number 19.

 7           PROSPECTIVE JUROR:  Eighteen, Alicia.

 8           MR. BASCO:  Thank you.

 9           PROSPECTIVE JUROR:  I think the only difficulty for me

10   would be, my dad passed away a few years ago, and I was the one

11   in the room with him.  So the dead body, he was in the hospital

12   for quite a while, the physical stuff, blood and things.  So

13   that's still a bit of an emotional thing for me, so I'm not

14   sure how I would do with that.

15           MR. BASCO:  Okay.  And I appreciate the response.

16           Does it at least calm you a little bit knowing that

17   you're going to see something like that, in the way you're

18   prepared for it, does that help you at all?

19           PROSPECTIVE JUROR:  No, not really.

20           MR. BASCO:  Not really.

21           PROSPECTIVE JUROR:  It makes me start thinking about

22   it, it sort of brings back bad memories of.

23           MR. BASCO:  Are you going to be able to -- if the judge

24   asked you to serve as a juror, be able to put that out of your

25   mind and worry only about the facts in this case?
```

1          PROSPECTIVE JUROR:  I will try my best.

2          MR. KLOCK:  You will try your best.  You're saying it's

3     a possibility you couldn't?

4          PROSPECTIVE JUROR:  Like it makes me nervous, just dead

5     bodies and stuff.  It was a really, really bad experience in

6     the hospital.

7          I mean, he passed away when I was in the room.  So the

8     whole dead body thing is very difficult.

9          MR. BASCO:  Thank you very much.

10         And next looks like Ms. --

11         PROSPECTIVE JUROR:  Nineteen.

12         MR. BASCO:  Nineteen, yes.

13         PROSPECTIVE JUROR:  I will be very uncomfortable.  I

14    would go over those pictures very fast.

15         MR. BASCO:  Very fast?

16         PROSPECTIVE JUROR:  Yes.

17         MR. BASCO:  But you would be able to look at them?

18         PROSPECTIVE JUROR:  I will try my best.

19         MR. BASCO:  Let me give you sort of an idea.

20         Say, the photograph, you need a question answered that

21    the photograph's going to answer, would you go back and look at

22    the photograph or are you going to say, "Do you know what?  I'm

23    not even going to answer that question because it's too much

24    for me to look at."

25         PROSPECTIVE JUROR:  If it's necessary for me to look at

1    it in order to make the right decision?

2            MR. BASCO:  Yes.

3            PROSPECTIVE JUROR:  I would overcome that.

4            MR. BASCO:  Thank you very much.

5            Anybody else in the gallery?  One more, number 22

6    again.  Yes?

7            PROSPECTIVE JUROR:  It would make me very

8    uncomfortable.  And not to get into specifics because I

9    understand you can't disclose anything, but especially if it

10   were children or women, that makes me very uncomfortable and

11   probably very, very quick to look at pictures.

12           MR. BASCO:  I think the natural reaction is that it

13   makes you uncomfortable, it's going to make you want to look at

14   it quick.  But my question is one step further.

15           Can you get past all that queasiness and

16   uncomfortableness and be able to look at it to make a decision

17   in this case?

18           PROSPECTIVE JUROR:  I think my objectivity would be

19   limited.

20           MR. BASCO:  Would be limited.  Okay.  Thank you very

21   much.

22           Anybody else in the gallery?  This is juror number 25.

23           PROSPECTIVE JUROR:  Every time I see blood or I see a

24   person that's dead, my mother-in-law, I see her constantly in

25   the pool of blood that we found her in.

1          MR. BASCO:  How long ago was that?  That was eight --

2          PROSPECTIVE JUROR:  Yeah, eight years ago.

3          MR. BASCO:  That's the situation we talked about

4    before?

5          PROSPECTIVE JUROR:  Uh-huh.

6          MR. BASCO:  I appreciate that.  Thank you.

7          THE COURT:  Counsel, you have three minutes.  Three

8    minutes.

9          MR. BASCO:  This is my last opportunity.  Does anybody

10   have anything that you think, "Do you know what?  I should have

11   told Mr. Basco this, I should have told Mr. Hunnefeld and

12   Mr. Klock, I need to say something."

13         And this is juror number 11, Mr. Hogan.

14         PROSPECTIVE JUROR:  I just wanted to be clear.  There

15   was a question about --

16         COURT SECURITY OFFICER:  One minute.  Thank you, sir.

17   All right.

18         THE COURT:  Thank you, Mr. Blanford.

19         Thank you, Mr. Hogan.

20         PROSPECTIVE JUROR:  The judge asked a question about

21   the Medical Examiner's Office, which I understood to mean

22   people today in the Medical Examiner's Office.  And I don't

23   know anyone there.

24         But between 1985 and 1993, I supervised all homicide

25   prosecutions in Dade County, so obviously I worked with the

1    Medical Examiner's Office on a regular basis.

2            MR. BASCO:  I understand.  One of the names they read,

3    I don't know if you heard it before, was Mark Shuman.  I'm not

4    sure if he's been there that long.  Doesn't ring a bell?

5            PROSPECTIVE JUROR:  No.

6            MR. BASCO:  Thank you very much.

7            Anybody else in the box have -- Do you know what I

8    should have told you this?  In order to sit as a fair and

9    impartial juror, you should know this about me.

10           Anybody in the box, first row?

11           Yes, juror number one.

12           PROSPECTIVE JUROR:  I'm going back before -- I don't

13   know his name, he went up there he was asking, Mr. Klock --

14           MR. BASCO:  Mr. Klock?

15           PROSPECTIVE JUROR:  He was talking about the unfairness

16   and what's going on with the police officers.

17           I believe that it has intensified both verbally and

18   physically.  It was never recorded before.  I've experienced it

19   before.  I've actually -- a prior job that I had when I got out

20   of high school, I used to be a court reporter digitally for the

21   Public Defender's Office, so I got to sit in, swore in officers

22   and I used to take the depositions.  I would actually see the

23   images and I would hear things.  And when the officer would

24   leave, I would also hear, you know, the excessive abuse that

25   was used.

1          MR. BASCO:  Let me ask you this, now sitting here

2     talking about this case, this sort of brought this up in your

3     mind, right?

4          PROSPECTIVE JUROR:  Correct.

5          MR. BASCO:  Are you going to be able to put those

6     thoughts out of your mind when we talk about this case?  Are

7     you going to base your decision only on the facts and evidence

8     presented on the witness stand and not take into consideration

9     anything you looked at in that position?

10          PROSPECTIVE JUROR:  It's not only with that, but also

11     my experiences with the police officers.

12          My best friend happens to be an African-American, and

13     I've been in the car where I've seen situations where I feel

14     were out of line or were taken incorrectly.

15          MR. BASCO:  What it sounds like you're telling me is

16     that you're going to take your personal experiences into

17     consideration in this case?

18          PROSPECTIVE JUROR:  Correct.

19          MR. BASCO:  And it's going to affect your ability to be

20     fair and impartial?

21          PROSPECTIVE JUROR:  Correct.

22          MR. BASCO:  Thank you very much.

23          Anybody else in the box, first row?  Second row on the

24     back?

25          Ms. Madison, again, I can read my handwriting this

```
 1   time, it was juror number 15.

 2           PROSPECTIVE JUROR:  Yes, I also want to just piggyback

 3   off of that.  I do feel that it's something that has been

 4   occurring.  It's just now --

 5           MR. BASCO:  So this is something that you've been

 6   thinking about while we're talking about this case?

 7           PROSPECTIVE JUROR:  Yeah.

 8           MR. BASCO:  So if I have a police officer go up and

 9   testify, the concern that you have, are you going to be

10   thinking about that even though it may not be involved in this

11   situation?

12           PROSPECTIVE JUROR:  No, I want to be totally impartial.

13   I don't -- but it is something that I do agree with, that it

14   has been something that's always gone on and it has been

15   increased.  And it's only been increased because people are now

16   capturing it.

17           MR. BASCO:  I understand.

18           If you would consider that, wouldn't you want to see

19   facts in evidence about that?

20           PROSPECTIVE JUROR:  Absolutely.

21           MR. BASCO:  If you don't see facts in evidence about

22   that, are you going to automatically assume that that fact is

23   probably out there; you just didn't hear about it because you

24   know about a prior situation?

25           PROSPECTIVE JUROR:  It could be.  I -- but I would
```

```
 1    really have to just hear everything.

 2          MR. BASCO:  Right.  So what I'm saying is, you've heard

 3    everything.

 4          PROSPECTIVE JUROR:  Yeah.

 5          MR. BASCO:  There's no testimony to that whatsoever,

 6    but you, in the back of your mind, remember the situation.  Is

 7    that going to affect your decision in this case even if you

 8    haven't heard any evidence of that?

 9          PROSPECTIVE JUROR:  I'm sorry, that really --

10          MR. BASCO:  Let me try and rephrase it a little bit.

11          You're going to hear only the evidence and make

12    decisions based on the evidence that's being presented.  You

13    don't have any similar evidence to any of those situations

14    you're concerned about.

15          PROSPECTIVE JUROR:  Okay.

16          MR. BASCO:  You're asked to make a verdict decision in

17    the back.  Now, no evidence has been presented about that, but

18    are you going to go, "Do you know, I remember this other

19    situation; I know we didn't have it here, I remember that."

20          Is that going to affect your decision in this case?

21          PROSPECTIVE JUROR:  No, because if it's not a factor in

22    this case.

23          MR. BASCO:  Anybody else, in the box?  Anybody in the

24    gallery, first row?  Anything I need to hear?  Anything I need

25    to know.
```

```
1              Juror number 22.

2              PROSPECTIVE JUROR:  Hi.  Currently, I work at Fusion

3    Media Network.  But prior to that I have 12 years of legal

4    experience working with litigators.

5              MR. BASCO:  In what facility -- in a law firm?

6              PROSPECTIVE JUROR:  At a law firm, correct.  At

7    multiple law firms.

8              MR. BASCO:  Which law firms?

9              PROSPECTIVE JUROR:  Welbaum Guernsey; Cozen O'Connor;

10   Sanchelima & Associates, Michael Palahach, P.A.

11             MR. BASCO:  Is that mostly commercial work?

12             PROSPECTIVE JUROR:  It's actually a variety.  At

13   Sanchelima, it was intellectual property; At Welbaum Guernsey,

14   it was construction litigation, family and civil; at Cozen

15   O'Connor, it was aviation products mal, products liability

16   insurance defense and med mal; and for Mr. Palahach, it was

17   personal injury and med mal.

18             MR. BASCO:  Okay.  Anything from that experience that

19   is going to change your ability to be fair and impartial in

20   this case?

21             PROSPECTIVE JUROR:  No, I believe it will inform it,

22   but I don't necessarily think that it will prevent

23   impartiality.

24             MR. BASCO:  Thank you very much.

25             Anybody else in the first row?
```

```
 1              Anybody else in the back row?

 2              Thank you very much, everybody.

 3              Thank you, Judge.

 4              THE COURT:  Ladies and gentlemen, before we get to the

 5    next phase, I have one other question or series of questions to

 6    ask you.

 7              All of you were told that this is a civil case and that

 8    the burden is on the plaintiff.

 9              In any trial, you are the judges of the facts; that

10    means you decide which witnesses to believe, and which

11    witnesses not to believe based upon the instructions.

12              Does everyone understand that, if you're selected as a

13    juror in this case, you would be the judges of the facts?

14    Please raise your hand if you understand that.

15              It gets harder from here.

16              Now, as to the law, I, as the judge, will give you

17    instructions on the law.

18              Do you all understand that, if you're selected as

19    jurors in this case, you must follow my instructions on the

20    law?  If you understand that, please raise your hand.

21              Once again, the easy part.  Here's the hard part.

22              Do you also understand you must follow my instructions

23    on the law even if you disagree with them?  Even if you

24    disagree with them.  If you understand that, please raise your

25    hand.
```

```
1              Now, juror number one, did I see your hand go up?

2     Would you be able to follow my instructions on the law even if

3     you disagree with me?

4              PROSPECTIVE JUROR:  Yes, I would, but it would make me

5     uncomfortable.  I wouldn't want to agree with something if I

6     don't agree with it.  I'm being honest.

7              THE COURT:  Thank you very much.

8              Anyone else says, I know what you said, Judge, but

9     you're not the boss of me?

10             Thank you very much, ladies and gentlemen.

11             If you would step to the hallway, I'll ask you back in

12    probably another ten to 15 minutes.

13             All rise for the Ladies and Gentlemen of the Jury.

14             (Prospective jurors exited courtroom at 12:12 p.m.)

15             THE COURT:  All right.  Counsel, once the door is

16    closed, you may all be seated and I'm going to start with

17    counsel for the plaintiff.

18             Do you have any challenges for --

19             MR. HUNNEFELD:  Your Honor, could we have just three

20    minutes to talk amongst ourselves?

21             THE COURT:  Three minutes.  Three minutes.

22             Counsel for Mr. Smart.

23             MR. BASCO:  Judge, do you mind if I remain seated

24    during this?

25             THE COURT:  No.  We all remain seated.
```

```
 1              MR. BASCO:  Thank you.

 2              MR. NAPOLEON:  Your Honor, do you mind if I stand?

 3              THE COURT:  If you'd like.

 4         I'm going to start with the challenges for cause from

 5    the plaintiff.

 6              MR. KLOCK:  Your Honor, we have the names in groups.

 7    First point would be anybody who says that they're more

 8    inclined to believe a police officer because they're a police

 9    officer we believe is cause.  And our list of that is two --

10              THE COURT:  Well, why don't we start, just give me one

11    at a time and their numbers, juror numbers.

12              MR. KLOCK:  Two, six, seven and 18.

13              THE COURT:  What's your second group?

14              MR. KLOCK:  Second category are people who think you

15    don't get arrested unless you did something wrong.  That's

16    four -- I'm sorry -- five, six, seven, 18.

17              THE COURT:  What was it, four --

18              MR. KLOCK:  I'm sorry, Your Honor, 5, 6, 7 and 18.

19              MR. BASCO:  Hold on, I'm sorry, 5, 6, 7, 18.

20              THE COURT:  What's your next group?

21              MR. KLOCK:  Judge, with respect to number 25, I

22    don't --

23              MR. BASCO:  We have a stipulation on that.

24              MR. KLOCK:  There's something seriously wrong there.

25              THE COURT:  Juror number 25?
```

1          MR. BASCO:  Judge, it's our murder-suicide, has

2     flashbacks of her mother-in-law's bloody body, when we talked

3     to her.

4          MR. KLOCK:  The waves of anger come forward.  She's an

5     extremely unhappy person.

6          Though, are causes, Judge, are two, five, 6, 7 and 18.

7          And then, Judge, also -- I apologize --

8          THE COURT:  Two, 5, 6, 7 and 18.

9          MR. KLOCK:  And then there's one third category, Judge,

10     that we did not raise, and I apologize; and that is, anyone who

11     does work for the City of Miami.

12          MR. BASCO:  There wasn't any.

13          MR. KLOCK:  Sure.  John Hogan's firm does work for the

14     City of Miami.

15          And also -- who else?  Cole Kissane.

16          MR. BASCO:  I'm sorry, Judge.  Juror number 16, Ms.

17     Rizo, Cole Scott & Kissane, there is some relationship with the

18     City of Miami.  However, she works for an attorney and I have

19     as co-counsel on one case and a plaintiff's counsel in another

20     case, Mr. Esco, so there is a link between --

21          THE COURT:  Go back to her.

22          The people that you say have relationships with the

23     City of Miami are?

24          MR. KLOCK:  I think just John Hogan, Your Honor, and

25     Ms. Rizo.

```
 1          THE COURT:  Mr. Hogan is juror number 11.

 2          MR. KLOCK:  Eleven, Judge.

 3          THE COURT:  And Ms. Rizo is juror number 16.

 4          So in other words the defense is asking to excuse, 2,

 5    5, 6, 7, 18 and 25.

 6          MR. KLOCK:  Twenty-five is by stipulation, and 11 and

 7    16.

 8          MR. HUNNEFELD:  That's plaintiff, Your Honor.

 9          THE COURT:  Defendant, what's your challenges for

10    cause?

11          MR. BASCO:  Judge, I would like to be heard on some of

12    those.  But my cause challenge is juror number 1.

13          THE COURT:  Okay.

14          MR. BASCO:  Juror number 11, I'll echo that as well.

15    Jurors number 12, 14, and 15, as well as jurors number 17, and

16    18.

17          THE COURT:  I'm going to go -- what's the cause

18    challenge for Ms. Wilson?

19          MR. BASCO:  Ms. Wilson recognizes one of the officers

20    in the case.  She has an ongoing working relationship.  She

21    says she remembers the name Mr. Bosch and would recognize him

22    more if she saw his face.  The danger is if he's allowed to

23    testify and takes the stand, it clicks at that point, and all

24    of a sudden we lose a juror.

25          MR. KLOCK:  Judge, I disagree with that, and I also
```

```
 1    don't think that's adequate to show it's race neutral.

 2            THE COURT:  What was 12?

 3            MR. BASCO:  Mr. Thakker, he's unable to look at the

 4    photographs.  He would get queasy.

 5            I asked, like I did with everybody else, If you're

 6    instructed to and need to, and he said, I'm not comfortable

 7    doing it.

 8            THE COURT:  And 15?

 9            MR. BASCO:  Fifteen, Judge, she gave me the same

10    ambivalence with the photographs, whether she could look at

11    them or not.  She also had a --

12            THE COURT:  Wouldn't you worry more about people who

13    said, you know, I just can't wait to look at bloody murder

14    photographs?

15            MR. BASCO:  Judge, there's a difference.  There's a

16    willingness.

17            THE COURT:  I mean, those are the people who I'd really

18    want to have a conversation with, maybe with one of our expert

19    psychological witnesses.

20            MR. BASCO:  You'd have to put me on the same list.

21    That's what I've done for most of my career.  I do get excited

22    when I get to work those kind of cases.

23            THE COURT:  All right.

24            MR. KLOCK:  Your Honor, if I may also --

25            THE COURT:  Let's be -- I'm going to start out with
```

1    counsel for defendant.

2          Of the list that the plaintiffs gave, are any of

3    those -- other than juror number 11, Mr. Hogan, and juror

4    number 25, are there any others that you agree on?

5          MR. BASCO:  Judge, I think we agreed number 18.

6          MR. KLOCK:  Eighteen.

7          THE COURT:  Ms. Nogueira, who's name I am murdering?

8          MR. BASCO:  We all tend to do that, Judge.

9          THE COURT:  N-O-G-U-E-I-R-A.

10         MR. BASCO:  Judge, I would agree with 18.  She had a

11    problem with the photographs as well.  She was unable to do it.

12          And juror number 7, I won't put up a fight for,

13    Judge.

14          So that's 11 -- I'm sorry, 7, 11 and 18 that we

15    agreed on.

16         THE COURT:  So 7, 11, 18 and 25, you agree on?

17         MR. BASCO:  Yes, Judge.

18         THE COURT:  Okay.  You disagree on two, Mr. Barreto?

19         MR. BASCO:  Yes, Judge.  Give me one second.

20          Mr. Barreto, I did not hear -- the rationale for the

21    cause is that he would believe police officers more because

22    they're simply police officers.  I don't remember him making

23    that statement, Judge.

24          There was -- that was the question asked of juror

25    number 7, which is why I did not fight number 7.  I think that

```
 1    was the question asked of her.
 2           I think juror number 6 may have indicated that she
 3    agreed, but that's the only one that I have.  I did not have
 4    Mr. Barreto.
 5           THE COURT:  So that's 2.  What's your issue with 5?
 6           MR. BASCO:  Judge, the question was asked generally,
 7    if -- I think what counsel's trying to get at is, are you going
 8    to assume that because they were arrested that they did
 9    something wrong?  That's not the way it was phrased.
10           She said you would think that if they were under
11    arrest, there was some reason for it.  I think that's what she
12    said, and what jurors number 5 and 6 both said the same thing.
13           Judge, it was a reasonable link between them being
14    arrested and having done something, which is a logical
15    conclusion.  It wasn't said, "Are you going to presume that
16    because they're under arrest, they have done something, without
17    considering the facts?"
18           That's the question that should have been asked.
19           MR. KLOCK:  And, Your Honor, my problem is in my
20    experience, okay, there isn't a rational connection between
21    being arrested and having done something wrong.  But the fact
22    of the matter is that the clear import of their answer is that
23    if somebody's arrested, they did something wrong.  It falls in
24    the same category of the people who think the police are always
25    right, which also doesn't square with my experience.
```

```
 1                THE COURT:  One at a time.

 2                Five and 6 are together on that issue.

 3                Two -- all right.

 4                Mr. Klock what about 12, 14 and 15, who are the

 5      defendants?  I think those are all your bloody photograph

 6      people.

 7                MR. KLOCK:  If you want to knock them out, Judge,

 8      that's okay with me.  I don't understand the significance of

 9      the bloody photographs anyway.

10                Hold a second.  I'm sorry.

11                MR. BASCO:  Twelve and 15 were the photographs.  Number

12      14 was Bosch and her relationship with officers.

13                THE COURT:  Okay, Counsel, we know this grows out of a

14      murder investigation.  There's no doubt that there were two

15      people who were murdered.

16                MR. KLOCK:  Hold on for one second.

17                Did 14 -- no, 14 did not have a problem with bloody

18      photographs.  It was the lady to her right.

19                MR. BASCO:  I agree, Judge, that's not what I said.

20                Number 14 is the relationship with police officers from

21      the City of Miami, and that she also believes that she knows

22      Detective Bosch, who's a witness in this case.

23                MR. KLOCK:  Well, if what they're saying is that anyone

24      who has a relationship with a police officer in the

25      City of Miami should be stricken for cause --
```

1          MR. BASCO:  Yes.

2          MR. KLOCK:  We don't want to lose Ms. Wilson.  But if

3     that's the point they're making and everybody who has a

4     relationship with the City of Miami police officers be stricken

5     from the panel, that's okay with us.

6          MR. BASCO:  Well, if there's somebody else that has a

7     connection with a listed witness who's going to testify, then I

8     would be glad to agree to with those as well.

9          MR. KLOCK:  Your Honor, all she said was that she knew

10    Bosch.  Okay?  And that she would recognize him.  And I think

11    we have a problem there.

12         You have a higher hurdle because it also has to be race

13    neutral.  And I don't think that's an adequate race neutral

14    reason to strike that lady.

15         THE COURT:  These are the jurors that I'm thanking and

16    excusing.

17         MR. KLOCK:  If I may make one point before Your Honor

18    speaks?

19         THE COURT:  Mr. Klock?

20         MR. KLOCK:  Juror number 1 that they wanted to strike,

21    I think before we determine whether or not he should be

22    stricken, he should be asked by the Court whether or not he

23    could put his bias aside and be fair.

24         That question was not asked by counsel.  And we're all

25    advocates, I understand why.  But the fact of the matter is

1 that for anyone to take the position that they believe that

2 African-American males are treated exactly the same as

3 everybody else, it's sort of a departure from reality.

4       To ask that man that he is supposed to completely set

5 aside all of his life experiences for purposes of being on the

6 jury is not the issue.

7       If police officers don't wish to be judged badly about

8 how they treat a certain class of people, they shouldn't do it.

9 But the important point for the Court is to determine whether

10 or not he can be fair and put aside his views on that and

11 listen to the evidence.  That's the question.  That question

12 was not asked.

13       The fact that he had an experience where he was with an

14 African-American who was treated badly by a police officer when

15 he wasn't is not a reason to disqualify him from being on the

16 jury.

17       MR. BASCO:  Judge, I'm glad Mr. Klock brings that up

18 because that wasn't the reason why I moved for cause.  I moved

19 for cause based on his belief that he cannot look at the

20 photographs.

21       That is another exact reason why I asked him

22 specifically, in consideration of the facts and the evidence in

23 this case, is that going to impede on your judgment in this

24 case?  And he said yes.  I don't think it's much clearer for

25 that.

```
 1            THE COURT:  The following jurors will be considered
 2    excused for cause:  Juror 11, juror 7, juror 16, juror 18,
 3    juror number 25, and juror 1.
 4            MR. BASCO:  Judge, I apologize, you didn't ask me about
 5    juror number 17.  That was the young lady that had the
 6    nightmares from a dead body she saw three months ago and would
 7    not be able to see photographs.
 8            THE COURT:  Was she on your list?
 9            MR. BASCO:  Yes, Judge.  That was one of the ones I
10    mentioned.
11            MR. KLOCK:  We would agree on that.  I would agree on
12    that, Judge.
13            THE COURT:  All right.  I'll strike juror number 17.
14            All right.  Starting with plaintiff, starting with the
15    juror seated in seat number two, Mr. Barreto, accept or reject?
16            MR. KLOCK:  Reject.
17            THE COURT:  Counsel for plaintiff, juror number 3,
18    accept or reject?
19            COURTROOM DEPUTY:  For the defense.
20            THE COURT:  For the defense, I'm sorry.
21            MR. BASCO:  Accept.
22            THE COURT:  Counsel for plaintiff, accept or reject
23    juror number 3?
24            MR. KLOCK:  Strike.
25            THE COURT:  Remember, you only have three.
```

```
 1            MR. KLOCK:  I know.  Thanks, Judge.

 2            THE COURT:  Plaintiff, juror number 4, Ms. Galler.

 3            MR. BASCO:  Judge, we will use our first perempt.

 4            THE COURT:  No.  That would go back to Mr. Klock.

 5            MR. BASCO:  Plaintiff's.  I'm sorry, Judge, I'm jumping

 6    ahead.  I apologize.

 7            MR. KLOCK:  Your Honor, you're waiting on plaintiff,

 8    correct?

 9            THE COURT:  Yes.

10            MR. KLOCK:  I'm sorry, what happened with four?  I

11    didn't catch it.

12            THE COURT:  Four is you.  You're the first one on four.

13    We alternate sides.  You're the first one up on Ms. Galler.

14    Accept or reject?

15            MR. KLOCK:  Excuse me one second.

16            We accept 4.

17            THE COURT:  Defendants, Ms. Galler, accept or reject?

18            MR. BASCO:  Reject.  I move to strike number 4.

19            THE COURT:  Number 5, Ms. Klaassens, accept or reject?

20            MR. BASCO:  Accept.

21            THE COURT:  It was an accept.

22            MR. BASCO:  Accepted, that's right.

23            THE COURT:  Plaintiffs, accept or reject Ms. Klaassens?

24            MR. HUNNEFELD:  Yes, Your Honor.

25            THE COURT:  You're accepting Ms. Klaassens?
```

```
1              So that's juror number one.

2              Back to defense, Ivan.

3              COURTROOM DEPUTY:  Back to plaintiff.

4              THE COURT:  Plaintiff, excuse me, Mr. Klock, juror

5   number 6, accept or reject?

6              MR. KLOCK:  Strike.  That's our last one, Judge, we

7   know.

8              COURTROOM DEPUTY:  Yes.

9              THE COURT:  That's your last one.

10             Counsel for defense, you have two remaining challenges.

11             Accept or reject juror number 8?

12             MR. BASCO:  Accept.

13             THE COURT:  That's juror number two.

14             Accept or reject juror number 9, that will be juror

15  number 3.

16             MR. BASCO:  We accept.

17             THE COURT:  Mr. Montanez, juror number 10?

18             MR. BASCO:  We accept.

19             THE COURT:  Juror number 12, accept or reject?

20             MR. BASCO:  We'll accept number 12, Judge.

21             THE COURT:  Juror number 5.

22             Ms. Garcia, juror number 13, accept or reject?

23             MR. BASCO:  Accept.

24             THE COURT:  Lakesha Wilson, accept or reject?

25             MR. KLOCK:  We have six.
```

```
 1              THE COURT:  I usually pick eight.  That way, you know,

 2   in civil cases, Federal Court, I need at least six to

 3   deliberate, not more than 12, so we don't strike anybody.

 4              MR. BASCO:  Judge, we'll reject number 14.

 5              MR. KLOCK:  We ask for a race-neutral reason,

 6   Your Honor.

 7              MR. BASCO:  Previously stated, Judge.

 8              THE COURT:  For Ms. Wilson?

 9              MR. BASCO:  Yes, Judge.

10              THE COURT:  Just for the record, so we can have it at

11   this point, Counsel.

12              MR. BASCO:  Judge, she stated during her testimony that

13   she may recognize Officer Bosch as someone she worked with.

14   Officer Bosch is listed by the plaintiff in this case and will

15   testify.  She additionally said that she worked with a number

16   of City of Miami officers in a number of criminal cases, and

17   that she had testified only last week.

18              THE COURT:  I will strike Ms. Wilson.

19              Ms. Madison, juror number 15?

20              That would be your last challenge if you use it.  Have

21   they used three, Ivan?

22              MR. BASCO:  That was our second, Judge.

23              THE COURT:  So Ms. Madison, you have one more

24   remaining, accept or reject?

25              MR. BASCO:  Judge, we reject Ms. Madison.
```

```
 1              THE COURT:  Seven would be juror number 19.

 2              COURTROOM DEPUTY:  Yes.

 3              THE COURT:  And eight would be juror number 20.

 4              Juror number 1 is Ms. Klaassens; juror number 2 is

 5    Ms. Arias; juror number 3 is Mr. Mejia; juror number 4 is

 6    Mr. Montanez; juror number 5 is Mr. Thakker; juror number 6 is

 7    Ms. Garcia; juror number 7 is Ms. Spittler; and juror number 8

 8    is Ms. Gopaul.

 9              All right.  Mr. Blanford, if you could bring them back

10    in and I'm going to send them to lunch.

11              It's now 12:40.  I'll give them an hour for lunch and

12    then we'll come back for opening statements.

13              MR. KLOCK:  And Your Honor indicated you're going to

14    4:45, correct?

15              THE COURT:  Probably around that time, yes.

16              MR. KLOCK:  Okay.

17              (Prospective jurors entered courtroom at 12:40 p.m.)

18              THE COURT:  Welcome back, ladies and gentlemen.  Please

19    take your same seats.

20              Ladies and gentlemen, you may be seated.

21              When I call your -- are we missing one?  Thank you,

22    Mr. Blanford.

23              (Prospective juror entered courtroom.)

24              THE COURT:  When I call your juror number, please

25    stand.  When I call your juror number, please stand.
```

1          Juror number 5; juror number 8; juror number 9; juror

2    number 10; juror number 12; juror number 13; juror number 19;

3    and juror number 20.

4          If I did not call your name, if I did not call your

5    name, please return to the jury assembly room.  Please return

6    to the jury assembly room.

7          COURTROOM DEPUTY:  That's on the fifth floor.

8          (Prospective jurors excused at 12:42 p.m.)

9          COURTROOM DEPUTY:  Ms. Klaassens, you are now juror

10   one.  Take your seat.

11         Ms. Arias, you're juror number 2.

12         Mr. Mejia, you're juror number 3.  Take the third seat

13   here.

14         Mr. Montanez, you're juror number 4.  Take the fourth

15   seat.

16         Mr. Thakker, you're juror number 5.

17         Ms. Garcia, you're juror number 6.

18         Ms. Spittler, you're juror number 7.  Take this last

19   seat here in the front row.

20         And Ms. Gopaul, you're juror number 8.  You can just

21   sit in the back row wherever you want.

22         THE COURT:  Ladies and gentlemen, you may be seated.

23         Counsel, we have our jury.

24         Now, ladies and gentlemen, before we go to the next

25   phase of our trial, I'm going to allow you and all of our

1    lawyers and the rest of us to have a break for lunch.

2         I'm looking at the clock.  It's about 12:45.  I'm going

3    to ask that you be back in the jury room ready to start no

4    later than 2:00, no later than 2:00.

5         Here are some things that I need you to remember during

6    the next hour and 15 minutes.

7         First of all, as I've said before, look around the

8    courtroom.  The lawyers, the people that work with them are

9    going to ignore you.  They're not going to have any

10   conversation with you, except here in our presence.

11        Second, if you have on your juror badges while you are

12   in the courthouse, please wear them.  That, once again, lets

13   everyone know and connected with the case know, that you are a

14   juror and they're not supposed to talk to you.

15        However, if you decide to leave the courthouse, just

16   drop it in your pocket or purse and put it back on when you

17   come in.

18        There is a snack bar, cafeteria, something, food, where

19   you can get food on the seventh floor.  You're welcome to use

20   it.

21        Once again, I want to remind for any of you, if you are

22   regular users of social media, Facebook, Tumbler, Twitter,

23   Snapchat, something that I don't even know about because some

24   12-year-old in Silicon Valley is inventing it right now, you

25   cannot use it to discuss your jury service.  You want to

```
 1   discuss something else on it, you're fine.

 2        If you need to inform your employers or your family

 3   where you are, you merely need to say that you're on jury duty

 4   in Federal Court, and Ivan can give you anything else that you

 5   need in terms of employer letters or other information.

 6        I want to thank you very much from taking time in your

 7   busy lives for jury service, and I'll see you all back in an

 8   hour and 15 minutes.

 9        Mr. Blanford's going to show you out so you'll know

10   where to come when you come back from lunch and where the jury

11   room is.

12        Thank you very much.  All rise for ladies and gentlemen

13   of the jury.

14        (Jury exited courtroom at 12:45 p.m.)

15        THE COURT:  All right.  Counsel, when we return, I'll

16   be swearing the jury and giving them their preliminary

17   instructions, and you should be ready for opening statements.

18        Counsel for the plaintiff, you should have witnesses

19   ready to go at that time.

20        Mr. Klock?

21        MR. KLOCK:  Your Honor, for the record, I want to make

22   an objection to the jury.  The defendant struck or moved to

23   have disqualified every person of color from the venire.  So

24   therefore, my client, who is African-American, is about to have

25   a trial with respect to his race decided by eight white people.
```

 1   And it's not reflective of the community, and I believe it's a

 2   basic flaw of the fundamental constitutional rights that he

 3   has, to have a jury of his peers.

 4        THE COURT:  Well, I'm only going by who I can observe

 5   as present in the box, Mr. Klock.

 6        Mr. -- I believe it would be -- the first

 7   African-American juror, on observation, would be juror number

 8   14, Ms. Wilson; correct?  Am I wrong?

 9        MR. KLOCK:  I'm seeing the people of color -- I believe

10   one of the other jurors was a person of color.

11        THE COURT:  That's what I'm saying, help me.  Tell me

12   who else you think was --

13        MR. KLOCK:  I'm sorry, you're talking about

14   numerically?  14.

15        THE COURT:  All right.

16        MR. KLOCK:  And then was it 16?  Fifteen, also a person

17   of color.

18        THE COURT:  Fifteen was the juror who said that she

19   would get physically ill if she viewed any pictures of blood.

20        MR. KLOCK:  Well, Judge, that may be, in which case she

21   should be given a bucket.

22        The fact of the matter is, is that, as Your Honor

23   pointed out, you know, with the exception of counsel who

24   apparently works in those kind of cases and likes them, the

25   issue is whether or not my client can get a fair trial from

```
 1    eight white people.  That's the issue.  It's not reflective of

 2    this community.

 3              THE COURT:  And I have to look at the standard that the

 4    court has given me for striking of jurors; and that is whether

 5    or not counsel for the City gave me race-neutral reasons for

 6    the jurors who, on appearance, appear to be African-American.

 7              MR. KLOCK:  So then let -- I'm sorry.

 8              THE COURT:  The first one -- if I'm wrong, correct me.

 9    The first one would have been Ms. Wilson, juror number 14; am I

10    incorrect?

11              MR. KLOCK:  That's correct.

12              THE COURT:  Okay.  Who would be the next juror after

13    that?

14              MR. KLOCK:  Fifteen.

15              THE COURT:  Fifteen.  All right.  She was the juror who

16    had the issue.

17              And then, unfortunately, I don't believe there's any

18    other --

19              MR. BASCO:  Juror number 17, Judge, was struck by

20    agreement by both parties.

21              MR. HUNNEFELD:  She was the one with nightmares,

22    Your Honor.

23              THE COURT:  That's Ms. Wilson, the juror who has family

24    in Ocala.  There was agreement on that juror.

25              MR. KLOCK:  Well, here's the problem we have, Judge.
```

```
 1              THE COURT:  What I'm saying is, the problem may be in

 2    the venire, not in the selection.

 3              MR. KLOCK:  Well, Judge, I think there's two problems.

 4    One problem is the venire, and the other problem is the

 5    selection.  Okay?

 6              Ms. Wilson, okay, is stricken because she recognizes

 7    Detective Bosch; yet other people on the jury pool who had

 8    relatives, brothers, brothers in law, bosom buddies who are

 9    cops --

10              THE COURT:  But they're not going to testify,

11    Mr. Klock.

12              MR. KLOCK:  But, Your Honor, the fact that she

13    recognizes somebody doesn't mean that she can't judge their

14    testimony.

15              THE COURT:  She specifically named -- usually in cases

16    if someone is acquainted with a witness in more than a

17    peripheral way, we don't usually allow their testimony.

18              MR. KLOCK:  But isn't that peripheral, Judge?

19              THE COURT:  Well, but this is the testimony -- excuse

20    me, the statements from Ms. Wilson as I recall them:  That she

21    is presently a child protective investigator.

22              MR. KLOCK:  Right.

23              THE COURT:  That she very often works with the police

24    department, including homicide officers, in investigating child

25    death cases.  She recognized Detective Bosch's name, but
```

```
 1    candidly admitted "I wouldn't know" -- "I would need to see him

 2    to be sure."

 3         Now, if I were to follow -- and I'm not saying that

 4    this venire is our most diverse; but if I follow your logic, I

 5    would have to wait until or if Detective Bosch shows up, then

 6    inquire of Ms. Wilson, "Is this the person you know," then

 7    strike a person from the panel who sat here for three or four

 8    days when she should be -- if she's not going to perform jury

 9    service, be out protecting kids from being harmed.

10         MR. KLOCK:  Well, Your Honor, I appreciate the Court's

11    sensitivity.  But my problem is, my client is now going to be

12    tried by eight white people in a community that's 20 percent

13    black.  Okay?  And if the problem is -- and perhaps the entire

14    venire has to be struck and we have to start out from scratch.

15    But the fact of the matter is, is that one of the ways that

16    could be solved is to have an alternate juror picked and then,

17    if Bosch comes and she knows Bosch, to strike him.

18         But my problem, Judge, is, I have eight very white

19    people.

20         THE COURT:  I'm looking at the panel.  The other

21    African-American, as I'm looking by observation only -- the

22    record should be clear I'm going by observation only -- the

23    jurors who appeared to be African-American are jurors number

24    14, juror number 15, juror number 17.

25         MR. BASCO:  Twenty-three.
```

```
 1              THE COURT:  Mr. Patrick.

 2              MR. KLOCK:  Well, in her case she gave very specific

 3    reasons as to why she was concerned.  But --

 4              THE COURT:  And you agreed.

 5              MR. KLOCK:  That's correct.  But the other lady, Judge,

 6    all she said was that it made her queasy and it would be

 7    difficult.

 8              Well, I would hope so.  It makes me queasy looking at

 9    them, too.

10              MR. NAPOLEON:  And as my colleague just pointed out, 5

11    said exactly the same thing, and she was okay, they picked her.

12              MR. BASCO:  I didn't have 5.

13              MR. KLOCK:  Your Honor, all I care about is, there's

14    eight white people judging this case.

15              THE COURT:  And defense also accepted her.  Juror

16    number 5.

17              You struck Mr. Barreto.  You struck Mr. Brown.

18              MR. KLOCK:  Neither of whom are black.

19              THE COURT:  No, but I'm saying, you used your

20    challenges.

21              MR. KLOCK:  But, Judge -- I don't want to fight with a

22    Federal judge.

23              THE COURT:  But -- no, you're not fighting.

24              But what I'm saying is, at some point in time -- this

25    is not a situation where, due to unavailability of peremptory
```

```
 1    challenges and --

 2              MR. KLOCK:  You have a flawed panel.

 3              THE COURT:  Your objection is noted and preserved for

 4    the record.

 5              MR. KLOCK:  Thank you, Judge.

 6              THE COURT:  I'll see everyone back in an hour.

 7              MR. KLOCK:  Thank you, Your Honor.

 8              THE COURT:  And it's considered preserved for any

 9    further motions in connection with this case.

10              MR. KLOCK:  I'm sorry, Judge?

11              THE COURT:  And I said, considered preserved for any

12    further motions in connection with this case.

13              MR. KLOCK:  Thank you, Your Honor.

14              (Lunch recess taken from 12:54 p.m. to 2:18 p.m.)

15              COURTROOM DEPUTY:  All rise.

16              THE COURT:  We're ready to start.  The rule's invoked.

17              (Jury entered courtroom at 2:20 p.m.)

18              THE COURT:  Welcome back, ladies and gentlemen.  Please

19    take your seats as directed.

20              Jurors, I'm going to ask that you remain standing for

21    the oath.

22              COURTROOM DEPUTY:  Please raise your right hands.

23              Do you swear or affirm that you will well and truly try

24    the issues in the case before the court and render a true

25    verdict according to the law and the evidence given to you by
```

1    the Court, so help you God?

2           (All jurors responded in the affirmative.)

3           COURTROOM DEPUTY:  Thank you.  You may be seated.

4           THE COURT:  Good afternoon, ladies and gentlemen.

5           Members of the jury, it will be your duty to find from

6    the evidence what the facts are.  You, and you alone, are the

7    judges of the facts, and you will then have to apply the

8    facts -- the law to the facts as I give them to you.

9           You must follow the law whether you agree with it or

10    not.  I will decide all questions of law and procedure that may

11    arise during the trial.  Nothing I may say or do during the

12    course of the trial is intended to indicate or should be taken

13    by you as indicating what your verdict should be.

14           The evidence from which you will find the facts

15    consists of the testimony of the witnesses, documents and other

16    things received into the record as exhibits, and any facts the

17    lawyers agree to or stipulate to or that I instruct you to

18    find.

19           The exhibits will be available for your review but you

20    will not have a transcript of the testimony.

21           Certain things are not evidence and must not be

22    considered by you, and I will list them for you now.

23           Statements, arguments and questions by the attorneys

24    are not evidence.  Objections to questions are not evidence.

25    The attorneys have an obligation to their clients to make

1  objections to evidence that they think is inappropriate or

2  improper under the rules of evidence.

3      You should not be influenced by the objection or my

4  ruling on it.  If an objection is sustained, ignore the

5  question.  If it is overruled, treat the answer like any other.

6      If you are instructed that some item of evidence is

7  received for a limited purpose only, you must follow that

8  instruction.  Testimony that I have excluded or told you to

9  disregard is not evidence and must not be considered by you.

10      Anything you may have seen or heard outside this

11  courtroom is not evidence.  You are here to decide this case

12  solely on the evidence presented here in court.

13      During the course of the trial, it may be necessary for

14  me to confer with the attorneys to hear certain legal

15  arguments.  I will try to keep these so-called sidebars to a

16  minimum.  The noise that I have to make with that little thing

17  will let you know why I keep it to a minimum.

18      There are two kinds of evidence, direct and

19  circumstantial.

20      Direct evidence is direct proof of a fact, such as the

21  testimony of an eye witness.

22      Circumstantial evidence is proof of facts from which

23  you may infer or conclude that other facts exist.

24      I will give you instructions on these as well as other

25  matters at the end of the case.  But keep in mind, you may

1      consider both kinds of evidence.

2            You may take notes during the trial if you wish.  In

3      fact, I think there were notebooks on your chairs when you came

4      back out just now.

5            If you decide to take notes, please don't get so

6      involved in your note-taking that you're not listening to the

7      evidence.  Any notes that you take are simply aids to your

8      memory and are not entitled to any greater weight than your

9      recollection of what the testimony was.

10           It will be up to you to decide which witnesses to

11     believe, which witnesses not to believe, and how many of any

12     witness's testimony to accept or reject.  And I will give you

13     guidelines for determining the credibility of the witnesses at

14     the end of the trial.

15           As I mentioned earlier, this is a civil case.

16           The plaintiff has the burden of proving his case by

17     what is called a preponderance of the evidence.  This means the

18     plaintiff has to produce evidence which, considered in light of

19     all the facts, lead you to believe that what the plaintiff

20     claims is more likely true than not.  To put it differently, if

21     you were to put the plaintiff's and defendant's evidence on

22     opposite sides of the scale, the plaintiff would have to make

23     the scale tip somewhat on their side.

24           Those of you who sat in criminal cases will understand

25     that this is a different burden of proof.

1          Now, a few words to your conduct as jurors.

2          First, I instruct you that nothing -- that during the

3   trial you are not to discuss this case with anyone or permit

4   anyone to discuss it with you.  Until you retire to the jury

5   room to begin your deliberations, you are simply not to talk

6   about this case.

7          Second, don't read or listen to anything outside this

8   courtroom in any way about this case.  If anyone other than

9   those lawyers in the courtroom while we're in court attempts to

10  talk to you about this case in any way, bring it to my

11  attention immediately.

12         Third, don't try to do any research on your own.

13  Everything you're going to learn about this case or need to

14  know you will learn in this courtroom.

15         And fourth, ladies and gentlemen, keep an open mind.

16  Keep an open mind until you start the deliberations in this

17  case.

18         Now, the trial is going to begin in just a moment, and

19  let me give you some words about the order of the case.

20         First, the plaintiff will have an opportunity to make

21  an opening statement.  Remember, an opening statement is

22  neither evidence nor argument; it is an outline of what the

23  party intends to prove and is offered to help you follow the

24  evidence.  Then the defendant, if they choose, may make an

25  opening statement.

```
 1              After the opening statements, the plaintiff will

 2    present his witnesses and the defendant may cross-examine them.

 3              Then the defendant will present its witnesses and the

 4    plaintiff may cross-examine them.

 5              The plaintiff may elect to put on a rebuttal case.

 6              After the evidence is presented, the parties will make

 7    their closing arguments to summarize and interpret the evidence

 8    for you.  And the evidence (sic) themselves, once again, are

 9    not evidence.  And at the conclusion of the testimony and the

10    arguments, I will give you instructions on how to begin your

11    deliberations.

12              Counsel for the plaintiff, your opening statement,

13    please.

14                    PLAINTIFF'S OPENING STATEMENT

15              MR. NAPOLEON:  May it please the Court, Your Honor.

16              Good afternoon, ladies and gentlemen of the jury.  My

17    name is Hilton Napoleon, along with Mr. Joseph --

18              THE COURT:  Mr. Napoleon, you're going to need the

19    wireless mic.

20              MR. NAPOLEON:  -- along with Joseph Klock and Miguel

21    Morel, we have a privilege and an honor of representing

22    Mr. Taiwan Smart.

23              This case has a lot of facts, but it's quite simple

24    what happened.

25              The evidence is going to show that the City of Miami
```

1    used its most important Governmental function, the function to

2    protect and serve its citizens; it used the department that is

3    the most heavily funded in the City, which is the police

4    department; and it used its most important unit within that

5    department, the homicide department, and they turned it into a

6    stage production.

7            The evidence is going to show that the City of Miami

8    entered into a contract with "The First 48", and the evidence

9    is also going to show that the City of Miami was one of the

10   major spots for "The First 48."  They contracted with them.

11   They said this is the place that we want to be.

12           The City of Miami allowed its homicide officers to

13   stage scenes, to cooperate with producers and in even some

14   instances be compensated.  They were compensated so that they

15   could promote the show.

16           On the one hand, you have people who are wanna-be

17   stars.  They even put it in their production or they put it in

18   their booklets or pamphlets that they handed out to the general

19   public, We are stars.  And whenever you have a situation where

20   you have people who are wanting to be stars who are --

21           THE COURT:  Excuse me, Counsel.  Can you hold that mic

22   up?  I don't think we can hear you.

23           MR. NAPOLEON:  Whenever you have a situation where you

24   have people who are promoting themselves as stars, who are

25   really supposed to be investigating homicides, it's a collision

1    course for disaster.

2           And ladies and gentlemen of the jury, the evidence is

3    going to show that my client's life was a disaster after that.

4           Let me introduce you to Mr. Smart.  But before I do

5    that, before I introduce you to Mr. Smart, let me tell you who

6    he is.

7           Mr. Smart was born and raised in Miami-Dade County,

8    Florida.  When he was a kid, he bumped from shelter to shelter,

9    apartment to apartment.  He didn't grow up in a great home.

10          As a matter of fact, while he was in high school, he

11   dropped out in the eleventh grade to go work at places like

12   Subway and other fast-food restaurants, to put food on the

13   table.

14          Now, the City of Miami did not train its homicide

15   officers whatsoever during this production.  Okay?

16          According to the person who has the most knowledge who

17   is -- at that point she was a sergeant, and that's who they

18   designated as the person with the most knowledge; she said that

19   they were told to cooperate with "The First 48."  And her

20   understanding was that if "The First 48" is allowed and -- if

21   she's allowed to be there, "The First 48" is allowed to be

22   there.  There were no boundaries whatsoever.

23          Now, back in 2009, Mr. Smart's mom had become evicted

24   from her apartment unit.  Okay?  So Taiwan was lucky enough to

25   find a friend who had a mother that would let him stay in an

1    efficiency.  Okay?

2         At this particular point in time, Taiwan was living

3    with his mother, his uncle, his, I believe, 12-year-old sister

4    and six-year-old brother at the time; five people in all.

5         So the efficiency that Taiwan was supposed to move into

6    was really a bedroom that was converted.  I want to give you a

7    perspective of how large this particular unit was that he found

8    for his family as opposed to moving to a shelter.

9         You see these tiles right here?  They're two-by-two.

10   Okay?  Two, four, six, eight, ten, twelve.  Two, four, six,

11   eight, ten, twelve.  Five people.

12        Ladies and gentlemen of the jury, you have more space

13   than what those five people had at that particular point in

14   time.  They were supposed to sleep there.  They were supposed

15   to bathe there.  They were supposed to cook there.  In this one

16   bedroom, there's a refrigerator, there's a stove, and there's

17   also a makeshift bathroom.  There was no space.

18        And Taiwan got sick of his family moving in and out of

19   apartments, being homeless, and he wanted the best decision for

20   his family.  So Taiwan said I won't be there.  Do you know why?

21   They had to take -- the toilet wasn't even working.  There was

22   no running water.  They used to pour buckets that they would

23   get from outside from a neighbor to flush the toilet.

24        He didn't want to add to that, so instead of doing

25   that, instead of forcing his family to be living in a worse

1    situation by having another individual there who wouldn't even

2    fit, he moved out.

3         Now, Taiwan had a friend from the neighborhood; his

4    name is Jonathan Volce.  Mr. Volce had an apartment not too

5    much bigger than the space I just described was the living room

6    area; but there was a one bedroom, there was a designated

7    kitchen and there was a bathroom.  And there was somewhere for

8    Mr. Smart to lay his head.

9         Mr. Smart knew that Mr. Volce sold marijuana out of

10   that apartment.  He admits it right now.  He told the police

11   that from the beginning.  Okay?  There's no doubt about it

12   whatsoever.  But he moved anyway because he figured that that

13   was the best thing for his family to do.

14        Mr. Smart was in the process of moving back -- or I'm

15   sorry, moving to New Jersey because he had met a young lady up

16   there; and around Halloween he moved back and went back to the

17   apartment with Jonathan.

18        On November 13th, 2009, Mr. Smart's life changed

19   forever.  On that particular day, Mr. Volce was on the phone

20   with the young lady.  There's another individual in the house

21   named Nathan Ray.  A customer knocked on the window to purchase

22   marijuana.  Mr. Smart had been sleeping the entire day.

23        Mr. Volce asked Mr. Smart, Can you go get the window?

24   Mr. Smart looked at him with the impression, you know that's

25   not what I do.  But Mr. Volce said, You haven't done anything

1    all day.

2         Mr. Smart felt pressured because he was living there

3    for free.  He answered the window.  Mr. Smart walked over,

4    pulled the curtain back, the person on the other side said, Can

5    I have marijuana?

6         Mr. Smart said, Where's your money?

7         The guy asked again, Can I have marijuana?

8         Mr. Smart said, Where's your money?

9         All of a sudden, a second individual popped up from out

10   of nowhere.  Mr. Smart was startled and he figured that they

11   were about to be robbed; so as the person popped up, Mr. Smart

12   fell back.

13        The next thing, boom, boom, boom, boom, gunshots.

14        Mr. Smart ran out the back of the apartment, and at

15   that particular point in time, he thought that his buddies were

16   going to follow.  But, unfortunately, which you'll see later,

17   is that his buddies were unable to follow.

18        Mr. Smart ran out of the back of the apartment and he

19   went to a house.  He actually went to several houses trying to

20   get somebody to call 9-1-1.

21        Now, what you'll see today, you'll see Mr. Smart

22   describe in great detail exactly what he did.  Okay?  Mr. Smart

23   is going to come over here.  He's going to sit right on this

24   stand.  He's going to raise his hand, swear to tell the truth,

25   the whole truth and nothing but the truth.  He's going to tell

1    you exactly what happened.  He's going to tell you exactly how

2    it happened.

3           And what I want you all to look for is to see how he

4    explains these things.  He explains it the exact same way that

5    he described it to the police back in 2009.  There isn't going

6    to be anything different.  Your job is to judge the

7    credibility.  Your job is to listen to what he says and

8    determine whether or not you believe him.

9           The evidence will show that Mr. Smart was telling the

10   truth, and you'll have an opportunity to do it, to decide that.

11          I can't even, as I was trying to prepare, describe to

12   you in detail what happened.  He can do it.  I don't want to

13   try to do that.  I want to give you all an opportunity to hear

14   it from him.  Okay?

15          Mr. Smart ran away, and he went to several people.  And

16   he's going to describe to you exactly what he did, how he did

17   it, what he did it, just as he described it to the police.

18          Mr. Smart is also going to tell you that the people who

19   he went to told him, based on their experience, that if you go

20   and tell the police what happened, you're going to be arrested.

21          And the evidence will show that he went and he told the

22   police what happened, and he got arrested.

23          Those people were right.  Everybody kept telling him,

24   Don't go to the police, don't go to the police.

25          At that point in time, he was already in the area.  He

 1   heard and he actually sent people to see if his friends were

 2   okay, and he knew that what happened to them.

 3         The police arrive.  Before they arrive, what do they

 4   do?  They call "The First 48.".  call them on the phone, Hey,

 5   we have a homicide over here, want to come by.

 6         And at that point the clock starts ticking.

 7         And for those of us who may have seen the show and know

 8   what the show is about -- which you will have an opportunity to

 9   do -- they want to get leads within "The First 48" hours.  And

10   that creates -- the evidence will show -- a large amount of

11   pressure on the City and on those officers who are trying to

12   investigate.

13         The first person that they talked to when the police

14   arrived was a young lady by the name of Ciara Armbrister who

15   was actually kind of a girlfriend to Jonathan Volce.  She lived

16   in the same row of apartments that Mr. Volce and Mr. Smart was

17   living at the time.  I believe she lived in Apartment Number 2,

18   they lived in Apartment Number 5.

19         I'm not going to go into every single detail, but the

20   most important parts that Ms. Armbrister told the police is

21   that Jonathan Volce, the guy who was selling marijuana out of

22   the unit, was nervous since Halloween because somebody was out

23   to get him.  Okay?  And that somebody was somebody who he was

24   involved in a fight with, and there were rumors in the

25   neighborhood that those people were trying to come after

1    Jonathan.

2         Jonathan told Ciara Armbrister that he had to lay low.

3         Now "lay low" does not mean, the evidence will show,

4    that he was afraid of Mr. Smart.  Okay?

5         As a matter of fact, the evidence will show that what

6    Ms. Armbrister actually said to the police -- and I'll come

7    back to that later -- is that they never argued, they never

8    fought.  They were closest of friends.

9         So the police interview Ms. Armbrister.  The first

10   people that she assumes were involved were the people that he

11   had a fight with.  The police are pressuring her because she

12   actually went into the apartment, she had blood on her feet,

13   and they were trying to determine, put a little bit of pressure

14   on her, you could see that they didn't really believe what she

15   was saying.  So then she describes an incident, or fussing,

16   which the police turn into an argument or describe as an

17   argument between Mr. Volce, Mr. Smart and a Spanish guy.

18        The Spanish guy was a customer.

19        Ms. Armbrister told the police that she heard Taiwan

20   fussing or Jonathan fussing with the Spanish guy, and she later

21   heard Taiwan say specifically, "That's between you-all.  I

22   don't have anything to do with that.  It's between Jonathan and

23   the Spanish guy; I'm not involved."

24        What really happened, and the evidence will show, is

25   that the Spanish guy was trying to convince Taiwan, who was not

1    involved in Mr. Volce's activities other than the fact that he

2    admittedly covered the window for him when he was asked to do

3    so, "That's not me.  I don't have anything to do with that."

4    Okay?

5              She said it.  That's what she told the police.  The

6    police later spinned it into something else for the show, but

7    you will see that that's what she said.

8              So the second individual that Mr. -- I'm sorry --

9    Ms. Armbrister accused was the Spanish guy.  She actually said,

10   "Okay, maybe it was the Spanish guy who did it.  I didn't

11   actually see what happened.  I know that there was an argument.

12   I know" -- I'm sorry -- there was fussing is what she actually

13   said.  But maybe it's the Spanish guy.  So that's number two.

14             Number one is the people who were looking for him.

15   Number two is the Spanish guy.

16             The police, "I don't believe you.  You're holding

17   something back."

18             Then there's TY, Taiwan Smart, who's commonly referred

19   to as TY.

20             She told the police that she never seen Mr. Smart argue

21   with Mr. Volce, and that they were the best of friends.

22             But after the police sat there and pressured her, hours

23   and hours and hours on end, she said, "Maybe Taiwan had

24   something to do with it, because when I walked in there and I

25   found them on the floor, I thought that I would see Taiwan,

```
 1    too."

 2          So what did the police do?  They ignored the first

 3    thing she said, ignored the second thing she said, and focused

 4    on somebody who she could actually identify so that they could

 5    get more leads.

 6          Now, the police call crime scene in.  And the evidence

 7    is going to show that the crime scene took over 50 pieces of

 8    DNA and fingerprints.  And the evidence is going to show that

 9    for 19 months while Mr. Smart sat in jail, they didn't test any

10    of it.  They didn't do anything with it.

11          The clock is still ticking.  The city employees, the

12    police department, they're staging scenes, they're -- as you're

13    going to see in "The First 48" video, at one point

14    Detective Sanchez, who's the lead detective, his tie looks one

15    way, and then another point it looks a different tie, and it's

16    the same supposed situation.  They were staging it.

17          You'll also hear Detective Sanchez, his marathon thing;

18    a homicide is like a marathon.  And he's saying all these other

19    things that in the video that you're going to see looks like

20    he's saying it at the particular time it's happening, but, in

21    reality, it happens at a different point.

22          The clock is still ticking.  They go to Taiwan's mom's

23    house.  Now, at this point, Taiwan still believes that people

24    are going to try to do something to him because he may have

25    information about what happened to his two friends.  Okay?
```

1          So the police go to Taiwan's house.  He hears about it.

2     People in the neighborhood are talking about they see TV

3     cameras at his mom's house, who also lives in the neighborhood,

4     so they call Taiwan and tell him.

5          And at this particular point Taiwan says, I have a

6     brother, I have a sister, I have a mother who lives there.  If

7     they're taking these people over to my house -- to my mom's

8     house, the people who are looking for me or who may want to do

9     something to me, may try to hurt my family.

10          Taiwan calls Detective Sanchez himself, calls him on

11     the phone.  "Detective Sanchez, this is it, here I am.  Let's

12     talk."  Taiwan calls Detective Sanchez.

13          What does Detective Sanchez do?  Calls "The First 48."

14     Let's get the cameras rolling.

15          As Detective Sanchez approaches Taiwan where he asks

16     him to meet him, "First 48" crew, they're in the car, "There he

17     is, over there."

18          As soon as "The First 48" film crew walked up, Taiwan

19     says, "I'm scared for my life.  I don't want these people

20     around.  Don't let them video record me."

21          Does Detective Sanchez listen?  Of course not.  Because

22     the policy is, if I can be there, "The First 48" can be there.

23          Detective Sanchez talks to Taiwan for about 20 minutes,

24     and Detective Sanchez tells the cameras, Right now he's acting

25     more like a witness than a suspect.  But he wants to wait until

```
 1   he gets him in the box, in the interview room, in the

 2   interrogation room where the lights are on.

 3        "The First 48" paid for the cameras to be there.  They

 4   retrofitted it to make sure that the microphones worked

 5   properly.

 6        It was so bad that one of the officers who was

 7   transporting Mr. Smart to the police station, "Oh, here's the

 8   celebrity right here," almost like it's a game.

 9        So Taiwan is transported to the station.  And at the

10   station Taiwan tells the same story that he told everybody else

11   previously beforehand at the different houses that he went to.

12        He tells the detective, "I went to the window.  I did

13   not see the person actually pull out the gun.  I saw a person

14   spring up, I was startled, and I fell backwards.

15        "Then I heard boom, boom, boom, boom, boom."  That's

16   what he told the police.

17        The police, in their infinite wisdom, "Why isn't the

18   window broken?"

19        Taiwan tells the police, "They must have stuck the gun

20   through the crack in the window."

21        But the police consistently said over and over and over

22   again that they didn't believe what he was saying, even though

23   he waived his right to counsel, voluntarily spoke to them, did

24   everything that they asked him to do.

25        As a matter of fact, the police offered Mr. Smart a
```

1   polygraph test, and Mr. Smart 85 times begged them, "Give me

2   the polygraph.  Give me the polygraph.  Give me the polygraph.

3   Give me the polygraph."  And you'll see it.

4          What you won't see is any of them agreeing to that,

5   because they weren't interested in that.  They were interested

6   in performing for the cameras.

7          Mr. Smart also asked for a GSR, this is a gunshot

8   residue test.  "I'll take a GSR.  I'll do anything you want me

9   to do."

10         Did they give him a GSR?  No.

11         They just consistently said that your story doesn't

12  match the physical evidence.  And that's why we're arresting

13  you, we don't believe you.  Your story doesn't match the

14  physical evidence.  Because they could not understand that a

15  person could stick a gun through a window and pull a trigger.

16         Even after that, Mr. Smart agreed to take the police

17  and backtrack his steps as to what happened.  He took them to

18  the people across the street who he initially went to, and he

19  also took them to the places that he went immediately

20  afterwards.

21         But the evidence wasn't consistent so he got arrested.

22         What happens after arrest?  You get a bond hearing.

23  And the evidence will show that Detective Sanchez grossly

24  misrepresented the facts to the bond hearing judge to make sure

25  that the show was ran and to make sure that Taiwan stays in

1   jail.

2           At the bond hearing, Detective Sanchez told the judge,

3   who had issues about the way that the arrest affidavit was

4   written -- the judge didn't believe that just because a person

5   was inside an apartment where a homicide occurred, that doesn't

6   mean that he actually did it.  If a shooting happens, yeah,

7   people will run.

8           So the judge ordered a probable cause hearing, which

9   requires the lead detective to come to the court, raise his

10  right hand, swear under oath, tell the truth, the whole truth

11  and nothing but the truth, and give the judge facts to

12  determine whether or not Mr. Smart will be released from jail

13  or not.

14          The deputy for the Department of Corrections told

15  Mr. Smart that he may be getting out.  He was hopeful for a

16  second.  But the next day, everything changed, because do you

17  know what Detective Sanchez did?  He walked in and he lied to a

18  judge.

19          He told the judge that Ms. Armbrister said Mr. Smart

20  was arguing with Mr. Volce over money and drugs, and that is

21  not what she said.  She said that they were not arguing.  She

22  told them that the Spanish guy was arguing and Mr. Smart said

23  he had nothing to do with it.

24          Do you think that Detective Sanchez, who you're going

25  to see, told that to the judge?  The evidence is not going to

 1    show that.

 2           Detective Sanchez also told the judge that he

 3    offered -- or that Mr. Smart took a gunshot residue test.

 4    Didn't happen either.

 5           But most importantly, Detective Sanchez continued to

 6    say that the evidence -- the physical evidence that they have

 7    is inconsistent with Mr. Smart's story.

 8           Detective Sanchez told a judge that Mr. Smart in his

 9    statement said that his friends were shot from outside the

10    window, suggesting that the kill shots came from outside the

11    window.

12           But that's not what Mr. Smart said.

13           Mr. Smart actually said he saw a person pop up, he fell

14    over and he ran out.

15           Now, the reason why that's important is, because what

16    happened in this particular case is that the two kids, who he

17    was living with, were murdered at point-blank range; they had

18    two bullets in the back of their head, which suggested that

19    there may have been gunshot residue on the person who did it,

20    his clothes, which they didn't test.

21           And that's the inconsistency of their story.

22           The ironic part about it, that you're going to have the

23    crime scene technician, Arnold Yen.  He's going to come in

24    here.  He's going to testify that the physical evidence is

25    consistent with Mr. Smart's story, and that the trajectories

 1   could have come from an individual who stuck their hand through

 2   the window.

 3            Do you think that Detective Sanchez told that to the

 4   judge?  Ehh... (makes a noise).  He let him go for 19 months

 5   while Mr. Smart sat and rotted in jail.

 6            Detective Sanchez asked Mr. Yen to process the window.

 7   Mr. Yen lifted fingerprints from the outside of the window.

 8            Detective Sanchez, lead detective, never had that

 9   evidence tested.  He's the one who's supposed to pick up the

10   phone, call the lab, "Test this evidence to see if it's

11   correct."  Did he do that?  No.

12            Mr. Yen is going to testify that there were four shell

13   casings, one, two, three, four.

14            The casings -- when I'm talking about "the casings,"

15   after a bullet is fired, the projectile goes that way, the

16   casings comes out.

17            Four casings that were found inside of the apartment.

18   Seven bullet holes inside the apartment.  You can't fire seven

19   shots unless somebody just decided to pick up three casings and

20   leave the other four laying around.  They were outside, but

21   they never checked.  They never did anything about it.

22            You had more bullet holes than shell casings in that

23   apartment, and that didn't raise any suspicion about what was

24   happening.

25            For 19 months Mr. Smart was in the cell while the

```
 1    evidence sat on a shelf.  And the only reason why Mr. Smart --

 2    or one of the reasons why Mr. Smart is sitting here is probably

 3    divine intervention.

 4          What happened is that the person who actually did it

 5    ended up in the same jail unit as Mr. Smart.  And that

 6    person --

 7          MR. HUNNEFELD:  Your Honor, there's a motion relating

 8    to this.  That was discussed pretrial.

 9          THE COURT:  Rephrase, Counsel.

10          MR. NAPOLEON:  There's an individual who said something

11    in jail that raised a lot of suspicions about whether or not

12    Mr. Smart was the person.  So much so --

13          MR. HUNNEFELD:  Same thing, Your Honor.

14          THE COURT:  Overruled.

15          MR. NAPOLEON:  So much so that it caught the State

16    Attorney's Office's attention.

17          Just so you know, the State Attorney's Office is the

18    executive branch that prosecutes criminal cases here in

19    Miami-Dade County.

20          After the State Attorney's Office found out what

21    happened in jail, they wrote a memo.  Remontos, the Assistant

22    State Attorney that was assigned to this case, stated on June

23    14th, 2011, I met with lead detective, Fabio Sanchez, of the

24    City of Miami Police Department.  After discussing the case

25    with him, he agreed that we cannot prove the case, and it
```

```
1    appeared that Taiwan Smart was not the shooter.  And they

2    dropped the case.

3         Nineteen months and now Detective Sanchez wants to say,

4    "Well, we got the wrong guy."

5         Now, I suppose that you may hear evidence that

6    Mr. Smart has a prior conviction for drug sale, and I suppose

7    that the city may try to make a big deal out of it.  But what

8    they won't tell you is that when Mr. Smart was arrested, he was

9    immediately released; he received a withhold of adjudication,

10   which means that, first, he wasn't convicted.

11        But remember what I told you before, he was bouncing

12   from house to house?  He had no stable residence?  He couldn't

13   do probation.  They violated --

14        MR. HUNNEFELD:  Objection, Your Honor.  This is totally

15   outside.

16        THE COURT:  Move on, Counsel.

17        Objection sustained.

18        MR. NAPOLEON:  The evidence will show that the

19   City of Miami's policy of allowing its officers to stage

20   scenes, to reenact instances, caused Mr. Smart harm, because

21   Mr. Smart will tell you that his friends, to this day, who knew

22   him, who grew up with him, who loved him, who cared about

23   him -- their show made it look like he did it; caused people

24   who was closest to him to question what type of person he was,

25   to the extent his eight-year-old son saw that television
```

```
1    program.  And his eight-year-old son tells people that his dad
2    was in jail for killing people.
3             He was at a car wash.  He worked there.  People see
4    him.  They recognize him.  "Aren't you the guy we saw on TV?
5    How did you get out?"
6             They don't know.  They don't follow up to see that.
7    They still see the episode running over and over and over and
8    over and over again.
9             And the City of Miami's policy didn't do anything to
10   stop it.  They didn't have a policy, "Stop running it, he's not
11   guilty."  They didn't do anything.
12            You have a simple job.  And this is kind of a simple
13   case to a certain extent.
14            We raised the fact that they violated his
15   constitutional right to privacy.  They filmed his home without
16   his permission.  If you believe that that's more likely true
17   than not true, you find in his favor.
18            We raised the fact that they filmed him in places where
19   the general public didn't have the right to be.  If you find
20   that that's more likely true than not true, you find in his
21   favor.
22            And we raised that they let him rot in jail for 19
23   months.  And if you think their policy caused that, you find in
24   his favor.  Thank you, ladies and gentlemen of the jury.
25            THE COURT:  Thank you, Counsel.
```

1          Counsel for defendant.

2                    DEFENDANT'S OPENING STATEMENT

3          MR. HUNNEFELD:  May I approach, Your Honor?

4          Ladies and gentlemen, this is a much simpler story than

5     it's made out to be.  And there's a good reason why counsel for

6     plaintiff can't describe the story that plaintiff describes.

7          The evidence will show that on November 13th, 2009,

8     Taiwan Smart was a month away from being 22 years old.  He was

9     living in a drug hole in Little Haiti selling crack and

10    marijuana with an 18-year-old and a 14-year-old.

11         At the end of that night, the 18-year-old, Jonathan

12    Volce, and the 14-year-old were shot in the head, execution

13    style, on the ground in the apartment that Mr. Smart lived in.

14         Now, the lifestyle that Mr. Smart lived was a terrible

15    lifestyle.  The bedroom of that drug hole, in Mr. Smart's own

16    words, was so disgusting he would never consider sleeping in

17    it.

18         Yes, Mr. Smart would sleep on a couch in the living

19    room where the drug sales went on morning and night, and he

20    would sleep on one couch, the 14-year-old would sleep on

21    another, and the 18-year-old would sleep on another.

22         The evidence will show that living in that drug hole

23    wasn't just a matter of not having a bed or bedroom.  That one-

24    bedroom place that was set up specifically for the purpose of

25    selling drugs was terribly filthy and disgusting, but it was

1    also, specifically, incredibly dangerous.  So dangerous that

2    they used to keep a gun on the table in the middle.

3          I mean, this is a very small living room; just, you

4    know, a few feet from one side to the other.  There's couches

5    on either end, there's a couch in front of the doorway and a

6    coffee table, and on the coffee table was a gun that's kept for

7    protection.

8          As bad a life as that was, though, Mr. Smart loved the

9    "thug life," as he called it.  He went up at the end of October

10   to visit his girlfriend who was pregnant with a child for

11   Mr. Smart -- he had another child; that's the one that counsel

12   was talking about, but this is a different lady who's in

13   New Jersey, going to school up in New Jersey, at Rutgers, I

14   believe.  And nice area.  She wanted him to stay up there with

15   her and get a job, especially because she was pregnant.

16         But he said it was too boring, not enough action; he

17   wanted to go back to Little Haiti in the drug hole that he had

18   been in for months before.

19         You know, counsel mentioned that Mr. Smart, prior to

20   November 13th of 2009, had been convicted, drug conviction,

21   twice; spent --

22         MR. NAPOLEON:  Objection, Your Honor.

23         THE COURT:  Sustained.

24         Move on, Counsel.

25         MR. HUNNEFELD:  Your Honor, I'm going to mention what

1    happened this time in jail.

2         He spent 270 days in jail, and that time in jail was

3    from mid-2007 --

4         MR. NAPOLEON:  Objection, Your Honor.

5         THE COURT:  Counsel, approach.

6         (Sidebar discussion held as follows:)

7         MR. HUNNEFELD:  On the question of time in jail,

8    Your Honor?

9         THE COURT:  No, it's not the time in jail.  We talked

10   about what we were going to allow in terms of Mr. Smart's

11   prior.

12        MR. HUNNEFELD:  No mention of misdemeanors; I can talk

13   about the two felonies because those are serious things and

14   would keep him from getting a job and --

15        MR. KLOCK:  No, that's not what you said.

16        What Your Honor's order said was we moved to exclude

17   the motion in limine, Judge.

18        THE COURT:  That's why I went back to it.

19        MR. KLOCK:  That's the discussion of the incarceration,

20   and Your Honor ruled that if we were to make any argument about

21   the traumatic experience of being in jail, that they could use

22   the 270 days he spent in jail.

23        It had nothing to do with what Mr. Hunnefeld just said.

24        THE COURT:  I'm trying to find my order, and I'm going

25   so quickly --

1          MR. NAPOLEON:  Judge, the interesting part, more

2     important, is when I tried to talk about this same very

3     subject, Mr. Hunnefeld made an objection and it was sustained.

4     Now he wants to sit and talk about it.

5          THE COURT:  It's actually in paragraph one.  I should

6     have seen it right away.  The plaintiff's motion in limine A

7     and B, to receive evidence, testimony, argument of Smart's 2007

8     arrests and conviction and of Smart's prior misdemeanors.

9          The first -- defendant may introduce evidence of

10    Smart's prior felony convictions.  Defendant may not, however,

11    introduce evidence of Smart's misdemeanor arrests or

12    convictions.  That's in paragraph one.

13         MR. NAPOLEON:  Yes, Your Honor, but the issue is that

14    when I started to talk about the felony, there was an

15    objection, it was sustained.  I think that in all fairness --

16         THE COURT:  I believe that was the issue that talked

17    about --

18         MR. HUNNEFELD:  Probation and him not being guilty, why

19    it went out that way.  That's totally outside the scope.

20         MR. NAPOLEON:  No, Judge.  What I was explaining -- I

21    was trying to explain -- he did serve 270 days.  He objected

22    before I got to that point, and what I was going to explain is

23    that --

24         THE COURT:  I thought you were talking about, you know,

25    not having a place to live, and he couldn't --

```
1          MR. KLOCK:  No, it had to do with the fact that he had

2    a probation violation, because he wasn't there.  He served 270

3    days for violating probation because he couldn't do it.

4          MR. HUNNEFELD:  270 days is fine, for the reason 270,

5    but going to probation as opposed to --

6          THE COURT:  But I think what counsel for the plaintiff

7    was saying is they did not explore the 270 days because I

8    sustained your objection.

9          MR. KLOCK:  Correct.

10         MR. NAPOLEON:  Correct.

11         THE COURT:  Wait, let me finish and make sure I made

12   the understanding, and the reason why he spent the 270 days in

13   jail was he was unable -- in my understanding you -- to go --

14   to have a probative sentence because he had no place to stay.

15         UNIDENTIFIED SPEAKER:  Right.  That's the not -- Judge,

16   it wasn't a willful violation.

17         MR. KLOCK:  No, not that count.

18         THE COURT:  No.  Two different things he wanted, and I

19   stopped him because I thought it wasn't relevant.  He wanted to

20   say, ladies and gentlemen of the jury, my client spent 270 days

21   in jail because he didn't have a place to go.

22         MR. BASCO:  Probation.

23         THE COURT:  No.  He's getting ready to talk about the

24   270 days.

25         MR. HUNNEFELD:  About the time, it's relevant.
```

```
 1          THE COURT:  But if you would have been able to blunt it
 2   to the jury saying he stayed in jail not totally to the
 3   probation violation, because he could have taken probation on
 4   the outside.  He could have lived with someone, he could have
 5   found someone, like -- I'm just going to say -- you or I, I'm
 6   not going to say guilty -- but we could have had a home to go
 7   to, he could have had a place where the probation officer could
 8   come to visit us and vouch for us, and we wouldn't have to stay
 9   in jail.
10          MR. NAPOLEON:  Correct.
11          THE COURT:  He didn't have any of that.  He had to take
12   the 270.
13          MR. HUNNEFELD:  The fact that he went 270 days is
14   independently relevant.
15          THE COURT:  What they're saying is not independent.
16   They didn't get to argue the fact that, yes, he did do 270.
17          MR. HUNNEFELD:  Because he's homeless.
18          THE COURT:  Yes.
19          MR. HUNNEFELD:  Your Honor, that is irrelevant.  The
20   underlying -- we would have to try the case --
21          THE COURT:  Why do you believe him to say it?
22          MR. HUNNEFELD:  I just want the time --
23          THE COURT:  You said 270 days.
24          MR. HUNNEFELD:  The facts leading into his underlying
25   conviction are irrelevant to that case.  I would have to try
```

```
 1   the case all over, the fact that he spent 270 days in

 2   violation.

 3           THE COURT:  You want to say he violated his probation

 4   and was found guilty of violating his probation, I have no

 5   problem with that.  But I just kept him from talking about why

 6   he spent 270 days.  His argument is my client would not have

 7   spent 270 days if he had a house.

 8           MR. HUNNEFELD:  But that would be an improper argument.

 9   That's opening the door.  It's issues far afield of this.  I

10   committed the two felonies and 270.

11           THE COURT:  I think we have to agree to disagree on the

12   evidence.  You can talk about the fact that he violated

13   probation, you can say that.  But that he actually spent 270

14   days in jail, since I just kept him from saying --

15           MR. NAPOLEON:  And why he --

16           MR. HUNNEFELD:  Why he violated probation.

17           MR. NAPOLEON:  If he wants to talk about it later in

18   his case-in-chief, feel free.  I'm saying as far as opening

19   statements are concerned, he not be allowed to talk about it.

20           THE COURT:  I agree.  The only reason I'm saying this

21   right now is because I just stopped him.  I just said, "No, you

22   can't."

23           MR. HUNNEFELD:  Your Honor, I was just giving -- I

24   think it's improper to get into the underlying basis for the

25   criminal conviction.  That is improper, because --
```

```
 1              MR. KLOCK:  Why?

 2              MR. HUNNEFELD:  -- because we would then have -- it

 3    would be implying that he was not guilty of that underlying

 4    offense, that then we would have to go into prove that he was

 5    guilty.

 6              THE COURT:  No, nobody's ever said that.  He's agreed

 7    that he violated probation.  What he wanted to get into was my

 8    client violated his probation; given the circumstances, he

 9    might have been allowed to go somewhere but --

10              MR. HUNNEFELD:  We would have had -- sorry to

11    interrupt.  But we would have to interview probation officers

12    and get them to establish that -- how far afield do we have to

13    go through this case?

14              THE COURT:  Why are you getting to do it all?

15              MR. HUNNEFELD:  I'm not getting to do it all.  270

16    days -- what I'm saying, two felony convictions, 270 days into

17    the jail --

18              MR. NAPOLEON:  Counsel --

19              MR. HUNNEFELD:  -- that he was jailed has a bearing on

20    his lifestyle, has a bearing on who he knows and who he doesn't

21    know.  That's Mr. --

22              MR. KLOCK:  It doesn't have a bearing on the lifestyle.

23              MR. HUNNEFELD:  I don't understand why, for the -- he

24    spent nine months in jail has --

25              THE COURT:  Why would you object to him saying it?
```

```
 1              MR. HUNNEFELD:  Because I don't want to get into the

 2     probation.

 3              THE COURT:  But you just did.  We have to agree to

 4     disagree here.  Move on, Counsel.

 5              MR. HUNNEFELD:  Thanks, Judge.

 6              (Sidebar discussion concluded and the following

 7     proceedings were held in open court:)

 8              THE COURT:  Counsel, would you approach for a moment,

 9     please?

10              (Sidebar discussion held as follows:)

11              THE COURT:  To your knowledge, did your client ever

12     attend Hialeah High School?

13              MR. KLOCK:  Pardon me?

14              MR. NAPOLEON:  I'm not sure.

15              THE COURT:  In the neighborhood that -- this doesn't

16     look like he would have gone to Hialeah.  I'm asking for the --

17              MR. NAPOLEON:  I will ask him.

18              MR. KLOCK:  He may have, because he lived all over the

19     place.  Because if you live, like, on 95th Street, Judge, like,

20     on west of 27th, you go to Hialeah.

21              THE COURT:  You have to be far west.  But this took

22     place in Miami, 57th -- right?

23              MR. KLOCK:  77th -- 60 Northwest 77th Street.

24              MR. NAPOLEON:  He did not, Judge.

25              THE COURT:  Okay.  Thank you.
```

```
 1              (Sidebar discussion concluded and the following
 2     proceedings were held in open court:)
 3              THE COURT:  Now you know why I keep telling you I don't
 4     want to do those sidebars, is that noise.
 5              Counsel, I apologize for the interruption.  You may
 6     continue, subject to the discussion that we had at sidebar.
 7              MR. HUNNEFELD:  Thank you, Your Honor.
 8              Mr. Smart worked at Subway and Wendy's for a short
 9     time.  But as of February of 2009, he decided it wasn't for
10     him.  And he said himself that he decided to go back to the
11     thug life.
12              Now, on November 13th, Taiwan Smart -- Taiwan Smart
13     told police that on November 13th -- to be clear -- about two
14     separate drug sales that he was involved in:  One, at
15     approximately 10:30 on the evening of the murders, November
16     13th, he sold four crack boulders, as he described it, or
17     rocks, on credit to an individual named Papi who lived in the
18     neighborhood.
19              MR. KLOCK:  Objection, Your Honor.
20              MR. HUNNEFELD:  Now, Papi --
21              THE COURT:  Sustained.  Move on, Counsel.
22              MR. HUNNEFELD:  This is relevant -- very relevant to
23     the facts that occurred afterwards.
24              MR. KLOCK:  Your Honor, without a speaking objection,
25     it's inconsistent with facts on the record.
```

```
 1              MR. HUNNEFELD:  Oh, inconsistent with facts.  We will
 2      prove this.
 3              THE COURT:  For now, Counsel, I'm going to ask you to
 4      move on, we may take it up in the case in chief.
 5              MR. HUNNEFELD:  Your Honor, this is pivotal to my --
 6              THE COURT:  Approach, please.
 7              (Sidebar discussion held as follows:)
 8              THE COURT:  Mr. Klock, what's your objection?
 9              MR. KLOCK:  Your Honor, there is no basis that he was
10      involved in selling at 10:30.
11              MR. HUNNEFELD:  And I think there is.
12              THE COURT:  What I'm trying to figure out is, what does
13      that have to do with --
14              MR. HUNNEFELD:  I will connect it up.
15              MR. KLOCK:  If you do anything that then it's okay to
16      be put in jail for 19 months because of a --
17              THE COURT:  Okay.  Give me the connection.
18              MR. HUNNEFELD:  Your Honor, during the interrogation of
19      Mr. Smart, he failed -- he failed to disclose the fact that
20      about an hour before, someone's come over -- that's the
21      argument to the Ciara Armbrister who's referring to was
22      Mr. Volce -- and Mr. Smart talking about the credit for the
23      drug transaction with Papi.  I can't tell the story without
24      that.
25              THE COURT:  But remember that, her testimony is they're
```

1    having arguments with a Spanish guy, right?

2         MR. HUNNEFELD:  That's -- there's a Spanish guy there,

3    and there is an argument.  Mr. Smart testified --

4         THE COURT:  Wait, wait, wait.  But wait.  What does the

5    officer tell the judge at the probable cause hearing?

6         MR. KLOCK:  He tells the judge that Mr. Smart and

7    Mr. Volce were arguing over drugs.  That's a lie.

8         MR. HUNNEFELD:  That is not a lie.  I will give

9    testimony.

10        THE COURT:  If I recall, it's not that he says that.

11   He says that that's what Ciara Armbrister -- does she say that?

12        MR. HUNNEFELD:  Yes, she says about the drugs.

13        THE COURT:  She says that Mr. Smart --

14        MR. HUNNEFELD:  -- and Volce --

15        THE COURT:  -- were arguing over drugs and money?

16        MR. NAPOLEON:  She did not say that.

17        MR. KLOCK:  That's not what she said.

18        MR. HUNNEFELD:  Opening statements is what I believe

19   the evidence will show.  I believe that's --

20        MR. KLOCK:  In the motion for summary judgment this was

21   never put forward.

22        THE COURT:  I don't recall this idea of him not -- what

23   you're saying is the fact that he did not say that he was

24   involved in a drug transaction?

25        MR. HUNNEFELD:  At the beginning of the interview, for

```
 1   five hours.  I'm sorry.  It's a complicated thing.  It's not

 2   one hour; he waits five hours to give this information.  This

 3   information --

 4           THE COURT:  Okay.

 5           MR. HUNNEFELD:  -- is what Ciara Armbrister heard the

 6   argument about -- the argument between Jonathan Volce and

 7   Taiwan Smart, where Mr. -- they're shaking their heads but --

 8           MR. KLOCK:  It came out of Mr. Smart's own mouth.

 9           THE COURT:  Here's my thing.  If you're saying it now,

10   that means you know it from somewhere.

11           MR. HUNNEFELD:  Yes, I do.

12           THE COURT:  Where do you know it from?

13           MR. HUNNEFELD:  Interrogation of Mr. Smart.

14           THE COURT:  So Mr. Smart says during the

15   interrogation --

16           MR. HUNNEFELD:  During the interrogation...

17           THE COURT:  -- I had an argument with Volce and Nathan

18   Ray.

19           MR. HUNNEFELD:  Yes, he says Volce; not Nathan Ray.  He

20   said Volce said, call me to give credit, that's the fellow that

21   was coming in that was trying to get credit.  And he was -- he,

22   Smart -- was trying to explain the argument that was a time --

23           MR. KLOCK:  Judge, it's not the truth.

24           THE COURT:  Is it the truth?

25           MR. HUNNEFELD:  Your Honor, this is opening statement.
```

```
 1    In closing argument, if I don't prove --

 2          THE COURT:  Slow your roll.  Okay.  First of all, they

 3    don't get to beat you.  What both sides have an opportunity to

 4    do is to present evidence.

 5          Now, if you want to talk about the interrogation,

 6    actually what Mr. Smart said during the interrogation.

 7          MR. HUNNEFELD:  Yes.

 8          THE COURT:  But my understanding what you just said

 9    was -- and if I'm wrong, I'll stand corrected -- was that

10    Mr. Smart didn't tell the interrogating officer about a

11    narcotics transaction or a drug transaction that he engaged in

12    prior to the shooting; am I incorrect?

13          MR. HUNNEFELD:  He did tell them about it.  He delayed

14    telling them about it.  What I am saying is coming from his

15    testimony in that interrogation.

16          THE COURT:  So while he's being interrogated, he tells

17    them, dear officers, I was engaged in a drug transaction before

18    the murder?

19          MR. HUNNEFELD:  Yes.

20          THE COURT:  He's going to say that?

21          MR. HUNNEFELD:  Yes, he will say that.  We will hear

22    that.

23          THE COURT:  We will hear that in the course of the

24    interrogation?  Mr. Klock, what is he going to --

25          MR. NAPOLEON:  Judge, he's saying I'm not involved in
```

```
 1    that.  I'm not involved in -- that's what he said.

 2           MR. HUNNEFELD:  I'm taking his words from the

 3    interrogation.

 4           THE COURT:  Who's the interrogation now?

 5           MR. HUNNEFELD:  Because this is opening statement.  I'm

 6    in the middle -- my opening statement is being ripped apart.

 7           THE COURT:  I agree, and I don't like to interrupt

 8    opening statements.  To let you know why I had a concern,

 9    because we had such lengthy motions in limine in this case that

10    caused me to write a four or five page omnibus order, and I'm

11    wondering why in all of these orders that this issue didn't

12    come up.

13           MR. KLOCK:  Because that was --

14           THE COURT:  Motion in limine -- I'm trying to figure

15    out why that is one that just kind of escaped.

16           MR. HUNNEFELD:  Do you know what, I didn't think it

17    should escape anyone.  I thought that was one of the central

18    features of the case.

19           MR. HUNNEFELD:  I don't want to stop my opening

20    statement.  I want to -- I'm only saying what the evidence will

21    show.  It's correct, if I show it.

22           THE COURT:  You better do it quickly and move on.

23           MR. KLOCK:  Judge, let me ask this one question.  If

24    the evidence doesn't show what it's going to show, then what?

25           THE COURT:  That always happens, and you know that is a
```

1    danger -- that is a danger that --

2         MR. HUNNEFELD:  Exactly.

3         THE COURT:  -- on opening statements.  And I think the

4    colloquial expression is "never write a check with your mouth

5    that your evidence can't cash."

6         MR. HUNNEFELD:  Exactly.  Right.

7         MR. NAPOLEON:  Thanks, Judge.

8         MR. HUNNEFELD:  Thanks.

9         (Sidebar concluded and the following proceedings were

10   held in open court:)

11        THE COURT:  All right, counsel.  Finish up, please.

12        MR. HUNNEFELD:  Thank you, Your Honor.

13        Taiwan Smart told police about two separate drug sales.

14   He told police about the four crack boulders that he sold to

15   Papi who promised to pay him back with interest the next day.

16        He also said -- this comes from Mr. Smart -- that he

17   was involved in discussions for sale of Crip, a form of

18   marijuana that's especially strong, at the time that the

19   shooter allegedly came up to the window.

20        That night, Mr. Smart was in that drug hole with

21   Jonathan Volce, 18; Ray -- Nathan Ray, shortly before midnight

22   when there were two -- two volleys of gunshots.

23        First bang, bang, bang; pause, maybe a few seconds, up

24   to a minute maximum; and then bang, bang, bang.

25        Mr. Smart will say that all the shots ended before he

1    left the room -- before he left the apartment.  He went out the

2    back door.

3            Now, I -- there will be testimony based on an

4    interrogation of Ciara Armbrister, and there will be -- who was

5    one of the neighbors; and there will also be testimony from

6    another neighbor, Willie Parker, who lived in that same

7    five-plex that this was occurring at.

8            Both Mr. Parker and Ms. Armbrister specifically say

9    that sometime between a few seconds and a minute was the time

10   period or interval for the two volleys of shots, which -- that

11   actually is consistent with Mr. Smart's testimony.

12           But Mr. Smart says that he hadn't even left the

13   apartment yet at the time that the guns, the shooting, stopped;

14   that he unbolted the door and ran out and didn't hear any more

15   shots after that.  And he would have, if there were.

16           And Ciara Armbrister says there weren't any more shots

17   after those two quick volleys.  Mr. Parker says there weren't

18   any more shots.

19           So those are all consistent.

20           So we have that two bursts of shots when Mr. Smart is

21   still in the apartment.  And -- that means all of the shots.

22   And we have, when that's done, two individuals who are lying

23   face first, whose faces are on the floor, lying down on the

24   floor with bullets in their head.

25           Now, it was not possible for shots coming from --

```
1          MR. NAPOLEON:  Objection, Your Honor.  Argument.

2          MR. HUNNEFELD:  The evidence will show --

3          THE COURT:  Overruled.

4          MR. HUNNEFELD:  The evidence will show that it was not

5    possible for those two individuals to have been shot the way

6    they were from outside the apartment.  Those two shots were by

7    a person who was standing above those individuals and shooting

8    down.

9          In fact, for Mr. Volce -- I apologize to anyone

10   squeamish, but the bullet actually went through his head to the

11   other side.  But it's because his head was on the ground, it

12   didn't exit; it stayed just protruding a bit from the head.  He

13   was on the ground.

14         For Mr. Ray, there was something called stippling,

15   which means that the person was within 18 inches to 36 inches.

16   And the trajectories of those gun shots clearly put those shots

17   inside the apartment.  Couldn't have been fired -- the evidence

18   will show could not have been fired from outside of the

19   apartment.

20         And the description of this incident by Mr. Smart was

21   that somebody was shooting through the window, that somebody

22   jumped around the corner.  This is so small -- when we're

23   talking about jumping around the corner, we're talking about

24   just a few feet; that when he's doing that drug deal that was

25   described, the marijuana, the weed, the Crip, that the person
```

```
 1    who was teaming with him jumped around the corner, and he said

 2    he was two feet away.

 3              You'll actually see the video.  And it will show him

 4    placing the officer how far away he was from him when the

 5    person pulled up a gun -- supposedly from outside, pulled up a

 6    gun and started shooting.

 7              Now, one thing that I did not mention was, as a drug

 8    hole, this is set up for security.  They're dealing with drug

 9    addicts and drug users; it's dangerous, as we said.  So the

10    front door is not only really locked and bolted, but there's a

11    couch blocking it.

12              The windows, specifically the window through which they

13    sold drugs in the apartment, that has metal grating on it and

14    also has a screw that prevents the window from being opened

15    more than, approximately, four-and-a-half inches; in other

16    words, this amount (indicating).

17              And so, obviously, that's not enough even for someone

18    to barely put their arm through.  The idea is --

19              MR. NAPOLEON:  Okay, Your Honor, mischaracterization of

20    the evidence.

21              THE COURT:  Overruled.

22              MR. HUNNEFELD:  The idea is that all they wanted was

23    enough space for someone to pass through money and take out

24    drugs.  More than that is a danger to them.

25              That's the space through which Mr. Smart was telling
```

1    the police they must have been firing through.  And he was

2    saying they must have been firing through that because there

3    was no explanation for why he wasn't killed.

4          The window wasn't broken.  There wasn't any bullet

5    holes around the window.  The person's two feet away from him,

6    the evidence from Mr. Smart will show.

7          So Mr. Smart's description could not have occurred.

8          Now, that evidence from Mr. Smart, and which had been

9    added to by Ciara who talked about the argument that took place

10   over a transaction that was occurring, and also saying that

11   Mr. Smart sold crack and weed from the apartment, and combined

12   with the timing of those shots, and placing Mr. Smart there

13   just before the shooting occurred, created an awful lot of

14   evidence.

15         So there's fingerprints and testimony that put him in

16   the apartment.  There's -- they were selling -- what are you

17   selling?  The fact that he was arguing.  That there was a gun

18   on the table.

19         But there's also evidence that wasn't highlighted

20   before, but it was four days passed from the time of the

21   shooting until he called police.

22         The evidence will show that Mr. Smart considered

23   Mr. Volce a very close friend, a very close friend.  And it was

24   obvious that if the police were going to have the best chance

25   of catching the person who killed his good friend and the

```
 1    14-year-old boy who lived with them, that they needed all the

 2    information as quickly as possible to follow up on any possible

 3    leads.

 4            But Mr. Smart fled, left, never called police until

 5    after the police went to his mother.  And then within an hour

 6    he calls.

 7            So at that point Mr. Smart believes that, I guess, I

 8    have to speak to them now.  But when he speaks to them, it gets

 9    worse because he tells this story that can't be true.

10            A shooter two feet away, not killing him, not

11    killing -- not shooting a hole.  So he's shooting through the

12    window.  Of course he's shooting through the little hole.

13    Except the bullets don't match up, and the CSI doesn't match up

14    with what he's saying.

15            So there was talk of seven holes.  Well, what there

16    wasn't talk of was the fact that one of those holes was through

17    a refrigerator and another one was through a wall.  Those

18    multiple holes were from the same shot.  The trajectory lines

19    up.  There's no dispute that that's the case.

20            MR. KLOCK:  Your Honor, objection.  Can we approach

21    sidebar, please?  It's a speaking objection.

22            THE COURT:  You may approach.

23            (Sidebar discussion held as follows:)

24            THE COURT:  Because I have another question.

25            Did you just open the door to the polygraph?
```

1          MR. HUNNEFELD:  No.

2          THE COURT:  You just said he told a story that "can't

3     be true."  He must be guilty of the murder.  Why is that -- why

4     is the polygraph inad -- the whole point of this was that we

5     had constructed this, that it was about the lack of probable

6     cause for the non-bondable offense; not talking about who

7     committed the murder, who said what happened in the murder,

8     that no one was actually -- we haven't talked about anybody

9     else who's actually prosecuted, and you're basically retrying

10    the murder case.

11         MR. HUNNEFELD:  Your Honor, probable cause.  It's the

12    evidence that was available.  I'm giving the evidence that was

13    available, and that evidence was pointed to him.

14         THE COURT:  But you didn't say the evidence available

15    to the officer -- or what the officer is --

16         MR. HUNNEFELD:  I said "trajectories."

17         THE COURT:  No, that's not what you said, and I can

18    have the court reporter read it back.

19         You said a story that was not true.

20         MR. HUNNEFELD:  Right.

21         THE COURT:  No, but --

22         MR. HUNNEFELD:  That's what the police officer said,

23    that the story wasn't true, that it couldn't have been the

24    way -- that's what --

25         MR. KLOCK:  The order touches upon -- the order says

1    the investigator testified that it was possible for some of the

2    bullet holes to strike --

3          THE COURT:  Don't get frustrated at me.  I'm not the

4    one speaking.  I'm listening.  I specifically tailored it so we

5    could talk about this case, because I struck the arrest,

6    remember?  I said you had probable cause for the arrest based

7    upon the summary judgment.

8          MR. HUNNEFELD:  I understand, but --

9          THE COURT:  We are talking about only, to me, in terms

10   of this cause of action was what happened in terms of him being

11   held in -- for the 19 months and what was the relationship with

12   what the city did and offered to keep him held and the

13   relationship with "The First 48."

14         MR. KLOCK:  Mr. Basco has explained to you at least

15   four times so far that if there's probable cause to arrest,

16   that's probable cause to hold him for 19 months.

17         THE COURT:  And that was the difference.  So you

18   understand that was a legal difference that we had --

19         MR. KLOCK:  Even if we still --

20         THE COURT:  -- in the motion for summary judgment, and

21   I told you that in the facts of this case, it wasn't.  That

22   there are some cases where the arrest and the imprisonment are

23   co-existing.  It's not in this case.  You had a probable cause

24   to arrest him.  It's once you keep him for 19 months that I

25   believe there are questions of facts in this case about the

```
 1    probable cause.

 2             MR. HUNNEFELD:  Your Honor -- Your Honor, can I address

 3    something that I think touches on what Mr. Klock said?  It's

 4    been said again and again that we kept him for 19 months.

 5             MR. KLOCK:  You did.

 6             MR. HUNNEFELD:  The evidence will show he had to be

 7    kept for 19 months, the State Attorney -- it was based on the

 8    information.

 9             THE COURT:  Based upon --

10             MR. HUNNEFELD:  No, independent investigator.

11             THE COURT:  Who did the bond hearing?

12             MR. HUNNEFELD:  That was one hearing.  At that hearing

13    the judge finds probable cause.

14             THE COURT:  Okay.  Which they took him away, right?

15             MR. HUNNEFELD:  Right.  After that, the State

16    independently investigates this and files an information based

17    on their review of the evidence, not the police officers'

18    statements.

19             THE COURT:  Who -- who gives him the evidence?

20             MR. KLOCK:  He could have bond.

21             THE COURT:  At the time they look at the evidence and

22    the time the statements were made, did anybody ever examine

23    what happened outside?  If I recall, nobody examines outside

24    that window.

25             MR. HUNNEFELD:  That's the dispute.  That is totally
```

1    disputed.

2           MR. KLOCK:  He may in the box.  They sent Mr. Yen as

3    one of their best CSI guys.  He took fingerprints of the

4    window.  He did different things.  He didn't do anything with

5    the window.  The bottom line is this, Judge -- the bottom line

6    is this, when -- at a point in time, when someone identifies

7    someone else as having done a killing and when the CSI Yen says

8    that the bullets could have been fired through the window

9    initially, they did nothing.

10          They had swabs, they had fingerprints, all they had to

11   do, Judge, was to compare those DNA swabs and those

12   fingerprints with the match of Arsenio Carter and they could

13   have found out whether he was in that apartment that day, which

14   would have been the corroboration they needed to the statement.

15          They didn't care.  They were running the show, Judge.

16          MR. BASCO:  If I can breakdown what we just talked

17   about.  One of the rationales Your Honor has ruled, that is

18   separate from the false arrest.

19          THE COURT:  In this case?

20          MR. BASCO:  The way I read the order, he shouldn't have

21   been held for that long.  That's part of our rationale for

22   felony murder and possession with intent; but for second degree

23   murder, and part of the rationale for that is that the factual

24   basis given by the plaintiff during his testimony is incorrect,

25   could not happen.

1      MR. HUNNEFELD:  Yes.

2      MR. BASCO:  What I want to say, that that's our

3  presentation of the evidence.  They're saying he's telling the

4  truth.  They're saying he's not telling the truth.

5      THE COURT:  You want to talk about the officer.  Your

6  argument is presented as if you're ready to re-try this murder

7  investigation, not as if you're basing your facts off of what

8  the officer said.

9      But right now you have opened -- and I will say it, and

10 you can go home tonight and brief it.  You have opened the

11 door, I think, for allowing Mr. Smart's result of his polygraph

12 that said he did not --

13     MR. BASCO:  And Your Honor's --

14     THE COURT:  He said it's not true.

15     MR. NAPOLEON:  Couldn't be possible.

16     THE COURT:  Now if you want to take a moment and go

17 over with what the court reporter wrote down, but that's not

18 what my notes reflect, and I will allow you to do --

19     MR. BASCO:  Judge, the inverse of that, what you would

20 say by introducing the results of the polygraph, is that is the

21 truth and the polygraph is accurate.  But that's not

22 admissible piece of evidence.  It would not be in any criminal

23 trial at all.

24     THE COURT:  Except you're re-trying the criminal case.

25 I agree with you.

1           MR. BASCO:  Because, Your Honor, it says it's not

2    reasonable to hold him 19 months; implied for the rationale for

3    keeping him in.

4           THE COURT:  Can we at least try to finish

5    Mr. Hunnefeld's opening statement, allow the jury to go, and

6    you can brief these issues, talk to the court reporter, all

7    right?

8           MR. HUNNEFELD:  Thank you, Judge.

9           THE COURT:  All right.  Let's try.

10          (Sidebar discussion concluded and the following

11   proceedings were held in open court:)

12          MR. HUNNEFELD:  Your Honor, may I proceed?

13          THE COURT:  You may.

14          MR. HUNNEFELD:  After all of the evidence and testimony

15   was gathered by the police officers, it was handed to the State

16   Attorney's Office.

17          Based on that evidence and testimony, the State did an

18   independent investigation of that testimony and evidence.  And

19   after that independent investigation filed an information

20   charging Mr. Smart with multiple offenses, including second

21   degree murder.

22          Now, "The First 48" was there to document the

23   investigation and to shed light on the tough job that homicide

24   detectives have.  There's something that helped the Miami

25   Police Department get information in other investigations.

1    Nothing about their filming of plaintiff did anything except

2    police officers doing their job and showing that they're real

3    people, too.

4         The evidence does not support Mr. Smart's claims.  And

5    when you've heard all of the evidence and testimony in this

6    case, we believe you'll find for the City of Miami.

7         Thank you.

8         THE COURT:  Thank you very much.

9         Ladies and gentlemen, normally, we'd go on to hear our

10   first witness, but as you might have been able to figure out,

11   there's some issues that I need to discuss with counsel outside

12   your presence.

13        So it's about 3:50.  We would normally go for about

14   another hour, but I'm going to allow you to leave a little

15   earlier today.

16        Here are my instructions:

17        You're free to go home, obviously, tonight and go about

18   your business.  I'm going to ask that you be back in the jury

19   room tomorrow at about 9:15.  Remember, no discussing the case.

20        Also, I just want to remind you that when you're in the

21   courtroom, although I don't keep your cell phones away from

22   you, please don't use your cell phones in any way in the court,

23   even when we're at a sidebar.  That's very important.

24        So, ladies and gentlemen, look around the room.

25   Remember, you see these individuals coming into court, going

```
 1    out of court, parking in a garage where you park, having a soda

 2    where you buy a soda.  They're going to ignore you.

 3            And I will see everyone back this evening.

 4            See you all in the jury room about 9:10, 9:15.

 5    Remember, we're trying to try to start as close to 9:30 as

 6    possible.  If you're all here ready to start, we'll be here

 7    ready to start.  Thank you.

 8            COURT SECURITY OFFICER:  All rise for the jury.

 9            (Jury exited courtroom at 3:50 p.m.)

10            THE COURT:  Two things, Counsel.  I'm going to ask

11    Ms. Powers to go back in the transcript for me for a moment,

12    please.

13            And also, to the attorneys sitting on plaintiff's side,

14    you have had or had been having some issues with your power

15    from your table, electricity or something?  I think your --

16            MR. NAPOLEON:  It was an earlier display problem, but

17    he fixed it.

18            THE COURT:  They are going to come in tomorrow morning.

19    I think you're running off of a power strip or something, so I

20    need to make sure -- normally you can leave the things on your

21    table at night.  But tonight I need to have you take your

22    things off your table so when GSA comes, they're not fiddling

23    amongst your stuff.

24            Can everyone give me just a moment?  You may be seated

25    while Ms. Powers goes back for me a moment in the transcript.
```

```
1              MR. BASCO:  Judge, when we are done, I would like to

2    clarify two things, if I can.

3              THE COURT:  I'm going to start reading from a specific

4    part of the transcript, and Ms. Powers will help me out from

5    her copy.

6              This is from Mr. Hunnefeld:

7              "The evidence will show that it was not possible for

8    those two individuals to have been shot the way they were from

9    outside the apartment.  Those two shots were by a person who

10   was standing above these individuals and shooting down.

11             "I apologize to anyone squeamish, but the bullet

12   actually went through his head to the other side.

13             "For Mr. Ray" -- then it goes on:

14             "And the description of this incident by Mr. Smart was

15   that somebody was shooting through the window, that somebody

16   jumped around the corner.  This is so small, when we're talking

17   about jumping around the corner, we're talking about just a few

18   feet.

19             "The windows, specifically the window through which

20   they sold the drugs in the apartment, that has metal grating on

21   it and also has a screw that prevents the window from being

22   opened more than, approximately, four-and-a-half inches.

23             "And so, obviously, that's not enough even for someone

24   to barely put their arm through.

25             "The idea is that all they wanted was enough space for
```

1    someone to pass through money and take out drugs.

2         "That's the space through which Mr. Smart was telling

3    the police they must have been firing through."

4         -- Notice, you used the word, "Mr. Smart." --

5         "And he was saying they must have been firing through

6    that because there was no explanation for why he wasn't killed.

7         "So Mr. Smart's description could not have occurred."

8         MR. HUNNEFELD:  Correct, Your Honor, that's exactly

9    right.

10        MR. BASCO:  Judge, and the point of this information

11   is, as Your Honor indicates in page 11 of your summary judgment

12   order for false imprisonment claim:  The City need only

13   establish that probable cause existed to detain Mr. Smart on

14   charges of which would warrant holding him without bond, which

15   is a second-degree murder case.

16        So the City is required to present, based on

17   Your Honor's ruling, reasonable facts that a reasonable officer

18   would conclude that he had committed second-degree murder.

19        And that's what we have to do.

20        Now, the inverse of that -- I understand Your Honor is

21   saying he's not telling the truth and that opens the door to a

22   polygraph.  The polygraph -- let me start with my initial

23   problem.

24        Counsel's representation is that the officers offer ed

25   the polygraph to him, and so that Your Honor's ruling is that

1    that is now admissible because there's an affirmative right for

2    him to have that polygraph and the officers need to do that?

3          THE COURT:  No, I never said that.

4          MR. BASCO:  Because what the Court's ruling is is that

5    gets to come into play in their investigation.  Now the police

6    officers have now become the investigators of exculpatory

7    evidence on behalf of the plaintiff, the criminal defendant in

8    that case.

9          What we're saying is that his rationale or his belief

10   that he tells the officer of how the shooting occurred wasn't

11   reasonable.  So if it's not reasonable, the facts that are

12   there, the physical evidence that's there, that's the

13   reasonableness for the probable cause he committed

14   second-degree murder.

15         The polygraph is wholeheartedly inadmissible.  The only

16   way he can say he's lying --

17         THE COURT:  Do you understand -- at no point in this

18   argument does anybody on your side of the room say the police

19   did not believe what Mr. Smart said was true?

20         MR. BASCO:  Judge, it's implied when we're saying that

21   what he said was not true.

22         THE COURT:  No, it's not.

23         You're saying what Mr. Smart said wasn't true.

24         MR. BASCO:  And that's the conclusion made by the

25   officers.

1          MR. HUNNEFELD:  It was testimony that was given by

2     Mr. Smart to the police officers, he said it didn't happen.  In

3     fact, at the bond hearing, they said the evidence wasn't

4     consistent with Mr. Smart's story.  So that's where I was

5     coming from.

6          MR. KLOCK:  If I may, Judge?

7          MR. HUNNEFELD:  All this information is coming from the

8     interrogation of Mr. Smart.

9          MR. KLOCK:  Judge, we've --

10          MR. HUNNEFELD:  And that's what we have to determine.

11          MR. KLOCK:  We again get back to the point that I was

12     raising sidebar.

13          In the City's mind, if there's probable cause for an

14     arrest, then anything that follows is fair game.  19 months, 44

15     years, 50 years, makes no difference if there's probable cause.

16          From our point of view, we never filed a motion for

17     reconsideration.  But one of the things that Your Honor will

18     see, you know, if you look at the interview is, at a certain

19     point in time -- and it appears on ""The First 48"" hour tape

20     they go over and over and over again -- Mr. Smart never

21     testified that the kill shots came through the window.  Never.

22          He said that shots came through the window and he got

23     out of there.  He didn't even know those boys were dead for a

24     couple of hours after it happened, or an hour or so after it

25     happened.

1          So our view is, when we have the dramatic moment when

2     Detective Sanchez -- when Taiwan says, "That's it, I've told

3     you over and over again that's what happened, that's it, case

4     closed," Detective Sanchez stands up and with a flourish,

5     "You're under arrest for two counts of murder."  That, Judge is

6     the arrest.

7          If they want to paper it later by filing an affidavit

8     of arrest -- which Judge Cueto -- and I think you know Judge

9     Cueto, a former police officer, a former assistant State

10    Attorney, and an extremely well-regarded criminal and civil

11    judge in the circuit court, looks at the arrest affidavit and

12    says "Uh-huh, no probable cause here," he sets a hearing for

13    the next day.

14         Detective Sanchez then comes in and intentionally

15    misrepresents the facts which this Court in its order referred

16    to is, at best, a gross mischaracterization of the facts, which

17    Mr. Hunnefeld now wants to spin a different way.

18         So our view has always been, you know, you don't look a

19    gift horse in the mouth, obviously; but the fact of the matter

20    is, if there's no probable cause for the arrest, big deal,

21    that's 24 hours worth of incarceration.

22         To us, the real damage occurs when Sanchez comes in,

23    lies to the judge, knows exactly what it is that the judge

24    needs to hear, and says it.

25         Now, they think that once the bond judge has made that

```
 1    determination and fixed the bond as "no bond," that somehow

 2    something that the state does makes a difference.

 3            The fact is that he was held in jail for 19 months

 4    because of what Detective Sanchez's false imprisonment.  That

 5    is what our issue is.

 6            And, Judge, in addition to the point that you're

 7    raising --

 8            THE COURT:  One moment, please.

 9            MR. KLOCK:  Yes, ma'am.

10            THE COURT:  So are you saying that what

11    Detective Sanchez told Judge Cueto was truthful?

12            MR. HUNNEFELD:  Judge --

13            THE COURT:  One at a time.

14            Yes or no:  What Detective Sanchez told Judge Cueto,

15    was that the truth?

16            MR. HUNNEFELD:  It was a slight misstatement.

17            THE COURT:  Yes or no, was it the truth?

18            MR. HUNNEFELD:  Your Honor, "truth" implies the

19    converse being a lie.

20            It wasn't a lie.  It was a misstatement.  He said that

21    he saw -- that plaintiff admitted --

22            THE COURT:  Is there a transcript of that proceeding?

23            MR. HUNNEFELD:  Oh, yes, there is.

24            MR. KLOCK:  Yes.  And, Judge, we also have the video if

25    you want to look at it.
```

```
 1              THE COURT:  No.  I want the transcript of what Sanchez
 2   said to Judge Cueto.
 3              MR. NAPOLEON:  Judge, Sanchez also said in his
 4   deposition and he admitted that what he said was not accurate,
 5   in his deposition when we took it.  So, I don't know why
 6   Mr. Hunnefeld is trying to spin it like it is accurate, because
 7   Sanchez himself said it is not.
 8              THE COURT:  But I think the important part is what he
 9   told Judge Cueto.
10              MR. KLOCK:  Right.  Which is the point, because that's
11   what caused him to stay in jail, Judge.  That's what caused him
12   to stay in jail.
13              THE COURT:  Because if Judge Cueto had questions, I'm
14   not sure about probable cause here, and then Sanchez comes back
15   with things that he thinks fills in the blanks to make it
16   probable cause --
17              MR. KLOCK:  Yes, that's exactly what happened.
18              MR. NAPOLEON:  It's right there.
19              MR. KLOCK:  Page 7 of the November 19th transcript.
20              THE COURT:  Just hand it -- if you can hand it to my
21   law clerk, please, or the court security officer.  Someone will
22   make sure that I get it; don't worry.
23              MR. KLOCK:  We're on page 7, Judge, starting with line
24   16.  I assume the Court doesn't need to be read to.
25              And specifically, Judge, at the bottom of page 7,
```

```
 1   Mr. Smart said, "that him" --

 2          THE COURT:  I need you on a microphone, Mr. Klock.

 3          MR. KLOCK:  I'm sorry, Your Honor.  I'm rarely accused

 4   of not speaking loud enough.

 5          Page 7, line 20:

 6          "Mr. Smart's statement was him -- he and the two

 7   deceased victims were in the apartment at the time of the

 8   shooting.  Mr. Smart claims that he went to the window to serve

 9   some narcotics to a buyer.  The buyer was pushed to the side by

10   the alleged shooter, and the shooter shot through the window,

11   killing both victims."

12          That, Judge, is a lie.  He never said that.

13          And that is exactly what Sanchez had to say to stick

14   this guy into jail for 19 months.

15          THE COURT:  Well, that's also the part where he says

16   there's no evidence that the shooting occurred outside.  And

17   correct -- I just want someone to correct me if I'm wrong.

18          At the time of this probable cause hearing, was there

19   ever any examination done outside?

20          MR. HUNNEFELD:  Yes, Your Honor.  Yes, Your Honor.

21          MR. KLOCK:  That's not clear, Judge.

22          THE COURT:  Enough for him to say there was no

23   evidence?

24          MR. HUNNEFELD:  There was no evidence that there was

25   outside.  There were no casings that were found.  There were no
```

1  bullet holes in the wall.  There was no damage done to either

2  the glass or any of the equipment behind it.

3       So there is no -- there was no evidence that was found

4  as of the time of that bond hearing outside, and there was no

5  evidence found afterwards.

6       MR. KLOCK:  Except that the CSI guy says that the story

7  is plausible.  They're a guide, Judge.  Of course, there's no

8  shots through the window.  The gun was fired through the space,

9  the four-and-a-half or six-inch space.

10      But that's not the point, Judge.

11      The point is Sanchez lied.  He lied to the judge to get

12  the kid held for 19 months, and it worked.

13      The day before -- and we have that transcript, too --

14  the judge looked at the arrest form and he says, "Okay, it says

15  that this guy was in the place before the shooting took place,

16  that no one else was there at that time; but there's no

17  indication of who was there at the time of the shooting.

18  Sorry, Charlie, not enough.  This is what I want to know

19  tomorrow."

20      Then they have a probable cause hearing the next day.

21  Sanchez comes, Sanchez lies.  As a result of Sanchez's lie,

22  Judge, that's why this young man spent 19 months in jail, not

23  because of the trajectory of bullets and anything else.

24      MR. BASCO:  And, Judge --

25      MR. KLOCK:  And the other problem, Judge, apparently

1   well-trained homicide detectives at the City of Miami don't

2   have a problem with seven bullet holes and four shell casings.

3   Your Honor's order even indicates that there's more than four

4   shots.

5          THE COURT:  Well, it also says -- he says, also on page

6   8, between lines 8 and 9, "There's no evidence.  The absence of

7   evidence was also very, very loud and clear."

8          MR. HUNNEFELD:  Talked about the evidence outside.

9   There were no shell casings.  There was no evidence that

10  somebody was shooting -- this was an automatic weapon which

11  would have ejected casings --

12         MR. KLOCK:  Judge --

13         MR. HUNNEFELD:  -- if someone was shooting from the

14  outside.

15         But honestly, we account for each -- that seven is

16  misleading.

17         THE COURT:  I know you have all this in your head,

18  Mr. Hunnefeld, but that's not what the papers said.

19         MR. KLOCK:  Not what the judge was told.

20         MR. HUNNEFELD:  If I can just complete that thought.

21         The fact that there was no evidence outside.  The

22  absence of evidence is also strong -- I mean, I have to

23  interpret -- I have to tell you what Mr. Sanchez said, what he

24  meant by what he said.

25         THE COURT:  You don't have to tell me and you don't

```
 1   have to say what he meant.  I have a transcript.

 2              MR. HUNNEFELD:  In the absence --

 3              MR. KLOCK:  He's willing to interpret it.

 4              MR. HUNNEFELD:  You're saying that's not what he said.

 5   He said the absence of evidence is also very strong, but I'm

 6   telling you what the absence of evidence was.

 7              THE COURT:  This is the question and here is the

 8   answer:

 9              "There's no evidence the shooting occurred outside.

10   The evidence that we have places the shooter inside the crime

11   scene.

12              "Question:  What evidence is that?

13              "Answer:  Body placement, along with the casings and

14   the actual window, where he claimed that the shooting happened

15   through, was not shattered in any way.  There's a curtain that

16   was hanging over it.  There's no evidence -- the absence of

17   evidence was also very, very loud and clear."

18              MR. HUNNEFELD:  Correct.

19              MR. BASCO:  Correct, Judge.

20              And that's what the facts are.

21              I know what counsel is representing, that there's seven

22   bullet holes.  There won't be a witness that says there's seven

23   bullet holes.  I know counsel is saying there's probable --

24              MR. KLOCK:  Four casings, Judge, and they were holes

25   all over the place.
```

1          MR. HUNNEFELD:  Four.

2          MR. BASCO:  Judge, I have the photographs if Your Honor

3   would like to see them.  There's an indication of the same

4   exact shots; there's four shots, there's four casings.

5          What Technician Yen will say, he will not say that it's

6   probable that the shots happened from the outside.  What he

7   will say is that crime scene technologists do not say

8   impossible.  So possible is always a thing, given the number of

9   circumstances.

10          He will say it's not probable, it's not reasonable,

11   it's not logical.  My finding and my own opinion is that all

12   the shootings occurred inside the home and all three were

13   inside the home, including this plaintiff.

14          MR. KLOCK:  Judge, we took the man's deposition, okay?

15   And let's finish up the story because they don't want to talk

16   about this.  Okay?

17          What happened in the jail?  What happened in the jail

18   and what Mr. Smart's testimony would show is he is in a cell at

19   the stockade.  And as Your Honor may or may not know, there's

20   about 20 to 30 beds in the cell.  Okay?

21          The officer's outside in that particular facility.

22          Somebody who's in the cell who's had some conversations

23   with Taiwan, but Taiwan really hasn't paid a lot of attention

24   to him, approaches someone else in the cell -- this is

25   Mr. Carter -- he says, "I got something I'd like to tell you;

1    if I tell you, you know, I'd have to do something serious."

2            "So, then don't tell me."

3            But then he goes ahead and tells him.  This is what

4    he's telling him.  He tells him:  "I murdered these two niggers

5    in there, and this one didn't get away, and I'm supposed to get

6    him, too."

7            So the kid that he's talking to is all upset, goes to

8    the trustee inside the cell.

9            The trustee says, "You got to tell him."  But he didn't

10   tell him right away.

11           So at some point in time during the day Taiwan and this

12   other young man, Arsenio Carter, are having some argument about

13   something.

14           The other kid walks in and sees the two of them and

15   says, "Oh, you told him."

16           And Taiwan said he knew immediately what he was talking

17   about.  Arsenio Carter is taken out.

18           The State Attorney sends over an investigator, sends

19   over Sanchez's people.  They take statements from the two or

20   three people in the cell that this kid admitted to, and this is

21   what he admitted happened.

22           After they fired into the place, Taiwan got away.

23           They came around, they went -- they held a gun

24   apparently inside, got someone to open the door, went in,

25   robbed the place, put the two boys on the floor and shot them

 1    through the head.

 2              That's what he did.

 3              Now, why has the State Attorney not done anything about

 4    it?  Because, apparently, one statement is not enough.  But

 5    this is the point we want to get into with the evidence.

 6              There are hundreds or at least dozens and dozens of

 7    swabs, dozens and dozens of fingerprints from inside the

 8    apartment that have never been tested.  Why?  Well, everything

 9    was fine, Judge, the show was running.  30 more runs.

10              Every time the thing is running, this boy's out of

11    jail, he's getting calls from people, people looking at him

12    suspiciously on the street.

13              And the other thing, they had no interest whatsoever in

14    solving this crime.  They didn't then.  They don't now.  No

15    interest whatsoever.

16              But our point with respect to this is, he went into

17    Judge Cueto and he lied.  That's what he did.  He told whatever

18    lie he had to tell to get the job done and he got it done.

19    Because otherwise, Judge, what would have happened is the young

20    man would have been held on three bonds of $5,000 apiece,

21    except one of the bonds, which is, you know, selling drugs

22    within a thousand feet of a school.  Wouldn't have stuck

23    because of the time it was on the arrest form.  But that's

24    nothing.  That's $1,500 worth of premiums.  They can pass a hat

25    around where -- the neighborhood he lived in and kids would

1    come up with that.  But you can't come up with a bond, number

2    one, when there is no bond.  And then the huge bond you would

3    have for a murder.

4         And our point is -- the very simple point that we

5    raised before:  The damage is not done -- first, we think he's

6    arrested.  When you're arrested, two counts of murder, the fact

7    that they come up with another paper, Assistant State Attorney

8    Aroca charges all these other things.  That's fine.

9         But that's not why he was arrested.

10        It's there in the video, Judge.  "You're under arrest,

11   two counts of murder."  That's what he says.

12        MR. BASCO:  And you've already ruled on false arrest,

13   Judge.  This is all arrest.

14        MR. KLOCK:  That's fine.  But the point is, so why

15   didn't I fuss with you about that?  Because it's only 24 hours,

16   Judge.  That's not the 24 hours I'm worried about; I'm worried

17   about the 19 months which was filed.

18        MR. BASCO:  Which is not a false arrest claim; which is

19   a false imprisonment.

20        THE COURT:  It's a false --

21        MR. BASCO:  And the problem is, Judge, is that based on

22   his argument, what we're trying to show is that probable cause

23   existed so the detention was reasonable.

24        That's their argument, is that probable cause is,

25   therefore, a defense to false imprisonment because probable

 1    cause for that count detains him.  That's the evidence that

 2    we're showing that our side is reasonable, his side is not.

 3           That's what it comes down to.

 4           What he wants to say is that there is a malicious

 5    prosecution, an intentional lie and intentional logical basis

 6    to keep him in custody, and it's sort of scheme done by the

 7    officer for the sole purpose of keeping him in.

 8           Your Honor said, this is not malicious prosecution; you

 9    said it's false arrest.

10           MR. KLOCK:  False imprisonment.

11           MR. BASCO:  I'm sorry, it's false imprisonment.

12           But probable cause is an absolute defense, so we can go

13    and show probable cause for second-degree murder.  That allows

14    our officer to say, I didn't believe what he said; I believed

15    what he said.

16           Really what comes out is a criminal defendant in

17    custody telling the officer, "I didn't do it," no probable

18    cause exists.  That's essentially what has to happen for

19    Mr. Klock's side to be correct.

20           Because he says whatever the defendant says has to go

21    against probable cause, and that's not the case.  There has to

22    be a reasonable basis that he believed that he committed a

23    crime.

24           And that's what we're doing by showing this evidence.

25    That's what he started talking about, Judge, is why we were

```
 1    presenting such evidence.  And that's the reason.
 2              MR. KLOCK:  Let's go back down to where we were, Judge.
 3              First, our point is false imprisonment is triggered by
 4    Detective Sanchez's intentional lying.  He admitted that he,
 5    quote/unquote, "misspoke," right?
 6              And then later, you know, Henry was sort of, like,
 7    almost demolished him on the sidewalk outside the building
 8    after the deposition was over, understandably.
 9              But that is the issue, Judge.
10              The issue is that he was falsely imprisoned because of
11    what Sanchez said.  What Sanchez said was false.
12              The other things he had in the arrest affidavit were
13    false.  Okay.  The arrest we think took place when he said,
14    "You're under arrest for two counts of murder."  But let it
15    slide.
16              The false imprisonment is 19 months; that's where the
17    real damage is.  19 months, Judge, when the kid doesn't know
18    whether he's going to spend the rest of his life in jail; when
19    no one is having any contact with him; when he has no money for
20    commissary, no money for telephones; when he loses 19 or 20
21    pounds.  19 months of torture because of Detective Sanchez who
22    didn't care.  They don't care.  The City still doesn't care.
23    They don't care.  They don't care.
24              The only thing that was important, Judge, when you see
25    the first videotape, if you haven't seen it yet, is you have
```

```
 1    glowing pictures of cars going across the causeway to

 2    Miami Beach.  Palm trees flowing in the air.  Shots of downtown

 3    Miami.  The whole purpose of ""The First 48"" policy of the

 4    City of Miami was promote the city.  The instructions to the

 5    officers were, do whatever it is they want.  If you're there,

 6    they can be there.  They even sent a tape before any show was

 7    broadcast for them to review.  They didn't do anything with

 8    those tapes.

 9            THE COURT:  Let me ask a question.

10            MR. KLOCK:  Yes, ma'am.

11            THE COURT:  The tape of -- for review of Mr. Smart's

12    show, was he still incarcerated?

13            MR. KLOCK:  Yes, Your Honor.  The tape for the show was

14    shown in July 2010.  He was in jail.

15            THE COURT:  One at a time.

16            MR. HUNNEFELD:  At the time.

17            THE COURT:  So the show was aired in July of 2010?

18            MR. HUNNEFELD:  When he was still in custody.

19            THE COURT:  One at a time.

20            MR. KLOCK:  It's been shown repeatedly.  I have seen it

21    at least ten times.

22            THE COURT:  When was it shown?

23            MR. KLOCK:  July of 2010.

24            THE COURT:  Was he incarcerated in July of 2010.

25            MR. KLOCK:  Yes, Your Honor, he was.  He was.
```

```
 1              THE COURT:  So does that mean -- someone can answer
 2    this question for me:  Was that reviewed -- meaning Mr. Smart's
 3    interrogation -- and the other portions at A&E sent to --
 4              MR. KLOCK:  Buhrmaster.
 5              THE COURT:  Was that reviewed by the City --
 6              MR. KLOCK:  Yes, Your Honor.
 7              THE COURT:  -- while Mr. Smart was still in custody?
 8              MR. KLOCK:  Yes, Your Honor.
 9              MR. BASCO:  I'm sorry, what does "reviewed by the City"
10    mean?  I want to just clarify.
11              MR. KLOCK:  The tape was reviewed before it ran the
12    first time in July 2010.
13              MR. BASCO:  Does that mean there's editorial?  I don't
14    think he's saying that there's editorial.
15              "Review" sounds like he edited it, Judge.
16              MR. KLOCK:  He didn't.
17              THE COURT:  I just said "reviewed."
18              MR. HUNNEFELD:  I don't believe there's any evidence of
19    anybody specifically remembering viewing this tape.  That's not
20    an element of --
21              THE COURT:  Hold on a second.  Hold on.
22              Counsel for the plaintiff, do you have any evidence
23    that, prior to this airing the first time while Mr. Smart was
24    still in custody, did someone at the city review it?
25              MR. KLOCK:  Yes, Your Honor.  The testimony was that
```

 1    before it ever --

 2            THE COURT:  When you said "the testimony."  Who are you

 3    saying said that?

 4            MR. KLOCK:  Commander Cooper was the designated

 5    representative of the City.

 6            THE COURT:  Microphone, please.

 7            MR. KLOCK:  I'm sorry.

 8            Commander Cooper was the designated representative of

 9    the City at the time.  She, at the time, still is commander of

10    homicide.  She also has other duties directly reporting to the

11    Chief of Police.

12            But she testified, and the contract shows, that each

13    episode before it is run is sent to the City for its review.

14            It was sent originally to Buhrmaster when he was in

15    charge of homicide, and then later was sent to Commander

16    Cooper.  But Commander Cooper was not there at the time that

17    Taiwan's tape was reviewed.  She was there, but she was in

18    charge of a homicide team.  She has since been elevated to a

19    couple of other positions.  Buhrmaster was in charge then.

20            THE COURT:  So, do you know, at the time this tape was

21    sent to the City, who would have been responsible for the

22    review?

23            MR. KLOCK:  Buhrmaster.

24            MR. HUNNEFELD:  Buhrmaster's deposition wasn't taken in

25    this case.  No evidence was taken.  He's no longer an employee

```
 1    of the City of Miami.  And, Your Honor, I think -- if we focus

 2    on the elements of the claim --

 3              MR. BASCO:  Judge, what we're doing is jumping to a

 4    "First 48" thing and I'm trying to focus on --

 5              THE COURT:  Let me go back, and let me tell you what

 6    I'm hearing.

 7              MR. BASCO:  Judge, I think I have a good summary, if I

 8    can just spit it out.  I think I'm the one that's not

 9    understanding.

10              What I understand is that the plaintiff's claim that he

11    was maliciously and without probable cause held, and that later

12    on something was done that it terminated in his favor and it

13    caused him harm.  That's what he's saying.

14              THE COURT:  No, no.

15              MR. KLOCK:  That's wrong.

16              MR. HUNNEFELD:  What he's saying is that he's lying in

17    the deposition.  There's your malicious --

18              MR. KLOCK:  Definitely lying.

19              MR. BASCO:  Hold on.

20              THE COURT:  Here's where I'm coming from.  You have

21    whatever happens on the street; I'm not worried about that.

22    The officers are doing what they're doing.  All right?

23              Mr. Smart comes into the station.  He's arrested.  I'm

24    not even worried about that.

25              Sanchez has the first contact with the judicial officer
```

1    on day one.  And the judge reads the form and says, "HMM, I do

2    not think we have probable cause here."

3            MR. HUNNEFELD:  He doesn't say that.  He says, "I would

4    like to have more information."

5            THE COURT:  Whatever.

6            But more information usually means I don't have

7    probable cause.  Judges don't ask for more information if they

8    think they have probable cause.  They go in and do what judges

9    do.

10           Day two comes about and Sanchez comes in personally;

11   correct?

12           MR. HUNNEFELD:  Correct.

13           THE COURT:  For which we now have this transcript.

14           MR. HUNNEFELD:  Yes.

15           THE COURT:  So, I am assuming he came into court in

16   front of Judge Cueto, raised his right hand, took an oath and

17   testified to these things as true.

18           MR. HUNNEFELD:  He did.

19           THE COURT:  Okay.

20           MR. HUNNEFELD:  He answered the questions.

21           THE COURT:  At the time, knowing that at least some of

22   them were not true?

23           MR. HUNNEFELD:  I -- I believe that's not correct.

24           I believe he said certain things in a way that it

25   implies that it was a certain way.  But the bottom line is, he

1    said -- what Smart says is, there are no more shots after I

2    leave that apartment.  Everybody agrees with that, the other

3    two witnesses, no more shots --

4            MR. KLOCK:  Wrong, Judge.

5            MR. HUNNEFELD:  -- within that period of time.

6            MR. KLOCK:  Wrong, Judge.

7            MR. HUNNEFELD:  Please.

8            THE COURT:  Let him finish.  Let him finish.

9            MR. HUNNEFELD:  There's no more shots when I leave the

10   apartment.

11           THE COURT:  There's no more shots that he hears.

12           MR. KLOCK:  That's right, Judge.  No more shots that he

13   hears, and he would have been in a position to hear.

14           MR. HUNNEFELD:  They would have put in -- I'm sorry,

15   Your Honor.

16           THE COURT:  Let him finish.

17           MR. HUNNEFELD:  I sit and listen, but I don't want to

18   be interrupted, the same way that I didn't interrupt.

19           The testimony of the two other individuals were, there

20   were no other shots, other than those in that first -- bang --

21   minute.

22           So him saying, "All the shots were done by the time I

23   left the apartment," meant he was in the apartment at the time

24   that the deadly shots occurred.

25           If he's in the apartment at the time that the deadly

1  shots occurred -- and Mr. Yen will testify that the shots that

2  killed these individuals, those two shots, no question, could

3  only -- and I think this is agreed -- could only have been done

4  inside the apartment.

5          MR. KLOCK:  Correct, Judge.

6          MR. HUNNEFELD:  So when he says that he sees the shots

7  that kills the two other boys that were there, what he is

8  saying -- he's in the apartment when the shots occurred.  He's

9  admitting to hearing those shots that killed those individuals.

10          MR. KLOCK:  Wrong, Judge.  That's nowhere in the

11  record.

12          MR. HUNNEFELD:  He's saying, I did not --

13          THE COURT:  Mr. Klock, please.

14          MR. HUNNEFELD:  I can't.

15          THE COURT:  Keep going, please.

16          MR. HUNNEFELD:  So he's in the apartment when the

17  shots (sic) were killed.  He says, "I didn't see them killed."

18  That's the difference.  That's the -- so -- nobody else is in

19  that apartment, he's saying.  All the shots are heard before he

20  leaves the apartment.

21          So the shots could only -- that killed these people

22  could only have come from within the apartment.  So when you're

23  asked questions the night after an investigation where you've

24  been doing -- barely sleeping, and the judge is asking you

25  questions quickly, you will hear his tone of voice.  It's not

```
1    about lying; it's about trying to remember tons of testimony in

2    the exact way that it's given.  And his statement, while not

3    exactly what plaintiff said, is -- can reasonably be implied

4    from what plaintiff said, but it wasn't what he said.

5         MR. KLOCK:  So, Judge, here's the problem we have at

6    the end of the day, and this gets back to the point I raised

7    before.

8         I have an extremely high regard for Mr. Hunnefeld.

9    He's an excellent lawyer.  But the problem is, Judge, the City

10   didn't care then and they don't care now.

11        They had investigators go out and take statements from

12   somebody, two people.

13        Judge, how often have you heard of two people in jail

14   implicating a third person for a murder committed by somebody

15   else in the cell?  Never.  Okay?

16        So they have -- this evidence that they have, all they

17   have to do, Judge, even after 19 months, okay, all they have to

18   do is take Arsenio Carter's fingerprints that they have a

19   record, because he's in prison; Arsenio Carter's DNA that they

20   have on record and match it against the boxes of material they

21   still have.

22        But, Judge, all they were interested in doing was

23   getting ""The First 48"" in the box.

24        THE COURT:  That's another part of your analysis.  Get

25   me by the probable cause hearing.  That's where I am.  That's
```

1   another cause of action you got going on.  I can't get there.

2        If I find -- and the result would have been very

3   different here.  If I thought Sanchez was truthful, that Judge

4   Cueto had accurate information in order to make his probable

5   cause determination, the motion for summary judgment would have

6   been very different.

7        MR. KLOCK:  I know that, Judge.  That's clear from

8   reading it.

9        THE COURT:  I don't think Sanchez was truthful and I

10  think the facts -- I think that -- let me put it like this, and

11  it's not what I think.

12       The question of fact that it is, is there a material

13  issue about that fact?  And I believe there is on the issue of

14  probable cause.

15       MR. KLOCK:  I'm not following you exactly.

16       THE COURT:  That's the summary judgment standard.

17  Taken in the light most favorable to the nonmoving party, is

18  there an issue, a fact?  And I believe the fact is, was Sanchez

19  truthful?

20       If Sanchez is truthful and Cueto has accurate

21  information -- when I say "truthful," if he is representing the

22  facts as he sees them at the time.

23       He can always make a mistake.  He can always find out

24  other information that would say, No, Judge, I thought X was Y

25  and Y was Z when I first came on the scene.  But I've now done

```
 1    further investigation and I knew that those facts are not

 2    accurate.

 3         I think that there is a question of fact about whether

 4    or not Sanchez gave accurate information relating to probable

 5    cause to Judge Cueto.  Because I believe you take the facts in

 6    favor of the nonmoving party; and that is, if those facts are

 7    not accurate, you survive.

 8         MR. KLOCK:  Yes.

 9         THE COURT:  Now somebody needs to somehow prove that

10    Sanchez's presentation at the hearing was accurate.

11         MR. KLOCK:  Not us.

12         THE COURT:  No.  But I'm saying, you've said, Judge,

13    look, this is what's happened.  I don't have any of this.  It's

14    not accurate.

15         MR. KLOCK:  Oh, I'm sorry.

16         THE COURT:  It's not accurate.

17         MR. KLOCK:  No, no.  Okay.

18         Now, fortunately -- see, in most situations where you

19    have law enforcement officers, you have their word against the

20    suspect's word.  Fortunately here every minute is transcribed,

21    Judge.  There's a camera recording every minute.  It has been

22    transcribed.

23         At no point in time during the 15 hours of

24    interrogation did Mr. Smart ever indicate that the kill shots

25    came through the window; did he ever indicate that he was
```

1    present when anyone was shot; that he ever thought the people

2    were shot at the time he left.

3           And why CSI whatever his name is, Yen, Yen said that

4    what he said about shots being fired through the hole in the

5    window could -- in the crack of the window could well have

6    occurred.  And there's shots, Judge, that go off in the

7    direction that he was going in; it's not a really big room.

8           But the fact of the matter is, Judge, that our point is

9    that that was what kept the young man in jail, and it was

10   intentional.

11          Sanchez never said, "Oops, I meant something

12   different."  He didn't mean anything different.

13          In the closeout memo he agrees with Mato that he didn't

14   do it.  Then he comes in and takes his deposition and says he

15   did do it; and that way he's still telling Mr. Hunnefeld, who

16   wouldn't make that misrepresentation to the Court, okay.

17          And the problem is -- and my problem with his opening

18   statement was, it was the old four-part syllogism where you're

19   taking the middle term and you're having it applied both ways.

20          There was a shooting, that's correct.  Mr. Smart says

21   there was a shooting through the window.  He doesn't say that

22   the shooting went into their heads.

23          He wants to leave the impression that that's what he

24   said.  He never said that.

25          And the evidence that was later presented to the State

1    Attorney was that Arsenio Carter held a gun on people, had them

2    open the door, that they pushed the sofa out of the way, came

3    in, he put those boys on the floor, Judge, and shot them

4    through the head.

5           MR. BASCO:  As said by the State Attorney's Office.

6           MR. KLOCK:  Judge, the problem is, Detective Sanchez.

7    Detective Sanchez told a lie.  He told a lie to the judge.  He

8    has never suggested that he didn't mean to say that to the

9    judge.  To this day he has never suggested that.

10          MR. BASCO:  And, Judge, if we take that -- I'm not

11   going to argue with him saying he's lying.  Let's just say he's

12   lying.

13          The other part is that, you can look at all of these

14   statements during the probable cause hearings and at the arrest

15   in conjunction with what the Court was doing at that point and

16   determine if, based on his statement, after that one the

17   probable cause still exists with second-degree murder.

18          Now the reason why we're arguing probable cause is, the

19   next thing that's going to happen is, if there's no probable

20   cause for second-degree murder, is his detention therefore

21   reasonable and under the color of law.  There are other

22   charges.  There is a lesser-included offense with second-degree

23   murder which is third-degree felony murder, which is what he's

24   admitting to.  I'm sorry.

25          THE COURT:  He hasn't admitted to that.

```
 1              MR. BASCO:  Judge, I'm involved in a drug transaction

 2    during one of the people -- I'm in the drug transaction --

 3              THE COURT:  I dealt with that in the motion for summary

 4    judgment.  Let's move on.

 5              MR. BASCO:  Correct, Judge.  But that is going to go

 6    into play for a number of reasons.  It's going to go into

 7    play -- which I think Your Honor found probable cause for that.

 8    If probable cause --

 9              THE COURT:  Okay, this is what everybody needs to do

10    tonight.

11              MR. KLOCK:  Judge, one other thing before we --

12              THE COURT:  I just want to be really clear here.

13              MR. KLOCK:  Right.  Did you invite me to say something?

14              THE COURT:  No.  I'm pausing.  I know the sound of

15    silence is --

16              MR. HUNNEFELD:  It's a void that we all want filled.

17              THE COURT:  To the City, I think when you are referring

18    to what occurred as probable cause, you need to be very

19    specific about what the officers saw, observed and did.  And do

20    not couch it in terms of Mr. Smart being truthful or

21    untruthful.

22              MR. HUNNEFELD:  But --

23              THE COURT:  Now, I know that that is what went into

24    Sanchez's head when he's interrogating him.  That's different.

25    That's different.  Because if my understanding is correct, the
```

```
 1    plaintiffs are going to play certain portions of the

 2    interrogation.  Am I wrong?

 3            MR. KLOCK:  That's correct, Your Honor.

 4            MR. HUNNEFELD:  As will the defense.

 5            THE COURT:  And that will then allow the jury to make

 6    the factual determination on their own.

 7            But I don't want you all characterizing if something

 8    Mr. Smart said was true or untrue.

 9            MR. HUNNEFELD:  I understand.

10            THE COURT:  And that was my concern, Mr. Hunnefeld,

11    when I first had paused during your opening statement.

12            MR. HUNNEFELD:  I believe I understand, Your Honor.

13    It's not the fact --

14            THE COURT:  If Detective Sanchez says, Listen --

15            MR. KLOCK:  Officer.

16            THE COURT:  -- Officer, excuse me, I saw A, B and C,

17    then I spoke to Mr. So-and-so; and based upon my training and

18    experience, I did not think that was accurate so I did Y,

19    that's what police officers do all the time.

20            MR. HUNNEFELD:  That's right, Judge.

21            THE COURT:  That's why we pay them.  Not enough money

22    but we pay them.

23            That's very different than saying Mr. Smart was not

24    telling the truth.  The jury may determine that later.  But

25    that's very different.
```

1          If that theme continues to run on the City's side of

2     the aisle, I'm just letting you know that I may view that as

3     opening the door to the results of the polygraph.

4          What I have allowed so far is only the fact that

5     Mr. Smart asked for one.  I have not allowed any results.

6          MR. HUNNEFELD:  Your Honor, how about if we go through

7     specific instances in the interrogation where untruthful

8     statements are made by Mr. Smart to the police officers?

9     Demonstrable run-through.

10         THE COURT:  I think that what you have is examples of

11    compare and contrast; what Mr. Smart says and what the evidence

12    shows.

13         So all I'm going to say is, Mr. Smart says, "I was

14    wearing a blue shirt," and you have a witness that said, "I saw

15    Mr. Smart at X time, and he was wearing a red shirt."

16         MR. HUNNEFELD:  Well, Mr. Smart in his deposition --

17         THE COURT:  Says I was wearing...

18         You have what is open to you as the normal channels of

19    witness impeachment, and you would never -- in any case, you

20    would never say to a witness -- usually -- "You're lying."

21         You would use your powers of impeachment:

22    cross-examination, recollection recorded.

23         I am certain -- and no disrespect to anyone -- that if

24    I were to add up the collective trial experience in this room,

25    it's a lot of it.  So I don't feel like I have to go over

1    Newbie Trial Lawyer 101.  You know how to impeach.  You know

2    how to refresh recollection.  You know what to do with

3    depositions, and I shouldn't be doing that.

4           MR. KLOCK:  But, Your Honor, if I may.  Here's the

5    difficulty I have with this.

6           First, how do we unring the bell we already had in the

7    opening statement he made?

8           He also said that Mr. Parker said that there was one

9    volley of shots.  There's an investigative report from the

10   City of Miami that says I made contact with Mr. Parker inside

11   Apartment Number 1.  Mr. Parker stated that earlier in the day

12   he heard two shots coming from the south side of the apartment

13   complex.

14          THE COURT:  Is Mr. Parker a witness?

15          MR. KLOCK:  No.  He says he is, but he's not listed.

16          MR. HUNNEFELD:  Your Honor, we're going to be

17   introducing his statement to the police.

18          MR. KLOCK:  That's not a witness.  It was a statement

19   made to the jury that he's going to present a witness who's

20   going to testify.

21          THE COURT:  Well, wait, let's see what happens.

22          MR. KLOCK:  Okay.  And then about a minute later

23   Mr. Parker heard two to three additional shots.  So the

24   representation to the jury that he's heard one volley of shots

25   is wrong for two reasons:  Number one, he's not listed as a

1    witness and he's not testifying; and number two, he didn't say

2    one volley of shots.

3            THE COURT:  Mr. Klock, it's early.

4            MR. KLOCK:  Yes, ma'am.

5            THE COURT:  I understand what you're saying, but we

6    just got past opening statements.

7            MR. KLOCK:  But, Judge --

8            THE COURT:  I think everyone understands where I expect

9    the case to go.  We probably won't even be having closing

10   arguments in this case until next Thursday.

11           MR. KLOCK:  Judge, but what do we do now about the

12   statement made to the jury with respect to the truthfulness?

13           THE COURT:  I think you keep going.  There's no --

14   would you like for me to say to not think about the pink

15   elephant in the room?  That's not really helpful to you either,

16   is it, Mr. Klock?

17           MR. KLOCK:  Judge, here's one problem we have; and that

18   is, despite the fact that you've ruled three times what the

19   felony murder rule means, they doggedly insist that the felony

20   murder rules still apply, and to talk about the felony murder

21   rule and bring in Mr. Aroca and have him testify about the

22   felony murder rule.

23           THE COURT:  Well, if I have not made it clear:  We're

24   not talking about the felony murder rule.  All right?

25           MR. KLOCK:  One final thing before we break.

```
 1          Based on what he said during his statement, he has said

 2   he acknowledges that "First 48" did what they did without

 3   Mr. Taiwan Smart's permission.  He said they did it because of

 4   good police work and community, blah, blah.

 5          The Wilson case makes it clear that that doesn't carry

 6   any water.

 7          We would move for a directed verdict, that the jury be

 8   directed to find that there was a violation of his Fourth

 9   Amendment rights when they went into his --

10          THE COURT:  I am not prepared to do that at this time.

11   Please reserve that motion.

12          MR. KLOCK:  Okay.

13          MR. BASCO:  I'm sorry, Judge, I was trying to find -- I

14   know, Judge, we're getting late here.

15          The felony murder rule, what you found was that there

16   was probable cause within the motion.  There's no limitation to

17   that.  What this comes to is reasonableness of incarceration

18   and potential damages.  What is going to come into play is that

19   that's a lesser included offense, he can be held for that.  And

20   if he's guilty of that --

21          THE COURT:  That is a bondable offense, not a

22   non-bondable offense.  And I do discuss that very specifically

23   in the motion for summary judgment.

24          MR. BASCO:  And I understand that, Judge.  And in

25   April, four months later, he has a bond for those counts.  So
```

1    that's another issue for another day.

2         But what our argument is, is that if he is guilty of

3    felony murder, then his incarceration for 19 months, whether

4    it's on us or the State Attorney's Office, is reasonable.

5         THE COURT:  We're not going to talk about guilt or

6    innocence; are we?

7         MR. BASCO:  Judge, I think we have to because --

8         THE COURT:  Why are we going to talk about guilt or

9    innocence of felony murder?

10        MR. BASCO:  Because if he's held in custody and he's

11   guilty of a crime which he has confessed to --

12        THE COURT:  I just said, we're not going to re-try the

13   case.  You guys want to think about another way of doing it,

14   I'm not doing it.  All right?

15        MR. KLOCK:  And Judge, also now it seems to me that you

16   should also rethink your ruling about Arsenio Carter, because

17   they have now said that it's positively untrue, could not have

18   happened.  And now we have a theory that was presented to the

19   police, which they have done nothing with, that Mr. Carter

20   was --

21        THE COURT:  I'm thinking, but right now I don't think

22   it's risen to that level.

23        MR. KLOCK:  Okay.

24        THE COURT:  But what keeps happening is, if you keep

25   saying that -- this is what you don't understand.  If you want

1    to try felony murder, then why can't I let them bring in

2    Arsenio Carter?  Why can't I let them talk about the

3    fingerprints?  Why can't I let them talk about who he talked to

4    in the stockade?  Why can't I just bring all of that evidence

5    in too?

6         MR. HUNNEFELD:  Let me say, Your Honor, that if they

7    wanted to bring in Mr. Carter and prove that he did it, we

8    would be thrilled.

9         They can't find Mr. Carter.

10        THE COURT:  But that's not their job.

11        MR. HUNNEFELD:  They don't know where he is.

12        If I can just have three or four uninterrupted minutes.

13        This is the -- the confession is the rankest hearsay

14   that you can possibly imagine.  It's one person in jail talking

15   about what another person in jail allegedly said.

16        This wasn't an admission by Mr. Carter to anybody else.

17   This was somebody talking in jail who isn't available.  I

18   understand that he's deceased.  I --

19        THE COURT:  Mr. Carter is deceased.

20        MR. HUNNEFELD:  But the person who was the conduit for

21   the information that Carter allegedly told him that he did it,

22   and he told Smart; my understanding is he is not alive.

23        It is hearsay, the fact that he said it.  Carter didn't

24   admit to doing it, and there's nothing else there.  We're just

25   going to say, since somebody potentially could have done it,

```
 1   somebody said that they did it, well, that changes everything.

 2   It changes nothing.

 3         If this was about the guilty or innocence of Mr. Smart,

 4   let us try Mr. Smart for all the offenses.  Mr. Smart is

 5   saying -- well, I don't want --

 6         THE COURT:  Somebody on the State side elected not to.

 7         MR. HUNNEFELD:  Excuse me?

 8         THE COURT:  Somebody on the State side elected not to.

 9         MR. HUNNEFELD:  And I guess Ms. Mato will explain her

10   determination.  But we're in a civil court.

11         MR. KLOCK:  The police department has the

12   responsibility of conducting the investigation, not Ms. Mato.

13   The police department is supposed to.  And as a matter of fact,

14   Detective Sanchez and Detective Cepero have both said that the

15   case is still open.  Okay, the case is still open and being

16   looked at.

17         MR. BASCO:  The homicide; not the felony murder charge,

18   Judge.  Those are two separate instances.

19         THE COURT:  It's the same thing.

20         MR. BASCO:  They're not, Judge.  They're completely

21   separate.

22         A felony murder is completely different than a murder.

23   A murder is I'm the shooter.  Felony murder is, I'm involved in

24   a transaction with the shooter.  You can do two separate

25   prosecutions of the two separate people.
```

1    THE COURT:  But either way, they elected not to do it.

2    MR. BASCO:  That's correct.

3    THE COURT:  Both of which resulted in the murder of two

4    very young men.  And they would think that --

5    MR. HUNNEFELD:  That has nothing to do with probable

6    cause, Your Honor.

7    THE COURT:  Pardon me?

8    MR. HUNNEFELD:  It has nothing to do with probable

9    cause, Your Honor.

10   Ms. Mato would, in all likelihood, spoken to the issue

11   of whether the case could be tried in one.  And that's a

12   different standard under reasonable doubt.

13   We weren't dealing with that standard.  The State

14   Attorney's Office is the only one that handled this case.  They

15   directed the City of Miami to do whatever they wanted the

16   City of Miami to do after they filed their information.

17   We did nothing to keep him in there any additional

18   amount of time.  His criminal defense attorney could have moved

19   for an Arthur hearing at any time.  Could have gotten the bond

20   a week after this.  Did not do it.  They did get a bond on

21   April 30th.

22   THE COURT:  I'm sorry, just one at a time.

23   MR. HUNNEFELD:  And so under these circumstances, it's

24   hard for us to figure out exactly what we need to prove in this

25   case, because here's this kid who's saying that he didn't have

```
 1    any money in the world, he was only living in a place because

 2    he had free rent because his family was in such a terrible

 3    situation, yet this $20,000 worth of bond for the other

 4    offenses that would have kept him in jail for -- until --

 5            THE COURT:  Did he make those bonds?

 6            MR. BASCO:  No, Judge.

 7            MR. HUNNEFELD:  I don't know.

 8            So do we get into the evidence of that?  Is that a

 9    relevant issue for the plaintiff to get into with the

10    defense --

11            THE COURT:  Let me ask this question.  What was the

12    charge he was held on in jail?  Was it --

13            MR. BASCO:  He was held on five charges.

14            MR. HUNNEFELD:  Multiple.

15            MR. KLOCK:  Non-bondable offense charges.

16            MR. BASCO:  Held on five charges.  He was held on two

17    counts of second-degree murder, possession with intent.

18            I actually have the A-form, Judge, if you just allow me

19    one second.

20            MR. HUNNEFELD:  The information, I thought.  It's right

21    here.

22            MR. BASCO:  I have the form.

23            Judge, he's held on four count -- I'm sorry.

24            He's held on murder second degree, no bond; murder

25    second degree, no bond; Count 3, possession of marijuana with
```

```
 1    intent to sell, that's 7500; Count 4, possession of firearm by

 2    a convicted felon, that is 5500; and possession of -- I'm

 3    sorry, I got them out of order, Judge.

 4         Cocaine, 7500; marijuana possession with intent 5500;

 5    possession of a firearm, convicted felon, 7500.

 6         THE COURT:  So it didn't matter.  Even if he made all

 7    the bonds in those cases, the non-bondable offense would have

 8    kept him inside.

 9         MR. BASCO:  And he would have had to show that he could

10    have made those bond, Judge.  It's a "but for" causation.

11         MR. HUNNEFELD:  Whether he could have made 20,000 as

12    opposed to 90,000.  Do we have to prove that he couldn't make

13    20,000 in this case?  He had a $75,000 bond.

14         THE COURT:  What I was going to say is, even if he had

15    the $75,000 bond and he posted those, he couldn't have been

16    released.

17         MR. HUNNEFELD:  Why not, Your Honor?

18         THE COURT:  Didn't he have the non-bondable murder

19    charge?

20         MR. HUNNEFELD:  That's what I was saying.

21         MR. KLOCK:  And what was -- that's wrong, Henry.

22         MR. HUNNEFELD:  It was $75,000.

23         MR. BASCO:  The court jacket -- I will pass it up to

24    Your Honor.  The court jacket shows that on April 30th -- and

25    this is the biggest problem we had, Judge, is that they said he
```

212

1    was being held without bond.

2         Judge, April 30th, 2010, the State agrees, proof not

3    evident, presumption not great; Court hears an argument as to

4    Phase II and sets Count 1 and 2, $75,000, with a Nebbia and a

5    bracelet, each count; Count 3, Count 4 and Count 5, $5,000

6    each, with no Nebbia.

7         MR. KLOCK:  So how do you count?  Seventy-five and 75

8    equals 150.

9         MR. BASCO:  There is a bond, Judge, in case he was not

10   being held no bond.

11        MR. HUNNEFELD:  So -- but that raises a question.  So

12   do we have to prove that he couldn't have made either bond or

13   was that irrelevant?  And what -- I don't think this is the

14   usual course where someone has to address the issue of making a

15   certain amount of a bond.

16        What the Court was looking at previously was that this

17   was non-bondable, so that nothing he did was going to change

18   it.

19        THE COURT:  Mr. Basco, show me where it says "bond," or

20   which line it says "bond"?

21        MR. BASCO:  Judge, April 30th, on the left-hand side.

22        MR. KLOCK:  It's an Arthur hearing, Judge.

23        THE COURT:  State does not --

24        MR. BASCO:  It says, "State agrees."

25        MR. KLOCK:  The State did not contest the first one.

```
 1              MR. BASCO:  PNE/PNG, proof not evident, presumption not
 2    great.  Court holds Phase II of the Arthur hearing, which is
 3    the reasonableness of detention, and Count 1 and 2, they are no
 4    longer non-bondable offenses.  The Court heard argument and
 5    gave each count 75,000 with a Nebbia requirement and a
 6    bracelet.
 7              MR. KLOCK:  Your Honor, except the papers filed with
 8    the Court represents $75,000.
 9              THE COURT:  So that's April 30th.
10              MR. BASCO:  April 30th, 2010.  There is no bond on any
11    of the counts at any time.
12              MR. KLOCK:  You can't post a partial bond, Judge.
13              MR. BASCO:  You could bond out a single count.  It
14    doesn't make logical sense, but --
15              THE COURT:  Shhh.
16              MR. KLOCK:  No, you can't.
17              THE COURT:  What I want to know by tomorrow is that, as
18    of April 30th, 2010, defendant goes into custody on November --
19              MR. KLOCK:  14th, I think, Judge.  18th.  November
20    18th.
21              THE COURT:  Was bond available to the defendant?
22              MR. BASCO:  On April 30th?
23              THE COURT:  On April 30th.
24              MR. BASCO:  Yes, Judge, after this hearing.
25              THE COURT:  On April 30th -- I want somebody to write
```

1    it down for me.

2         And I don't mean that he had a bond.  I mean -- because

3    I can give you a bond on all the other little things; but if

4    there's one offense that keeps you in --

5         MR. HUNNEFELD:  It's a question of money.

6         The Court is inquiring whether with the right amount of

7    money --

8         THE COURT:  Whether it's just a question of money,

9    that's what I want to know the answer to.

10        MR. KLOCK:  Yes, Your Honor.

11        MR. BASCO:  Judge, what would show Your Honor that is

12   the information which charges the five counts.  There's no

13   other count on there that -- Count 6 is not addressed.  All

14   five held within the information, Judge.  All five are

15   delineated within the jacket of the court document.

16        MR. KLOCK:  Your Honor, if he had $165,000 on April

17   30th, he could have gotten out of jail.

18        MR. NAPOLEON:  Judge, there's one other thing that

19   we're not talking about that I would like to point out.

20        THE COURT:  Hold on just a second.

21        The fact that he couldn't make bond and the fact of

22   being non-bondable, Mr. Klock, is two entirely different

23   things.

24        MR. NAPOLEON:  Judge, let me speak to that for just one

25   second because what we're failing to overlook is the fact that

```
 1    at the probable cause hearing the judge made a determination of

 2    proof evident/presumption great, which causes a person to be

 3    held without bond.

 4            At a particular point, if you get enough evidence in

 5    this particular case, then you may be able to move for an

 6    Arthur hearing, but you have to wait for an availability of the

 7    judge who has this case.

 8            One thing that we are missing in this particular

 9    circumstance is that Mr. Smart's attorney, he actually switched

10    attorneys, so there was a time period where there was no

11    availability for him to have an Arthur hearing.

12            Another thing that we're not recognizing, Judge, is

13    that usually, before you have an Arthur hearing, you receive a

14    report from the lead detective; and in this particular

15    situation they did not receive that report.  They didn't have

16    the information because, unlike Federal Court, the police

17    officers are not forced to turn that information over

18    immediately.

19            So what you're, in essence, asking is for the defense

20    attorney below to have a hearing before they even get the

21    evidence.  And that is the problem in this case regarding when

22    he got a bond, because they didn't --

23            THE COURT:  But, whatever -- if I'm understanding what

24    the City is saying -- there is this time period, from April

25    30th to when he is ultimately released, that he at least had
```

1    access to a bond.  Now, whether or not he got it --

2         MR. KLOCK:  No.  Judge, if you mean could he have

3    bonded out, yeah?  But, Judge, if he can't get the money, what

4    difference does it make?

5         I mean, the question of if it was a matter of whether

6    or not he was going to cash in his AT&T bonds or not, that's

7    one thing.  The man had no money.

8         THE COURT:  But I don't -- it's no disrespect, but

9    that's not Mr. Hunnefeld's problem.

10        MR. KLOCK:  Sure it is, Judge.

11        THE COURT:  No.  The problem is, is that when his

12   client's actors had the initial probable cause finding and he

13   goes in on the non-bondable, is there a period of time for

14   which he becomes bondable?  And their argument back to me just

15   now is, as of April 30th he became bondable.

16        MR. KLOCK:  That's correct.

17        THE COURT:  Now, if you want to talk about that he

18   couldn't, that's another; but at some point in time, you should

19   understand, if you want to go there, that may limit what you

20   can argue to this jury about what damages, if any, that you

21   have when that time period begins.

22        MR. KLOCK:  But, Judge, that's fine.  Except that if

23   the detective hadn't lied, the bond would have been $20,000 at

24   most, it would have been $2,000 on the street.  You cannot,

25   Judge, whistle your way into a $150,000 bond.  It requires

1    collateral.

2           On the street, in Criminal Court, okay, if some kid on

3    the street gets a $20,000 bond, he can scrape that up.

4           This is a $150,000 bond, plus a Nebbia, which only

5    occurred because Sanchez lied.  And if what the Court is

6    saying, respectfully, is --

7           THE COURT:  Why is that only available because Sanchez

8    lied?  Sanchez is on the second-degree murder, not what's

9    happening as of -- what is different on April 30th?  How is it

10   Sanchez's problem on April 30th?

11          MR. KLOCK:  Because, Judge, what happens in the state

12   system is, that once a bond is set and a finding is made, then

13   the only way to get it unmade is through an Arthur hearing.

14   The Arthur hearing is held and the judge, in effect,

15   establishes a bond which keeps him in jail.

16          But like the eggshell defense, you can't --

17          THE COURT:  So what you're saying is that at some point

18   in time after April 30th an attorney on his behalf could have

19   moved for a lower bond.

20          MR. KLOCK:  They did.  It was denied.

21          MR. BASCO:  It was denied.  There's no record in the

22   court docket and no record in the electronic docket that any

23   mitigating bond or any change of circumstances was ever filed

24   in this case.

25          MR. KLOCK:  Well, fortunately, Ms. Montaner will be

```
 1    here and able to testify about those things.

 2         THE COURT:  Well, I -- but right now, I will let you

 3    know, it looks like April 30th is a different day here.

 4         MR. KLOCK:  Judge -- I don't get it.

 5         MR. BASCO:  Judge, I want to point out another thing.

 6         MR. KLOCK:  So I don't get it.  So, in other words, if

 7    Detective Sanchez lied and, as a result of a lie, this guy is

 8    put in a situation where the only way out is to come up with

 9    $150,000 that he doesn't have, good for Detective Sanchez, he's

10    only responsible for nine months in this man's life that he

11    screwed up, as opposed to 19.

12         MR. BASCO:  Four months, five months.

13         THE COURT:  It may well be.

14         MR. KLOCK:  Well, I mean, but that's the issue that the

15    Court has.

16         THE COURT:  I don't know.  I'm going to hear the

17    evidence.  But it may well be.

18         MR. KLOCK:  Okay.

19         MR. BASCO:  And judge, just to point out one other

20    thing.  The polygraph happens after April 30th.  The confession

21    happens after April 30th.  That's why we've been fighting those

22    two issues so sternly, Judge, because the situation really

23    is -- I understand what Your Honor is saying.

24         At this point, the damage may be limited from if he

25    lied, from that period, until April 30th, which is part of our
```

```
 1    motion for reconsideration was.
 2          So getting into polygraphs and confessions of other
 3    people, it's when he already has a bond.
 4          MR. KLOCK:  Your Honor, the polygraph -- they keep
 5    making the argument about the polygraph not being admissible in
 6    court.  Okay?  The polygraph --
 7          THE COURT:  I said the fact that he asked for the
 8    polygraph is admissible, not the --
 9          MR. KLOCK:  Right.  But the polygraph in question that
10    was given here was ordered by the State of Florida.  And after
11    the State of Florida got its results, then within a week he was
12    released.
13          So we don't have to talk necessarily about what the
14    results of the polygraph were, and the polygraph doesn't have
15    to come into court.  It had to go to the State Attorney's
16    Office.  The State Attorney's Office took it to
17    Detective Sanchez on that thing; unless Detective Sanchez is
18    going to come in and claim that Ms. Mato is lying, too, maybe
19    he is.  That's a lie --
20          THE COURT:  Mr. Klock, everybody, slow down.
21          We're going to start tomorrow morning with your first
22    witnesses.  I'm going to keep in mind, as I've told you, what's
23    just been said, what I heard from the City's side.  It may
24    affect how the evidence comes in in this case.  Everybody's on
25    notice.
```

1        And sometimes, after sitting here and listening to the

2   evidence, makes things a little clearer.

3        MR. KLOCK:  Okay.

4        THE COURT:  So tomorrow morning, who will be your first

5   witness, Mr. Klock?

6        MR. KLOCK:  Mr. Smart.

7        THE COURT:  Okay.

8        MR. BASCO:  Judge, may I retrieve the exhibits?

9        THE COURT:  Yes, you may.

10       MR. HUNNEFELD:  Another matter.

11       MR. KLOCK:  Again, the issue with Detective Sanchez,

12   who we're going to try to fit in tomorrow, and I'm perfectly

13   willing to have my client come off the stand to accommodate

14   Sanchez.

15       THE COURT:  If you all agree to have evidence taken out

16   of turn, I have no problem with that.  And I will instruct the

17   jury that that is proper.

18       MR. KLOCK:  Okay.  Thanks, Judge.

19       MR. HUNNEFELD:  Thank you.

20       THE COURT:  Everybody understand what the deal is about

21   plaintiff's counsel table?  The courtroom will be available to

22   you for the next 15 minutes, and the then the court security

23   officer will lock up.

24       MR. KLOCK:  Thanks, Judge.

25       COURTROOM DEPUTY:  All rise.

```
 1        (Proceedings adjourned at 5:00 p.m.)

 2        (Continued in Volume 2.)

 3

 4              C E R T I F I C A T E

 5

 6      I hereby certify that the foregoing is an

 7    accurate transcription of the proceedings in the

 8    above-entitled matter.

 9    August 4th, 2015    /s/Glenda M. Powers
      DATE                GLENDA M. POWERS, RPR, CRR, FPR
10                        Official Federal Court Reporter
                          United States District Court
11                        400 North Miami Avenue, 08S33
                          Miami, Florida 33128
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```