```
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2
                 CASE NO. 13-24354-CIV-COOKE/TORRES
 3


 4
   TAIWAN SMART                        Miami, Florida
 5
                                       June 5, 2015
 6        vs.                          Friday

 7
   THE CITY OF MIAMI                   Scheduled 9:30 a.m.
 8                                     9:46 a.m. to 4:28 p.m.
   ----------------------------------------------------------
 9
                          JURY TRIAL
10                       VOLUME 2 OF 8
                         PAGES 1 - 260
11
              BEFORE THE HONORABLE MARCIA G. COOKE
12                UNITED STATES DISTRICT JUDGE
            WILKIE D. FERGUSON COURTHOUSE COURTROOM 11-2
13

14   APPEARANCES:

15
     FOR THE PLAINTIFF:         JOSEPH P. KLOCK, JR., ESQ.
16                              HILTON NAPOLEON, II, ESQ.
                                Rasco Klock Perez Nieto, PL
17                              2555 Ponce de Leon Boulevard
                                Suite 600
18                              Coral Gables, Florida  33134

19   FOR THE DEFENDANT:         HENRY J. HUNNEFELD, ESQ.
                                NICHOLAS PETER BASCO, ESQ.
20                              Office of City Attorney, City of Miami
                                444 S.W. 2nd Avenue, Suite 945
21                              Miami, Florida  33130-1910

22   STENOGRAPHICALLY
     REPORTED BY:               GLENDA M. POWERS, RPR, CRR, FPR
23                              Official Court Reporter
                                United States District Court
24                              400 North Miami Avenue, Room 08S33
                                Miami, Florida 33128
25
```

```
1                    I N D E X

2                                              PAGE

3              PLAINTIFF'S EVIDENCE

4  WITNESSES

5  TAIWAN SMART

6    Direct Examination by Mr. Klock          20

7        Videotape excerpt of "First 48"      107

8        Videotape excerpt of Polygraph Interrogation  131

9        Videotape excerpt of Bond Review     175

10       Videotape excerpt of Probable Cause Hearing  187

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      E X H I B I T S

 2

 3    EXHIBIT                                  PAGE RECEIVED

 4                                             INTO EVIDENCE

 5

 6

 7    Plaintiff's Exhibit 61                          187

 8    Plaintiff's Exhibit 62                          187

 9    Plaintiff's Exhibit 65A                         129

10    Plaintiff's Exhibit 65B                         129

11    Plaintiff's Exhibit 124                          92

12    Plaintiff's Exhibit 249                         252

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              (Continued from Volume 1.)

2              (Call to the order of the Court:)

3         COURTROOM DEPUTY:  All rise.  Court is in session.

4    Please come to order.

5         THE COURT:  Good morning, everyone.  Our jurors are all

6    here.

7         Counsel, are you prepared to proceed?

8         MR. HUNNEFELD:  Yes, Your Honor.

9         MR. BASCO:  Judge, we have a few things that we wanted

10   to bring up before; based on your ruling and what Mr. Klock

11   sent over yesterday.  I don't know if Your Honor is going to

12   continue the argument yesterday that they're going to have a

13   problem presenting evidence past April 30th.

14        That's how we left yesterday.

15        THE COURT:  I didn't say -- I said they may have a

16   problem with damages after April 30th.  But I said I was

17   leaving that issue open, allowing for their proof.  All right.

18        MR. KLOCK:  And, Your Honor, the other point is, it's

19   mitigation.  If you read that case and other cases, that is an

20   argument to mitigation.  It hasn't been raised as an

21   affirmative defense.  We haven't stipulated to the amendment of

22   the pleadings.  If they were going to raise that, there was a

23   time to do it.

24        THE COURT:  And see, that was something that -- and I

25   know Mr. Hunnefeld is shaking his head.  The first you raised
```

```
 1    that issue was in your motion to reconsider, which is not

 2    allowed on summary judgment.  You can't bring up a new issue.

 3         MR. BASCO:  Judge, the mitigation is separate.

 4         What they filed as mitigation and the case they

 5    provided is not mitigation from incarceration.  It's from the

 6    conditions of incarceration.  That's the case they cited.

 7         THE COURT:  I understand.  But I'm saying this issue as

 8    it relates to the April -- what's the date again, Lori -- April

 9    10th?  The first time that comes up is in your reply.

10         MR. BASCO:  Because, Judge, the entire time --

11         THE COURT:  In your motion to reconsider.  Excuse me.

12         MR. BASCO:  Because the entire time the response from

13    counsel is that he was held no bond throughout his

14    incarceration, and in his --

15         THE COURT:  Let me tell what you my ruling will be, and

16    this is going to carry over and we're going to have no

17    discussion on this afterwards.

18         First of all, let's start with Sanchez's testimony,

19    that goes to the probable cause hearing, that creates the

20    probable cause for Judge Cueto to hold him on the second

21    degree.  Even if he could have been so-called "bondable," what

22    that judge is looking at is the carry-over from Sanchez.

23         MR. KLOCK:  That's right.

24         THE COURT:  That's the argument that Mr. Klock has been

25    making all along.  But for Sanchez's lie -- I'm using that in
```

1    quote -- and/or misrepresentation -- which, as I said, I'm

2    taking it in the light most favorable to the non-moving party.

3    You'll have an opportunity to show that he was not.

4        But for that misrepresentation, he would not have been

5    incarcerated in the first place, there never would have been

6    this second so-called "Arthur" or "bond hearing" that took

7    place in April.

8        MR. HUNNEFELD:  Your Honor, could I just --

9        THE COURT:  So even though he could have put up money,

10   he would have never had money to put up if he had not been

11   incarcerated in the first place.  It's the classic chicken and

12   egg.

13       MR. HUNNEFELD:  Your Honor, this is a classic Frank

14   situation; where if there's one statement that is incorrect but

15   there's still probable cause from the balance of the testimony

16   that's been submitted to the judge, that that one statement

17   cannot control.

18       THE COURT:  Well, that will be your opportunity to tell

19   me that Judge Cueto had other evidence from -- remember, it's

20   Detective Sanchez and what he says -- and I have that here

21   somewhere, I may have given you back -- so all I have is what's

22   in that hearing transcript, and that's what you'll be able to

23   testify to in court as to what Sanchez told Judge Cueto.

24       Now, there may have been tons of other stuff that

25   Sanchez knew, but it's what he told Judge Cueto that allowed

1    Judge Cueto to bond him out -- bond him over -- excuse me --

2    on the first -- second degree.  All right.

3            MR. HUNNEFELD:  I want to --

4            MR. KLOCK:  Your Honor, one last matter, which is

5    different.  We'll be happy to brief this, if you want it

6    briefed, over the weekend.

7            But one last matter has to do with the stipulation for

8    different kind of exhibits, okay.

9            I've had Hilton take Mr. Smart out of the room.

10           Mr. Smart has never seen any photos of the deceased or

11   the crime scene.  Whenever we've show him photos, we've always

12   taken any of the photos out that have bodies in them, okay.

13   Now, they have a whole pile -- for God knows what reason --

14   they've decided --

15           THE COURT:  Which I'm still kind of unsure of why

16   that's going to be important, but anyway...

17           MR. KLOCK:  Well, because -- well, I think I know what

18   the reason is, you know.  We have the thug life, Judge.  We

19   have this -- you know, we have this fortress, you know, in the

20   middle of Little Haiti that, you know, is being used for these

21   major drug transactions; and apparently, if someone gets killed

22   in that, we get to parade all of these gory, grotesque photos

23   in front of the jury hoping that it will upset them.

24           THE COURT:  But I think you could show a picture of the

25   apartment and how the apartment may have been made up to sell

```
 1    drugs without -- I mean, guys --

 2          MR. BASCO:  Judge, when they --

 3          THE COURT:  Wait a minute.  At the end of the day --

 4          MR. HUNNEFELD:  Judge --

 5          THE COURT:  -- you have two people killed who were

 6    barely boys, and I just don't think that whatever they were

 7    doing means that whatever's left of them just needs to be

 8    splayed scandalously across this courtroom.

 9          MR. HUNNEFELD:  Your Honor, there were photos that are

10    specifically relevant to the location of the bodies.  It

11    explains the crime scene.  It explains the --

12          THE COURT:  But it is what Judge Cueto was told and

13    what Sanchez knew.  If Sanchez wants to talk about what he

14    observed, he can do that without showing all of these photos.

15          MR. HUNNEFELD:  Your Honor, one clarification.

16          If there was absolute probable cause for the Murder II

17    and there was a misstatement or not all the information was

18    given to Judge --

19          THE COURT:  Cueto.

20          MR. HUNNEFELD:  -- Cueto at the time, then there is

21    no -- there should be no case.  If this is about a false

22    imprisonment; it is not about a technical failure to make a

23    statement, if all that --

24          THE COURT:  It is.

25          MR. HUNNEFELD:  -- information is there.
```

1         THE COURT:  It is.  Because Judge Cueto says the day

2    before:  Based upon the A-form, there's something I'm not

3    understanding, I'm not seeing.

4         I'm not quoting him exactly.

5         MR. HUNNEFELD:  We have his testimony.

6         THE COURT:  He could have bond him over on just the

7    A-form.  He chose not to.  He had a hearing.  So it doesn't

8    matter what's -- if all this Sanchez knew but he never told

9    Cueto, Cueto didn't use that to establish probable cause.

10        That goes to probable cause for Sanchez to arrest,

11   which is why I sectioned off your arrest -- arrest cause of

12   action.

13        MR. HUNNEFELD:  But, Your Honor, when you say

14   "Judge Cueto didn't use that to establish probable cause."

15        Probable cause either exists or it does not exist.

16   It's not something that the judge establishes.

17        It's something that the facts establish.

18        THE COURT:  But the judge passes on the facts.  If that

19   was the case, we could just have police officers arresting

20   people and put them in jail, but we don't allow that.

21        MR. HUNNEFELD:  No, but --

22        THE COURT:  What we do is, we have a process.  You have

23   a form.  You fill it out.  A judicial officer then reviews that

24   form and says, based upon these facts, I believe you, Officer,

25   had probable cause.  Am I incorrect?

1          MR. HUNNEFELD:  Your Honor --

2          THE COURT:  Am I incorrect?

3          MR. HUNNEFELD:  No.  That often is the way it happens.

4   But in a false arrest case, for example, if a false statement

5   is made on the A-form --

6          THE COURT:  But you -- for lack of a better word, we

7   don't have to worry about the false arrest.

8          MR. HUNNEFELD:  But I think the analogy is very

9   important.

10          THE COURT:  No, it's not, and I'm not going to let you

11   continue to argue it because it's no longer important.

12          It's what happens after Sanchez goes to Cueto that's

13   important.  It's what judge -- if Judge Cueto had been told

14   truthful statements.

15          MR. HUNNEFELD:  Do we know that he would not have still

16   found probable cause?

17          MR. KLOCK:  Do you want to bring him over?

18          THE COURT:  He said himself.

19          MR. HUNNEFELD:  He did not say that he would have found

20   probable cause about that.

21          THE COURT:  Well, he didn't bond him over day one.

22          MR. HUNNEFELD:  He didn't release him on day one.  He

23   gave him more information.

24          THE COURT:  He allowed the officer to come back and

25   supplement what was in the A-form.

1           MR. HUNNEFELD:  And if he found that there wasn't

2   probable cause for that offense, he would have addressed the

3   other offenses for which there was admitted probable cause.

4           THE COURT:  But do you know what, if I would have,

5   could have, that's what I'm saying.  You can't now go back and

6   rewind the tape.

7           MR. HUNNEFELD:  We're trying to re-think a judge's

8   decision when -- perhaps he thought there was probable cause

9   but just wanted to be more comfortable.  That's not what we

10  should be doing here.  We should be determining whether

11  probable cause --

12          THE COURT:  But he used the statements that Sanchez

13  made to him to make the decision.

14          MR. HUNNEFELD:  Well, that -- I think what that does,

15  Your Honor, is that eliminates my ability to say that

16  because -- a judge's ruling on probable cause is usually an

17  absolute defense that any of these types of claims.  I couldn't

18  use that in this case because of that situation.

19          THE COURT:  Okay.  Is it an absolute defense if the

20  officer misrepresented and --

21          MR. HUNNEFELD:  No.

22          THE COURT:  Okay.

23          MR. HUNNEFELD:  And that's why I said --

24          THE COURT:  And that's the issue.

25          MR. HUNNEFELD:  -- I couldn't use it in that case, but

1   that's the only thing that --

2        THE COURT:  So you have to now show to this jury that

3   Sanchez did not misrepresent facts to Cueto.

4        MR. HUNNEFELD:  I can't just show that there was

5   sufficient facts in the record that Judge Cueto could have

6   found probable cause?

7        THE COURT:  No.  He had to find it.

8        MR. HUNNEFELD:  Okay.  But we don't know -- I didn't

9   think that -- what if Judge Cueto was to be a witness in this

10  case and say, I would have found it with this amount of

11  evidence?

12       THE COURT:  I don't know.  And I don't know if you plan

13  to call him, but that's the way this case is.

14       MR. HUNNEFELD:  I don't think we should be inquiring

15  into a judge's decision that way --

16       THE COURT:  We're not.

17       MR. HUNNEFELD:  -- of which piece of evidence made the

18  decision.

19       THE COURT:  I'm not inquiring into the judge's

20  decision.

21       My focus is on what Sanchez said under oath in a court

22  of law.

23       If this jury finds that what Sanchez said was not a

24  misrepresentation of what he was told, observed, heard, did

25  whatever he would do with his normal police functions, then I

1  am assuming you would prevail.

2      If they find that what Sanchez said to Judge Cueto was,

3  at best, a misrepresentation, and Judge Cueto may not have had

4  probable cause, then they may find for the plaintiff.

5      MR. HUNNEFELD:  Your Honor, is that the only -- is that

6  the issue that -- we start with the probable cause hearing and

7  nothing that happens after that, no additional evidence that

8  comes out, nothing else; if we stop there --

9      THE COURT:  Well, I don't think there is someone that

10  said --

11      MR. HUNNEFELD:  -- I don't know why that's not a

12  malicious prosecution case.

13      THE COURT:  Because you start -- I don't know, but

14  that's the one they pled.  They pled false imprisonment.

15      MR. HUNNEFELD:  Right.  They didn't plead malicious

16  prosecution.  Malicious prosecution is --

17      THE COURT:  Well, what they -- what they focused on is

18  the fact --

19      MR. HUNNEFELD:  -- when someone that lies at a hearing.

20  Mr. -- Detective Sanchez did not lie.

21      THE COURT:  What he's focused on -- when I say "he,"

22  Mr. Klock, on behalf of his client, and when I say "he," I am

23  referring to Mr. Smart.  I mean no disrespect to either

24  Mr. Klock or Mr. Smart.

25      What he is focusing on is saying you could have

1   arrested my client for a number of things.  I don't know if

2   that -- I'm, once again, speaking here -- if you had probable

3   cause for this.

4        And if you had probable cause for them, let's -- I'm

5   going to use for the sale of marijuana -- that was a bondable

6   offense for which -- maybe or maybe not -- by using family,

7   friends, acquaintances, passing the hat at church, he might

8   have been able to raise the amount of money for which to get

9   out of jail.

10        MR. HUNNEFELD:  But that's something the courts have

11   never inquired into before, whether someone would have been

12   able to -- what if the bond were a million dollars or $500,000

13   and he couldn't have bonded?

14        THE COURT:  And I think that's Mr. Klock's point; that

15   once Sanchez misrepresents to the judge, everything else that

16   flows from that affects Mr. Smart's detention.

17        MR. HUNNEFELD:  Even when the prosecutor agrees with

18   the criminal defendant that there isn't proof evident and

19   presumption great, at that point, it doesn't change?

20        THE COURT:  But what's -- isn't he still looking at a

21   second degree murder charge?

22        MR. HUNNEFELD:  He is, but this is a case that's not

23   been --

24        THE COURT:  And what's the bond on second degree

25   murder?

```
 1            MR. HUNNEFELD:  75,000 per count.

 2            THE COURT:  Okay.

 3            MR. HUNNEFELD:  But, Your Honor, again, it's like

 4    you're a little bit, you know -- I hope this isn't considered

 5    inappropriate -- but when someone says, "Would you take $10 to

 6    go to bed?"

 7            And says, "I wouldn't take that."

 8            "But would you take a million dollars?"

 9            "Yes."

10            We have established something by the monetary factor.

11    After that, it's just a matter of negotiation.

12            No court has ever gone into that negotiation before,

13    whether 20,000 as opposed to 10.

14            Well, what if there were three counts instead of one,

15    but you only have probable cause for one?  He couldn't make

16    30,000.  He could only make 10.

17            That's not an appropriate area.

18            There was a bond that ultimately was obtained.  It was

19    75,000 two times, the $150,000, as opposed to $20,000 in the

20    other situation.

21            But courts should not be getting into whether the

22    amount of the bond that was set is appropriate or not

23    appropriate, and they haven't in the past.

24            THE COURT:  I am not.  I am not.

25            MR. HUNNEFELD:  But that's -- Your Honor, it is
```

```
 1    admitted that there is probable cause.  I'm sorry.

 2            THE COURT:  Excuse me.

 3            (Brief pause.)

 4            THE COURT:  This is what I'm going to do for this

 5    morning, because I do believe after kind of flushing this issue

 6    out a little bit, I'm going to start with Smart's direct

 7    testimony today -- Mr. Smart's direct testimony.

 8            When we break for either a midday break or sometime

 9    before you get to cross Mr. Smart, we will resolve this issue,

10    because I think what you're trying to do in the photographs

11    relate to this issue of probable cause and how that should be

12    fleshed out for the jury.  And it's what -- three things are

13    going on at the same time:

14            What Sanchez knew based upon his police observation and

15    did that constitute probable cause; what Sanchez told Judge

16    Cueto in terms of the probable cause hearing; and what

17    Mr. Smart told Sanchez that Sanchez then uses to tell

18    Judge Cueto based upon the observation from number one leads

19    him to believe that Smart is not being truthful during his

20    interrogation.  All right.

21            So can we get -- yes, Mr. Klock?

22            MR. KLOCK:  And then, Judge, with respect --

23            THE COURT:  As soon as I think I'm, you know, marched

24    across, you know, the Rubicon, you just take me all the way

25    back.
```

1          MR. KLOCK:  Judge, you know how frustrating it is for a

2   trial lawyer to have to keep his mouth shut.  You know.

3          THE COURT:  And particularly you.  But you have like 30

4   seconds.

5          MR. KLOCK:  Judge, here's the point I wanted to raise

6   with you, with respect to the photos, also.  There's a whole

7   bunch of photos, including a bunch of photos showing

8   footprints outside the --

9          MR. BASCO:  Judge, we're not showing photos to

10  Mr. Smart, we've decided.

11         THE COURT:  We're not going to use the photographs this

12  morning, so I don't think that's --

13         MR. KLOCK:  With respect to the photos, there's no

14  guarantee that's where the bodies were when they fell.  The

15  medical people were in there, they moved them around, the

16  neighbors...

17         THE COURT:  We're going to go through that.  We're

18  going to hash it out.  Listen, what did I tell the jury when

19  they left here yesterday?  If they're on time, we'll try to be

20  on time.  They were all pretty much here by 9:25.  They've been

21  waiting for 35 minutes.  All right.

22         MR. HUNNEFELD:  One quick question, and this is because

23  I have a witness outside who it sounds like we won't get to,

24  and I'd rather him not wait any longer.

25         THE COURT:  Well, I don't think -- I'm guessing,

```
 1    Mr. Klock, that Mr. Smart is going to be how long on the stand?

 2              MR. KLOCK:  You know, but Judge, we'll interrupt and my

 3    thought was that as far as we get with Mr. Smart before lunch,

 4    we stop, he then puts Detective Sanchez on.

 5              MR. HUNNEFELD:  No, Your Honor, I don't want to break

 6    up --

 7              THE COURT:  You don't want to do that?  Okay.  It's

 8    totally up to you.

 9              MR. HUNNEFELD:  I don't want to do that.  Mr. Sanchez,

10    you know, understands the importance of this case.  He has told

11    me, you know, he doesn't want to do this.  He is giving up the

12    first half of his vacation in order to come here.

13              THE COURT:  Well, you make the decision.  We're going

14    to go now until about, hopefully, 11:30, quarter of 12, until

15    one of our jurors needs a comfort break.  We'll break for 15

16    minutes and come back and then go probably until 1:00, all

17    right.  So you can advise your witness accordingly.

18              MR. HUNNEFELD:  Thank you.  And I'd also want to tell

19    him one other thing.  I received a text from him.  We haven't

20    started the evidence yet, but I don't want him texting me.  I

21    mean, he's doing this innocently, but I don't want any texts.

22              THE COURT:  No, he's probably, where do you want me to

23    be, what time do you want me to be there, I got it.

24              MR. HUNNEFELD:  Okay.  Thank you.

25              THE COURT:  Do you need or does Mr. Basco need to step
```

 1    out while we bring in the jury?

 2            MR. BASCO:  Just, Judge, one thing.  We renew all

 3    previous objections and motions.

 4            THE COURT:  Noted, it's preserved.

 5            Mr. Blanford, let's get our long-suffering jury in

 6    here.

 7            (Jury entered courtroom at 10:09 a.m.)

 8            THE COURT:  Welcome back, ladies and gentlemen.  Thank

 9    you for your patience.  You may be seated.

10            Counsel for Mr. Smart, are you prepared to call your

11    first witness?

12            MR. KLOCK:  Yes, Your Honor.

13            THE COURT:  I would ask you to have your first witness

14    step forward, please, to be sworn.

15            MR. KLOCK:  We call Taiwan Smart, Your Honor.

16            THE COURT:  We have an extra garment left from

17    yesterday.  Okay.  Ivan will take care of it and get it to

18    jury.  They might even be downstairs today.

19            COURTROOM DEPUTY:  Mr. Smart, before you have a seat,

20    I'm going to ask you to raise your right hand.

21            Do you swear or affirm the testimony you're about to

22    give will be the truth, the whole truth, and nothing but the

23    truth, so help you God?

24            THE WITNESS:  Yes, sir.

25            COURTROOM DEPUTY:  Thank you.  Please have a seat right

```
 1   there, adjust the microphone in front of you.  State your full
 2   name and spell your last name for us, please.
 3            THE WITNESS:  Taiwan Marquis Smart.  You said spell my
 4   last name?
 5            THE COURT:  Please.
 6            THE WITNESS:  S-M-A-R-T.
 7            THE COURT:  Counsel, you may inquire.
 8            MR. KLOCK:  And, Your Honor, I am restricted to
 9   quarters here?
10            THE COURT:  Within reason, Mr. Klock.
11            MR. KLOCK:  Okay.  Thank you.
12            (TAIWAN SMART, having been first duly sworn, was
13   examined and testified as follows:)
14                        DIRECT EXAMINATION
15   BY MR. KLOCK:
16   Q.  Okay.  Taiwan, how old are you?
17   A.  I am 27 years old.
18   Q.  And where do you currently reside?
19   A.  600 Northwest 98th Street, Miami, Florida.
20   Q.  How long have you been there?
21   A.  About a year-and-a-half.
22   Q.  Do you have any children?
23   A.  Yes, sir.  One son.
24   Q.  How old is he?
25   A.  Eight years old.
```

1   Q.   Does he reside with you?

2   A.   No, sir.

3   Q.   Okay.  Now, prior to -- I would like to see prior to 2009

4   where you lived, let's start about in 2006.  2006, you would

5   have been how old?

6   A.   18.

7   Q.   Starting in 2006, where were you living?

8   A.   I was living with my mom in an apartment in North Miami.

9   Q.   Who else was living in the apartment?

10  A.   My grandmother, my uncle, my brother, and my sister.

11  Q.   And how long did you stay there?

12  A.   About a year.

13  Q.   Okay.  And then what happened?

14  A.   In June of 2006, we were evicted from that house.

15  Q.   And then what happened?

16  A.   We stayed with a family friend for awhile.

17  Q.   Okay.  And then where did you go?

18  A.   To a motel for a few months.

19  Q.   Okay.  And then what?

20  A.   The homeless shelter called The Hack.

21  Q.   The what?

22  A.   It's a homeless shelter in Overtown called "The Hack."

23  Q.   Okay.  And how long were you there?

24  A.   About two months.

25  Q.   And then where did you go?

```
 1   A.   I lived with a family friend.

 2   Q.   And how long were you with the family friend?

 3   A.   About a month, a couple of weeks.

 4   Q.   And then where did you go?

 5   A.   To another family friend.

 6   Q.   Okay.

 7   A.   And I slept in the car a little bit.

 8   Q.   What time -- what period -- where are we now in terms of

 9   years?

10   A.   2007.

11   Q.   Okay.  And then where did you go from the car?

12   A.   I stayed with another family friend.

13   Q.   And then?

14   A.   And then -- what do you mean?  -- the question --

15   Q.   Are we near the end of 2007?

16   A.   No, this is like the middle.

17   Q.   So then -- I'm trying to -- can you just indicate where you

18   lived for the balance of 2007?

19   A.   I lived with a family friend; then I stayed with another

20   family friend, like, I bounced around from house to house

21   awhile until the end of 2007.

22   Q.   Why weren't you living with your mom?

23   A.   Because she was living in a homeless shelter still at that

24   time.

25   Q.   Okay.  Were you working during this period of time?
```

 1   A.   Up until mid-2007, yes.

 2   Q.   Okay.  And then, in 2008, where were you?

 3   A.   Incarcerated.

 4   Q.   Okay.  Until when?

 5   A.   Until June 2008.

 6   Q.   And then after June 2008 where were you?

 7   A.   I lived with my mom for a little.

 8   Q.   And then why didn't you stay with your mom?

 9   A.   I couldn't stay there anymore because of the circumstances

10   of our housing.

11   Q.   What does that mean?

12   A.   She lived in a Section 8 housing program, and if you're not

13   on the lease, you're not, by law, permitted to live in the

14   residence.

15   Q.   Okay.  So where did you go then?

16   A.   I started staying at Jonathan's house sometimes.

17   Q.   Jonathan who?

18   A.   Jonathan Volce.

19   Q.   And Jonathan is one of the two young men who died in your

20   apartment in 2009; correct?

21   A.   Yes, sir.

22   Q.   Okay.  And you stayed with him in his home, his mom's?

23   A.   Yeah.  His older sister had her own apartment and sometimes

24   she would allow me to sleep in his room with him.

25   Q.   Okay.  And after that, where did you stay?

1   A.   I started staying on 77th Street at the house.

2   Q.   So the apartment and 77th Street, that's the apartment

3   where the two young men lost their lives; correct?

4   A.   Yes, sir.

5   Q.   And about when did you move into that place?

6   A.   Around July or beginning of August 2009.

7   Q.   2009.  And how long did you stay there?

8   A.   Up until the incident occurred in November 2009.

9   Q.   Okay.  Did you leave there at any point in time?

10  A.   Yes, sir.

11  Q.   Where did you leave for?

12  A.   I went to New Jersey for, like, two weeks to go visit my

13  girlfriend at the time.

14  Q.   And what else were you doing up there?

15  A.   Looking for apartment so I could move to Jersey with her,

16  because she wanted me to get out of Miami.

17  Q.   Okay.  Did you look around for jobs?

18  A.   Yes, sir.

19  Q.   Now you heard Mr. Hunnefeld say that the attraction of the

20  thug life in Miami is what brought you down; you turned your

21  back on Jersey and went back to Miami so you could pursue the

22  thug life.  Is that true?

23  A.   No, sir.

24  Q.   Why did you come back to Miami?

25  A.   Because at the time when I went to New Jersey I only went

```
 1    to see if I could find employment first, like, a venture out

 2    and after looking around, the minimum wage was higher, so I

 3    came back to Miami to get some things in order like clothes and

 4    stuff, and then I was headed back in January.

 5    Q.   Why January instead of -- at this point, we're like in

 6    October of 2009.  Why didn't you just go right back?

 7    A.   Because December was coming up and my birthday was coming

 8    up; and Christmas, and my son was in Miami at the time.

 9    Q.   So you were planning on going back in January --

10    A.   Yes, the 1st.

11    Q.   -- and tearing yourself away from the thug life.

12         What does Mr. Hunnefeld mean by the "thug life," do you

13    know?

14              MR. HUNNEFELD:  Objection, Your Honor, "What does

15    Mr. Hunnefeld."

16              THE COURT:  Objection sustained as to phraseology --

17              MR. KLOCK:  Right.

18              THE COURT:  -- what another person meant by something.

19    BY MR. KLOCK:

20    Q.   You heard Mr. Hunnefeld say "thug life?"

21              MR. HUNNEFELD:  Objection, I don't think my name should

22    be --

23              THE COURT:  Overruled.  Overruled.  I want to hear the

24    question first.

25    BY MR. KLOCK:
```

```
 1   Q.   Did you hear Mr. Hunnefeld refer to the fact that you

 2   wanted to return to Miami to pursue the thug life?

 3   A.   Yes, sir.

 4   Q.   Is that true?

 5   A.   No, sir.

 6   Q.   Do you have any idea what he meant by that?

 7        MR. HUNNEFELD:   Objection, Your Honor.   It calls for

 8   speculation.

 9        THE COURT:   Sustained.

10   BY MR. KLOCK:

11   Q.   So why did you return to Miami?

12   A.   In order to get my -- the rest of my things together before

13   I went back.

14   Q.   Okay.   So that brings us then to -- when did you get back

15   to Miami from Jersey?

16   A.   October 31st or the 30th.

17   Q.   And also, Mr. Hunnefeld talked about the fact that the

18   young lady up there was pregnant, correct, you hear -- do you

19   remember that?

20   A.   Yes, sir.

21   Q.   Was that your child?

22   A.   No, sir.

23   Q.   Okay.   And so any suggestion that that was your child, you

24   wouldn't want anyone to have that misunderstanding; correct?

25   A.   Yes, sir.
```

```
 1    Q.   Now, you come back to Miami, Halloween?

 2    A.   Yeah, Halloween, or the day before.

 3    Q.   Okay, fine.  And what happens between then and November 1?

 4    A.   I came back.  I was working on a CD when I was recording

 5    music.  So I came back and I was in Miami for about a couple of

 6    days.  I slept at different friends' house.  The first day I

 7    came back, I didn't sleep on 77.

 8    Q.   And then you returned to 77th?

 9    A.   That's right.

10    Q.   Who else was living there with you?

11    A.   Well, it was me, Jonathan, and sometimes Ray Nathan would

12    sleep over.

13    Q.   Now, Mr. Hunnefeld also talked about the fact that you had

14    a 14-year-old living in the house.  Did you know he was 14?

15    A.   At the time, no, sir.

16    Q.   Well, what do you mean you didn't know how old?

17         How old was he?

18    A.   At the time, I didn't know how old he was.  He told us he

19    was about to be 18; 17, going on 18.

20    Q.   You can't tell the difference between a 17-year-old and a

21    14-year-old?

22    A.   He was larger than Jonathan, and Jonathan was 18.

23    Q.   Okay.  So he looked older?

24    A.   Yes.

25    Q.   You had no reason to question how old he was?
```

```
 1    A.   No, sir.  I never seen him go to school or anything.
 2    Q.   Okay.  Now, discuss who Jonathan Volce was in your life.
 3    A.   That was my best friend, like, at the time, and still to
 4    this day, that's my best friend.  He was my best friend.
 5    Anything I needed when I got out, he looked out for me, and he
 6    didn't have much and he still managed to look out for me.
 7    Q.   How long had you known him?
 8    A.   I known him since he was younger, but we didn't really
 9    connect until we got older.
10    Q.   And did you ever have any arguments with him?
11    A.   Not one to him, ever, in my life.
12    Q.   Did you ever tell Detective Sanchez you had arguments with
13    him?
14    A.   No, sir.
15    Q.   Did you ever tell any officer or detective from the
16    City of Miami that you had an argument with him?
17    A.   No, sir.
18    Q.   Did you have an argument with him on the day he died?
19    A.   No, sir.
20    Q.   Did anyone have an argument with him the day he died that
21    you know of?
22    A.   Eduardo.
23    Q.   Pardon me?
24    A.   Eduardo.
25    Q.   Who?
```

1    A.    Eduardo Rivera.

2    Q.    And who's he?

3    A.    Spanish gentleman.

4    Q.    And where did he live?

5    A.    Like two blocks from 77th Street.

6    Q.    And why was he having an argument with Jonathan?

7    A.    It wasn't argument as much as they were going back and

8    forth about a deal -- a discussion they were having.

9    Q.    Okay.  And what was the discussion about?

10   A.    He wanted Jonathan to give him some drugs on credit.

11   Q.    Okay.  Now, you heard Mr. Hunnefeld say that you were

12   engaged in a drug transaction with this gentleman.

13         Did you hear him say that?

14   A.    Yes, sir.

15   Q.    Was that true?

16   A.    No, sir.

17   Q.    Okay.  How did Mr. Volce, how did Jonathan get involved in

18   dealing with him that day?

19   A.    He came to the apartment.

20   Q.    And what happened?

21   A.    He knocked on the door and Ray Nathan left him in; and when

22   he came inside, he asked for Jonathan, but at the time Jonathan

23   was in the room talking to --

24   Q.    Ciara Armbrister, the girl?

25   A.    Yes, sir.

1    Q.   Now, Mr. Hunnefeld indicated that the place was barricaded

2    that you couldn't get in.   How did Eduardo get in?

3    A.   Ray Nathan let him in through the front door.

4    Q.   So he came through the front door?

5    A.   Yes, sir.

6    Q.   Through the barricades?

7    A.   It was not barricaded.   The couch was just against it.   You

8    can just slide the couch back a little and open the door.

9    Q.   Okay, fine.   So he comes in.

10        Were you in the living room at the time?

11   A.   Yes, sir.

12   Q.   Okay.   And he asked you for what?

13   A.   He didn't ask for me.   He asked for Jonathan originally.

14   Q.   Okay.   And so you went and got Jonathan?

15   A.   I called him, I said, "Yo, Jonathan, come to the living

16   room."

17   Q.   And did you stay in the living room while he and Eduardo

18   had their discussion?

19   A.   Yes.   I was watching TV.

20   Q.   Okay.   Was it a loud discussion, were they fighting or

21   arguing?

22   A.   No, they were just more of, like, one person wanted to him

23   to do something and he didn't what to do what he wanted him to

24   do.

25   Q.   Did they reach some sort of accommodation?

1   A.   Yes, sir.

2   Q.   Okay.  Now, how long did Eduardo stay there?

3   A.   Maybe six or seven minutes, at tops.

4   Q.   Do you remember what time of day that was?

5   A.   It had to be around late that night, around nine, between

6   nine, 10:00.

7   Q.   Okay, fine.  And how do you know what time it was?

8   A.   Because it was dark out and a TV show that I remember

9   playing that night was on.

10  Q.   Now, could you describe to the jury, first, the size of the

11  living room.

12  A.   If I had to give a description based on this room, I would

13  have to say that the booth that they're in, maybe from here to

14  maybe where the Judge is, a little closer, like here, about

15  12 -- 10 by 12, 12 by 12, something like that.

16  Q.   That's the size of the living room; right.

17  A.   Yes, sir.

18  Q.   And then, adjoining the living room is what room?

19  A.   The kitchen.

20  Q.   Okay.  And then what else is there?

21  A.   The kitchen, and there's a hallway right to the left of the

22  kitchen.

23  Q.   Okay.  And then the bedroom's on the other side of the wall

24  from the living room?

25  A.   Yes, sir.

1    Q.   Now, was there a couch up against the parting wall between

2    the living room and bedroom; correct?

3    A.   Yes, sir.

4    Q.   That couch would have, therefore, been facing west;

5    correct?

6    A.   The one against the parting?

7    Q.   The one against the parting wall would be facing west;

8    correct?

9    A.   Yes.

10   Q.   And also on the west wall is a window and a door; correct?

11   A.   Yes, sir.

12   Q.   Okay.  And the distance, you said, of that room is like

13   maybe 10 feet wide or so?

14   A.   Yeah, about 10 feet.

15   Q.   Okay.  And the bedroom, how big's the bedroom, smaller than

16   the living room?

17   A.   No, it's a little -- a little larger than the living room

18   was.

19   Q.   Okay, fine.  What was the distance between the couch -- I'm

20   sorry -- and in the bedroom, were there any doors leading

21   outside?

22   A.   Yes, there was an exit in the bedroom.

23   Q.   Okay.  What was the distance between the sofa and the back

24   door?

25   A.   Without the wall being there?

1   Q.   Going down the hallway, how far would it be?

2   A.   About five, six feet.

3   Q.   Okay.   Fine.   So five or six feet from the couch to the

4   back door?

5   A.   Yes, sir.

6   Q.   Okay.   Now, where were you located after 9:00 on the 13th?

7   A.   I was on the couch in the apartment.

8   Q.   Which couch?

9   A.   The couch facing west.

10  Q.   Okay.   And then there was another couch on the wall that

11  was the north wall of the apartment and that couch would be

12  facing south; correct?

13          MR. HUNNEFELD:   Objection, leading.

14          THE COURT:   Sustained.   Rephrase, counsel.

15          MR. KLOCK:   Okay.

16  BY MR. KLOCK:

17  Q.   Could you describe, Mr. Smart, the placement of the other

18  furniture inside the room and what walls they were on or not

19  on?

20  A.   It was three couches; one was on the west wall facing east;

21  one was on the south wall facing north; and one was on the

22  north wall facing south.

23  Q.   Okay, fine.   And where's the door?

24  A.   The door is on the east side of the apartment, faced --

25  it's on the east side.

1    Q.   The door to -- I'm sorry -- the front door to the apartment

2    is on which wall?

3    A.   The wall -- the east wall.

4    Q.   Okay.  The east wall is the same wall that your couch is

5    on; correct?

6    A.   No.  My couch is on the west wall facing east.

7    Q.   Okay.  You're right.  I'm sorry.  So the door's on the east

8    wall, the couch -- is there a couch on that wall, too, or not?

9    A.   No, sir, there's no couch on the east wall.

10   Q.   So the couch would be on the north wall?

11   A.   The north wall and the south wall.

12   Q.   Okay.  Now, describe whether or not there were any windows

13   in the room.

14   A.   There are -- there were, I think, three windows visible in

15   the living room.

16   Q.   And where were they?

17   A.   There was a double-pane window on the east wall and there

18   was a single-pane window on the south wall.

19   Q.   And where was the single-pane window on the south wall

20   located?

21   A.   Behind the couch that Jonathan was sitting on.

22   Q.   Okay.  So there's a couch and the wall, and the window's

23   where with respect to the couch?

24   A.   Right behind it, like up against it, like the tip of the

25   couch where the couch stops at.

1   Q.   Okay.  And what occurred after Eduardo left the apartment

2   that evening?

3   A.   After Eduardo left me, Ray Nathan, we sat in the living

4   room, which he was watching a show called White Collar, and we

5   watched it for awhile until Jonathan returned to the living

6   room with us.

7   Q.   When was that?

8   A.   About 10-something, closer to 11.

9   Q.   Okay.  Then what happened?

10  A.   We sat there watching TV, normal day, I was texting my

11  girlfriend at the time; and then someone knocked on the window.

12  Q.   Where was Jonathan at the time?

13  A.   He was the closest to the window at the time with his back

14  facing it.

15  Q.   Was he under the window, next to the window, what?

16  A.   Basically, under the window, in a sense, because it was,

17  like, behind him.

18  Q.   So someone knocks on the window.  Could you describe the

19  window to the jury.

20  A.   The window had a blue curtain over it and some Venetian

21  blinds.

22  Q.   Okay.  And the blue curtain hung over the window?

23  A.   Yes, sir.

24  Q.   Okay.  Was there glass in the window?

25  A.   Yes, it was glass, it was the --

1   Q.   Can you describe that to the jury?

2   A.   It was the type of window that you slide up, like.

3   Q.   Okay.  Was it open or closed?

4   A.   It was closed at the time.

5   Q.   Okay, fine.  Someone tapped on the window.

6        What happened then?

7   A.   The person tapped on the window, I disregarded it.  I

8   continued to text my girlfriend.

9        And Jonathan was on the phone with a girl he had just met.

10  So he looked over at me, and he was like, "Ty, could you get

11  the window?"

12       And I was like, "For what?  I don't work here.  I don't

13  work for you."

14       He was, like, "I know, man, but you done sleep all day, you

15  ain't do nothing all day, the least you can do is get the

16  window.  Don't be lazy."

17       At which time I got up, I put my phone on the edge of the

18  couch.  I stood up.  I walked over to the window, and I was,

19  like, "excuse me."

20       He moved over, and I opened the window.

21  Q.   Okay.  Now, what other furniture was in the living room,

22  other than the three couches?

23  A.   There was a large, like, coffee table in the middle.

24  Q.   Okay.  And that was in front of the couch you were on and

25  presumably in front of the couch he was on as well; right?

1   A.   Yes, it was in the center of all three couches.

2   Q.   Okay.  Now, when you went to the window, did you stand on

3   the floor?  Where was your body positioned?

4   A.   My feet were placed on the cushions next to him.  I was on

5   the same couch he was on, but like crouching down standing on

6   it.

7   Q.   Okay.  And looking through the window?

8   A.   Yes, sir, I had to squat down a little because you know I'm

9   kind of tall.

10   Q.   And how about the curtains, was the curtain closed or open?

11   A.   It was -- I had it like moved over, I grabbed it from the

12   right side of the curtain and pulled to the left so I could see

13   out of the triangular portion of the curtain.

14   Q.   At that point you said the window was closed?

15   A.   Yes, sir.

16   Q.   Did you open it?

17   A.   Yes, sir.

18   Q.   How far?

19   A.   About maybe five, six inches, like that.

20   Q.   Okay.  And then what happened?

21   A.   There was a guy standing there and he said he wanted to buy

22   some marijuana.

23   Q.   What did he look like?

24   A.   I couldn't see him because the way the building is, it's

25   very dark and there's like shrubbery on the back of the trees,

```
 1  and there's no light to really see him.  I could just see his
 2  silhouette.
 3  Q.   Okay.  What did he say?
 4  A.   He asked, was there any marijuana.
 5  Q.   And what did you say?
 6  A.   I asked him for his money.
 7  Q.   How much?
 8  A.   $10.
 9  Q.   What did he say?
10  A.   "Let me see the marijuana."
11  Q.   What did you say?
12  A.   "Where's your money?"
13  Q.   What did he say?
14  A.   "Let me see the marijuana."
15  Q.   Then what?
16  A.   I asked him for his money again; and at that time, I kind
17  of starting leaning down to look at his face better, because I
18  was getting a little suspicious of him.
19  Q.   Then what happened?
20  A.   And as I leaned in to try to get a better look at him,
21  somebody else, like, came off of his right side and, like, kind
22  of, like, moved him out of the way and tried to rush off
23  towards the window at me; at which time I pulled off the
24  window, and I said, "Oh, shit," and I turned away.
25  Q.   And then what happened?
```

```
 1   A.   I stepped on the coffee table, but because the coffee table
 2   is shorter than the couch, when I stepped down, it made me slip
 3   forward, and I ended up landing, like, in the kitchen.
 4   Q.   In the kitchen, how wide is the room?
 5   A.   The room is small.  And the way it is, the way the room is,
 6   as soon as I fell, my half -- my torso was in the kitchen, but
 7   my lower legs and stuff was spanning the living room area.
 8   Q.   Okay.  So are you spanning the hallway then?
 9   A.   I'm spanning -- I'm in front of the freezer laying down,
10   like, kind of almost in front of the freezer at that point.
11   Q.   The freezer?
12   A.   Yes, sir.
13   Q.   Okay.  How many -- is there more than one, is there a
14   refrigerator and a freezer or just one?
15   A.   It's a connected, like frigerator on top, freezer on the
16   bottom.
17   Q.   So there's only one appliance in the kitchen --
18   A.   And the stove.
19   Q.   Very good.  So then what happened?
20   A.   When I hit the ground, I started hearing, like, shots going
21   off, and I heard somebody say, "Now what" -- a cuss word --
22   "Now what" -- he kept saying.
23   Q.   "Now what," what?
24   A.   "Fuck nigger."
25   Q.   Okay.  And then what?
```

1   A.   I heard the shots and I was laying on the floor for a few

2   seconds, and I remember thinking, oh, man, they trying to kill

3   us in here.

4   Q.   So then what?

5   A.   I scrambled behind the entertainment system.  This was on

6   the west wall, as well, next to the couch I was on.  And for a

7   split second -- I scrambled -- I looked over and ran -- the

8   back door was there, so I got up and ran to the back door.

9   Q.   Was the back door open or closed?

10  A.   It was locked.

11  Q.   Was the back door opened or closed?

12  A.   Closed.

13  Q.   Was it locked or unlocked?

14  A.   Locked.

15  Q.   What did you have to do to unlock it?

16  A.   Just unsnap the lock.

17  Q.   Okay.  And then what happened?

18  A.   I unsnapped the lock, and I pushed the door open, and I

19  slipped out the door and started running.  And I ran towards

20  the front of the building, and I exited going west.

21  Q.   Okay.  And did you hear anything further in the apartment?

22  A.   I was running, like, all I heard is the shots when I was in

23  there going off; and I just ran, I didn't hear nothing after I

24  ran.

25  Q.   Do you recall how many shots you heard?

1    A.   A couple, maybe two, three, I don't know I just know there

2    was shots behind me as I was running.

3    Q.   Okay.  How were you dressed?

4    A.   I was wearing a white tank top shirt and some red your Dan

5    shorts with no shoes on.

6    Q.   Did you take anything with you when you left?

7    A.   No, sir.

8    Q.   Did you leave anything behind?

9    A.   Yes, sir.

10   Q.   What?

11   A.   My cell phone was there, my wallet, other personal effects

12   like clothes and shoes.

13   Q.   Okay.  So you're wearing your tanktop, a pair of red

14   shorts, no shoes.  Do you have socks on?

15   A.   No, sir.

16   Q.   So where did you go?

17   A.   I ran west, and then I ended up making a right on that

18   first corner, and I ran behind this yellow house and I laid in

19   the grass for a second.

20   Q.   Doing what?

21   A.   Hiding.  I thought the person was going to chase me.

22   Q.   Okay.  Then what happened?

23   A.   I laid there for a few minutes until the neighbor came out,

24   I guess, because he heard me jump his gate.

25        And he came out, and he looked over the gate, and he said,

```
 1    "Oh, I knew I heard somebody back there."

 2           MR. HUNNEFELD:  Objection, hearsay, Your Honor.

 3           MR. KLOCK:  Hearsay.

 4           THE COURT:  Objection overruled.

 5           THE WITNESS:  Can I say it?

 6           MR. KLOCK:  When the Judge overruled the objection, you

 7    can continue; when she sustained, you can stop talking.

 8           THE WITNESS:  The neighbor saw me run out, "What are

 9    you doing back here?"

10           "Somebody just came to the house and started shooting.

11    Can I use your phone, please?"

12           MR. HUNNEFELD:  Objection, out-of-court statement.

13           THE COURT:  The fact that he said, "Can I use your

14    phone?"  I'll allow him to.

15           MR. HUNNEFELD:  The neighbor's response, well, would

16    be.

17           THE COURT:  Ladies and gentlemen, the neighbor's

18    statement is not offered for its truth.  It's only offered to

19    show the situation that this witness was in at the time.

20           Counsel, you may continue.

21    BY MR. KLOCK:

22    Q.   Okay.  So then what happens?

23    A.   He gives me the phone, and I'm holding the phone, but I'm

24    shaking, I'm shaking so bad that I can't, like, concentrate.

25           So I asked him, I said, "Sir, can I please come inside your
```

house, because I'm scared."

At sometime he said, "I have my own family to worry about. That's not my problem," and he took the phone back and asked me to get away from his house.

Q. Let me ask this question. What were you shaking about?

A. Somebody just was shooting at me.

Q. Has anyone ever shot at you before?

A. No, sir.

Q. Has anyone shot at you since?

A. No, sir.

Q. So now you're in the guy's back yard; he's closed the door. Where do you go?

A. I stood against the wall for a second, and another neighbor right across the gate, she started talking loud in Creole. I didn't understand what she was saying.

Q. Why?

A. Because I don't understand Creole. I just jumped the gate and then I ran west.

Q. When you say "gate" -- excuse me.

A. I meant fence. Sorry.

Q. Just so we don't confuse the jury, a gate is something that opens, a fence doesn't?

A. Sorry.

Q. You jumped over the fence?

A. Yes, sir.

1    Q.   Where did you go?

2    A.   At that time, I jumped over the fence and made that first

3    right and that's, I think, 78th Street now.

4    Q.   And where did you go then?

5    A.   As I was running down 78th Street.  I encountered Eduardo

6    Rivera again.

7    Q.   Where was he?

8    A.   He was coming out of his gate in front of his house.

9    Q.   So the same Eduardo Rivera that had been in buying drugs

10   from Jonathan earlier in the evening, you run into him in the

11   street?

12   A.   Yes, sir.

13   Q.   So what happened?

14   A.   I went up to him and tell him what just occurred, "Somebody

15   just came shooting, I need to use the phone, I need to use the

16   phone.  Can I come inside?"

17   Q.   And then what happened?

18   A.   He allows me to come inside.  His wife is there, and he's

19   there, so they asked me what happened, and I explained to them

20   what just happened.

21   Q.   What did you explain to him?

22   A.   I said, "Somebody came to the window acting like they were

23   trying to buy a bag of weed, and when I asked for the money,

24   another guy pushed away and came to the window and started

25   shooting through the window.

1   Q.   Did you tell them about your two friends shot?

2   A.   No, sir.

3   Q.   Did you know your two friends had been shot?

4   A.   No, sir.

5   Q.   So then what happens?

6   A.   Me and Eduardo talk for a second.  At the time, he said

7   he's going to go around the corner and see if neighbors are in

8   the yard.

9         MR. HUNNEFELD:  Objection.

10        THE COURT:  The objection is overruled.

11        Once again, ladies and gentlemen, these statements are

12   not offered for the truth as made by any other person other

13   than Mr. Smart, merely to paint the picture for you of what was

14   going on at the time.  Counsel, you may proceed.

15        MR. KLOCK:  Thank you, Your Honor.

16   BY MR. KLOCK:

17   Q.   So he said what to you?

18   A.   He said, "I'll go and look and see if neighbors or anything

19   are outside, like, if it's clear for you to come back, like, if

20   it's safe," because I was scared to go around the corner.

21   Q.   You asked about a phone.  How about the phone?

22   A.   He said they didn't have a phone anymore.

23   Q.   They didn't have a phone?

24   A.   They didn't have a phone.

25   Q.   So he disappears?

```
 1    A.   He gets on his bike and goes around the corner and I'm with

 2    his wife.

 3    Q.   And you're staying with his wife?

 4    A.   Yes.

 5    Q.   Then what happens?

 6    A.   He returns and he asks me if what I told him was true,

 7    because it was quiet outside, the neighbors were not out, no

 8    one was, like -- everything was just calm.

 9    Q.   So about how much time has gone by at this point in time?

10    A.   I can't give an exact number because I wasn't keeping track

11    of time, but it had to, it had to -- it felt like 10, 15

12    minutes.

13    Q.   So no sirens?

14    A.   No, sir.

15    Q.   And he says nothing's going on at the house?

16    A.   He said it was calm, it was normal, there was nothing going

17    on.

18    Q.   So then what happens?

19    A.   I said, "Are you sure?  Are you sure?"

20         He said, "Yeah, I'm going to go check again to be sure."

21    Q.   Then what happens, he leaves again?

22    A.   Yes.  And he comes back the second time, and he says he

23    went to the curtain, and he said -- he moved the curtain and

24    looked through the window and he said, he says he sees either

25    somebody hiding or in the corner over there.
```

1    Q.   So then what happens?

2    A.   I said, "that could be one of my friends, they could be

3    hurt.  I need you to call the police."

4         And I asked his wife to do it, and she asked me for 50

5    cents for the pay phone.

6    Q.   What pay phone?

7    A.   She asked me for 50 cents to use the pay phone to call the

8    police.

9    Q.   What pay phone?

10   A.   Any pay phone.

11   Q.   She didn't have a phone and she didn't have any phone?

12   A.   I asked her.  I didn't want to go back outside.

13   Q.   Okay.  Did you have 50 cents on you?

14   A.   No, sir.

15   Q.   So then what happened?

16   A.   I got frustrated because at that point Eduardo kept trying

17   to pressure me to go back into the house and get the drugs that

18   were in the house.

19   Q.   I'm sorry?

20   A.   Mr. Rivera made a comment to me and said, "It would be in

21   your best interest to get the drugs," he said, "because if they

22   find it in there, it's going to be worse if anything happened

23   there."

24   Q.   So what happened then?

25   A.   I didn't want to do that, so I told him that my Godmom

1   lived directly across the street from him.  I asked him -- I

2   told him I wanted to go over there.

3   Q.   So then what happens?

4   A.   Him and his wife, they escort me across the street.  At

5   which time Mr. Rivera puts the code to the gate in and he

6   escorts me inside, and I knock on the door and my Godmother

7   answered the door.

8   Q.   To what, the gate?

9   A.   To the security gate of the apartment complex, like, it was

10  a townhouse.

11  Q.   Did he live there?

12  A.   No, sir.

13  Q.   But he -- so he opens the gate for you to go in; then what

14  happens?

15  A.   We get to the door, my Godmother comes to the door, he's in

16  his boxers and his T-shirt, because it was pretty late.  And

17  when he comes to the door, I start instantly telling him,

18  "somebody came to the house and they started shooting, and I

19  don't know if Jonathan and them are okay because Eduardo says

20  he thinks he sees somebody on the ground."

21  Q.   Then what happened?

22  A.   They bring me inside, and his mom and his grandma come

23  downstairs, and Adrian, my Godfather's girlfriend comes, and

24  they start asking me questions, like what happened, what

25  happened, over and over.

1   Q.   What did you tell him?

2   A.   I told him the people came shooting, the people came

3   shooting, like, they need to call the police.

4   Q.   Did you tell him you saw anybody shot?

5   A.   No, I didn't see anybody shot at that time.  I didn't see

6   what was going on.

7   Q.   Okay.  Then what happened?

8   A.   At that time, Eduardo's wife or girlfriend, Wanda, and

9   Adrian, my Godmother's girlfriend, Kiesha, they took it upon

10   themselves to walk back around the corner to the house because

11   we heard the sirens headed over there.

12   Q.   So, finally, you heard sirens?

13   A.   Yes, sir.

14   Q.   And who goes over to the apartment?

15   A.   Kiesha, that's Adrian's girlfriend, and Wanda.

16   Q.   Adrian being your Godmother?

17   A.   Yes.

18   Q.   So then what happens?

19   A.   They go and like a few minutes later they come back and

20   they said that the police recovered two bodies outside, and I

21   started crying.

22   Q.   Then what happened?

23   A.   At that time I started crying, and I was shooken up because

24   now I'm realizing that my friend is dead and the kid is dead,

25   too, so I'm crying, I'm sitting there.  And Adrian's mom, she's

1    older, she told me like just, "Stay inside, don't go back over

2    there."

3    Q.   Why?

4    A.   Because she said, "You're going to be in trouble if you go

5    back over, you're going to get in trouble, you didn't have

6    nothing to do with that, just stay in the house."

7    Q.   So did you?

8    A.   Yes, sir.

9    Q.   Now, let's pause and go for a second -- I think you heard

10   Mr. Hunnefeld say that there was a gun kept on the table in the

11   living room.  Was there a gun on the table in the living room

12   on October 13th or November 13?

13   A.   No, sir.

14   Q.   Was there a gun anywhere in the place that you knew of?

15   A.   No sir.

16   Q.   Was there any return fire that you heard?

17   A.   No, sir.

18   Q.   So if Mr. Hunnefeld mistakenly was suggesting that there

19   was a gun in the room at the time, that would just be a

20   mistake; correct?

21   A.   Yes.

22   Q.   There was no gun there?

23   A.   No, sir.

24   Q.   Had there been a gun there?

25   A.   Previously, Jonathan had a gun.

```
 1   Q.   And when did you see the gun disappear?

 2   A.   That Tuesday or Wednesday.

 3   Q.   Before this happened?

 4   A.   Yes, of that week.

 5   Q.   Now, your Godmother says, "Stay inside, don't go over there

 6   because you're going to get in trouble."

 7   A.   Yes, sir.

 8   Q.   Well, what kind of trouble could you get in, just going

 9   over and helping the police in their investigation; right?

10   A.   She just assumed that because I'm --

11        MR. HUNNEFELD:  Objection, speculation.

12        THE COURT:  Sustained.

13        MR. KLOCK:  Sorry, Judge.

14   BY MR. KLOCK:

15   Q.   What did you -- did your Godmother give you any reason for

16   not going over there and helping the police?

17   A.   No.  She said, "Don't go back there."

18        MR. HUNNEFELD:  Objection.

19        THE COURT:  I'm sorry, Mr. Smart, don't answer that

20   question.  That objection is sustained.

21        MR. KLOCK:  I'm sorry.  Let me back up then.

22   BY MR. KLOCK:

23   Q.   Did you hear Mr. Hunnefeld during his opening statement say

24   that you did not go over to the apartment to help out the

25   police after you left, did you hear him say that?
```

1    A.   Yes, sir.

2    Q.   Okay.  Why didn't you go over to the apartment to help the

3    police after you left?

4    A.   Like, I was so visibly -- I was so shaken up, like, at that

5    time, I was sweating, I was so scared, I didn't even want to

6    walk back outside, period.  I didn't want to go back outside no

7    more, period.

8    Q.   So how long did you stay there?

9    A.   Until the morning, because she came in the morning, because

10   I didn't go to sleep.  And in the morning she said, you know,

11   listen, I love you like a son, but, she said, "You have to

12   leave there.  I don't want the police at my house, I don't want

13   that type of stuff in my house, because she was like 60.

14   Q.   Watch yourself.

15   A.   I'm sorry.  60.

16   Q.   Okay.  Now -- he didn't mean anything by that.

17        Now, you left there and went where?

18   A.   I went to North Miami.

19   Q.   Okay.  What was in North Miami?

20   A.   My friend's house, a good friend of me and Jonathan, he was

21   a mutual friend of ours, he hung with us as well.

22   Q.   When you say North Miami, the apartment that you were

23   living in was on 77th Street; right?

24   A.   Yes, sir.

25   Q.   Where was Mr. -- was it Loussant, is that his first or his

1   last name?

2   A.   His first name is Loussant.

3   Q.   And where was his apartment?

4   A.   135th Street and Northeast 6th Avenue.

5   Q.   How did you get there?

6   A.   Huh?

7   Q.   How did you get there?

8   A.   The jit (phonetic).

9   Q.   You get there.  And are you still dressed in the same

10  clothes?

11  A.   Yes, sir.  I had my same clothes on, and she gave me some

12  pants to put on because my shorts were kind of short looking,

13  and she gave me some, like, shoes to put on.

14  Q.   Okay.  So the clothing that you had on in the apartment at

15  the time that the gun shots were fired, where did that clothing

16  go?

17  A.   With me.  I had it on still.

18  Q.   Okay.  And did you at any point in time change it?

19  A.   Yes I took it off.

20  Q.   And where did you put it?

21  A.   Right there, in his house, just put it right down on the

22  floor.

23  Q.   And then you changed into other clothes?

24  A.   He gave me shorts and shirt that he had there.

25  Q.   How long did you stay there?

1  A.   Two days.  Two-and-a-half -- until that third day, until I

2  went to the police.

3  Q.   Okay.  Now, why didn't you go to the police during that

4  two-day period?

5  A.   Because in those two days a lot of people was coming to his

6  house asking me what happened and everybody kept giving me the

7  same advice, just like, if you go to the police, you're going

8  to be involved in this, you're going to go to jail.

9      I kept telling people, "I want to go to the police."

10     My girlfriend was like, "Taiwan, just go to the police.

11 You're going to be in trouble, go to the police."

12     And other people say, "If you go to the police" --

13     MR. HUNNEFELD:  Objection, all these statements of what

14 people would tell him.

15     THE COURT:  Ladies and gentlemen, this statement is not

16 offered for the truth of why Mr. Smart took certain actions and

17 you should take it as such.  So continue, please.  All right.

18 BY MR. KLOCK:

19 Q.   So then what happens?

20 A.   I was there and, like, I think it was the third day,

21 someone called and said that they seen the police in front of

22 my mom's residence with camera crews outside; and that's when I

23 said, do you know what, I'm tired of this.

24     I said, "Now my mom's getting involved, my sister, my

25 brother lives there," I said, "I'm just going to go to the

1  police and get them out of there."

2  Q.  Well, what difference does it make if there's police and

3  camera crews at your mother's house?

4  A.  My mom's house was maybe ten blocks from where this thing

5  occurred at.  And by them going, they was going to bring

6  attention to my mom house.  And at the time I was afraid

7  somebody do something to my sister and my mom.

8  Q.  So then what happens?

9  A.  I got a mother -- I got my problem, this isn't their

10  problem, they shouldn't be involved in this.  So I walked to

11  the convenience store on 135th and Miami Avenue.

12  Q.  Now, with respect to -- getting back for a second to the

13  apartment.  Do you know who paid the rent for the apartment?

14  A.  I know Jonathan used to give some money to somebody who the

15  lease was really under their name.

16  Q.  Okay.  Did you pay anything towards the rent?

17  A.  No, sir.

18  Q.  So you were staying there for free?

19  A.  Yes, sir.

20  Q.  Okay.  So you go to the convenience store and what you said

21  125th Street?

22  A.  135th Street.

23  Q.  135th Street, and you call who?

24  A.  I called down to the police station and I told them that my

25  name was Taiwan Smart and that detectives are looking for me

 1    involved in questioning about a homicide.

 2    Q.   Okay.  Now, let me ask you a couple other questions before

 3    we go further down that path.

 4         Did Jonathan have any enemies that you knew of?

 5    A.   He didn't have any enemies, but he had a problem that

 6    occurred that week of the incident.

 7    Q.   And what was that problem, as you understood it?

 8    A.   The problem was that Tuesday morning Jonathan and another

 9    gentleman and a third gentleman was involved in a fight with

10    some dude on the same street as we were on, and they ended up

11    -- one of them ended up shooting that gentleman.

12    Q.   Okay.  And so why is that a problem?

13    A.   They ran back to the house on 77th Street.

14    Q.   Okay.  So did Jonathan say anything to you about that?

15         MR. HUNNEFELD:  Objection.  Hearsay.

16         THE COURT:  Sustained.

17    BY MR. KLOCK:

18    Q.   Okay.  So did you say anything to Jonathan about that

19    situation?

20         MR. HUNNEFELD:  Objection, hearsay.

21         THE COURT:  What he said to Jonathan?

22         MR. HUNNEFELD:  Yes, out-of-court statement by a party,

23    it's hearsay, Your Honor, in response to a hearsay statement.

24         THE COURT:  That objection is overruled.

25    BY MR. KLOCK:

```
 1   Q.   Did you say anything to Jonathan about this situation?

 2   A.   I told him, before he -- they was talking about why did you

 3   do that, why you went down there.

 4   Q.   And did you say anything else to him?

 5   A.   No.  I just told him -- not much else.  They just came

 6   inside and they said, "What happened?"

 7   Q.   Okay.  Did he appear frightened?

 8   A.   He didn't look scared, but he was, like, worried about it a

 9   little.

10   Q.   Okay.  Now, you're now at the convenience store you

11   called -- was it the Miami police?

12   A.   Yes.

13   Q.   Okay.  And who did you talk to there?

14   A.   Fabio.

15   Q.   Pardon me?

16   A.   Fabio Sanchez.

17   Q.   How do you know it was him?

18   A.   He said, this is -- after they put me through to him, he

19   said, "This is Detective Sanchez."

20   Q.   And what did you say to him?

21   A.   I said, "Detective Sanchez, this is Taiwan Smart.  I heard

22   you guys are looking for me, and I want to talk to you guys.

23   I'm at the convenience store at 135th and Memorial Highway."

24   Q.   How long did you talk to Detective Sanchez on the phone, if

25   you recall?
```

1    A.   Maybe five minutes or so.

2    Q.   So it was as long as five minutes; it wasn't just --

3    A.   No, it was quick.  We spoke for a minute.  I explained to

4    him that I was nervous and I was scared, because people were

5    saying people were going to kill me, too.

6    Q.   What else did you say to him?

7    A.   I told him I was scared for my life.

8    Q.   Anything else?

9    A.   Not that I recall.

10   Q.   Okay.  And so how long did it take for detective -- did he

11   tell you he was coming?

12   A.   Yes, he said he was on his way; he told me to just hang

13   tight.

14   Q.   How long did it take him to get there?

15   A.   Maybe 15, 20 minutes or so.

16   Q.   Was anyone with you?

17   A.   Yes, Loussant Major, the person whose house I was at.

18   Q.   So you were standing in front of the store waiting for

19   Detective Sanchez?

20   A.   Yes, sir.

21   Q.   So tell the jury how Detective Sanchez arrived.

22   A.   He pulled up in a Ford Taurus, a black Ford Taurus,

23   accompanied by a few Metro-Dade officers and a cameraman.

24   Q.   First, were the Metro-Dade officers in green-and-white with

25   him in the police car or separate car?

1    A.   They were in separate cruisers.

2    Q.   So there were how many of those green-and-whites,

3    Metro-Dade Police cars, because we're outside the

4    City of Miami; right?

5    A.   Yes, sir.

6    Q.   So we have Metro-Dade police cars.

7         How many of them were there?

8    A.   Maybe, a total of four.

9         MR. HUNNEFELD:  Objection, Your Honor.

10        THE COURT:  Overruled.

11   A.   Maybe three or four of them.

12   Q.   Who's in Detective Sanchez's car?

13   A.   The cameraman from First 48.

14   Q.   So in Detective Sanchez's official vehicle, a cameraman

15   gets out from First 48 with his camera?

16   A.   Yes, sir.

17   Q.   Okay.  Then what happens?

18   A.   I tried to walk up to Detective Sanchez at which time he

19   told me to stand right there, like, don't walk up on him.  So I

20   stood there, and he took me to the side and he asked me, can he

21   frisk me first.

22   Q.   Okay.  And you said?

23   A.   I let him frisk me.  And he asked me to tell him what

24   happened.  And as we were conversing, the camera guy came up

25   and, like came really close with my face to the camera, so I

```
 1   started turning to my left, turning my face away.

 2       And Fabio was, "Why do you keep looking that way?  Are you

 3   going to run?"

 4       I just stated, "No.  I don't want my face on no camera," at

 5   which time he handcuffed me.  He said he handcuffed me so I

 6   wouldn't run.

 7   Q.  So he handcuffs you behind your back or front?

 8   A.  Behind my back.

 9   Q.  So now you're standing there having a conversation with

10   him, First 48 camera videotaping you --

11   A.  Yes, sir.

12   Q.  -- handcuffed?  And what do you tell Sanchez?

13   A.  I tell him that people in the hood was telling me that

14   those guys that killed my friend said they was going to kill

15   everything that has something to do with that.

16           MR. HUNNEFELD:  Objection, Your Honor, it's hearsay,

17   it's double hearsay.

18           MR. KLOCK:  He's a party.

19           THE COURT:  Ladies and gentlemen, this statement is

20   hearsay but it is not offered for the truth of the matter

21   asserted by for why Mr. Smart took certain actions you may

22   continue, please, Mr. Klock.

23   BY MR. KLOCK:

24   Q.  So he told you what?

25   A.  He basically said, "Don't worry, we're going to help you
```

1    get to the bottom of this, we're going to help you see who hurt

2    your friends, don't worry, I'm going to protect you."

3    Q.   He said he was going to protect you?

4    A.   Yes.

5    Q.   How did he do that?

6    A.   At that time he put me in the back of the Ford Taurus and

7    Metro-Dade police officer lady walked up and said --

8         MR. HUNNEFELD:  Objection what the Metro-Dade officer

9    said.  It's a non-party.

10        THE COURT:  Sustained.

11   BY MR. KLOCK:

12   Q.   Did officer -- did Detective Sanchez have any conversations

13   with the Metro police that were there?

14   A.   Yes, sir.

15   Q.   And did he give them anything?

16   A.   He went in his truck -- I think he gave him some First 48

17   bag or something, like, some memorabilia from First 48.

18   Q.   That he got from his car?

19   A.   Yes, sir.

20   Q.   And gave to the Metro police officer?

21   A.   Yes, sir.

22   Q.   Fine.  Was anything said to you by the officers that

23   transported you that upset you?

24   A.   One of them said I was -- was I the murderer, was I the

25   celebrity.

```
 1   Q.   What did Detective Sanchez say he was there right?
 2   A.   He told me to disregard that, he apologized for the actions
 3   of the officer, and he was like they shouldn't have said that
 4   to me.
 5   Q.   Okay.  So now we're on our way to the police department, so
 6   that Detective Sanchez can help you; correct?
 7   A.   Yes, but we had to wait for transportation.
 8   Q.   Okay.  And what transportation?
 9   A.   A City of Miami officer came and transported me.
10   Q.   A blue-and-white?
11   A.   Yes, sir.
12   Q.   And now you're taken down to the police station; correct?
13   A.   Yes, sir.
14   Q.   Now, did Detective Sanchez ask you whether or not it was
15   okay to be filmed by the First 48 camera?
16   A.   No, sir.
17   Q.   Did you have a discussion with Detective Sanchez,
18   irrespective of what he said to you, to address the issue of
19   being photographed and videotaped by the cameraman?
20   A.   I told him I did not want to be videotaped or anything.
21   Q.   And what did he say?
22   A.   He just dismissed it and let them record me.
23   Q.   So they continued to record you while you were standing
24   next to the store?
25   A.   Yes, sir.
```

63

1    Q.   Recorded you as you walked to the back of the car?

2    A.   Yes, sir.

3    Q.   Now, you said you were transported in a blue and white, but

4    that's not the car you got into on film; is it?

5    A.   No, sir.

6    Q.   What car did you get into on film?

7    A.   The Ford Taurus.

8    Q.   So Detective Sanchez takes you and brings you over and puts

9    you in the back of the Ford Taurus while the camera's running;

10   right?

11   A.   Yes, sir.

12   Q.   How long did you stay in the back of the Ford Taurus?

13   A.   Maybe we was on the scene 20 minutes waiting for

14   City of Miami to come transport me.

15   Q.   And then they take you from that car and put you in the

16   other car?

17   A.   Yes, sir.

18   Q.   Was that recorded by First 48, too?

19   A.   Yes.

20   Q.   Okay.  And so now you get down to the police.

21        Did anyone talk to you in the car on the way down?

22   A.   The transporting officer spoke to me briefly.

23   Q.   What did he say?

24   A.   He showed me a picture of me, like, a BOLO that said I was

25   on probation or something like that.  He asked me if I was on

```
 1    probation.

 2           MR. KLOCK:  May I approach, Your Honor?

 3           THE COURT:  You may.

 4           MR. KLOCK:  I assume we have a stipulation on

 5    Plaintiff's 135 for admission?

 6           MR. HUNNEFELD:  No.  No, Your Honor, we don't have a

 7    stipulation on that.

 8           MR. KLOCK:  Good, that's fine.

 9           May I approach the witness, Your Honor?

10           THE COURT:  All right.

11           MR. HUNNEFELD:  It's going to be a relevance objection

12    to the document.  It's a hearsay document, more important,

13    really, it's irrelevant.

14           THE COURT:  He saying -- you're objecting on relevance.

15    Counsel, can you approach for sidebar, please.

16           (Sidebar discussion held as follows:)

17           MR. KLOCK:  It's a BOLO issued by the City of Miami

18    Police Department.

19           MR. HUNNEFELD:  That's not -- Your Honor, that's not --

20    the City would say that it's not relevant to any of the issues

21    in this case.  It's a BOLO that's out there.

22           THE COURT:  What's the relevance?

23           MR. HUNNEFELD:  It didn't come out until four days

24    later.

25           MR. KLOCK:  What's the relevance?  First, Judge, it's
```

```
 1   issued by the City of Miami.

 2        Secondly, it incorrectly says "on probation and

 3   continues to sell drugs in the above-mentioned areas."

 4        Now, do you recall that Detective Sanchez showed up to

 5   "help him?"  So this is what's given to him in the car by the

 6   officer that's transporting him.

 7        THE COURT:  So he has this in the car?

 8        MR. KLOCK:  It's relevant to the issue of, first, this

 9   is where the pattern of lies from the City of Miami starts,

10   that indicates that he's on probation.  He was BOLO'd, that

11   says somebody "on probation," and they're, in effect, putting a

12   target on him.

13        THE COURT:  Well, here's my other question -- and maybe

14   I can go back and Mr. Hunnefeld can help me -- I understand he

15   believes or we think he believes that when Sanchez first

16   confronts him and says, "Don't worry, I'm going to help you,"

17   I'm assuming Sanchez knows about this, correct?  Because he's

18   got his name.

19        I'm assuming Fabio Sanchez is the same Sanchez;

20   correct?

21        MR. HUNNEFELD:  That's his name, Your Honor.

22        MR. KLOCK:  So you understand, Judge, Mr. Hunnefeld

23   should be able to ask if anybody is using his name without

24   authorization.

25        THE COURT:  He doesn't deny that this is not an
```

1    authentic document.  His objection is purely on relevance

2    grounds.

3          MR. KLOCK:  The relevance is that the City of Miami has

4    issued a document that has false information on it.

5          MR. HUNNEFELD:  His probation status?

6          THE COURT:  Was he not on probation at that time?

7          MR. BASCO:  So what's the relevance that he's not --

8          THE COURT:  That doesn't go to -- we're still at the

9    probable cause stage, so just tell me why this is relevant to

10   what happens to him next or what he thinks is happening to him.

11         MR. KLOCK:  Judge, it shows the City is lying about his

12   status, putting him in danger; when all this is out to conduct

13   the investigation, because the clock is ticking, Judge, on the

14   48 hours, it's ticking, it's ticking.  We don't get it done in

15   a certain amount of time and get it in the can, we cannot make

16   the big time.

17         THE COURT:  Does this somehow go to establish anything

18   with Detective Sanchez?

19         MR. KLOCK:  He lied.

20         THE COURT:  He's lying here; but remember, my goal is

21   what does he tell Judge Cueto, what is he talking about in

22   terms of establishing probable cause?  He could have lied to

23   everybody on the street about what was going on, but what I'm

24   saying is, as far as I know, Judge Cueto never saw this.

25         MR. KLOCK:  The point is he painted a bulls-eye on the

```
 1    kid.

 2            THE COURT:  In what way?

 3            MR. KLOCK:  When you get someone's charged with murder

 4    and they're on probation, Judge -- my experience, as you can

 5    imagine, is not as extensive as other young men, but I have

 6    young men live with me and one of them was a misdemeanor, baby

 7    mama drama, and 9 police cars and 18 police officers showed up

 8    at my house.

 9            THE COURT:  I understand.  But just give -- connect the

10    dots here from this BOLO to your cause of action, this now

11    remains, false imprisonment and with the "First 48" in 1983.

12            MR. KLOCK:  So in terms of what I want to present to

13    the jury, that the entire thing -- the entire thing, from day

14    one was decided that he did it, they decided they were going to

15    push it forward -- there was no reason not to -- the entire

16    object of the game was to get this thing -- this show done.

17            There's no training whatsoever from the City how to

18    conduct themselves or how these people were to conduct

19    themselves.  These guys all had stars in their eyes, they were

20    big time.  They were going to continue from their drab

21    existences and be Hollywood starlets.

22            THE COURT:  Well, I don't think we have any evidence of

23    that.  The question is what -- both of them, do you get both of

24    them or --

25            MR. KLOCK:  These are the two that are shown --
```

1          THE COURT:  You want to show him both pieces of paper?

2          MR. KLOCK:  Yes.  -- my understanding.

3          MR. BASCO:  Judge, your initial question:  What effect

4     does that have on him?  Relevance to this witness.  And it's

5     been expressed as relevance towards officers on "First 48" and

6     stuff that this person has no testimony towards.

7          MR. KLOCK:  Let's just pause for a second.  Here's the

8     interesting thing about Henry's last argument.  Henry's last

9     argument is that it doesn't make any difference what the bond

10    judge is told with respect to probable cause; if somewhere out

11    there in the universe there's probable cause, then that's the

12    only thing that determines whether or not he's held on bond.

13         The Court has, I think, gotten right to the point that

14    the way our system works and has knowledge -- not a lack of

15    familiarity with the criminal justice system -- which I have a

16    great deal of familiarity with and Hilton Napoleon does.

17         The way it works, you have an arrest form.  The judge

18    looks at the arrest form.  If the judge does not think that

19    there's probable cause, okay, then he then establishes an ROR

20    status on the defendant.  He's released to his own

21    recognizance.  Because the next step is to see what the State

22    is going to do about it.

23         If there is not anything sufficient on the face of it

24    even for him to do that, the judge has two options:  He can

25    either dismiss the charges on this -- which most responsible

```
 1    judges do not do -- or he can conveniently have a hearing to

 2    get additional evidence.

 3              MR. HUNNEFELD:  That's not the document.

 4              THE COURT:  So does the police department prepare this?

 5              MR. KLOCK:  Yes, Judge.

 6              MR. HUNNEFELD:  I never heard testimony to that.

 7              THE COURT:  Did Sanchez prepare that?

 8              MR. HUNNEFELD:  He wasn't asked at the deposition.

 9    There's no predicate.

10              MR. BASCO:  Judge, it's away from relevance.  We're

11    still talking about the relevance for this issue.  That entire

12    last document has nothing to do with this document, with the

13    relevance of this conduct that this witness --

14              MR. KLOCK:  Just so the Court understands the point.

15    The conduct of counsel -- very fine counsel -- is simply a

16    continuance of a lack of regard that the City of Miami has for

17    that young man and his rights; and that the only thing they're

18    interested in protecting are the pictures of the City of Miami

19    of palm trees waving, cars going cross causeways.

20              The whole thing was designed as a marketing pitch for

21    the City of Miami.  That's all they care about.

22              Complete disregard for --

23              MR. BASCO:  We're here for this document, and it

24    doesn't address anything in this document.

25              THE COURT:  No.  I understand.
```

```
1              MR. BASCO:  Okay.

2              THE COURT:  Here's where I'm coming from.  This

3    document is prepared on -- I mean, I think -- Mr. Smart, on

4    like the second or third day?

5              MR. KLOCK:  The fourth day.

6              THE COURT:  The fourth day after.

7              MR. NAPOLEON:  Third day.

8              THE COURT:  The third day, they already got this out in

9    the community somewhere; right?

10             MR. HUNNEFELD:  The murder occurred on the 13th.  The

11   17th, they met with Mr. Smart.  In between -- they prepared it

12   in between and tried to gather information because, obviously,

13   he was a person of interest and they were trying to get any

14   information they could to track him down and showing the --

15             MR. KLOCK:  Judge, it would be helpful to --

16             MR. NAPOLEON:  The police didn't know about it until

17   the 14th.

18             THE COURT:  I don't think the issue is whether or

19   not -- I mean, I don't think the lie -- it was just said -- had

20   anything to do at this time.

21             What goes on later, you want to talk about what he puts

22   on this form, maybe, if you want to start with this form that

23   he was given, this exhibit, and you want to explore it later

24   with Sanchez, you can.

25             MR. KLOCK:  Or --
```

```
 1              THE COURT:  I'm going to let you identify that he was

 2   shown Exhibit 135 in the police car.  You want to show it and

 3   admit it through Sanchez, you can, and not --

 4              MR. HUNNEFELD:  Not to the jury at this point.

 5              THE COURT:  Not at this time.

 6              MR. HUNNEFELD:  Thank you, Your Honor.

 7              MR. KLOCK:  Thank you.

 8              (Sidebar discussion concluded and the following

 9   proceedings were held in open court:)

10              MR. KLOCK:  May I approach, Your Honor?

11              THE COURT:  You may.  The exhibit number is 135.

12              MR. KLOCK:  Yes, Your Honor.

13              THE COURT:  Ladies and gentlemen, I am reserving

14   admission of Exhibit 135 at this time, and it will not be shown

15   to you.

16   BY MR. KLOCK:

17   Q.  Have you ever seen this document before?

18   A.  Yes, sir.

19   Q.  When did you see it?

20   A.  At the police station.

21   Q.  When was it handed -- who handed it to you?

22   A.  The first page?

23   Q.  No, the second page.  I'm sorry.

24   A.  The City of Miami officer who transported me.

25   Q.  So that was when you were going from the convenience store
```

 1   into the police station?

 2   A.   Yes, sir.

 3   Q.   And the first page of the document, you saw inside the

 4   police station?

 5   A.   Yes, sir.

 6   Q.   Who gave you that document?

 7   A.   Fabio.

 8   Q.   Okay.  Move for identification, Judge, at this point in

 9   time.

10        THE COURT:  Identified by this witness, subject to

11   admission by some other witness.

12        MR. KLOCK:  Thank you, Your Honor.

13   BY MR. KLOCK:

14   Q.   Now, Detective Sanchez had indicated that he had put you in

15   handcuffs because he was concerned that you were going to run

16   when you were turning your face away from the camera; correct?

17   A.   Yes, sir.

18   Q.   And once he had you in the police car did he take the

19   handcuffs off?

20   A.   No, sir.

21   Q.   Did he ever take the handcuffs off?

22   A.   Once we got inside the interrogation room.

23   Q.   Okay.  And the interrogation room, can you describe that to

24   the jury?

25   A.   A room about six or eight feet and padded walls and just

1   three chairs and a table.

2   Q.   And how long were you in that room?

3   A.   15 hours altogether.

4   Q.   15 hours.   Okay.   So could you tell the jury after you sat

5   down in the room what occurred.

6   A.   Once I was brought to the police station, they put me in

7   the room and they closed the door, and Fabio told me that he

8   was hungry, and he was going to get food for his-self, and he

9   will be back shortly.

10   Q.   And how long was he gone?

11   A.   About an hour, an hour-and-a-half.

12   Q.   So he put you in the room for an hour and a half while he

13   goes to get something to eat; correct?

14   A.   Yes, sir.

15   Q.   How are you dressed?

16   A.   I was wearing a black shirt, some shorts, and some shoes.

17   Q.   What was the temperature in the room?

18   A.   Like 20-something degrees, was pretty cold in there.

19   Q.   And it was cold the entire time?

20   A.   Yes, sir.

21   Q.   Did anyone ever offer to adjust the temperature or give you

22   a blanket or anything?

23   A.   No, sir.

24   Q.   So now what happens in the inter -- when Detective Sanchez

25   gets back from his dinner or lunch, or whatever it is, then

```
 1   what happens?

 2   A.   He comes in and he brings a big 42-ounce Subway cup in,

 3   like, a six-inch sub and puts it on the table and tells me to

 4   eat it.

 5   Q.   Okay.  Now, meanwhile when you got to the station, did you

 6   ever see your friend from First 48 again?

 7   A.   Loussant Major?

 8   Q.   No, the camera.

 9   A.   He was in the hallway outside with him.

10   Q.   So did he follow you up from -- where was he?  When you

11   were in the police car being transported, do you have any idea

12   where the First 48 guy was?

13   A.   When I got out of the car, he was already there.

14   Q.   At the police station?

15   A.   Yeah, they was ahead of us.

16   Q.   When you get out of the police car, there's a back

17   entrance, correct, like, in a covered area?

18   A.   Yes, sir.

19   Q.   And when you got out of the police car, was the First 48

20   Hour taping?

21   A.   Yes.

22   Q.   And did he follow you into the police station?

23   A.   Yes.

24   Q.   And did he go up the elevator with you?

25   A.   Yes.
```

```
1    Q.   And did he walk through the homicide department to the
2    interrogation room?
3    A.   Yes.
4    Q.   Did he ask you your permission to do that?
5    A.   No, sir.
6    Q.   Okay.  Did you tell him you could do that?
7    A.   No, sir.
8    Q.   Okay.  So now you're in the room.  Where's he?
9    A.   I don't know at that time.
10   Q.   Okay.  Were you aware that the room that you were in had
11   both audio equipment to record everything that you said and
12   also a television link that was being observed by First 48 the
13   whole time you were there?
14        MR. HUNNEFELD:  Objection, form, Your Honor.
15        THE COURT:  Sustained.  Rephrase, counsel.
16        MR. KLOCK:  Okay.
17   BY MR. KLOCK:
18   Q.   Were you aware that the room was televised?
19   A.   No.  I assumed it was audio, but I didn't realize it was
20   visually televised.
21   Q.   Did you ever give permission to anyone to take a television
22   tape of your interrogation or audio of your interrogation?
23   A.   No, sir.
24   Q.   Did you know that that particular interrogation, both
25   visually and audio was being provided to First 48?
```

```
 1   A.   No, sir.

 2   Q.   Would you have given your permission for that?

 3   A.   No, sir.

 4   Q.   Did Detective Sanchez or anyone from the City of Miami

 5   police department ask you for permission to do that?

 6   A.   No, sir.

 7   Q.   Okay.  So now we're in the room.  And just also for the

 8   record, did you ever see the First 48 guy again?

 9   A.   Later that day.

10   Q.   Okay.  When was that?

11   A.   When they were taking me to the elevator to take me to

12   jail.

13   Q.   So as you walked out of the room, the First 48 guy is

14   there?

15   A.   Yes.

16   Q.   Where's the camera?

17   A.   In my face, he's following me.

18   Q.   How close?

19   A.   At least like this, this close.  I could feel the heat from

20   the light on my face as he's recording me.

21   Q.   And so he follows you down the hallway in the police

22   department?

23   A.   Into the elevator.

24   Q.   Into the elevator.  Does he get in the elevator with you?

25   A.   Yes, sir.
```

```
 1   Q.   Do they wait for him to get in the elevator?

 2   A.   Yes, sir.

 3   Q.   And where's the camera now?

 4   A.   Still is in my face.

 5   Q.   Down the elevator, and then out to the police car correct?

 6   A.   Yes.

 7            MR. HUNNEFELD:  Objection, leading, Your Honor.

 8            MR. KLOCK:  Sorry, Judge.

 9            THE COURT:  Sustained.  Sustained.  Rephrase, counsel.

10   BY MR. KLOCK:

11   Q.   Did the elevators door open at some point in time?

12   A.   Yes.

13   Q.   Did the First 48 hour man stay in the elevator or he got

14   out?

15   A.   He got out in front of us.

16   Q.   In front of you?

17   A.   Yes.

18   Q.   And then what happened, did he continue taping?

19   A.   Yes, sir, they taped.  They put me in the car.

20   Q.   So he taped you from the elevator all the way until they

21   put you in the car; correct?

22   A.   Yes, sir.

23   Q.   Okay.  Now, with respect to the areas that we're talking

24   about, when you were brought into -- first let's back up to the

25   convenience store.  At the point in time that Detective Sanchez
```

1    arrived, was the area cordoned off by the police, was the

2    general public walking around at that point in time?

3    A.   Yes.

4    Q.   When you got into the car and then you went down to the

5    police station, from the time you went into the City of Miami

6    police station until you went out, were you ever in an area

7    that the general public is invited to be and is located?

8            MR. HUNNEFELD:  Objection, Your Honor, speculation.

9            THE COURT:  Rephrase.  Sustained.

10           MR. KLOCK:  Okay.

11   BY MR. KLOCK:

12   Q.   Actually, when you pulled into the Miami police station and

13   got out, describe the environment that you were in, the

14   location.

15   A.   We were by that parking garage by that back door, we got

16   out and there was like three other detectives out there, and

17   they started asking me a few questions downstairs before we got

18   upstairs.

19   Q.   Was that area inside the enclosure of the City of Miami

20   Police Department?

21   A.   It was inside their property, yes, the gate.

22   Q.   Is there a gate that closes after you drive in?

23   A.   Yes, sir.

24   Q.   Was the general public around there anywhere?  Do you see

25   anyone walking up and down selling newspapers?

1    A.  I don't recall.

2    Q.  Walking from place to place?  Okay.  Was the area a secure

3    area?

4    A.  Yes.

5            MR. HUNNEFELD:  Objection, Your Honor, "secure."

6            THE COURT:  Rephrase.  I don't think this witness would

7    know whether or not this would have been secure.  He can talk

8    about what he observed.

9            MR. KLOCK:  Okay.

10   BY MR. KLOCK:

11   Q.  The time that you spent -- the 19 months you spent in jail,

12   do you know the difference between a secured and an unsecured

13   area?

14   A.  Yes, sir.

15           MR. HUNNEFELD:  Objection.

16           THE COURT:  Counsel, the only reason why I'm sustaining

17   Mr. Hunnefeld's objection is, "secure" in law enforcement has a

18   very specific term of art.  I think he can describe what he

19   observed.

20           MR. KLOCK:  Okay.

21           THE COURT:  It terms of locks, doors, windows,

22   et cetera.

23           MR. KLOCK:  That's fair.

24   BY MR. KLOCK:

25   Q.  Who did you see when you got out of the police car at the

 1    police station?

 2    A.   It was Fabio, Detective Cepero, and a third detective, I

 3    don't remember his name.

 4    Q.   Was there anybody else around?

 5    A.   The cameraman.

 6    Q.   That's it?

 7    A.   Yes.

 8    Q.   So we have three or four City of Miami police employees and

 9    the First 48 cameraman?

10    A.   Yes, sir.

11    Q.   The door that you walked into the police station, is that

12    the general public entrance or a different entrance?

13            MR. HUNNEFELD:  Objection, Your Honor.

14            THE COURT:  Basis?

15            MR. HUNNEFELD:  Speculation.

16            THE COURT:  I understand where you're going, Mr. Klock

17    and Mr. Hunnefeld, but Mr. Hunnefeld's objection is right, and

18    that is, he would not know general public area versus --

19            MR. KLOCK:  Okay.  We will back up.

20    BY MR. KLOCK:

21    Q.   Have you ever been to the City of Miami police department?

22    A.   That one.

23    Q.   Yes?

24    A.   Prior to that, no, sir.

25    Q.   Have you been there since?

1    A.   No, sir.

2    Q.   Describe the area that you came in through.

3    A.   We came in, like -- an automatic gate opened, we drove

4    through and went like around a parking structure; and they

5    parked in front of the door and one of the officers had to

6    either use a card or some type of buzzer to be let into the

7    building.

8    Q.   Okay, fine.  Was the door locked?

9    A.   Yes, sir.

10   Q.   Okay.  And when you walked into the building, describe

11   where you were.  You're in a hallway?

12   A.   I was in like a smaller hallway that we had to go through.

13   I think it was another door with clearance that led to an

14   elevator.

15   Q.   And he had to use his card there, too?

16   A.   Yes.

17   Q.   Did you see any other people in that hallway?

18   A.   Not that I recall.

19   Q.   Okay.  And then when you went up the elevator, was there

20   anyone else in the elevator except police officers and the

21   First 48 cameraman?

22   A.   No, sir.

23   Q.   Okay.  When you got up to the top floor, would you describe

24   what it was that you saw.

25   A.   We walked out the elevator into like a waiting room-type of

1    situation, it had, I think, a blue carpet and there was like

2    six chairs, three on each side, a small coffee table, some

3    books on the coffee table, and some plants and a door.

4    Q.   Okay.  Who was there?

5    A.   I think officers, I'm not sure.

6    Q.   Did you see any non-officers present?

7    A.   No, sir.

8    Q.   Okay.  And then you went into the homicide area?

9    A.   They had to have another door open, like, a clearance to

10   get through it.

11   Q.   And they used the card again?

12   A.   Yes.

13   Q.   Was there anyone in that room, other than City of Miami

14   police officers?

15   A.   Just detectives.

16   Q.   And the First 48 guy, was he allowed in, too?

17   A.   Yes, sir.

18   Q.   And he followed you all the way in?

19   A.   Yes, sir.

20   Q.   And the same on the way back out?

21   A.   Yes, sir.

22   Q.   Did you see any members of the general public the whole

23   time you were in the City of Miami Police Department building?

24   A.   Not that I'm aware of, no.

25   Q.   Okay.  So you get into the room and he presents you with

1    the Subway sandwich -- I'm sorry -- the sandwich and the drink.

2        Then what happens?

3    A.   I refused to eat the food and stuff.  I explained to him

4    that I didn't really have an appetite, I just wanted to talk

5    and I just wanted to tell him what I knew, so I could find out

6    what happened to my friend.

7    Q.   Was Mr. Loussant there, too?

8    A.   Yes.  They separated us at that point.

9    Q.   Okay.  He came with you as well; right?

10   A.   He came for support.

11   Q.   Was he in the elevator with you?

12   A.   I believe so.

13   Q.   Okay.  And did they videotape him, too?

14   A.   Yes, sir.

15   Q.   Okay.  And was he brought into the homicide area?

16   A.   Yes, sir.

17   Q.   And then where did they put him?

18   A.   In a separate homicide interrogation room.

19   Q.   Did anyone tell you why he was there?

20   A.   He asked to be brought there.

21   Q.   Okay.  For what purpose?

22   A.   Because he didn't want them to take me by myself.

23   Q.   Okay.  And so now you're in the room.  And incidentally,

24   the room -- the interview room is where on the hallway?

25   A.   It's the last door on the right.

1    Q.   So as you walk down the hallway --

2    A.   I meant the other right.

3    Q.   -- there's a wall here and a door that goes into the

4    interview room; correct?

5    A.   Yes.

6    Q.   There are no other doors on the hallway at that point, it's

7    the end of the hallway?

8    A.   Yes, yes, the last door.

9    Q.   Are there any other rooms in the hallway that you seen?

10   A.   I seen several interrogation rooms, the green doors.

11   Q.   Now, you get in there and you tell him you're really not

12   all that hungry, you just want to provide information to them

13   and go.  What happens then?

14   A.   At what time Fabio tells me that he's going to go eat real

15   quick and then he'll come back and talk to me.

16   Q.   Okay.  And so then you wait an hour-and-a-half for him to

17   get back from eating?

18   A.   No.  Just asked me about the food.  He brought the food

19   into me and told me that now he has to go and eat his food

20   first.

21   Q.   So he was gone for an hour-and-a-half getting his food?

22   A.   Yes.

23   Q.   And then he brought his food back, and he stuck your food

24   in there and then he went back to have his food?

25   A.   Yes, sir.

1    Q.   How long did it take him to eat his food?

2    A.   I'm not sure.  At that time, I was not really -- I had no

3    track of time, no sense of time.

4    Q.   Why was that?

5    A.   There was no clocks or anything present.

6    Q.   There was no clock in the room?

7    A.   No, sir.

8    Q.   Any radios?

9    A.   No, sir.

10   Q.   Anyone come in or out?

11   A.   No, sir.

12   Q.   So you're just left in the room alone, a 60-degree room, no

13   clock, no music, no interaction with human beings; you have no

14   idea how long it was?

15   A.   No.

16   Q.   Okay.  So then Sanchez comes back in the room after he's

17   finished eating, presumably.  Then what happens?

18   A.   He comes in the room and I immediately start trying to tell

19   my story, but at sometime he says we're not going to get into

20   that yet I want to get some background information on you like

21   about your life before we get into that.

22   Q.   Okay.  So what did he ask you about?

23   A.   Like, where did I grow up, my childhood, my relationship

24   with my parents, my relationship with my siblings,

25   relationships with just people in general, and just stuff like

1    that.

2    Q.   Did he ask you about your relationship with Jonathan?

3    A.   Briefly.  But he was really concerned asking me questions

4    about myself or stuff.  He didn't really talk to me about the

5    case yet or anything pertaining to that.

6    Q.   Okay.  Then what happened?

7    A.   After awhile, his detective partner Cepero comes in the

8    room and sits directly across from me, and Fabio is sitting to

9    my right.

10   Q.   Okay.  Describe Detective Cepero to the jury.

11   A.   He's a medium-build gentleman, maybe five eight, five nine

12   or so, clean shaven head.  He had like brownish eyes, and he's

13   very quiet.

14   Q.   And then Detective Sanchez, describe him to the jury.

15   A.   He's a heavier-set gentleman, a little taller -- a little

16   shorter than me.  He had a full head of hair.  He was more

17   talkative at first and more like -- he was pressing, like,

18   talking to me more.

19   Q.   And did you note -- how are they dressed?

20   A.   Detective Sanchez had on a white shirt, a tie, some black

21   pants and some dress shoes.  And Cepero was dressed the same,

22   like, in dress clothes.

23   Q.   And the entire time that you were in that room for the 15

24   hours off and on, did they change their ties or change their

25   shirts?

 1   A.   I wouldn't be able to remember that.  I wasn't focusing on

 2   that.

 3   Q.   Okay.  And so now Cepero comes into the room, too.  So when

 4   they're finished talking to you about your life story, then

 5   what?

 6   A.   Then they start.  They show me this.

 7   Q.   Put that down?

 8   A.   They show me that and they ask me, do I recognize the two

 9   people.

10        MR. KLOCK:  Your Honor, can I have a partial admission

11   of the first page of that document -- I can wait, Judge -- and

12   do it all at one time?

13        THE COURT:  All right.

14        MR. KLOCK:  Okay, fine.

15   BY MR. KLOCK:

16   Q.   So they showed you what is Plaintiff's 235, the first page;

17   correct?

18   A.   Yes, sir.

19   Q.   Did they show you the second page?

20   A.   No.

21   Q.   But you had seen that in the car already; correct?

22   A.   Yes, sir.

23   Q.   Now they show you that picture, and what did they ask,

24   anything about that picture?

25   A.   They asked me, do I know who the people in the picture are

```
 1    and to write under each one of their names under their
 2    pictures, who are they.
 3    Q.  Okay.  And did you do that?
 4    A.  Yes, sir.
 5    Q.  Okay.  Now, when they were asking you about your family and
 6    that kind of thing, did they ask you whether you lived in that
 7    apartment?
 8    A.  Yes, sir.
 9    Q.  And you told them you did?
10    A.  Yes, sir.
11    Q.  And did they ask you about the activities that went on in
12    the apartment?
13    A.  Yes, sir.
14    Q.  And what did they say about those activities, if anything?
15    A.  They told me that we're homicide detectives, we don't care
16    about that, they said, we just want to know how truthful you
17    are.  They said if you be honest with everything, we'll be more
18    inclined to believe you.
19    Q.  Okay.  So then they told you that they didn't care about
20    any kind of drug sales or anything else?
21    A.  Yes, sir.
22            MR. HUNNEFELD:  Objection.
23            MR. KLOCK:  Let me rephrase the question.
24    BY MR. KLOCK:
25    Q.  Did they discuss anything with you as to what they wanted
```

1   you to be truthful about, Mr. Smart?

2   A.   Yes.

3   Q.   And what did they want you to be truthful about?

4   A.   His words were if there were drugs in the house, just tell

5   the truth because if you lie to us about this it will make it

6   harder for us to believe you about anything.

7   Q.   And they indicated they didn't care about that?

8        MR. HUNNEFELD:  Objection, leading.  He said that

9   before.

10        THE COURT:  Overruled.

11        MR. KLOCK:  Okay, fine.

12   BY MR. KLOCK:

13   Q.   After we have the little meet and greet, okay, and Cepero

14   comes in and they show you that picture, then what happens

15   next?

16   A.   He asks me to take him through the events of that night.

17   Q.   And what did you tell him?

18   A.   I told him exactly what I told you.

19   Q.   Exactly what you told us, to the best of your recollection?

20   A.   Oh, I said that on the night of November 13th, me, Jonathan

21   and Nathan were in the living room watching TV.  We were

22   watching White Collar, a show, and Family Guy was on; and as we

23   were watching Family Guy, a knock came on the window.

24        At sometime Jonathan asked me to get the window, "You don't

25   do nothing all day, you're lazy, just get the window for me" --

```
 1    but like in a playful manner -- at which time I proceeded to go

 2    to the window.

 3        And I opened the window and the guy said he wanted a bag of

 4    weed.  And I asked him for his money.

 5        He asked me to show it to him.

 6        I asked him for his money again.

 7        He asked me to show it to him.

 8        And the third time I asked him for his money, a second

 9    person sprung up towards me, which startled me enough that I

10    backed away from the window and said, "Oh shit," and I stepped

11    on the table and landed, like, on my stomach, at which time I

12    started hearing gun shots and slid behind the entertainment

13    system before making the decision to run out the back.

14            MR. KLOCK:  Okay.  May I have a moment, Your Honor?

15            THE COURT:  You may.

16            MR. KLOCK:  Your Honor, would the Court be willing to

17    take a brief recess now for a comfort break or is it too soon

18    or --

19            THE COURT:  All right.  I have -- it's approximately

20    11:20.  Ladies and gentlemen, we will come back in about 15

21    minutes.  Remember you know a lot more than when you came in

22    this morning.  The temptation gets strong to want to talk about

23    this case amongst yourselves.  Remember you can't until it's

24    been submitted to you for your deliberations.

25            All rise for the ladies and gentlemen of the jury.
```

```
 1              (Jury exited courtroom at 11:20 a.m.)

 2              (Recess taken from 11:20 a.m. to 11:46 a.m.)

 3              (Jury entered courtroom 11:46 a.m.)

 4         THE COURT:  Thank you very much, ladies and gentlemen.

 5   You may be seated.  Right now, counsel the monitors are off.

 6         MR. KLOCK:  That's fine, Judge.

 7         THE COURT:  Just for the record, Mr. Smart, I remind

 8   you that you remain under oath in connection with this matter.

 9         Mr. Klock, you may continue.

10         THE WITNESS:  Yes, ma'am.

11         MR. KLOCK:  Thank you, Your Honor.

12   BY MR. KLOCK:

13   Q.  Mr. Smart, Taiwan, I will get into -- but we'll return to

14   some additional questioning.

15       I just want to get a couple things clear, okay.

16       First, was there ever an argument between you and Jonathan

17   Volce on October 13th?

18   A.  No.  That was my best friend in the world, like, we agreed

19   on everything that was how it was between us.

20   Q.  Okay.  Did you ever tell anyone from the City of Miami that

21   shots were fired through the window and hit either Jonathan

22   Volce or Ray Nathan Ray?

23   A.  No.  I told them just what I told them, people were

24   shooting, I ran, I didn't see no blood, I didn't see nobody get

25   shot.  I didn't see none of that.
```

1   Q.   Okay.  Now, my colleagues tell me that the only other thing

2   I do worse than trying to walk across a flat floor is to

3   describe something, so I would like to, if I could, Your Honor,

4   introduce Exhibit 124, which I believe is a stipulated exhibit,

5   and if that could come up on the screens and --

6           THE COURT:  Counsel, is there any objection to

7   Exhibit 124.

8           MR. BASCO:  Judge, as on the screen, that's fine.

9           THE COURT:  Exhibit 124 is received.

10          Ladies and gentlemen your monitors are on.  Mr. Smart,

11  you should have a monitor on in front of you displaying the

12  exhibit.

13          (Plaintiff's Exhibit 124 received into evidence.)

14  BY MR. KLOCK:

15  Q.   Okay.  There are, apparently, three pages on this exhibit.

16  This is the third page of the exhibit.  Okay.

17      Mr. Smart, Taiwan, can you explain to the jury what they're

18  looking at?

19  A.   It appears to be a layout of the apartment.

20  Q.   Okay.  Now, if I'm correct about this, okay, if we look at

21  the very bottom, there is one measurement that shows 10 feet

22  and one measurement that shows 12 feet, okay.

23      The 12-foot measurement appears to be the living room; is

24  that correct?

25  A.   Yes, sir.

1    Q.   And the 10-foot measurement appears to be the bedroom;

2    correct?

3    A.   Yes, sir.

4    Q.   Okay.  Then the dimension on the other side on the right

5    side of the frame that we're all looking at shows the

6    three-foot front door and shows -- it's kind of hard exactly to

7    figure out what it shows -- but it shows a, perhaps, as much as

8    a 12-foot dimension to the living room on the opposite side;

9    correct?

10   A.   Yes, sir.

11   Q.   Okay.  At the top of -- and if we can at this point in time

12   just pay attention to that section, okay.

13        Now, where is the kitchen?

14   A.   The top right-hand corner.

15   Q.   Okay.  When you say the top right-hand corner, what are you

16   referring to?

17   A.   The picture of the layout of the apartment.

18   Q.   Good.  Can you give us some numbers, like, for instance, is

19   it safe to say that the kitchen is 6, 7, 8, 9 and 10, that's

20   the kitchen?

21   A.   Yes, sir.

22   Q.   And the thing that is being surrounded by 6, 7, 8 and 9, is

23   that the refrigerator?

24   A.   Yes, sir.

25   Q.   Okay.  Great.

1          Now, the sofa -- and I think the easiest way of doing this,

2     even though the numbers don't relate to that is, if you're

3     describing a piece of furniture or something do it by numbers,

4     just come up with a group of numbers.

5          So by looking at this photo -- or rather this exhibit, what

6     is the sofa that you were sitting on when the individuals

7     approached from outside?

8     A.   17-5.

9     Q.   17 -- okay.  I'm sorry.  When they first knocked -- tapped

10    on the window, where were you?

11    A.   I was on 2,3 C4, C, that sofa.

12    Q.   Where was Jonathan?

13    A.   He was on 17-5.

14    Q.   Where, as between 17 and 5, what was he sitting closer to?

15    A.   Five.

16    Q.   Five.  And behind 5 and 17 is what, the window?

17    A.   Yes, sir.

18    Q.   How high is the window?

19    A.   It doesn't have the measurements there.

20    Q.   No, but I'm just asking you, I mean, is it shoulder length,

21    how -- where is it?

22    A.   Compared to where he was sitting?

23    Q.   Yes.

24    A.   It's over his head, the top of his window is passed him.

25    Q.   Over his head?

1    A.  Yes.

2    Q.  All right.  And the sofa that's marked 12, okay, is that

3    where Ray Nathan Ray was?

4    A.  Yes, sir.

5    Q.  It's not 1-2, it's 1C?

6    A.  1C, yes.

7    Q.  Okay, fine.  And the coffee table you're referring to is?

8    A.  19, 18.

9    Q.  Okay, fine.  Now, the tap comes at the window and you leave

10   2C, 3 and 4C and go where?

11   A.  I go to sofa 17, 5.

12   Q.  And where do you put your feet?

13   A.  I'm, basically, in 17 spot, and Jonathan's in 5.

14   Q.  Jonathan's on the phone?

15   A.  Yes.

16   Q.  Okay.  And that's where the various things occurred that

17   you indicated with someone coming to the window, tapping on the

18   window.

19       When you pushed off from the window, where did you land?

20   A.  I landed between VI number 1 and between where it says four

21   feet, in the right-hand corner, like -- next to the

22   entertainment deck, the enter deck, where it's 15, 14, 13.  I

23   was right next to 15, 14, 13.

24   Q.  Okay.  So, where did that come from?  There's an arrow --

25           COURTROOM DEPUTY:  All you have to do is touch it.

1          MR. KLOCK:  Crazy.

2          COURTROOM DEPUTY:  You can touch it.

3  BY MR. KLOCK:

4  Q.  Well, in any event, where it says "chair," that's where you

5  ended up?

6  A.  Yeah, there was no chair there.

7  Q.  There was no chair there, okay.

8      So you end up with your feet where?

9  A.  By more towards B1, and my body was more into the kitchen.

10  Q.  Okay, fine.  And where's out?

11  A.  You said "out?"

12  Q.  How do you get out; right.

13  A.  Through -- past the entertainment deck through the room,

14  and there's a back door.

15  Q.  And the back door is where?

16      Is that next the to dresser on the left-hand side?

17  A.  Yes, above the dresser on the right-hand -- I mean,

18  left-hand corner.

19  Q.  Now, the entertainment deck, how high is that?

20  A.  Maybe three feet off the ground.

21  Q.  Okay, fine.  So after you hit the floor, you scramble out

22  past where it says "three feet;" correct?

23  A.  Yes, sir.

24  Q.  And out the back door?

25  A.  Yes, sir.

Q.   What's back there?

A.   Grass and a fence, a tall fence.

Q.   And when you ran out, you ran -- you made a right-hand turn and ran passed five feet?

A.   Yes, sir.

Q.   Going back to the window, which is right where it says 12 feet, that back yard you described as dark; correct?

A.   It's very dark back there.

Q.   Okay.  Fine.  One second.  Thank you.  Excellent.

Okay.  Now, what I would like to do is, when we were back at the police station, okay?

A.   Yes, sir.

Q.   And what I would like to do is ask you, what do you know about a television show called "First 48" and an episode called "Inside Job?"

A.   It's an episode referring to the murder of my best friend and Ray Nathan Ray.

Q.   When did you first see that?

A.   2011, maybe July or August.

Q.   When did you first hear about it?

A.   2010, July.

Q.   And how did you hear about it?

A.   An inmate came --

MR. HUNNEFELD:  Objection.  Hearsay.

THE COURT:  Counsel, approach.

```
 1              (Sidebar discussion held as follows:)

 2         MR. KLOCK:  He said, "I heard about a television show,"

 3    an out-of-court statement offered to prove the truth about the

 4    matter, the television show.

 5         MR. HUNNEFELD:  I'm more concerned about what that

 6    other inmate is going to say than whether -- but I need -- he

 7    was starting to give a narrative of what another inmate was

 8    telling him, and that would be hearsay.

 9         I mean, if he said, for example --

10         THE COURT:  What do you anticipate he was going to say?

11         MR. KLOCK:  Excuse me.  When people are telling you

12    about something and the impact of how they meant, it's all the

13    statements by --

14         THE COURT:  That's kind of why I'm having a sidebar,

15    because his concern or his -- one of his damage areas is that

16    I'm somehow being held out in the community as this person who

17    committed the crime.

18         MR. KLOCK:  A murderer.

19         THE COURT:  And how else do you find out about how

20    you're being held out in the community as the person who

21    committed the crime but from people in the community?  So I'm a

22    little --

23         MR. HUNNEFELD:  I just I think -- one of the things

24    that I want to make sure is that upon other statements

25    around -- so if he says -- again, it merely depends on what he
```

```
 1    says, but then the bell's unrung.

 2          THE COURT:  Right.  I think what you're saying is, you

 3    don't want him to blurt out -- at least at this point --

 4          MR. HUNNEFELD:  In statements.

 5          THE COURT:  -- that "X" really killed these people?

 6          MR. HUNNEFELD:  Yes, things like that would be

 7    problematic.

 8          MR. KLOCK:  No.  He's going to say that people said the

 9    show is being run, that everyone thinks you killed these

10    people.  What's wrong with that?

11          MR. HUNNEFELD:  That's double hearsay.

12          THE COURT:  What do you think it's going to show?

13    Okay.  It's not offered for the truth of whether or not he

14    killed them, but for why he thinks this episode has besmirched

15    his name in the community.

16          MR. BASCO:  And that had a true effect, that's the

17    truth that comes out of it, Judge, that the community knows

18    this and begrudged that was the truth.

19          THE COURT:  If that is the case, a person who was suing

20    for the reputational damages would never be able to prove it.

21          MR. BASCO:  Judge --

22          MR. KLOCK:  Bring in 8,000 people.

23          MR. BASCO:  The witness shows evidence of it being

24    broadcast, and that's why we're objecting, to the hearsay.

25          THE COURT:  I'm -- okay, this is what I'm understanding
```

 1    from Mr. Klock.  He's going to say somebody told me I'm being

 2    shown on this episode, and they're saying you're -- you've

 3    murdered Ray Nathan and Jonathan; that's where he thinks the

 4    level of this, and you're objecting even on that level?

 5           MR. HUNNEFELD:  That the statement that -- a statement

 6    is said to the other person who said to another person, it's --

 7    an opinion is one thing, but --

 8           THE COURT:  No, he said, I'm told, "somebody told me

 9    that."  I mean, "I'm told that the A&E episode is airing and

10    everybody said I'm the murderer."

11           MR. HUNNEFELD:  He's being told by someone who didn't

12    see it himself --

13           MR. KLOCK:  Who cares.

14           MR. HUNNEFELD:  -- but somebody else.

15           THE COURT:  If I'm following his trail of damages, he's

16    saying that's what's happening to him -- that even people who

17    have never seen the episode -- and this is going to go to his

18    area of damages at some point when we discuss this -- I can't

19    get a place to live, I can't find a place to work.

20           I mean, because even people who have not personally

21    seen the episode are going, hey, you know, he's a guy on the

22    First 48.

23           MR. HUNNEFELD:  I think the most reasonable, Judge --

24    my most -- when I objected, he was concerned about those other

25    things.  As long as there's an instruction about truth, that

```
 1    it's not -- you know, this is a hearsay statement, but it's not

 2    being admitted for the truth of what's being said.

 3              MR. KLOCK:  This is.

 4              THE COURT:  That would be okay, but we have to make

 5    sure he doesn't digress into those other areas.

 6              THE COURT:  Okay.  You have to do -- and I've allowed

 7    you some wide latitude, and Mr. Hunnefeld has not objected

 8    because I don't think he feels it's being harmful, there's been

 9    a lot of leading.

10              MR. KLOCK:  Right.

11              THE COURT:  And I may allow a little bit more leading

12    here to make sure that we stay within the confines.

13              MR. HUNNEFELD:  I try not to do it every single time.

14              (Sidebar discussion concluded and the following

15    proceedings were held in open court:)

16              THE COURT:  For purposes of these proceedings, ladies

17    and gentlemen, you are about to hear statements that are

18    essentially hearsay, made by another person not in court today.

19    They're not offered for their truth but the effect that they

20    had on Mr. Smart in this case.

21              Counsel, you may proceed.

22              MR. KLOCK:  Thank you, Your Honor.

23    BY MR. KLOCK:

24    Q.  Taiwan?

25    A.  Yes, sir.
```

```
 1    Q.   After the day that you were in interrogation with

 2    officer -- I'm sorry, Detective Sanchez, Detective Cepero, you

 3    were incarcerated for how long?

 4    A.   19 months.

 5    Q.   19 months.   During that period of time, the First 48

 6    episode ran for the first time?

 7    A.   July.

 8    Q.   And how did you hear about it?

 9    A.   An inmate came into the cell from the streets and he

10    recognized me, he said, "I saw you on First 48 before I got

11    arrested."

12    Q.   And did he say anything else?

13    A.   He just said that he seen the episode.   He was like, "I'm

14    not going to lie, the way I look on TV, they made it look like

15    you did it."

16    Q.   And anyone else react?   Did you hear from anybody else?

17    A.   I mean, a dude was on the phone with his girlfriend once,

18    and he told me that she had asked him, was I in the cell with

19    him, because she had seen the episode as well.

20    Q.   And?

21    A.   He just told me she seen it.

22    Q.   What did you hear about the episode, anything?

23    A.   That it just looked bad like the way it was.

24    Q.   And how did it look bad?

25    A.   They misrepresented a lot of things that was said by me.
```

```
 1   Q.   Okay.  And when did you first see the episode, you said it
 2   was in 2011.  Was that after you got out of jail?
 3   A.   Yes, sir.
 4   Q.   And how many times have you seen it since then?
 5   A.   More than 25.
 6   Q.   And what impact has it had on your life?
 7   A.   To this day, when I go out, people recognize me from that
 8   episode and they assume that the case just recently happened,
 9   and they constantly want to know the facts of the case, how did
10   I get out, what happened.  People want to know the rest of that
11   story.
12   Q.   Well, at some point in time, the story they put on the end
13   the charges were dropped; so doesn't that solve the problem?
14   A.   But the neighborhood that I grew up in where I --
15        MR. HUNNEFELD:  Objection, Your Honor, that's an
16   improper question.
17        MR. KLOCK:  It's an unusual objection.
18        THE COURT:  As to form, the objection is sustained.
19        MR. KLOCK:  Okay.
20   BY MR. KLOCK:
21   Q.   Has that program had any impact on your life?  You answered
22   that question.
23        My next question is, at some point in time at the end of
24   the episode they put in there that the charges have been
25   dropped.  Did you ever see that?
```

1        MR. HUNNEFELD:  Objection, Your Honor.  That's

2   testifying.

3        THE COURT:  No.  He asked has he ever seen that.  Has

4   he ever seen the episode where they say the charges were

5   dropped.  He just asked him, has he seen that.  He may answer

6   that question.

7        The objection's overruled.

8        THE WITNESS:  Yes, sir, I have seen that.

9   BY MR. KLOCK:

10  Q.  Didn't that solve the problem?

11  A.  No, sir, it did not.

12  Q.  Why?  Why's that?

13  A.  Because it doesn't say I didn't do it.  It only states that

14  the charges were dropped, leading people to believe that there

15  were mitigating circumstances that might have released me other

16  than me being innocent.

17  Q.  Okay.  Has First 48 ever published anything indicating that

18  you were innocent?

19  A.  No, sir.

20  Q.  Has the City of Miami ever apologized?

21  A.  No, sir.

22  Q.  Has the City of Miami ever indicated that you didn't do it?

23  A.  Like to who, though?

24  Q.  Anybody that you know of?

25  A.  Not that I'm aware of.

```
 1   Q.   Okay.  Has Detective Sanchez ever given you his opinion as

 2   to whether or not you did it?

 3   A.   We haven't really spoke, so no.

 4   Q.   Okay.  At this point, Your Honor, if I could, I would

 5   like -- I'm sorry, one other thing.

 6        How about any problems getting a job?

 7   A.   Yeah.  I mean, people recognize me from First 48 and

 8   they're kind of apprehensive about even speaking to me, like,

 9   I've had situations where people have come over to visit other

10   friends and have told other friends, I'm leaving because that

11   guy killed his friends, I don't want to be in the house with

12   him.

13   Q.   Now, you look different than you did back then.  Why is

14   that?

15   A.   Because I cut my hair.

16   Q.   Why?

17   A.   Because people were associating me with the episode because

18   of my hair; like it make it harder for them to recognize me,

19   but once they hear my name, they recognize me.

20   Q.   Because of the fact it's an unusual name?

21   A.   Yes, sir.

22   Q.   And how about employment, any problems getting a job?

23   A.   Yeah, I've tried to get several jobs.  Wal-Mart did a

24   background check, and they refused to hire me based on my

25   background, and I ended up working at a car wash.
```

1    Q.   Making how much?

2    A.   6.09 an hour.

3    Q.   At the car wash?

4    A.   Yes.

5         MR. KLOCK:  Your Honor, at this time, we would like

6    to -- if we could show the episode of First 48.

7         THE COURT:  That's for the record, 68B.

8         MR. KLOCK:  68B.  The episode has two different stories

9    on it.

10        THE COURT:  We're only going to play B.

11        MR. BASCO:  Judge, I can resolve this.

12        THE COURT:  He only has -- we're going to start with

13   "B" and worry about "A" in a later time.

14        MR. KLOCK:  I want to make clear that if anything goes

15   wrong with this...

16        THE WITNESS:  Can you turn this off, because I don't

17   want to see it.

18        MR. KLOCK:  If anything goes wrong with it, it's not my

19   fault.

20        THE COURT:  The jury gallery monitor is on.

21        At Mr. Smart's request, he has asked that I turn his

22   monitor off.  Give me just a moment, counsel.  All right.

23        MR. KLOCK:  Your Honor, is there a glare that comes

24   through the windows.  I've never --

25        THE COURT:  Give me just a second.  Some days I feel

 1   more like Commander Kirk than a Judge.

 2        MR. KLOCK:  ...preparing the judge for courtrooms in

 3   Miami.

 4        THE COURT:  Counsel, you may begin.  Your PCs are on.

 5        At Mr. Smart's request, his monitor is off.

 6        Your monitors are on.

 7        MR. NAPOLEON:  I'm told that you have to turn on the

 8   audio.

 9        THE COURT:  I have to turn on the audio?  Okay.  I have

10   your P.C. on.

11        (Videotape excerpt played as follows:)

12        THE NARRATOR:  For homicide detectives, the clock

13   starts ticking the moment they are called.

14        VOICE:  Here are the bloody footprints.

15        Last day they were going to be open, that's pretty bad

16   luck.

17        Are you scared?  What are you scared about, man?

18        THE NARRATOR:  Their chance of solving a murder is cut

19   in half if they don't get a lead...

20        VOICE:  That's our suspect.

21        THE NARRATOR: ...within the First 48 hours.

22        VOICE:  It's in the box.  He's got a brick.  He didn't

23   die.  He was lying.  Who's lying?

24        THE NARRATOR:  Miami, 11:30 p.m., a quiet winter night

25   in Little Haiti.

```
1            VOICE:  9-1-1 police.  Hello.  You have an emergency?

2            VOICE:  There two of them in here.  Oh, my God, there's

3    blood everywhere.

4            THE NARRATOR:  Fire and rescue race to an apartment

5    complex and find two young men shot to death.

6            DETECTIVE SANCHEZ:  12:30, we're about to go home, you

7    know, and bam, we get hit with our case.

8            THE NARRATOR:  Lead Detective Fabio Sanchez has been on

9    the Miami police force for 11 years.  This is his second year

10   in homicide.

11           DETECTIVE SANCHEZ:  I was going to run the 10 miles for

12   my marathon training tomorrow, but, hey, when you work

13   homicide, that's to be expected.

14           VOICE:  How are you doing?

15           DETECTIVE SANCHEZ:  Fire rescue entered the apartment

16   and found the two dead boys.

17           THE NARRATOR:  Sanchez's partner, Detective T.C.

18   Cepero, has spent 11 years on the force, the last

19   year-and-a-half on homicide.

20           Bystanders have already given police a potential lead.

21           DETECTIVE SANCHEZ:  Constant traffic; all sorts of

22   people coming in and out.

23           THE NARRATOR:  The victims were allegedly dealing drugs

24   at the apartment.

25           DETECTIVE SANCHEZ:  It's going to be all the way at the
```

1   end.  Jonathan Volce...

2        THE NARRATOR:  18-year-old Jonathan Volce grew up in

3   North Miami.  He was about to become a father.

4        The second victim, Ray Nathan Ray, was raised by his

5   father after his mother died.  He was only 14 years old.

6        VOICE:  It's just brutal to see two teenagers killed

7   like this.

8        VOICE:  Nine millimeter.  No gun.  How weird.  Dopers

9   always have guns.

10       THE NARRATOR:  Outside the apartment...

11       VOICE:  Here are bloody footprints.

12       THE NARRATOR:  They find bloody footprints that lead to

13  a woman's apartment in the complex.

14       VOICE:  She went inside, saw the victims.  She came out

15  the front door, which accounts for her bloody footprints, and

16  met up with another witness who had a cell phone and called

17  9-1-1.

18       THE NARRATOR:  The woman who discovered the bodies was

19  taken to headquarters for questioning.

20       DETECTIVE SANCHEZ:  Apparently, Ciara, a female

21  witness, just said that she was hanging out with Jonathan, our

22  victim.  We're going have to interview her.  She might have the

23  key to what's going on over here.

24       THE NARRATOR:  While CSI processes the scene, Sanchez

25  heads back to homicide to interview his witness.

1          DETECTIVE SANCHEZ:  A homicide investigation's like a

2     marathon.  You got to pace yourself, you can't give up, you got

3     to keep on going.  All right, so, now we'll see.

4          Hi, Ciara, how are you doing?  Okay.  Tell me what

5     happened today.

6          CIARA:  So I was sitting, um, in the room talking to

7     him and stuff.

8          THE NARRATOR:  Ciara says she was with Jonathan in the

9     bedroom earlier that night.

10          CIARA:  (Inaudible) In the living room, I heard this

11     one guy, but I don't know who that was.

12          THE NARRATOR:  She says Jonathan went into the living

13     room where he and Ray were arguing with an unknown man.

14          CIARA:  It was something about money:  "I gave you your

15     money."

16          THE NARRATOR:  Ciara says she went back to her

17     apartment in the complex while the men were arguing.

18          DETECTIVE SANCHEZ:  You heard the shots, how long after

19     you left?

20          CIARA:  Maybe about ten minutes.

21          DETECTIVE SANCHEZ:  So who do you think killed them?

22          CIARA:  I don't know.  I wasn't in there.

23          VOICE:  She's holding out.

24          DETECTIVE SANCHEZ:  Tell me the truth, Ciara.

25          CIARA:  I am telling you the truth.  I wasn't over

```
 1    there.  I wasn't going to go back there.

 2           DETECTIVE SANCHEZ:  You know what happened in that

 3    room.  You know what happened.

 4           THE NARRATOR:  In Miami, Detective Fabio Sanchez and

 5    his team are investigating the murders of 18-year-old Jonathan

 6    Volce and 14-year-old Ray Nathan Ray.  They learned that a

 7    witness was with the victims just before they were shot.

 8           Now detectives need to find out what she knows.

 9           DETECTIVE SANCHEZ:  You know what happened.  What you

10    saw today was gruesome.  Two people died.  You walked through

11    their blood.  Don't you want to do right by Jonathan?

12           You do not recognize the voice of that other person?

13           CIARA:  T-Y.

14           THE NARRATOR:  The witness says that the man the

15    victims were arguing with is named "T-Y."

16           DETECTIVE SANCHEZ:  Did T-Y shoot Jonathan?

17           CIARA:  I don't know.  I wasn't there.

18           DETECTIVE SANCHEZ:  Tell me the truth, Ciara.

19           CIARA:  I just think T-Y had something to do with it.

20           DETECTIVE SANCHEZ:  Why's that?

21           CIARA:  (Inaudible) But he's not even there.

22           THE NARRATOR:  Sanchez and Detective T.C. Cepero run a

23    search for T-Y in the database.

24           VOICE:  That's him.

25           VOICE:  That's him?
```

```
 1              VOICE:  Let me see.
 2              DETECTIVE SANCHEZ:  That's our boy, T-Y.  Beautiful.
 3    His real name is Taiwan Smart.  He's 21 years old.  Doesn't
 4    really have a violent past.  He just has a couple of arrests
 5    for cocaine sale.  We need to find out who T-Y is.  He's either
 6    a witness or a suspect.  So we're going to go back to the crime
 7    scene and see what CSI has been able to find.
 8              THE NARRATOR:  CSI has worked through the night to zero
 9    in on the location of the shooter.
10              VOICE:  The shooter was probably over by that TV,
11    shooting this direction, shot the thing.
12              THE NARRATOR:  Trajectory rods show that the shooter
13    fired at least two shots from the living room couch.
14              DETECTIVE SANCHEZ:  The shooter was inside the
15    apartment in the couch.  If they're buddy, T-Y, was inside the
16    apartment when it happened, he's going to have a lot of
17    information to give us.  We're going to track down the family
18    members of the victims and see if they can help us locate T-Y.
19              THE NARRATOR:  Detectives meet with the family of the
20    victim, Ray Nathan Ray.
21              DETECTIVE SANCHEZ:  How are you doing?  May we come in?
22              Are you the relative of Ray Nathan Ray?
23              VOICE OF FATHER:  That's my son.
24              DETECTIVE SANCHEZ:  That's your son?
25              VOICE OF FATHER:  Yes.
```

1          DETECTIVE SANCHEZ:  All right.  The reason why we're

2   here is --

3          VOICE OF FATHER:  Oh, Lord have mercy.

4          DETECTIVE SANCHEZ:  There's no easy way of putting it

5   to you, sir, but a --

6          VOICE OF FATHER:  Lord, please don't tell me.

7          DETECTIVE SANCHEZ:  We have identified that your son

8   was at one of our scenes --

9          VOICE OF FATHER:  Oh, no... Somebody killed him...

10          DETECTIVE SANCHEZ:  And he was fatally shot, along with

11   another gentleman that was with him.  Do you know Jonathan?

12          VOICE OF FATHER:  No.

13          DETECTIVE SANCHEZ:  Do you know any other (inaudible),

14   T-Y, anybody?

15          VOICE OF FATHER:  No?

16          DETECTIVE SANCHEZ:  Okay.

17          VOICE OF FATHER:  Why?  Why?

18          DETECTIVE SANCHEZ:  Well, we don't have that answer

19   just yet.  Sorry for your loss, sir.

20          It's very sad that a 14-year-old was killed, and this

21   is probably one of my youngest victims that I've had to

22   investigate on a homicide.

23          We're going to hit a couple of addresses in the

24   morning, see if we can locate T-Y and get some answers.

25          THE NARRATOR:  The next morning Sanchez and Cepero head

1   out to track down T-Y.

2         DETECTIVE SANCHEZ:  Now we're checking an address for

3   the mother.  How are you doing, ma'am?  Detective Sanchez.

4         VOICE OF MOTHER:  Hello.

5         DETECTIVE SANCHEZ:  I'm looking for Taiwan Smart.

6         VOICE OF MOTHER:  That's my son.

7         DETECTIVE SANCHEZ:  That's your son?

8         VOICE OF MOTHER:  Yes.

9         DETECTIVE SANCHEZ:  Does he live here?

10         THE NARRATOR:  In Miami, Detective Fabio Sanchez and

11   his team are working the double murder of Jonathan Volce and

12   Ray Nathan Ray.  They learn that the victims were arguing with

13   their friend, Taiwan "T-Y" Smart, just before they were shot.

14         Now detectives need to find T-Y and bring him in.

15         DETECTIVE SANCHEZ:  I'm looking for Taiwan Smart.

16         Does he live here?

17         VOICE OF MOTHER:  No.

18         DETECTIVE SANCHEZ:  Do you mind if I go inside for a

19   second?  Do you know where he stays at?

20         VOICE OF MOTHER:  No, he don't tell me anything.

21         DETECTIVE SANCHEZ:  All right.  Someone died in his

22   apartment.  These guys that went after his friends, they might

23   be after him, too.  If he calls you, just tell him that I need

24   to talk to him and it's important.  Okay?

25         VOICE OF MOTHER:  Okay.

1        DETECTIVE SANCHEZ:  Thank you, Ms. Smart.

2        At least now if he comes here or calls her, he'll know

3    that we're looking for him.

4        THE NARRATOR:  As the clock ticks away...

5        DETECTIVE SANCHEZ:  Hi, guys.  How are you doing?  I'm

6    Detective Fabio Sanchez.

7        THE NARRATOR: ...Sanchez turns to patrol for help to

8    track down T-Y.

9        DETECTIVE SANCHEZ:  We're investigating a homicide that

10   occurred at Saturday morning at 12:30 in the morning.  Right

11   now, we're asking you guys for help to locate Mr. Smart.

12       THE NARRATOR:  Patrol units throughout Miami are on the

13   lookout for T-Y, but he is nowhere to be found.

14       In the First 48, lead Detective Fabio Sanchez and his

15   team responded to the double homicide of 18-year-old Jonathan

16   Volce and 14-year-old Ray Nathan Ray, learned that they were

17   arguing with their friend, Taiwan "T-Y" Smart, just before they

18   were shot, sent officers out to search for T-Y, but did not

19   find him.

20       The next morning, Sanchez and Detective T.C. Cepero set

21   out hoping to find T-Y.

22       DETECTIVE SANCHEZ:  If you (inaudible), you can do the

23   half marathon.

24       DETECTIVE CEPERO:  No.  You expect me to get up at 6:00

25   in the morning and run how many miles?

```
 1              DETECTIVE SANCHEZ:  Thirteen.

 2              DETECTIVE CEPERO:  Thirteen miles?

 3              DETECTIVE SANCHEZ:  Yeah.  Come on, man, you can do it.

 4              DETECTIVE CEPERO:  You're crazy.

 5              VOICE:  What apartment?

 6              VOICE:  Two.

 7              VOICE:  Hello.  Bad address.

 8              THE NARRATOR:  Then, Sanchez gets a break...

 9              (Cellular phone ringing.)

10              DETECTIVE SANCHEZ:  Hello.  You're scared?  What are

11    you scared about, man?

12              THE NARRATOR: ... a phone call from the man they've

13    been looking for, Taiwan "T-Y" Smart.

14              DETECTIVE SANCHEZ:  All right.  What's your address?

15    Okay.  Smart, stand by, we're going to be out to you.  Okay?

16              We got a call from Taiwan Smart.  He's afraid.  Taiwan

17    (inaudible) he wants us to help him out, so we need to get to

18    him.

19              THE NARRATOR:  In Miami, Detective Fabio Sanchez and

20    his team are investigating the double homicide of Jonathan

21    Volce and Ray Nathan Rey.  They just got a call from Taiwan

22    "T-Y" Smart, the last person to see the victims alive.

23              Now they need to bring him in.

24              VOICE:  Right here, that's him right there.  Let's go.

25              How are you doing, man?  How are you?
```

1          TAIWAN SMART:  I'm fine.

2          VOICE:  Let me just pat you down real quick, all right?

3    You got anything on you?

4          TAIWAN SMART:  No, sir.

5          DETECTIVE SANCHEZ:  All right, man.  What's going on?

6    You know what went down.

7          TAIWAN SMART:  Jonathan Volce --

8          DETECTIVE SANCHEZ:  Yeah.

9          TAIWAN SMART -- that was my right hand, man.  I loved

10   him to death.  Everybody getting me scared, because the streets

11   talk, man, the streets talk.

12         DETECTIVE SANCHEZ:  All right.  What's the street

13   saying?

14         TAIWAN SMART:  They say I kill everybody, man.

15         DETECTIVE SANCHEZ:  I know you're nervous.  I'm just

16   want to talk to you to see what you know, but we got to get you

17   to the station.

18         THE NARRATOR:  Sanchez sends T-Y down to headquarters

19   for questioning.

20         DETECTIVE SANCHEZ:  He's acting more like a witness

21   than he is a suspect right now, but we'll see what happens when

22   we get him in the box.

23         Our main witness puts T-Y and Jonathan and Ray Nathan

24   all in the same room shortly before the homicide happens.  So,

25   the other two are dead, and T-Y's in the office right now.  Our

1    main objective is to get him to talk.

2          I need you to walk me through it; just start from

3    whatever point you want to start.

4          THE NARRATOR:  In Miami, Detective Fabio Sanchez and

5    his team are investigating the double murder of Jonathan Volce

6    and Ray Nathan Ray.  They brought in Taiwan "T-Y" Smart, who

7    was with the victims just before they were shot.

8          Detectives need to find out what T-Y knows.

9          DETECTIVE SANCHEZ:  I need you to walk me through it.

10         TAIWAN SMART:  Let me draw the room.

11         THE NARRATOR:  T-Y draws a diagram of the living room

12   where Ray and Jonathan, nicknamed "Nata," were found shot to

13   death.

14         TAIWAN SMART:  Ray was laying on the little couch by

15   the door.  Nata was on this couch, and I was like that.

16         DETECTIVE SANCHEZ:  All right.

17         THE NARRATOR:  T-Y says that he and the two victims

18   were the only people in the apartment.

19         TAIWAN SMART:  So we all sitting, somebody around -- I

20   think it was around 11 -- somebody knocked on the window.  I

21   went to the window.  I opened the curtain, and it's a dude, I

22   can't see his face, it's dark.

23         THE NARRATOR:  He says he assumed it was a customer who

24   had come to buy dope.

25         TAIWAN SMART:  I said, "Yo, let me get your money."  I

1    looked, and I seen, like, the pistol, you know, up.  So, I

2    said, oh, (bleep).  I heard the gun shots go, bam, bam.  When I

3    heard the gun shots, I just got up, ran out the back door.

4         And I was so scared, sir; if I would have stayed in

5    there, sir, I would have been on the floor dead with them boys,

6    but I didn't see nobody get shot, I swear to God.

7         DETECTIVE SANCHEZ:  It's all right.  Give us another

8    minute.  All right.

9         THE NARRATOR:  Detectives compare T-Y's story to the

10   physical evidence.

11        VOICE:  That story doesn't match.  The window would

12   have been shot up.

13        VOICE:  Exactly.

14        VOICE:  The casings were found inside the apartment,

15   not outside the window.  Somebody had to be inside the house,

16   that's why it don't make any sense.

17        VOICE:  It doesn't make any sense.

18        VOICE:  Look at your physical evidence.  Your

19   trajectories clearly show that the shooter was on that couch.

20   You got your man now, he's in the box.  You just got to break

21   him.

22        DETECTIVE SANCHEZ:  This should be interesting.

23        VOICE:  The way those guys died.

24        VOICE:  They didn't die how you described it.  Who's

25   lying?

```
 1              TAIWAN SMART:  My home boys were murdered.  Ya'll think
 2    I did it?  I didn't do it.
 3              VOICE:  You need to calm down.  All right.
 4              TAIWAN SMART:  I swear to God, it happened just like
 5    that.
 6              THE NARRATOR:  After several hours of questioning, T-Y
 7    holds to his story that the shooter fired from outside the
 8    window.
 9              VOICE:  Taiwan, this happened inside.  The shooter was
10    inside the house.
11              TAIWAN SMART:  No.  Discussion closed, sir.
12              VOICE:  You want it closed?
13              TAIWAN SMART:  Yes.  I'm telling the truth.
14              VOICE:  You're under arrest.
15              TAIWAN SMART:  Huh?
16              VOICE:  You're under arrest.
17              VOICE:  You're going to be going in for two counts of
18    murder.  All right.
19              DETECTIVE SANCHEZ:  What we have is a circumstantial
20    case, but the circumstantial evidence we have tells a strong
21    story.  It's a shame that these two victims that were very
22    young had to lose their life to a person that they thought was
23    their friend.
24              DETECTIVE SANCHEZ:  Another marathon day.
25              DETECTIVE CEPERO:  Another marathon day.
```

```
1              (Videotape excerpt concluded.)

2              THE COURT:  You may continue, Mr. Klock.

3              MR. KLOCK:  Thank you, Judge.

4    BY MR. KLOCK:

5    Q.  Taiwan, at the end, at the point in the video when you

6    said, "discussion closed," how long had you been in that room

7    at that point in time?

8    A.  It was, like, 3 or 4:00 in the morning already.  I had been

9    there since the afternoon the prior day.

10             MR. BASCO:  I'm sorry, Mr. Klock.

11             Judge, can you shut off the television screens?

12             THE COURT:  Certainly.

13             MR. HUNNEFELD:  Also, Your Honor, I say, would it be

14   possible to elevate the shades again?  The shades?

15             MR. KLOCK:  That's really neat.

16             THE COURT:  Well, it's neat when it works.

17             MR. KLOCK:  Well, it's halfway there, Judge.

18             MR. HUNNEFELD:  Thank you, Your Honor.

19             THE COURT:  You're welcome.

20   BY MR. KLOCK:

21   Q.  Okay.  Now, had you left the room at all during that period

22   of time?

23   A.  Yes.  They took me back to the scene of where the thing

24   happened at.

25   Q.  And what did they do there?
```

1    A.   They made me point out the places that I ran and the

2    witnesses who could corroborate the story of where I went.

3    Q.   Do you know if they did that?

4    A.   Yes.  They took me, and I saw them go into people's house.

5    They left me in the cruiser -- I mean, in the Taurus while they

6    went inside.

7    Q.   Okay.  Now, did you ever tell either of those gentlemen,

8    Detective Sanchez or Detective Cepero, that the kill shots came

9    through the window?

10   A.   No, sir.

11   Q.   And why's that?

12   A.   Because I didn't see anybody get shot.  I didn't even know

13   they were shot.

14   Q.   Okay.  How many shots did you hear?

15   A.   A couple, like two, three -- it's hard to say when you're

16   getting shot at, to count shots.

17   Q.   Do you know where the shots went?

18   A.   At the time, I didn't.

19   Q.   Okay, fine.  And so when you ran out, you had no way of

20   knowing whether people had been shot; correct?

21   A.   Yes, sir.

22   Q.   Okay.  And the detectives concluded that the shots that

23   killed them had occurred inside the living room; correct?

24         MR. HUNNEFELD:  Objection, leading.

25   A.   Yes, sir.

```
 1              THE COURT:  Sustained as to leading.
 2   BY MR. KLOCK:
 3   Q.  Do you recall from the video where the detectives said the
 4   shots that killed these two boys were fired from?
 5   A.  The couch right next to the window.
 6   Q.  Did you ever say anything to them to indicate that that was
 7   not the case?
 8   A.  No, sir.
 9   Q.  Because you didn't know where the person was who shot them;
10   did you?
11   A.  No, sir.
12   Q.  Okay.  You said -- the shots that you heard, shots come
13   from outside; right?
14   A.  Yes, sir.
15   Q.  That you never saw anybody shot?
16   A.  Yes, sir.
17   Q.  You never claimed you saw anybody shot?
18   A.  No, sir.
19   Q.  Okay.  So, therefore, since the shots were fired from
20   inside, and you said that the shots fired at you came from
21   outside, they concluded that you were lying; correct?
22              MR. HUNNEFELD:  Objection, based on speculation.
23              THE COURT:  Sustained.
24   BY MR. KLOCK:
25   Q.  Did they ever ever show -- did they ever ask you whether
```

```
 1   you fired the weapon inside?

 2   A.   Did they ask me if, did I fire the weapon?

 3   Q.   Yes.

 4   A.   I didn't fire any weapon.

 5   Q.   Did they ask you whether or not you shot them inside?

 6   A.   No, they didn't ask.  They tried to tell me that.

 7   Q.   They told you that?  Okay.

 8   A.   Yes.

 9   Q.   Did they ever find a gun?

10   A.   No, sir.

11   Q.   No gun.  Okay.  And let's get back to Ciara, okay.

12        Now, Ciara and Jonathan are in the bedroom for some period

13   of time while you and Ray Nathan Ray are watching TV in the

14   living room correct?

15   A.   Yes, sir.

16   Q.   What time does Ciara leave the place?

17   A.   A little after 10:30, I believe.

18   Q.   A little after 10:30?

19   A.   Yes, sir.

20   Q.   And when did the taps come to the window?

21   A.   A little after 11:30, between 11:20 and 11:30.

22   Q.   And, therefore, the shots that were fired at you were fired

23   over an hour after Ciara left the apartment; correct?

24   A.   Yes, sir.

25   Q.   And how many times did you tell Detective Sanchez and
```

```
 1    Detective Cepero your story?
 2    A.   They asked me, at least, in excess of 20 times.
 3    Q.   Okay.  Did anyone ever raise with you any kind of testing
 4    that they wanted to take?
 5    A.   They asked me would I be willing to submit to a GSR, would
 6    I be willing to submit to a polygraph, would I be willing to
 7    submit to fingerprinting and have them take pictures of me.
 8    Q.   And what did you say?
 9    A.   I told them, yes, I'm over with it.
10         I complied with everything they asked from the beginning.
11    Q.   And after they asked you if they were going to take a GSR
12    test, did they take one?
13    A.   They took me in a room and first they took pictures of my
14    tattoos, and then I think they did something to my arms, but
15    I'm not sure if it was GSR.
16    Q.   Okay.  And did they take fingerprints?
17    A.   Yes, sir.
18    Q.   Okay.  And did they submit you to a polygraph test?
19    A.   No, sir.
20    Q.   Okay.  Did they ever mention the polygraph test again?
21    A.   Yes, in derogatory ways, though.
22    Q.   Did you ask for a polygraph test?
23    A.   Yes, sir.
24    Q.   How many times did you ask for a polygraph test during that
25    15 hours?
```

```
 1    A.   I never stopped asking for it until they took me to jail.

 2    Q.   Do you have any idea how many times it was?

 3    A.   80-something, maybe 90.

 4    Q.   And what did they say when you asked for a polygraph?

 5    A.   "Fuck the polygraph.".

 6    Q.   Who said that?

 7    A.   DC Cepero, Detective Cepero told me that.

 8    Q.   How many times did he say that?

 9    A.   Like twice.

10    Q.   And no matter how many times you asked for a polygraph,

11    they wouldn't give it to you; correct?

12    A.   Yes, they couldn't.

13         MR. KLOCK:  Now, Your Honor, I'd like to, if I could --

14    do we have an exhibit number on this -- and while they're

15    finding the exhibit -- Exhibit 65 -- the Judge is probably

16    going to require the curtain to go back down again.

17         THE COURT:  I'm pausing, Mr. Klock, because your

18    co-counsel seem to be having some conversation.

19         MR. KLOCK:  That's why I'm standing up here trying not

20    to pay attention, I don't want to be associated with it, Judge.

21         MR. HUNNEFELD:  We need to go sidebar for a moment.

22         (Sidebar discussion held as follows:)

23         MR. BASCO:  Judge, what he intends to show is snippets

24    from his fifth interrogation.  What I'm suggesting is since

25    multiple clips may be played from the interrogation -- like we
```

1    did with the video -- there be a Master exhibit of his

2    interrogation in which pursuant to your orders could not be

3    re-played or sent to the jury because there's a number of clips

4    to be taken out, and subsequent clips be marked as B, C, D, E

5    and F, I'm asking that the Master come in first.

6         MR. NAPOLEON:  Judge, the only issue that I foresee

7    potentially happening is that there may be objections to

8    portions of the clip.  I can represent as an Officer of the

9    Court that our clips are only talking about the times that he

10   requested a polygraph examination which Your Honor had already

11   ruled upon.  I don't know what their clips are going to say.

12        MR. BASCO:  That would be a separate exhibit.  I'm

13   sorry.  The entire composite in as the Master and secondary

14   ones, we will give you.

15        THE COURT:  We will call your plaintiff's whatever the

16   Master would be, 70A -- I'm just putting it out there for

17   you -- and then yours would be Plaintiff's 70B, 70C, 70D; if

18   and when the City decides to offer portions of Main 70, they

19   would become defense's whatever remaining numbers.

20        MR. NAPOLEON:  If --

21        MR. BASCO:  If there's no objection?

22        MR. NAPOLEON:  -- on the same page --

23        THE COURT:  I'm not saying they're admitted, but I'm

24   saying if we keep the Master of the interrogation 70 and the

25   snippets A, B, C, D defense side, and then plaintiff's -- I

```
 1    mean plaintiff's side --

 2            MR. BASCO:  Right.

 3            THE COURT:  -- and then defense side whatever other

 4    remaining.  What I'm saying is by marking it that way, I'm not

 5    saying that either of you have waived objections to it.

 6            MR BASCO:  Exactly.

 7            MR. KLOCK:  It will probably be, Judge, A through

 8    probably D.

 9            MR. BASCO:  Well, I thought you were playing one clip.

10    That's one, so, Judge, the Master is A; the entire clip that

11    they're playing is B.

12            MR. NAPOLEON:  That's fine.

13            THE COURT:  Right, it will be Plaintiff's B.

14            MR. KLOCK:  For my reputation, Judge, I am delayed if

15    you screw up putting the shade down.

16            THE COURT:  All right.  How long?

17            MR. KLOCK:  Sixteen minutes.

18            THE COURT:  Sixteen.  And then we'll take our lunch

19    break.

20            (Sidebar discussion concluded and the following

21    proceedings were held in open court:)

22            THE COURT:  All right, for the record, Master

23    Exhibit 65A is received, and we will be also admitting 65B.

24            Ladies and gentlemen, what the parties have done, in

25    case you're not familiar with how these things work, each of
```

```
 1    the episodes of 48 Hours usually concerns two cases.  There

 2    were two cases on the episode that aired with Mr. Smart.

 3         The previous exhibit that you saw only showed you

 4    exhibits that the -- portion of the exhibit that involved

 5    Mr. Smart with the other episode removed, so that's some of the

 6    blank spaces that you saw, as well as with any commercial

 7    breaks.  So those are the spaces.  I don't want you to think

 8    anybody did hanky-panky with anything.  That's what happened in

 9    terms of that exhibit.

10         The next exhibit you're about to see are excerpts from

11    the entire period of time that Mr. Smart was interviewed.  We

12    will not be playing the entire time that Mr. Smart was

13    interviewed at police headquarters.

14         You're going to see certain portions of that next, so

15    that's why the different letters -- numbers and letters, so

16    you'll understand what's going on.

17              MR. KLOCK:  Mr. Smart --

18              THE COURT:  I'm sorry?

19              MR. BASCO:  Pursuant to the same objection previously

20    stated.

21              THE COURT:  Okay.

22              MR. KLOCK:  Mr. Smart -- I'm sorry, Your Honor.

23              THE COURT:  Counsel, you may proceed.

24              (Plaintiff's Exhibits 65A and 65B received into

25    evidence.)
```

1  BY MR. KLOCK:

2  Q.  Ty, did we at some point in time go through the 15 hours of

3  interrogation and pull out certain segments that related to

4  your request for a polygraph or a GSR?

5  A.  Yes, sir.

6  Q.  And did you review that tape?

7  A.  Yes, sir.

8  Q.  And that was you in each of these tapes and also either

9  Detective Cepero or Detective Sanchez or both; correct?

10 A.  Yes, sir.

11 Q.  That's it.  And then, Judge, we'll be starting from the

12 beginning, and it doesn't indicate which hour or -- because

13 there were two separate tapes, and then it ends the last time

14 he asked for any of those things.

15       THE COURT:  Mr. Smart, are you requesting that your

16 monitor still remain off?

17       THE WITNESS:  Yes, ma'am.

18       THE COURT:  The witness's monitor remains off.

19       The jury and gallery exhibits are on.  PC's on.

20 Volume's on.

21       Counsel, you may begin.

22       MR. NAPOLEON:  Judge, we just checked it from our

23 computer, but I guess there's an issue with the system trying

24 to get the audio through the system.

25       THE COURT:  I have the presentation button all the way

1    up.  I got the room volume all the way up.  P.C. on.

2         MR. NAPOLEON:  Judge, we can try to put the mic to the

3    computer here.  I don't -- I guess we will have to ask the

4    court reporter if it's actually picking it up.

5         (Videotape excerpt played as follows:)

6         TAIWAN SMART:  I ain't set nobody up to get shot.  I

7    will take the polygraph, whatever.  I ain't set nobody up.  I

8    ain't set nobody up to get shot or none of that.  I'll take a

9    polygraph.  Ya'll want me to take a polygraph, whatever.

10        We hadn't had an argument.  You all want to get a

11   polygraph?  You all let me take a lie detector test to prove

12   this, that I was not arguing, I will take that.  If it comes I

13   had to take a lie detector test to prove I had no arguments

14   with nobody, I had no reason to do nothing.  I'll take a

15   polygraph.  I'll take whatever you all want me to do.

16        Please, can you set that up, please.

17        I will take a polygraph willingly, willingly,

18   willingly.  I'll willingly take a polygraph to prove there was

19   no argument.  Can you go do that, please?  I will willingly

20   participate in -- I will sign a paper, willingly participate in

21   a polygraph test, right now.

22        DETECTIVE CEPERO:  Right now?

23        TAIWAN SMART:  Uh-huh.  Go get the swabs.  I'll give

24   you my DNA, blood sample, I'll take a lie detector test,

25   whatever, I'll do it right now.  And I had nothing to do with

1    nothing, man.  If you can go get the lie detector test, get the

2    DNA, let's do this; if that will prove my innocence, I'll take

3    that.  I'll do it.  I'll do it.  I'll do it right now.  I'll do

4    it.  I'll do it right now.  Ya'll have to go get it, then go

5    get it, I'll do it.  I will do it.  I'll do it.

6         Can we do a polygraph right now?

7         DETECTIVE SANCHEZ:  Polygraph, we'll get that started,

8    but it's going to take awhile.

9         TAIWAN SMART:  We can do it today, though, right?

10        DETECTIVE SANCHEZ:  Uh-huh.

11        TAIWAN SMART:  Today, we get this over with?  So after

12   I pass the polygraph, ya'll going to believe me then?

13        My name is Taiwan Marquis Smart.  My birthday is

14   December 21st, 1987, I am not lying to you.  I'll take a

15   polygraph, man.  That's my best friend and my little homie,

16   man.  I'll take a polygraph right now; DNA, let's get it.  If

17   that's going to prove to let me go home from here, I'll do

18   whatever it takes right now:

19        Lie detector, polygraph, whatever you all want to do,

20   I'll do it.  I'll do it.  Whatever they telling you is a lie.

21   So let's get to the factual shit that's going to solve the day,

22   you get the polygraph.

23        DETECTIVE SANCHEZ:  Let me ask you a question.

24        TAIWAN SMART:  What I told you, what I told you is

25   true.  I'll take a polygraph, sir.  You say you all don't

1  believe me, can we get a polygraph and some forms to sign?

2  I'll prove there was no argument.  I ain't do it.  I ain't see

3  nothing, and I'm going to take a polygraph, and you're going

4  see I'm not lying to you all.  Ya'll going to see.

5       You see, go get the lie detector test, let's get this

6  polygraph on.  Let's get this DNA, let's get it on.  Let's do

7  it.  Because that's a -- let's prove that.  I will take the

8  polygraph right now, so go get it.

9       DETECTIVE CEPERO:  I'm in no hurry.  I have all night.

10      TAIWAN SMART:  So why ya'll going to prolong, when we

11 can find out right now with a polygraph?

12      DETECTIVE CEPERO:  I have all night.

13      TAIWAN SMART:  Just get the polygraph, please, get it,

14 the polygraph.  I tell you the truth, I didn't see nobody shoot

15 no nigga.  All right.

16      Can you get the DNA and a polygraph, sir?  I'm sorry

17 for being loud at you.  You've been nothing but nice to me all

18 day, and I apologize for that.  I'm sorry, I apologize for

19 that.  But as far as I'm concerned, I had nothing to do with

20 that.  I'll take a polygraph and a DNA and everything.

21      DETECTIVE SANCHEZ:  Polygraph is (inaudible)

22 explanation for it --

23      TAIWAN SMART:  Take a polygraph -- that I don't know.

24      DETECTIVE SANCHEZ:  Whatever happened in that room,

25 there's probably a good explanation.

1       TAIWAN SMART:  I can't give it to you.  I was not

2   around -- man, let's get the polygraph.

3       DETECTIVE SANCHEZ:  I don't want anything but the

4   truth.

5       TAIWAN SMART:  That's what I'm giving you.  You keep

6   talking about I don't want to tell you.

7       DETECTIVE SANCHEZ:  You know what, like I said, there's

8   certainly things that ain't going to lie.  The crime scene

9   ain't going to lie --

10      TAIWAN SMART:  Can you get the polygraph?

11      DETECTIVE CEPERO:  Would you forget about the

12  polygraph, please.

13      TAIWAN SMART:  Can we, like, I'm being serious.  I'm

14  not trying to be a dick or make you feel I'm doing something.

15  Can we actually get a polygraph through, please?

16      DETECTIVE CEPERO:  Don't worry about the polygraph.

17      TAIWAN SMART:  If I take a polygraph it going to prove

18  to you that I'm not lying.  That's what ya'all think I'm doing

19  is lying, and that's what I'm not doing.  What does the

20  polygraphs include?

21      DETECTIVE SANCHEZ:  Polygraph, I don't have it yet.  We

22  have to wait for that.  This is DNA and photographs and

23  fingerprints.

24      TAIWAN SMART:  So, when I scream, "okay, let's get the

25  polygraph, man," that's the lie detector that's going to tell

1   you if I'm lying, because if ya-all so sure that there was an

2   argument and I'm telling you it didn't occur, I'm going to take

3   the lie detector and you're going to ask me these specific

4   questions; and then I'm going to tell you the truth -- as I

5   told you before -- and then that should be it; right?  That

6   should let you know that I'm not lying to you all.

7          Ya'll telling me, oh, it's going to take how long for

8   the polygraph?  I don't think it would take that long for ya'll

9   to get that ready.

10          DETECTIVE CEPERO:  -- cause you obviously don't know

11   what's going on.-

12          TAIWAN SMART:  Okay.  Are you going to tell me how long

13   it take to get a polygraph ready?

14          DETECTIVE CEPERO:  There's got to be a perfect

15   explanation.

16          TAIWAN SMART:  Uh-huh, there's not.  I'm telling you

17   the truth, the whole truth, and nothing but the truth, so help

18   me God.  I would like -- that's what I say, the polygraph will

19   prove it.  Like, if I'm not, it's probably going to say it to

20   ya'll.  If it says he is lying, then I got no choice but to

21   say, okay, I'm lying.

22          DETECTIVE CEPERO:  Hold on.  GSR.  Do you know what GSR

23   is?

24          TAIWAN SMART:  Gunshot residue, gunfire residue; right?

25   No, there will be no GSR on this nigga. (Inaudible)  I'll get

1   naked for you all, to my booty cheeks.

2          But all this is true.  This probably sound all crazy,

3   and it sound like it just don't make sense, it can't make

4   sense, but you will be surprised how many things in this world

5   don't make sense.  That's --

6          DETECTIVE CEPERO:  That would be a surprise.

7          TAIWAN SMART:  Yeah, that's why if we did a polygraph,

8   you'd actually seen when I say yes, you'd be like, nah, so this

9   nigga was telling me the truth.

10         DETECTIVE CEPERO:  (Inaudible).

11         TAIWAN SMART:  There was no pistol there.  There was no

12  pistol there.  I tell you the truth.

13         I took it?  That's how you feel?

14         DETECTIVE CEPERO:  Yep.

15         TAIWAN SMART:  See, we back to this polygraph.  I ain't

16  take no pistol out there.

17         So why haven't you done this polygraph thing?

18         Ya'll don't want to hear the truth.  Ya'll want me to

19  say something.  I'm not going to sit there and try to say

20  that's not true.  I'm going to clarify that's not true.  I'm

21  going to keep it real to you.  Ya'll don't want me to lie to

22  ya'll, but ya'll not going to bully me out of no confession.  I

23  know what I know that what happened is what happened.

24         You gonna keep me me -- why don't you just do the lie

25  detector test and get this over with?  Ya'll just want me to

1    say things that I -- You all don't want to see facts, that's

2    what it is.

3         Ya'll want to -- go get a paper for the lie detector

4    test.  If ya'll are not going to cooperate with me, I'm not

5    going to cooperate with ya'll either.

6         Ya'll believe me.  You said that if I want the

7    polygraph, you were going to make that happen for me, but now

8    you don't want to do it no more; right?

9         I actually have to accommodate me, I ask for a

10   polygraph test.  Can I please have to sign the form right now,

11   please?

12        Can I please have the paper for a polygraph right now,

13   please?  I'm asking you.  I know that's (inaudible) to ask.

14   Please.  I saw that paper.  I have the right.

15        Can I please have that polygraph test, so I can sign

16   it?  And after, you see how it is, I'm telling the truth; you

17   all can let me go, because ya'll got your own words and ya'll

18   afraid that I'm telling the truth.

19        So can we get this polygraph paper, sign it?

20        I gave them a DNA, I let ya'll swab, me; I let ya'll

21   get my fingerprints; I let you take my picture; I let you do

22   whatever ya'll want because I'm telling the truth.

23        DETECTIVE CEPERO:  Can we -- (inaudible).

24        TAIWAN SMART:  I want a polygraph test, but you

25   harassing now.  I'm feeling I'm being harassed now.  You're

 1    trying to start harass me.

 2         Can I get a lie detector test, polygraph, or something

 3    to prove that I'm telling the truth?

 4         DETECTIVE:  (Inaudible)

 5         TAIWAN SMART:  The real truth.

 6         DETECTIVE:  Your truth is not matching up with the real

 7    truth.

 8         TAIWAN SMART:  Take this polygraph, and that's over,

 9    that's what happened.

10         DETECTIVE:  Your truth (inaudible).

11         TAIWAN SMART:  See, (inaudible) I truth me you all

12    probably telling me that was a lie.  I'm telling the truth.  My

13    mama told me, everybody tell me, come tell the truth; that's

14    what I tell you, the truth, only the truth, only the truth.

15         DETECTIVE:  Okay.

16         TAIWAN SMART:  And this is the truth.  You've asked.

17    Can I take a polygraph, sir?

18         DETECTIVE:  This right here is truth.

19         TAIWAN SMART:  I want to take a polygraph just to prove

20    I'm not lying.  That's going to prove I'm not lying to ya'll.

21    Okay.  Listen.  Can we set up some -- to take a polygraph?  Can

22    we do that, please?  I'm not lying.  You could have been got

23    this polygraph over with, and you would see I'm telling the

24    truth.  But you don't want to do that.  You want to sit here

25    and question me -- (inaudible)

1          DETECTIVE:  You fail a polygraph, and what now?

2          TAIWAN SMART:  Okay.  Then I will -- if I fail a

3     polygraph, then you can do whatever you got to do.  Can we just

4     schedule this polygraph?  The truth.  The honest truth.  Get

5     the polygraph.  Why are we still going through this when we can

6     just do the polygraph?  Why are we not doing the polygraph?

7     Ya'll don't trust yourself?

8          That don't mean nothing.  Get the polygraph and let me

9     tell you.  I can take the test and tell you what I see and what

10    happens.  Or just -- that polygraph will make me be truthful

11    and --

12         DETECTIVE:  The thing I'm not going to do is waste my

13    time.

14         TAIWAN SMART:  So get the polygraph.  And if that

15    polygraph tells the truth --

16         DETECTIVE:  I don't need to do a polygraph.  I know

17    when you're lying.

18         TAIWAN SMART:  If that polygraph tells you I'm telling

19    the truth, what -- how would you all feel?  How would you all

20    feel?

21         DETECTIVE:  (Inaudible).

22         (Talking over each other on the videotape.)

23         DETECTIVE:  It wasn't supposed to go down like that.

24         DETECTIVE:  You get up and something happened; you

25    defended yourself.

1          TAIWAN SMART:  Can I have the polygraph test, please?

2          DETECTIVE:  Fuck the polygraph.

3          TAIWAN SMART:  Okay.  Can I have a polygraph?

4          DETECTIVE:  Fuck the polygraph.

5          TAIWAN SMART:  And I was not allowed to my rights,

6     cause I asked for a polygraph test several times and I was

7     denied.  And you told me, "fuck the polygraph, fuck the

8     polygraph," blah, blah, blah.

9          I will repeat all these things that was said to me;

10    that I'm a liar; you refused my rights to a polygraph.

11         DETECTIVE:  We're all liars.  We're all liars.

12         TAIWAN SMART:  You're refusing my right to a polygraph.

13         DETECTIVE:  A polygraph is not one of your rights.

14         TAIWAN SMART:  It's not?

15         DETECTIVE:  No.

16         TAIWAN SMART:  It's not?

17         DETECTIVE:  No?

18         TAIWAN SMART:  Okay.  I keep asking for this polygraph

19    to prove it, because I see you don't believe me no more.  I

20    promise.  So I keep asking them, please, God, give me this

21    polygraph.  Please, God, so I can prove I ain't lying.  Please.

22    Please.  Just give me the polygraph.

23         DETECTIVE:  Sir (inaudible).

24         TAIWAN SMART:  If you have any decency, please give me

25    a polygraph.  Please, polygraph.  Can I get a polygraph,

1    please?  Would you believe me if I passed it?

2          Would you believe me?

3          I'm telling you.  That's why I keep asking for a

4    polygraph.  And when that happened, I told you that's what

5    happened, that's what really happened.

6          No, sir, I did not.  No.  That's why I'm asking for

7    this polygraph.  I ain't hurt nobody.  I ain't shoot nobody.

8          Trust me.  Give me a polygraph, please.  Please.

9          DETECTIVE:  Do you know how many people I have sitting

10   in that chair (inaudible).

11         TAIWAN SMART:  Before you take my life, just give me a

12   polygraph.  Before you take my life, please.

13         Can I please have a polygraph?

14         DETECTIVE:  You were there when the shooting happened.

15         TAIWAN SMART:  Can I have a polygraph, please?  That

16   would prove to you I'm telling the truth.

17         A lie detector, to prove I'm not lying to ya'll, but

18   (inaudible) somebody killed my -- (inaudible) I don't even -- I

19   didn't kill nobody.

20         If I thought -- please help me.  Please, I'm not -- it

21   will prove I ain't lying to you.

22         Okay, why won't you take me a polygraph, if you don't

23   want to.

24         I cooperated with you all day, so why you can't just

25   give me a lie detector test?  (Inaudible)  You feel me?

```
 1              Please give me a polygraph; I swear I'm not lying.

 2              Can you please trust me with this lie detector?

 3              Okay.  Can you get a lie detector test?  Oh, my God, my

 4    God, I'm not lying to you.  I don't want to go to prison.

 5              Please give me a polygraph test, that's all I'm asking

 6    you, that's my only hope.  That's my only hope.

 7              Please, polygraph.

 8              DETECTIVE:  (Inaudible) okay?

 9              Please give me a polygraph, sir.

10              DETECTIVE:  (Inaudible)  The only thing I don't have

11    respect for.

12              TAIWAN SMART:  When I go to jail, how can I go if I

13    can't get a lie detector test when I'm in jail?

14              Please get a polygraph.  Please.  Please.  Please.

15    Please.  I don't want to -- I'm trying to say -- ask you all,

16    please get a polygraph.  That is going to prove, you know, if

17    you get a polygraph, that's going to prove I'm telling the

18    truth, you will see that.  That's why you all have a polygraph;

19    right?

20              I will take everything you ask me, a polygraph.

21              I didn't kill nobody.  That's what happened.  I take a

22    lie detector test.  You don't all want to hear me.  Ya'll want

23    me to take a lie detector test, I'm asking you for that.

24              (Inaudible) If you give me a -- probably in the air

25    when I heard the first gunshot, that scared me.  He probably
```

1   stuck his hand in there and got out.  Because I tell you, the

2   first two shots scared me, it made me back away.  I didn't see

3   too much.  I want to take a lie detector test, it's going to

4   prove that I ain't lying.  That's what happened.

5        Please, just polygraph test.  Please.  That's all I'm

6   asking you for, just please do that for me.  Please.  I'm

7   asking for from the bottom of my heart.

8        Can you please do the lie -- are you going to do the

9   polygraph soon, please?

10       The polygraph, I ask you for the lie detector test.

11       DETECTIVE CEPERO:  Do you think that's going to help

12  solve this case?

13       TAIWAN SMART:  Yes.

14       If you give me a lie detector test, you are going to

15  see I'm not lying.  We can work with each other.  I didn't kill

16  my homies, I promise.

17       Please, sir, can you please give me the test?  Please?

18  Please.

19       Can you give me the polygraph?  After that, I will say

20  anything you want me to say; if you give me that polygraph.

21       After that polygraph, sir, I'll explain anything you

22  want me to explain.

23       DETECTIVE:  (Inaudible).

24       TAIWAN SMART:  If you see the discrepancies after I do

25  the polygraph, then whatever you think I'm lying about...

```
 1              Are you going to give me this polygraph test or no?
 2     Why are you -- can you give me the polygraph, please?  Please.
 3     Please.
 4              DETECTIVE:  You just bent up on that.
 5              TAIWAN SMART:  Huh?
 6              DETECTIVE:  You are bent up on that; aren't you?
 7              TAIWAN SMART:  What?  The polygraph?
 8              DETECTIVE:  The polygraph.  I'm telling you, it's going
 9     to fuck you.  It's going to fuck you.
10              TAIWAN SMART:  No.  Please.  Can you give it to me,
11     please.  Huh?  Please.  Please, give me a polygraph.  Please.
12     Please.  That's my only hope.  Please.
13              DETECTIVE:  You got to tell me how it went down.
14              TAIWAN SMART:  Please, the polygraph will tell you.
15              DETECTIVE CEPERO:  No.  The only one that's going to
16     tell me how it went down is you.
17              TAIWAN SMART:  The polygraph will --
18              DETECTIVE:  You're not telling me what that means.
19              TAIWAN SMART:  Okay.  If you strap me to the
20     (inaudible) you've got to ask me all the questions again.
21              I'm 200 percent sure that when the polygraph -- please
22     give me this test, please.  Please.
23              I submitted to you DNA, I give you pictures.  Please
24     give me this polygraph.  I gave you what you asked me for.
25     Please give me this one thing.  Can I get this polygraph?
```

```
 1   Please don't do this to me.

 2           DETECTIVE:  You're looking at two counts of murder.

 3           TAIWAN SMART:  Can I get the polygraph, please?  Can I

 4   get a polygraph?

 5           DETECTIVE CEPERO:  Your two friends got killed, man.

 6           TAIWAN SMART:  Can I get a polygraph?

 7           DETECTIVE:  You're looking at --

 8           TAIWAN SMART:  Please, if you give me a polygraph, oh,

 9   my God, my mom is going to have a (inaudible) I didn't kill

10   nobody.  Can I please have --

11           DETECTIVE:  You didn't kill nobody?

12           TAIWAN SMART:  No, nobody.  Can I have a polygraph?

13   I'll try to be calm.

14           I just want you to give me a polygraph right now; and

15   then wherever I go from there, I go.  Please.

16           When you were asking me for the DNA, didn't I give it

17   to you willingly?

18           DETECTIVE:  You did.

19           TAIWAN SMART:  And when you asked for the fingerprints,

20   I gave it to you willingly?

21           DETECTIVE:  You did.

22           TAIWAN SMART:  So when I ask you for the polygraph, you

23   can't be the same way about it?

24           'Cause you want to find out the truth, so give me a

25   polygraph.  That's going to show you that I'm not lying.
```

1          If something's wrong between what I said and what you

2    said don't make sense, the polygraph going to figure it.

3          DETECTIVE:  No, no.  What's going to happen is going to

4    be between you and me.

5          TAIWAN SMART:  So you think the polygraph is going to

6    tell you I'm lying?

7          I tell you the truth.  Can I get this polygraph,

8    please?  Sir, I kiss your shoes.  I kiss your feet.

9          DETECTIVE:  Listen, you're (inaudible).

10         TAIWAN SMART:  I kiss your feet if you give me --

11         DETECTIVE:  (Inaudible).

12         TAIWAN SMART:  -- a polygraph, the truth.

13         If you can, I have -- give me the polygraph.  I'm going

14   to get it.

15         DETECTIVE:  If you were telling me the truth right now,

16   it would match up with what I saw.

17         TAIWAN SMART:  If you give me a polygraph, you're going

18   to get it.

19         So you are not going to give me a polygraph, no matter

20   what?  Before I leave to go to jail?

21         DETECTIVE:  That is only true or false to whatever

22   you're answering.  You still got to go --

23         TAIWAN SMART:  I'm going to jail for murder?

24         DETECTIVE:  Two counts of murder.

25         TAIWAN SMART:  And you're not giving me a polygraph

1    tonight?  Can I get a polygraph tonight before I go to jail?

2           DETECTIVE:  Two counts of murder.

3           TAIWAN SMART:  I didn't kill nobody, sir.  I don't want

4    to get mad.  You trying to bring out.

5           DETECTIVE:  I'm going to come back.

6           TAIWAN SMART:  Can you all come back with a polygraph

7    paper or something, please?

8           DETECTIVE:  I'll be back.

9           TAIWAN SMART:  Can you get the polygraph?

10          DETECTIVE:  I'll be back.

11          TAIWAN SMART:  How can I get a polygraph taken here?

12          DETECTIVE:  You have to speak to the detective.

13          TAIWAN SMART:  They keep denying me a polygraph.  They

14   keep denying me.  Please, can you give me a form so I can get a

15   polygraph before going to jail?  I have to prove myself

16   whenever they deny me.

17          Can they do that?  Can they deny me of -- I did the

18   fingerprints, I did the pictures, and they won't give me the

19   polygraph, and I know that's the only thing that's going to

20   save me, and that's the only thing they don't give me.

21          I'm trying to see, please.  I give a polygraph.  I need

22   it.  That's the only thing that's going to prove that I didn't

23   do this.

24          I just want a polygraph, please, to have the paper for

25   the polygraph, please.

```
 1              (Videotape excerpt concluded.)

 2              MR. BASCO:  Judge, could we have a sidebar, please?

 3              THE COURT:  Has this concluded the portion that you

 4    want to play?

 5              MR. KLOCK:  Yes, Your Honor.

 6              THE COURT:  All right.  Ladies and gentlemen, it's

 7    1:00.  I'm going to ask that you be back in the jury room by,

 8    like, 2:05 so we can start.  Remember, you know a whole lot

 9    more than you did this morning.  The temptation gets stronger

10    and stronger to want to discuss this case amongst yourselves;

11    remember, you can't.

12              Once again, please look around the room because you may

13    actually encounter some of the individuals in our court

14    cafeteria; we only have one.  They're going to ignore you and

15    you're going to ignore them.

16              I will see everyone back at about 2:05.

17              COURT SECURITY OFFICER:  All rise.

18              (Jury exited courtroom at 1:03 p.m.)

19              THE COURT:  Mr. Hunnefeld, you had something, or was it

20    Mr. Basco?

21              MR. BASCO:  What we're asking for, Judge, is a limiting

22    instruction that goes, in part, with your prior ruling.  The

23    suggestive language I've passed over to counsel, I don't know

24    if you've had a chance to read it, but I'll read it anyway.

25              But first that evidence has been received regarding the
```

1    plaintiff's request to take a polygraph.  This evidence is for

2    consideration of the officer's investigation only, which is

3    what Your Honor says in your order.

4         "You should not assume that a polygraph is a

5    scientifically reliable method as a polygraph would not" --

6    would be -- wait, I'm sorry -- "a polygraph would be

7    inadmissible in a criminal prosecution for homicide."

8         MR. KLOCK:  Okay.  Your Honor, it would be inadmissible

9    in court.  It's definitely admissible for a homicide

10   prosecution, because in this case --

11        THE COURT:  I was thinking "inadmissible in court" is a

12   more proper phraseology.

13        MR. KLOCK:  Yeah.

14        MR. BASCO:  That's fine, Judge, "inadmissible in

15   court."

16        MR. KLOCK:  I don't have a problem with that.

17        THE COURT:  All right.

18        MR. KLOCK:  Now, if I may, Judge, so we don't have a

19   problem when we get back, what I want to be able to do -- can

20   we exclude the witness, Your Honor?

21        THE COURT:  Yes.  Mr. Smart, you may step outside.

22        (Witness steps down and exited courtroom.)

23        MR. BASCO:  Judge, that's my horrible handwriting.

24        THE COURT:  I don't know.  My staff has learned to

25   decipher mine, so your hieroglyphics have to be worse than

1    mine.  Lorayne, you're sworn to secrecy.

2         MR. KLOCK:  Your Honor, with respect to the

3    instruction, the other basis that a polygraph is admissible in

4    court is if the parties stipulate.  If the prosecution and the

5    defense stipulate, then it could come in.  That should be in

6    the instruction, too.

7         MR. BASCO:  I don't think so, Judge.

8         THE COURT:  Well, I think even it may have some merit

9    in some sort of civil realm or something, or in some pretrial

10   hearing, but the circumstances under which it comes in, in a

11   criminal jury trial, are --

12        MR. KLOCK:  Rare.

13        THE COURT:  Okay.  Once again, to borrow from the

14   colloquial, since I'm sort of known for this, slim-to-none, and

15   slim just left on vacation.  Okay.

16        MR. KLOCK:  Right.  Of course the reason for that,

17   Judge, is because if the State is willing to stipulate to the

18   admissibility of a polygraph test that shows innocence, they

19   don't prosecute, like they didn't in this case.  And the

20   question --

21        THE COURT:  I am not prepared to have the limiting

22   instruction go that far, Mr. Klock.

23        MR. KLOCK:  Okay.  Then if I can raise the matter that

24   I wanted to raise, and that's this, Judge.  When we get back,

25   I want to ask him if Detective Sanchez ever did bring him for a

1   polygraph test, because he did.

2       MR. BASCO:  And, Judge, let's -- okay.  This is what

3   happens.  After April 30th where he gets the bond, subsequent

4   to that, many months later, they take him for a polygraph.  You

5   cannot --

6       MR. HUNNEFELD:  At the direction of the state attorney.

7       MR. BASCO:  At the direction of the state attorney.

8   You cannot leave the jail unless you are escorted by officers.

9   It is the policy of the jail that you have to be escorted by

10  officers.

11      THE COURT:  Well, that kind of makes sense.  I don't

12  think they let people who are incarcerated just roam the

13  streets, so --

14      MR. BASCO:  Exactly, Judge.  That's a procedural thing

15  done at the request of the parties, the prosecutor and criminal

16  defense attorney, it has nothing to do with the City of Miami.

17      What he's going to do is suggest later on that that has

18  some sort of effect on this officer.

19      MR. KLOCK:  Judge --

20      MR. BASCO:  This officer is operating solely at the

21  discretion of the State Attorney's Office and --

22      THE COURT:  Yes.  This would no different than if an

23  AUSA said, I need to interview "X" person --

24      MR. BASCO:  Exactly.

25      THE COURT:  -- and the investigating FBI, DEA agent

1      says, Mr. AUSA, I would like to do that but that person is

2      incarcerated next door at our fine facility.  They may make

3      arrangements to have that person for purposes of interview or

4      debriefing be brought to a secure other location by the

5      investigating officers.

6               There's no nefariousness -- is that a word?

7               MR. KLOCK:  Yes.

8               THE COURT:  Because of that, that would be a normal

9      procedure.  So tell me what you want to do.  I think what the

10     City doesn't want to have happen, Mr. Klock -- and you all see

11     if you can work this out -- is the fact that detective or

12     Officer Sanchez or Cepero took him for this test because they

13     were performing a function in their police investigative

14     functions with the state attorney, that that meant that somehow

15     Sanchez is doing something nefar -- that now he's secreting him

16     out of the stockade to take him for this test.

17              MR. KLOCK:  No, no, to the contrary.  I want to make it

18     clear that Detective Sanchez did it on a voluntary basis, and

19     they're going to have Detective Sanchez --

20              THE COURT:  Not voluntary.

21              MR. BASCO:  Not voluntary.

22              MR. KLOCK:  He was requested through the State.

23              THE COURT:  That he did it because the state attorney

24     said, listen, I'm in the process of reviewing this case, let's

25     get this kid a polygraph.  He goes, he gets him, he does

1    whatever he has to do.

2         MR. KLOCK:  Fine.

3         THE COURT:  Now, if you want to come up with an

4    instruction that makes it sound that way, I don't think in and

5    of itself that it sounds nefarious, but your opposing counsel

6    does.

7         MR. KLOCK:  Of course they do, Judge, because the fact

8    of the matter is the next question after, "Did you got for a

9    polygraph test?" Is:  "Were you discharged from custody seven

10   days later?"

11        Answer:  "Yes."

12        MR. BASCO:  The thing we can't escape, Judge, is

13   twofold.  Number one, that the subsequent bond on April 30th

14   and that is somehow tied to all going back to the initial bond

15   hearing; that that investigation is somehow necessary.

16        The other part is by saying that the officer --

17        THE COURT:  Wait, wait, wait.  I can solve this,

18   at least I think I can.

19        MR. BASCO:  Okay.

20        THE COURT:  Can you just ask him what the date was he

21   had the polygraph test?

22        MR. HUNNEFELD:  Yes, Your Honor.

23        THE COURT:  And then will you ask him just the date

24   that he was released from the prison?

25        MR. BASCO:  Judge --

1      MR. KLOCK:  Yes, Your Honor.  Sold.

2      THE COURT:  That's a true statement.

3      MR. BASCO:  Yes, Judge.  But the conclusion is that --

4  hold on, let me finish -- if I can finish, please, sir?

5      The conclusion is that they're going to tie-in and

6  they're going to make this whole argument, in closing argument

7  and everything else, is because he took a polygraph, he was

8  released, therefore, the only logical reason is because the

9  polygraph is truthful and it's, therefore, admissible and,

10  therefore, he's given release.  That's the --

11      THE COURT:  I will outline some sort of instruction,

12  but I do not think that in and of itself is appropriate.

13  That's one of the investigative tools that led the state

14  attorney to say we are not going to proceed with this case.

15      MR. HUNNEFELD:  But, Your Honor, that was --

16      THE COURT:  One of them was the polygraph.  There's all

17  a whole boat load of other things, but one of them is the

18  polygraph.

19      MR. HUNNEFELD:  But, Your Honor, that shouldn't be

20  admitted to the jury.

21      THE COURT:  So how did he get out of jail,

22  Mr. Hunnefeld?  He just got his -- you know, platinum miles

23  were met on the Marriott and they let him go?

24      MR. HUNNEFELD:  Well, Your Honor, we then have to

25  inquire into the mind of the prosecutor, and we have --

```
 1              MR. KLOCK:  You have to close-out memo, Judge.

 2              MR. HUNNEFELD:  Please, Your Honor -- Joe, don't

 3     interrupt, don't interrupt.

 4              THE COURT:  Listen, I'm done with this one.

 5              Date, Mr. Klock, he took the polygraph, date he was

 6     released.  All right.

 7              MR. HUNNEFELD:  But, Your Honor, we will get to the

 8     polygraph --

 9              THE COURT:  We will get to the polygraph before the

10     closing argument.  But that is a fact, he took it on one date,

11     he was released on a date.  That is a fact.

12              MR. NAPOLEON:  Your Honor, can we be excused for lunch?

13              THE COURT:  Yes, you can, and I need to be excused for

14     lunch because obviously my crankiness is going to hunger.

15              MR. KLOCK:  Thank you, Judge.

16              (Lunch recess taken from 1:10 p.m. to 2:17 p.m.)

17              THE COURT:  All our jurors are here?

18              COURT SECURITY OFFICER:  Yes, Your Honor.

19              MR. BASCO:  Judge, I have a few things before we bring

20     in the jury.

21              THE COURT:  I'm sorry?

22              MR. BASCO:  Judge, I have a few things before we bring

23     in the jury.

24              THE COURT:  Always.

25              MR. BASCO:  Judge, I -- at this time, the City's
```

```
 1    compelled to make a motion for mistrial based on the evidence

 2    that's been presented.  What we have presented previously and

 3    what we objected to previously is admission of the polygraph

 4    examination.

 5            What's been mentioned in that approximately 16-minute

 6    clip is that he requested a polygraph, and his statement that,

 7    "I'm requesting a polygraph so that you will be able to tell

 8    that I'm telling the truth and that you'll let me go."

 9            This information, the way it's been presented, is

10    poisoning the entire jury.  The polygraph examination was

11    required; two, it has to be scientifically accurate; and three,

12    to prove that he is showing the truth; as part number four is

13    that he would not be arrested as he was taking one.

14            THE COURT:  I'm sorry, could I have the instruction?

15            MR. BASCO:  Judge, the reason I wrote that instruction

16    is it's consistent with Your Honor's motion in limine ruling,

17    which we are --

18            THE COURT:  Let me ask this question.

19            Was today the first day that you'd seen the excerpts?

20            MR. HUNNEFELD:  Yes.

21            MR. BASCO:  Yes, Your Honor.

22            MR. HUNNEFELD:  Yes.  We hadn't been given it before

23    today.

24            THE COURT:  Wait.

25            MR. HUNNEFELD:  In fact, we never actually got a chance
```

```
 1   to view it.

 2          MR. BASCO:  The clips, I did not see -- I was told that

 3   they were going --

 4          THE COURT:  I assumed -- so you're saying that prior to

 5   today, the City never saw the full interview?

 6          MR. BASCO:  We saw the full interview, but not these

 7   clips that were presented by plaintiff today.

 8          MR. HUNNEFELD:  Not the clips.

 9          MR. KLOCK:  Which comes with the full interview.

10          MR. BASCO:  Judge, not being presented with it the way

11   it was presented and the arguments put before the Court by

12   Mr. Klock is that a polygraph is, first, required.  They should

13   have given it to him because the polygraph told the truth and

14   he wouldn't have been arrested had he received that polygraph.

15          The next questions that were going to be asked, you

16   were given a polygraph later on and as a result you were

17   released.  That's a factual inaccuracy.  That's how it's going

18   to be painted for the jury, that the polygraph is correct and

19   it's true.  That's the problem we keep running into.

20          What Your Honor's limited instruction was that it could

21   come into the reasonableness of the officers' investigation,

22   which we again objected to.

23          But now it's coming into not the reasonableness of the

24   officers' investigation, but that he's telling the truth.  The

25   polygraph would have shown he's telling the truth, he would not
```

```
 1   have gone to jail had the polygraph been given to him, because

 2   when it is given to him, he's released.

 3        That is the -- whether it's argued by counsel in

 4   closing or now, it's the factual basis that jury has in their

 5   mind; when this entire thing was going on, crying by the

 6   plaintiff on the video, saying, If you give me this, you're

 7   going to set me free and don't lock me up --

 8        THE COURT:  Let me see -- well, hold on, just a moment.

 9        First of all, if I grant a mistrial, it would be that I

10   would do something different.

11        Would my ruling be any different?  No, it wouldn't.

12        MR. BASCO:  Judge, if I may continue?  I don't know if

13   Your Honor's taking a break?

14        THE COURT:  Not now.

15        MR. BASCO:  Okay.

16        (Brief pause in the courtroom.)

17        COURTROOM DEPUTY:  Have a seat.

18        THE COURT:  First of all, the defense motion for

19   polygraph -- for mistrial is denied.

20        I planned when we come back out to read the following

21   limiting instruction to the jury:

22        "Evidence has been received regarding the plaintiff's

23   request to take a polygraph.  A polygraph examination is not

24   required in a criminal case.  However, this evidence is for

25   consideration of the officers' investigation only.  You should
```

1    not assume that a polygraph is a scientifically reliable

2    method, as a polygraph would be inadmissible in court for a

3    criminal prosecution for homicide."

4           MR. BASCO:  Judge, there would be one additional

5    sentence we would ask for because of the way it had been

6    framed, we believe it needs to state:  "Police officers have no

7    obligation or duty under the law to provide a criminal suspect

8    with a polygraph."

9           THE COURT:  I just said "a polygraph examination is not

10   required in a criminal case."

11          MR. BASCO:  We think it's specific to the -- it's not

12   required in a criminal case, is too generalized, Judge.  We

13   think in this case, it's very specific that the argument would

14   be made that the officer should have given him a polygraph, and

15   here, the officer has no duty or obligation to make --

16          THE COURT:  Do you know what, the officers really don't

17   have a duty or obligation to do anything.

18          What you have consistently argued from your side is to

19   take the information that Detective Sanchez had objectively in

20   determining probable cause.

21          One of those things he had objectively in determining

22   probable cause was the entire facts -- lack thereof --

23   including the interview of over 15 hours that he had with the

24   plaintiff.

25          MR. HUNNEFELD:  Yes, Your Honor.  But asking for a

```
 1    polygraph is not evidence of -- that's relevant to probable

 2    cause.

 3          THE COURT:  You know, I wish I could -- I know why

 4    you're fighting this case.  I know that's your job.  But right

 5    now, you're in the weeds.  That's not the issue here.

 6          This issue is:  What happened to Mr. Smart and why?

 7          What objectively did Officer Sanchez -- and it seems to

 8    me tangentially -- Officer Cepero knew in terms of probable

 9    cause?

10          And one of the things that they can use in helping them

11    make a determination are the statements of the defendant.

12          Now one of the things that they consistently say is,

13    his statements don't match the evidence.  So you have

14    statements don't matching the evidence -- according to him --

15    and part of the evidence is I've got a guy who over a 15-hour

16    period to the point of tears and physical collapse asked me to

17    do certain things.

18          So even though a polygraph examination may not be

19    admissible, it is an appropriate investigative tool.

20          Wait a minute.

21          MR. HUNNEFELD:  There's no evidence of that.

22          THE COURT:  He also asked for a gunshot residue test;

23    that isn't done, although I recognize it's four days later, it

24    might not have had very much evidentiary value; but still, it's

25    there.
```

1        MR. KLOCK:  Judge, may I?

2        THE COURT:  It's overruled.  I am moving on.

3        MR. KLOCK:  Okay.

4        MR. BASCO:  Judge, I will ask that once counsel asks

5   his next questions about when -- "Did you take a polygraph and

6   did they let you go after that," I will renew the same motion

7   and I would ask that the Court recognize all previous arguments

8   towards that.

9        THE COURT:  Well, it's renewed, it's on the record.

10   You don't need to do it in front of the jury.  I consider it

11   preserved.

12        Bring in the jury.

13        COURT SECURITY OFFICER:  Yes, Your Honor.

14        MR. KLOCK:  And, Your Honor, if I may remind the Court

15   that the first issue of a polygraph was raised by

16   Detective Sanchez.  He said --

17        MR. BASCO:  Judge --

18        THE COURT:  We've moved --

19        MR. KLOCK:  -- it's -- what's this, being not able to

20   talk?

21        THE COURT:  I've moved on.  It's out.  It's going.

22        Jury, please.

23        MR. KLOCK:  Thank you, ma'am.

24        (Jury entered courtroom at 2:27 p.m.)

25        THE COURT:  Welcome back, ladies and gentlemen.

 1           Welcome back.  We're missing one?  We have everyone.

 2   You may be seated.  Yes, we're here.

 3           COURT SECURITY OFFICER:  Okay.  Good.

 4           THE COURT:  Ladies and gentlemen, before we resume to

 5   Mr. Smart's testimony, I am giving you the following

 6   instruction:

 7           Evidence has been received regarding the plaintiff's

 8   request to take a polygraph.  A polygraph examination is not

 9   required in a criminal case.  This evidence is for your

10   consideration of the officers' investigation only in this case.

11   You should not assume that a polygraph is scientifically

12   reliable method, as a polygraph would be inadmissible -- that

13   the results of a polygraph -- excuse me -- would be

14   inadmissible in court for a criminal prosecution for homicide.

15           Would you recall Mr. Smart to the stand for me, please.

16           (Witness resumes stand.)

17           THE COURT:  Mr. Smart, as you take the stand, I will

18   remind you that you remain under oath in connection with this

19   matter.

20           THE WITNESS:  Yes, ma'am.

21           THE COURT:  Counsel for plaintiff, you may inquire.

22           MR. KLOCK:  Thank you, Your Honor.

23                DIRECT EXAMINATION   (continued)

24   BY MR. KLOCK:

25   Q.  Taiwan.

```
 1   A.   Yes, sir.

 2   Q.   On November 14 -- 17, November 17th was when you called

 3   Detective Sanchez; correct?

 4   A.   Yes, sir.

 5   Q.   And did you ever return home after December 17th -- I'm

 6   sorry -- November 17th?

 7   A.   No, sir.

 8   Q.   You were incarcerated; correct?

 9   A.   Yes, sir.

10   Q.   And the last time you requested a polygraph test was on

11   November 17th; correct?

12   A.   Yes, sir.

13   Q.   Okay.  Did there come a time when a polygraph test was

14   administered?

15   A.   Yes, sir.

16   Q.   Do you remember the date of the polygraph test?

17   A.   June 6th, 2011.

18   Q.   June 6th, 2011.  And you went to have the polygraph test

19   taken and then returned to jail; correct?

20   A.   Yes, sir.

21   Q.   When were you discharged from custody?

22   A.   June 15th, 2011.

23   Q.   So you had the polygraph on June 10 (sic), you were

24   discharged on June 15th.  Can you tell the jury how you were

25   discharged?  What happened?
```

1   A.   I was called for court on June 15th, 2011.  I was in court,

2   they called my name.  My lawyer wasn't present.  And when my

3   lawyer -- before my lawyer got there, they told me to stand up

4   and the State Attorney announced the nolle pros to all the

5   charges.

6   Q.   And that meant what?

7   A.   That I was going home because I didn't do it.

8        MR. HUNNEFELD:  Objection, Your Honor.

9        THE COURT:  Ladies and gentlemen, you are to disregard

10  the defendant's last answer.

11       MR. HUNNEFELD:  Renew motion.

12       THE COURT:  Counsel, you may proceed.  I will take that

13  up outside the presence of the jury.  You may continue.

14       MR. KLOCK:  Okay.

15  BY MR. KLOCK:

16  Q.   So the State dropped the charges and you left; correct?

17  A.   Yes, sir.

18  Q.   Okay, fine.  Now, since the time that the State dropped the

19  charges and you left, okay, what impact, if any, has the

20  continued broadcast of First 48 made in your life?

21  A.   It makes it almost impossible to live a normal life when

22  you got the whole world assuming that you're some callous,

23  cold-hearted murderer -- when really, that's not my

24  character -- when you have the whole world believing you're a

25  pathological liar, because people take it upon themself to

```
 1   present things in a way in a light to make you look bad, as

 2   opposed to the truth.

 3        It's made it to the point family, friends, people who were

 4   close to me, they don't associate with me the same, because

 5   they still have their reservations, they're still apprehensive,

 6   because it was never clearly stated why I was released; only

 7   that I was released.

 8        And since then, I barely go outside.  I barely live a life

 9   outside of my house and work.

10   Q.  And, Taiwan, is it still being broadcast?

11   A.  No, sir.  As of 2014, it had been stopped being broadcast.

12   Q.  And when did it stop?

13   A.  When the lawsuit was brought up, formerly brought about.

14   Q.  When this lawsuit was filed; correct?

15             MR. HUNNEFELD:  Objection, Your Honor --

16   A.  Yes, sir.

17             MR. HUNNEFELD:  -- to that last statement.

18             MR. KLOCK:  I'm sorry, Your Honor.

19             THE COURT:  The objection is sustained.

20             Rephrase, counsel.

21             MR. KLOCK:  Okay.

22   BY MR. KLOCK:

23   Q.  When was the last time that the show was broadcast that

24   you're aware of it?

25   A.  Maybe late 2013, December.
```

1    Q.   Okay.

2    A.   November, December.  Sorry.

3    Q.   Thank you.  Okay.

4         Now, you recall the show; correct?  You've seen it?

5    A.   Yes, sir.

6    Q.   Okay.  Do you recall in the show that at a certain point in

7    time four of the detectives rise up in the homicide unit and

8    say, "I think we've got him," and they all go around to a

9    computer screen and they see your picture there; correct?

10   A.   Yes, sir.

11   Q.   And that picture is what?

12   A.   A picture of my Florida State ID at the time.

13   Q.   Your Florida State ID.  Okay.

14        Where did you last see your Florida State ID?

15   A.   It was in the apartment the night I ran out, on the

16   dresser.

17   Q.   So when you ran out of the apartment that night, you left

18   your Florida State ID there; correct?

19   A.   Yes, sir.  It was in my wallet.

20   Q.   So were you surprised when you watched the show to see how

21   amazed they were to locate you four days after when they had

22   your ID the entire time?

23   A.   Yes, sir.

24   Q.   Did that suggest to you that --

25             MR. HUNNEFELD:  Objection, Your Honor, what it might

1    suggest.

2         THE COURT:  As to anything it might suggest, the

3    objection is sustained.

4         MR. KLOCK:  Okay.

5    BY MR. KLOCK:

6    Q.   But as of November 14 when you left the apartment, your ID

7    was there?

8    A.   Yes, sir.

9    Q.   And the rest of your wallet was there?

10   A.   Yes, sir.

11   Q.   And your cell phone was there?

12   A.   Yes, sir.

13   Q.   So that anybody who came into the apartment would have been

14   able to locate those items; correct?

15   A.   Yes, sir.

16   Q.   And the very same picture that appears on First 48 with

17   four surprised detectives as they gather around the screen is

18   the very same ID that was left in the apartment; correct?

19   A.   Yes.

20   Q.   Okay.  Now, you indicated that you fell on the floor, that

21   your head was kind of in the kitchen and that your body

22   extended out and your feet were probably next to what you call

23   the entertainment center; correct?

24   A.   Yes, sir.

25   Q.   And that you scampered from that point out the back door.

```
 1        What was the distance?

 2   A.   Maybe six -- five, six, seven feet.

 3   Q.   You indicated you unlocked the door and you left?

 4   A.   That's right.

 5             MR. HUNNEFELD:  Leading, Your Honor.  He's leading.

 6             THE COURT:  Sustained.

 7             MR. KLOCK:  Sorry.

 8   BY MR. KLOCK:

 9   Q.   When you got up, what did you do?

10   A.   I got off the floor.  I kind of, like, took cover behind

11   the entertainment system for a split second, and I just looked

12   over and seen the door, and I decided, I got to get out of

13   here.

14   Q.   Which door?

15   A.   The rear door in the room.

16   Q.   Could you describe the condition of the door?

17   A.   It's a regular, standard door with a handle and the

18   top-locking lock, like that.

19   Q.   Was it locked or unlocked?

20   A.   It was locked.

21   Q.   Did you unlock it?

22   A.   Yes, sir.

23   Q.   Did you leave the building?

24   A.   Yes, sir.

25   Q.   Did you close the door?
```

1   A.   No, sir.

2   Q.   You left the door wide open?

3   A.   No, sir.  It was cracked.  Like, the way I left out the

4   door, I didn't open it.  I just kind of slipped out of the door

5   and ran.

6   Q.   Okay, fine.  Now, how far away from that door is the window

7   that you claim people shot through?

8   A.   Maybe ten feet.

9   Q.   Okay.  So if someone were standing outside that window and

10  walked around that side of the building, would they have seen

11  the door open?

12  A.   Yes, sir.

13  Q.   And could they have entered?

14  A.   Yes, sir.

15  Q.   There was nothing blocking the rear door, it was

16  completely -- the bedroom was an open room, they could walk

17  into that bedroom; correct?

18  A.   Yes, sir.

19  Q.   And they could walk into the living room; correct?

20        MR. HUNNEFELD:  Leading, Your Honor.

21        THE COURT:  Sustained.

22        MR. KLOCK:  I'm sorry.

23  BY MR. KLOCK

24  Q.   When you walk in the back door the way you left it, was

25  there any impedence between the back door and the living room?

```
 1   A.   No, sir.

 2   Q.   When you left the living room, who was in it?

 3   A.   Jonathan and Ray Nathan.

 4   Q.   And there was somebody outside the window shooting a gun;

 5   correct?

 6   A.   Yes, sir.

 7   Q.   Okay.  Now, you testified that the clothing that you were

 8   wearing when you left the unit -- and you were wearing when the

 9   gunshot took place -- was a tanktop and a pair of gym shorts;

10   correct?

11   A.   Yes, sir.

12   Q.   And when you went to Mr. Loussant's house -- what's his

13   last name?

14   A.   Major.

15   Q.   When you went to Loussant Major's house, you still had

16   those clothes on under other clothes; correct?

17   A.   Yes, sir.

18   Q.   And you took those clothes off and you put them on the

19   floor; correct?

20   A.   Yes, sir.

21   Q.   Did you tell Detective Sanchez and Detective Cepero about

22   that clothing and offer it for a GSR test?

23   A.   Yes, sir.

24   Q.   Did they go and collect the clothing?

25   A.   No, sir.
```

1   Q.   They did not.   Okay.

2       Now, a point is made that if you take a GSR test of someone

3   three or four days later off their skin that you might not get

4   anything.   Have you heard of that?

5           MR. HUNNEFELD:   Objection, Your Honor.

6           THE COURT:   Sustained.

7           MR. KLOCK:   Okay.

8   BY MR. KLOCK:

9   Q.   The clothing that you wore that night at the point in time

10  that you left Mr. Loussant Major's house and went to make the

11  phone call, was that clothing unwashed and in the same

12  condition that you took it off?

13  A.   Yes, sir.

14  Q.   Thank you.   Now, during your questioning by

15  Detective Sanchez and Detective Cepero, did either one of them

16  ever raise with you or discuss with you the possibility that a

17  gunman could have entered through the open rear door?

18  A.   No, sir.

19  Q.   They never discussed that?

20  A.   No, sir.

21  Q.   Did they ever say anything to indicate that it dawned on

22  them that perhaps they came from outside inside and shot those

23  two boys?

24  A.   No, sir.

25  Q.   So their only point was that your position was that the

1    shots that came through the window hit the boys when you never

2    said that?

3          MR. HUNNEFELD:  Objection, form, Your Honor.

4          THE COURT:  Sustained.

5          MR. KLOCK:  Okay.

6    BY MR. KLOCK:

7    Q.   Did you ever indicate that the shots that came through the

8    window hit either one of your friends?

9    A.   No, sir.

10   Q.   Did you ever see either one of your friends shot?

11   A.   No, sir.

12   Q.   Did you see any blood in the apartment before you left?

13   A.   No, sir.

14   Q.   Did you hear anyone scream before you left?

15   A.   No, sir.

16   Q.   Okay.  When you left the apartment, did you -- where did

17   you think the boys were?

18   A.   I assumed they was running behind me, because I never

19   looked back, I was scared.

20   Q.   Okay.  Now, for the 15 hours that you were in there and you

21   did not observe the tape, but you've seen the tape before that

22   shows the number of times that you requested either a GSR test

23   or a polygraph test; correct?

24   A.   Yes, sir.

25   Q.   Who first suggested the polygraph test?

```
 1   A.   I'm not certain, but it was one of the detectives.  I can't
 2   tell you exactly which one.
 3   Q.   So you didn't raise the issue of a polygraph test first; it
 4   was one of the two detectives that asked you if you would take
 5   a polygraph test; correct?
 6   A.   Yes.
 7   Q.   Did you have any idea why they asked that question?
 8   A.   No, sir.
 9   Q.   Okay, fine.  But you wanted to have a polygraph test taken?
10   A.   Yes, sir.
11   Q.   And asked for it 85 times; correct?
12   A.   Yes, sir.
13   Q.   And 85 times they ignored your request; correct?
14   A.   Yes, sir.
15   Q.   Did they ever explain to you why?
16   A.   He said it didn't make a difference because I was a
17   "fucking liar anyway."
18   Q.   Okay.  And who -- which of the two detectives responded in
19   such an erudite fashion?
20   A.   Both of them.
21   Q.   Now, you then go to jail; correct?
22   A.   Yes, sir.
23   Q.   Okay.  You go from there to jail.
24        And what happens next in jail?
25   A.   When I'm first arrested?
```

 1   Q.   Yes.

 2   A.   I go to jail.  I go to a bond hearing the next day.  And at

 3   the bond hearing, the Judge --

 4        MR. KLOCK:  Hold on one second.

 5        If I may, Your Honor, we'll just play the bond hearing,

 6   rather than having him testify about what happened at the bond

 7   hearing; if that's acceptable to the Court?

 8        THE COURT:  Is this marked in evidence?

 9        MR. KLOCK:  Yes, it is.

10   BY MR. KLOCK:

11   Q.   While efficiently looking for that clip, did you ever give

12   police consent to tape inside your house, the videotape?

13   A.   No, sir.

14   Q.   Did you ever give First 48 permission to tape inside your

15   house?

16   A.   No, sir.

17        MR. KLOCK:  I think we found it, Judge.

18        THE COURT:  Exhibit number?

19        MR. KLOCK:  What's the exhibit number?  59, Your Honor.

20        And, Your Honor, if you'll recall, this is the first

21   day, so this is the bond hearing.

22        THE COURT:  Is there any objection to Exhibit number

23   59?

24        MR. HUNNEFELD:  Subject to other objections, we would

25   like to preserve.

```
 1              THE COURT:  All right.  Counsel, you may proceed.

 2              MR. KLOCK:  One second.  We're locating it, Judge.

 3              Judge, I think this can probably be seen without

 4     lowering the shade because it's dark.

 5              THE COURT:  All right.  Let's give it a try, see what

 6     happens.

 7              MR. KLOCK:  Is it on your screen, Your Honor?

 8              THE COURT:  Yes.

 9              (Videotape played of Bond Review held on Wednesday,

10     November 18, 2009, with Honorable Judge George Cueto presiding,

11     as follows:)

12              THE COURT:  Taiwan Smart.

13              MR. SMART:  Yes, sir.

14              THE COURT:  Mr. Smart, do you have any money in the

15     bank?

16              MR. SMART:  No, sir.

17              THE COURT:  Do you own any real estate?

18              MR. SMART:  No, sir.

19              THE COURT:  Public defender is appointed.

20              Mr. Smart, you're charged with second-degree murder,

21     possession of cocaine with intent to sell, possession of

22     marijuana with intent to sell, possession of a firearm by a

23     convicted felon.

24              Is Mr. Smart a convicted felon?

25              THE STATE:  Yes, Your Honor.
```

```
 1              THE COURT:  Okay.

 2              MR. SMART:  But, Your Honor, I never had a pistol.

 3              THE COURT:  Listen, you are are in real trouble.  The

 4   best thing you can do right now to is let your lawyer talk.

 5   Okay?

 6              MR. SMART:  All right.

 7              THE COURT:  Let's start with the second-degree murder.

 8   Let's see --

 9              PUBLIC DEFENDER:  Your Honor, as to both counts, the

10   second-degree murder and the count of possession of a weapon by

11   a convicted felon, I have an objection as to probable cause.

12              THE COURT:  Sure.  Go ahead.

13              PUBLIC DEFENDER:  If you look at the A-form, Your

14   Honor, based on the four corners of the A-form, as the law

15   clearly states, there is really no indication -- the only

16   admission made on this A-form is that he was at one point

17   there, and the neighbor, so-called, heard an argument.  There

18   were three people in this apartment, two of which ended up

19   being the victims.  We don't know at this point --

20              THE COURT:  Who did what.

21              PUBLIC DEFENDER:  -- whether those two people killed

22   one another.  I think there's a great assumption in this case,

23   and this young man is going to be held on a non-bondable

24   offense.

25              THE COURT:   You want to --
```

1         THE STATE:  Judge, I believe that there is probable

2    cause on the A-form.  It does say that there were only three

3    people in the apartment when the shots were fired.

4         The two victims were found dead, and there's no

5    indication that the gun was found in the hand of one of these

6    dead people, which would be the only way that the defendant

7    wouldn't be responsible.

8         THE COURT:  Let's see.  According to the witness --

9         THE STATE:  And his fingerprints were in the --

10        MR. SMART:  Your Honor, I live there.

11        THE COURT:  Sir, sir, please.  Listen, I'm giving you

12   some free advice here:  Be quiet.  You are facing some real

13   serious problems here.

14        MR. SMART:  I'm sorry.

15        THE COURT:  "The physical evidence collected is not

16   consistent with the defendant's statement."

17        What does that mean?

18        PUBLIC DEFENDER:  That's part of my argument, Judge.

19        I mean, there may be suspicion here.  I would argue

20   that it does not rise to the level of probable cause for an

21   arrest on a non-bondable offense, two count for that matter.

22        THE COURT:  Okay.  Do you know what, I'm going to reset

23   for a probable cause hearing, and this is what I want to know.

24   I want to know the space between the shots being fired, the

25   space in time, as to, you know, was it an hour later or five

```
 1    minutes later, if he fled the scene, and I want to know what

 2    the statement was.  Okay?

 3              THE STATE:  Okay.  And just to lay the record for

 4    tomorrow --

 5              THE COURT:  I'm going to hold him.

 6              THE STATE -- the State is going to object.  It's the

 7    State's position there is probable cause on the four corners of

 8    the A-form.  It was only the defendant and the two victims in

 9    the apartment when the shots were fired, and then the defendant

10    left and the victims were found dead at the scene.

11              THE COURT:  Okay.  All right.  So those are the couple

12    of issues that I want.  I want to know proximity in time as to

13    when the bodies were found, and the -- what it is that his

14    statement was.

15              So we'll reset you for a probable cause hearing.  There

16    is a hold, and I'll see you in the morning.  Okay?  The best

17    thing you can do right now is that your lawyer has invoked your

18    right to be quiet; is that correct, counsel?

19              PUBLIC DEFENDER:  That's correct.

20              THE COURT:  Do not speak to anyone.

21              MR. SMART:  All right, sir.

22              (Videotape concluded.)

23              MR. KLOCK:  Your Honor, if I might.

24              Plaintiff's Exhibit 83, which is the arrest form that

25    Judge Cueto was reading from, he read it out loud, and it is a
```

1  little hard to hear what he said.  Can I publish it?

2       MR. BASCO:  If I can see a copy.

3       THE COURT:  Show a copy, please, to opposing counsel.

4       MR. KLOCK:  May I, Your Honor?

5       THE COURT:  You may.

6       MR. KLOCK:  On the above date and time patrol units

7  were dispatched.

8       THE COURT:  Just for the record, this is Exhibit

9  Number 83.

10       MR. KLOCK:  Yes, Your Honor.

11       "Patrol units were dispatched to 60 Northwest 77th

12  Street, number five, reference two males shot inside the

13  apartment.  Miami Fire Rescue arrived on the scene and

14  determined that the victims were deceased.

15       "Pursuant to a search warrant, physical evidence,

16  fingerprints were obtained that linked the defendant to the

17  crime scene.  According to witness number one, the defendant

18  was involved in a violent argument with the victim involving

19  money and narcotics.

20       "The witness further stated that the defendant and the

21  victims were the only occupants in the apartment and that she

22  heard multiple gunshot coming from within the apartment.

23       "The witness entered the apartment and found both

24  victims bleeding profusely and unresponsive.  The defendant was

25  not on the scene.

1        "On today's date the defendant was read Miranda and

2   confessed to being on the scene with the victims and running

3   from the scene.

4        "The physical evidence collected is not consistent with

5   the defendant's statement.  A search of the residence also

6   revealed narcotics, which the defendant confessed to have sold.

7        "We located 16 individually wrapped baggies containing

8   suspect marijuana, 16.2 grams, and 12 individually wrapped

9   baggies of suspected crack cocaine, 13.9 grams.

10       "A records check of the defendant revealed a felony

11  conviction of July 2, 2007.  Postmortem examination of both

12  victims performed by the medical examiner revealed the manner

13  of their death to be homicide.  The defendant was arrested."

14  BY MR. KLOCK:

15  Q.   Okay.  This is the arrest form that was read at the time of

16  your probable cause hearing; correct?

17  A.   Yes, sir.

18  Q.   And this was the arrest form that Judge Cueto refused to

19  find probable cause on; correct?

20  A.   Yes, sir.

21            MR. HUNNEFELD:  Leading.

22            THE COURT:  Sustained.

23            MR. HUNNEFELD:  Leading, Your Honor.

24            THE COURT:  Excuse me, counsel.

25            MR. KLOCK:  I'm sorry.

```
 1              THE COURT:  The witness's answer is stricken and the
 2    jury is to disregard.
 3    BY MR. KLOCK:
 4    Q.   Did Judge Cueto comment on whether this arrest affidavit --
 5              MR. HUNNEFELD:  Objection, Your Honor.
 6              THE COURT:  Sustained.
 7              MR. KLOCK:  Okay.
 8    BY MR. KLOCK:
 9    Q.   Now, in this arrest affidavit, it states that you were
10    involved in a violent argument with the victims; that's
11    Mr. Volce and Mr. Ray?
12              MR. BASCO:  I'm sorry, Judge.  I'm sorry.  The video's
13    playing.
14              MR. KLOCK:  It's on a loop, I guess.
15              MR. BASCO:  Sorry.
16    BY MR. KLOCK:
17    Q.   It says that "the witness was involved in a violent
18    argument with the victims over money and narcotics;" is that
19    correct?
20    A.   No, sir.
21    Q.   Was there any violent argument about money and narcotics at
22    any point in time that day?
23    A.   No, sir.
24    Q.   Okay.  And the only discussion with respect to that had
25    been earlier with Eduardo Rivera; correct?
```

```
1    A.   Yes, sir.

2    Q.   Okay, fine.  Now, do you know what physical evidence

3    collected was not consistent with your statements?

4         Did they ever explain that to you?

5              MR. HUNNEFELD:  Objection, Your Honor.

6              THE COURT:  The question is:  Do you know what physical

7    evidence was not consistent with your statement, comma, did

8    anyone ever explain that to you?

9         He may answer:  Did anyone ever explain to him about

10   the physical evidence in his statement, he may answer that

11   question.

12             THE WITNESS:  Well, I remembered him saying that it

13   didn't match because they assumed that the shooter was always

14   in the house.  That's all they told me.

15   BY MR. KLOCK:

16   Q.   Okay.  And was there anything you said to them that

17   indicated the shooter wasn't in the house?

18   A.   No, sir.

19   Q.   You never commented on where the shooting took place; did

20   you?

21   A.   No, sir.

22   Q.   You only commented on the shots that were fired at you;

23   correct?

24   A.   Yes, sir.

25   Q.   And those were fired outside the house; correct?
```

1           MR. HUNNEFELD:  Leading, Your Honor.

2           THE COURT:  Sustained.

3    BY MR. KLOCK:

4    Q.  Where were the shots fired that were in your direction?

5    A.  From the window.

6    Q.  From the window.  Okay, fine.

7        Now, it says on here that there were 16.2 grams of

8    marijuana and 12 bags of suspected crack cocaine, was in the

9    apartment?

10   A.  I don't know.  I can't answer that question.

11   Q.  Very good.  And finally, when the hearing was over with,

12   okay, and you stepped away from the podium, did the corrections

13   officer say anything to you?

14   A.  Yes, sir.

15          MR. HUNNEFELD:  Objection.  Objection to what was said.

16          THE COURT:  Counsel, wouldn't that be hearsay?

17          MR. KLOCK:  It's actually -- I mean, from his

18   perspective, it's part of the proceeding, what he was told.

19          THE COURT:  Ladies and gentlemen, the statement made by

20   any corrections officer is not offered for the truth of the

21   matter asserted and is considered hearsay.

22          Counsel, you may continue.  He may answer the question.

23   BY MR. KLOCK:

24   Q.  Did the corrections officer say anything to you?

25   A.  Yes.  After my bond hearing, I was confused with what a

```
 1   probable cause hearing was, because I never heard of it.

 2      And when I asked her, she said that it means that you might

 3   be going home tomorrow because it seems like the judge sees

 4   that you didn't do it.

 5         MR. HUNNEFELD:  Objection, Your Honor.  That's

 6   prejudicial hearsay.  It's -- that's not just -- it's for the

 7   truth of the matter asserted.

 8         MR. KLOCK:  It's her opinion.

 9         THE COURT:  Ladies and gentlemen, the last question and

10   answer is stricken and you are to disregard it.

11         MR. KLOCK:  And, Your Honor, the only thing I would

12   ask -- I think the Court was hopefully able to better follow

13   it, but that Judge Cueto --

14         MR. BASCO:  I object, Judge, can we go to sidebar

15   before there's a summary done by counsel?

16         MR. KLOCK:  Yeah, sure.

17         (Sidebar discussion held as follows:)

18         THE COURT:  It's important, when I follow, you play it

19   for the jury, they have it up on their screens.

20         There doesn't need to be any interpretation.

21         MR. KLOCK:  There will be no interpretation.  The judge

22   set it for hearing the next day.  They didn't set it for a

23   probable cause --

24         MR. HUNNEFELD:  He shouldn't be talking about probable

25   cause.
```

```
 1              THE COURT:  No, I'm not saying about probable cause.
 2    But we know the judge specifically says, "I want to know
 3    about."
 4              MR. BASCO:  Exactly.
 5              MR. KLOCK:  Okay.
 6              MR. HUNNEFELD:  Right.
 7              THE COURT:  He says that on the video, and then says
 8    "tomorrow,"  -- and whatever day this is, what I want to know.
 9              MR. KLOCK:  Thanks, Judge.
10              MR. HUNNEFELD:  Right.
11              (Sidebar discussion concluded and the following
12    proceedings were held in open court:)
13              MR. KLOCK:  Your Honor, if I may introduce Plaintiff's
14    60, which is a transcript of the video clip, so it's available
15    to the jury.
16              THE COURT:  Of the video we just had?
17              MR. KLOCK:  Yes, ma'am.  It's a transcription of it by
18    a court reporter.
19              THE COURT:  Any objection?
20              MR. HUNNEFELD:  Subject to previous objection,
21    relevance, not a problem.
22              THE COURT:  What's the number?
23              MR. KLOCK:  Plaintiff's 60.
24              THE COURT:  Plaintiff's 60 -- have you shown this to
25    opposing counsel?
```

```
 1              MR. KLOCK:  They have all of our exhibits in the book,

 2    Judge.

 3              THE COURT:  Show it to opposing, counsel, please, just

 4    to make sure you're on the same sheet of music.

 5              MR. KLOCK:  Judge, is it necessary to hand it up

 6    because I think the Court has --

 7              THE COURT:  No.  You can preserve your exhibits until

 8    the end of trial.  Then we will have them ready for the jury.

 9    BY MR. KLOCK:

10    Q.  Now, Mr. Smart, the next day, were you brought back to

11    court?

12    A.  Yes, sir.

13    Q.  Why?

14    A.  For the probable cause hearing.

15    Q.  Did anyone explain to you what that was?

16    A.  Not really.  They just told me I had to go back to court in

17    the morning.

18              MR. KLOCK:  Okay, fine.

19              Your Honor, we would -- what's the number on that one?

20    That's the transcript, 61.  Your Honor, we'd like to publish,

21    if we could, Plaintiff's 61, which is the video of the probable

22    cause hearing that was held the next day, the evidentiary

23    hearing before Judge Cueto.

24              And also, at the same time, Your Honor, introduce

25    Plaintiff's 62, which is a transcript of that hearing prepared.
```

1         MR. HUNNEFELD:  And subject to the relevance objection.

2         THE COURT:  As to relevance, the objection is

3    overruled.  Counsel, you may proceed.  Exhibits number -- for

4    the record again, counsel, 60 --

5         MR. KLOCK:  62, Judge.

6         THE COURT:  You said that the video and the transcript.

7         MR. KLOCK:  The transcript, Your Honor, is 62.  The

8    video clip is 61.

9         THE COURT:  61 and 62 are received.

10        (Plaintiff's Exhibits 61 and 62 received into

11   evidence.)

12        MR. KLOCK:  May we proceed, Your Honor?

13        THE COURT:  Yes.

14        (Videotape played of Probable Cause Hearing held on

15   Thursday, November 19, 2009, with Honorable Judge George Cueto

16   presiding, as follows:)

17        (Questions are being asked by The Court, and the

18   Answers are given by Detective Fabio Sanchez:)

19        The Court:  Okay.  What's the deal here -- the

20   detective is here?  Okay.  What page is he on?

21        Page 22, Mr. Smart, please.

22        Good morning, Detective.

23        Det. Fabio Sanchez:  Good morning.

24        The Court:  Swear the detective in.

25        (Detective Fabio Sanchez, having been first duly sworn,

1    was examined and testified under oath as follows:)

2    By The Court:

3    Q.  All right.  Detective, what is your name and who do you

4    work for?

5    A.  My name is Detective Fabio Sanchez.  I work for the

6    City of Miami Police, homicide unit.

7    Q.  All right.  I'm going to do this because you weren't here,

8    to make it easier.  These are some of the questions that I

9    have, Detective --

10              The Court:  Mr. Smart?

11              Mr. Smart:  Yes, sir.

12              The Curt:  Pay attention.  This concerns you.

13   By The Court:

14   Q.  Does the defendant live at the place that this happened?

15   A.  Yes.  He has several personal belongings that were in the

16   apartment, and from his statement he said he was living there

17   for the past couple days, sleeping over, and so --

18   Q.  Okay.  And how did this witness observe, or how did she

19   hear what happened in that place?

20   A.  The witness testimony places him at the scene with the two

21   victims at the -- prior to the shooting.

22   Q.  Where was the witness?

23   A.  She was in the residence.

24   Q.  She was in the residence.

25              Did she actually observe the shooting?

1   A.   She did not, sir.

2   Q.   Was she in another room?

3   A.   She was, uh -- I'm sorry.  She did hear the shooting, sir.

4   Q.   Yes.

5   A.   But at the time of the shooting, she was approximately two

6   apartments away, in her residence.

7   Q.   Okay.  And she -- you say she lives in the same --

8   A.   She lives in the same -- it's a five-unit apartment

9   complex, and she lives --

10  Q.   Between the last -- I need to know, how long was it between

11  the shots being fired and your witness responding and seeing

12  the victims?

13  A.   Between the shots that were fired, approximately 15 minutes

14  is when she returned to the apartment.

15  Q.   Did she actually observe Mr. Smart flee the scene?

16  A.   No, sir.

17  Q.   But she was aware that he was there prior to the shooting?

18  A.   She was there -- yes, she was aware that he was there prior

19  to the shooting, along with the two victims that are now

20  deceased --

21  Q.   And their --

22  A.   -- arguing over drugs and money.

23  Q.   So they arguing?  So she could hear the argument?

24  A.   Yes, Your Honor.

25  Q.   Did anyone else -- was anybody else there, besides the

1  three males?

2  A.  Well, the defendant placed himself and shortly before the

3  shooting he places somebody else in the apartment, but then

4  that person subsequently leaves.  So the defendant himself,

5  only places himself and the two deceased victims in the

6  apartment at the time of the shooting.

7  Q.  Was there any firearm found on the scene?

8  A.  No, Your Honor.

9  Q.  What else?  Was any of the two bodies tested for residues,

10  that you know of?  If you don't know, that's fine.

11  A.  I can't recall at this time, Your Honor.  I wasn't there --

12  I wasn't processing the scene.

13  Q.  What type of injuries did the victims have, gunshots?

14  A.  Gunshot wounds.

15  Q.  Where?

16  A.  To the head.

17  Q.  To the back or to the front?

18  A.  The trajectory -- one was to the back of the head, and the

19  other one was to the top of the head.

20  Q.  And were there any injuries on Mr. Smart?

21  A.  No injuries, Your Honor.

22  Q.  And then I understand -- I read the A-form on page two that

23  said that the physical evidence did not fit whatever it is that

24  Mr. Smart's statement was.  What was Mr. Smart's statement?

25  A.  Mr. Smart's statement was that him -- he and two deceased

1    victims were in the apartment at the time of the shooting.

2    Mr. Smart claims that he went to the window to serve some

3    narcotics to a buyer.

4         The buyer was pushed to the side by the alleged shooter,

5    and the shooter shot through the window, killing both victims.

6    There's no evidence that the shooting occurred outside.  The

7    evidence that we have places the shooter inside the crime

8    scene.

9    Q.  And what evidence is that?

10   A.  Body placement, along with casings and the actual window,

11   where he claimed that the shooting happened through, was not

12   shattered in any way.  There's a curtain that was hanging over

13   it.  There was no evidence -- the absence of evidence was also

14   very, very loud and clear.

15        The Court:  Okay.  Madam prosecutor, those are all my

16   questions.  Do you have any other questions?

17        The State:  No, I think the fact that the casings were

18   found in a different location is the compelling evidence that -

19        Detective Fabio Sanchez:  Yeah, yeah, correct.

20        The State:  -- this is the --

21        The Court:  All right.  Mr. Snyder, is there anything

22   that you would like to ask?

23   By Defense Counsel:

24   Q.  What I just need to find out is, Detective Sanchez, first

25   of all, your witness indicated she was inside the same complex

```
 1   where this incident allegedly occurred, in apartment number
 2   five; is that correct?
 3   A.   That is correct.
 4   Q.   What apartment does the witness reside in?
 5   A.   She resides in apartment two.
 6   Q.   And is this a one-story?
 7   A.   One-story apartment.
 8   Q.   Other than that individual, was there any other person from
 9   the location who provided any type of information at all?
10   A.   Other than the actual 9-1-1 caller, that was also a
11   resident at that apartment.
12   Q.   And did you speak with that individual?
13   A.   I did.
14   Q.   Did that individual provide information?
15   A.   Well, he's the one, along with the witness that discovered
16   the bodies, he did provide information, but he heard the shots.
17   Q.   And that's the extent of what that individual told you,
18   that he just heard some shots?
19   A.   That is correct.
20   Q.   Now, you indicated that you heard -- your witness heard
21   some type of argument; is that correct?
22   A.   That is correct.
23   Q.   Okay.  And what -- let me ask -- let me ask this, first of
24   all.  Did you take any type of formal or sworn statement from
25   your witness?
```

1    A.    A sworn statement.

2    Q.    And in that statement, what does your witness tell you?

3    And it's a female, I imagine?  That's what you indicated.

4    A.    Yes.  Ms. Armbrister.

5    Q.    What did that witness tell you as far as any comments?

6    A.    She overheard the defendants and one of the victims that

7    were in the living room arguing over some money, over drugs and

8    money.  And she says that the defendant, I believe -- I believe

9    it was the defendant -- that was asking for additional money.

10   One of the deceased was claiming that he wasn't going to give

11   any additional money.

12   Q.    And that's contained -- that statement is contained in the

13   sworn statement that you took?

14   A.    That is correct.

15   Q.    Thank you.  Was Mr. Smart tested in any fashion for any

16   type of gunshot residue?

17   A.    He was found -- the incident happened on November 11th --

18   I'm sorry -- November 14th, 2009, he came over to -- he called

19   my cellphone on December -- November 17th.  From what I can

20   recall, I believe he was tested.  He was processed at the

21   scene.  He did give consent to those procedures.

22   Q.    So basically for -- so we can clarify something.  You're

23   saying that Mr. Smart was located on the scene on the day of

24   the incident?

25   A.    He places -- we have physical evidence placing him on the

1   scene, and witness testimony placing him prior to the scene,

2   and himself in his own statement, placing himself at the scene

3   at the time of the shooting.

4   Q.   But what I'm trying to determine is back on November 14th,

5   on the date of the incident, was Mr. Smart ever --

6   A.   No, sir.   It wasn't until November 17th that he made

7   contact with the lead detective.

8   Q.   And the statement that you obtained from Mr. Smart, is that

9   recorded in any fashion?

10  A.   That is recorded, sir.

11          Defense Counsel:   (Inaudible) We are still maintaining

12  that this is a circumstantial evidence case, and it's our

13  position based upon the nature of the charge that the standard

14  is not probable cause; it's proof evident, presumption great,

15  which is a higher standard than proof beyond a reasonable

16  doubt.

17          So we are submitting that the testimony does not

18  establish proof evident, presumption great, and we are invoking

19  Mr. Smart's right to counsel.

20          The Court:   Okay.   I do find probable cause for the two

21  charges of murder in the second degree, hold you no bond on

22  Counts 1 and 2; on Count 3, $7,500; on Count 4, $5,000.

23          Is he a convicted felon?

24          The State:   I -- it states here he is.

25          The Court:   Okay.   On Count 5, it's $7500.

1          Sir, you're to stay away from the witnesses in this

2    case and your lawyer has asked me to tell you not to speak to

3    anybody without your lawyer being present.

4          Do you understand me?

5          Mr. Smart:  Yes, sir.

6          The Court:  All right.

7          The State:  Also, there's no indirect contact either,

8    because he has friends here in the courtroom.

9          The Court:  I already told him.

10         Defense Counsel:  If I can make one request of the

11   Detective --

12         The Court:  Sure.

13         Defense Counsel:  -- since he's here, and since I don't

14   have the information, I can possibly get the names and  dates

15   of birth of the alleged victims?  The reason that's important

16   is if there's a conflict, I want to be able --

17         The Court:  Can you do that, the names and DOBs of the

18   victims because they may have to conflict out.

19         The State:  Yeah, I have them.

20         The Court:  You got them?  Okay.  All right.  We got

21   them.  Okay.  All right.  Detective, do not contact him without

22   his lawyer being present, please.

23         All right.  Thank you.  Next case.

24         (Videotape concluded.)

25         MR. KLOCK:  That's the conclusion of the tape, Judge.

```
 1          We'd also move Plaintiff's 62, which is the transcript,

 2   for publication of the jury at a later time.

 3          THE COURT:  Received.

 4          (Plaintiff's Exhibit 62 previously received.)

 5   BY MR. KLOCK:

 6   Q.  Now, Taiwan, you've watched that clip; correct?

 7   A.  Yes, sir.

 8   Q.  I want to read to you from the transcript and ask you

 9   whether or not the information in that is true.

10          Referring Your Honor to page seven of the transcript,

11   starting at line 20, which is Detective Sanchez.

12          "Mr. Smart's statement was that him, he and the two

13   deceased victims, were in the apartment at the time of the

14   shooting.  Mr. Smart claims that he went to the window to serve

15   some narcotics to a buyer."  Is that true?

16          Did you tell him that?

17   A.  Yes, sir.

18   Q.  Okay.  "The buyer was pushed to the side by the alleged

19   shooter and the shooter shot through the window."

20          Is that true?

21   A.  Yes, sir.

22   Q.  And it says, "killing both victims."  Is that true?

23   A.  No, sir.

24   Q.  Did you ever tell him that the shots that came through the

25   window killed the victims?
```

```
 1    A.   No, sir.

 2    Q.   Did you know the victims had been shot?

 3    A.   No, sir.

 4    Q.   Okay.  He continues:

 5         "There's no evidence that the shooting occurred outside.

 6    The evidence that we have places the shooter inside the crime

 7    scene."

 8         Did you ever say anything to Detective Sanchez or

 9    Detective Cepero that suggested that the shooting did not take

10    place inside?

11    A.   No, sir.

12    Q.   Okay.  And did they ever ask you any questions or present

13    anything to you that indicated the possibility that someone

14    entered the property after they shoot through the window?

15              MR. HUNNEFELD:  Objection to the form of the question,

16    Your Honor.

17              THE COURT:  Sustained as to form.  It would be

18    speculation.

19              MR. KLOCK:  Okay.

20    BY MR. KLOCK:

21    Q.   Was any other theory of the crime ever presented to you

22    other than the fact that the shots were fired inside and that

23    you claim the shots came from outside?

24              MR. HUNNEFELD:  Objection, form, Your Honor.

25              THE COURT:  Overruled.  If he can answer.
```

```
 1    A.  No, sir.
 2    BY MR. KLOCK:
 3    Q.  So their position was that you were claiming that the kill
 4    shots came from outside; correct?
 5          MR. HUNNEFELD:  Objection, Your Honor.  Commenting on
 6    somebody else's position.
 7          THE COURT:  Sustained.
 8          MR. KLOCK:  Okay.
 9    BY MR. KLOCK:
10    Q.  Did you ever testify that the kill shots came from outside?
11    A.  No, sir.
12    Q.  What was your testimony consistently with these two
13    gentlemen?
14          MR. HUNNEFELD:  Objection, Your Honor, to the --
15          MR. KLOCK:  I'm sorry, Your Honor.
16          THE COURT:  The objection is overruled.  He may answer.
17    A.  My position was then, and always is, that I went to the
18    window; somebody else came to the window and brandished the
19    firearm; I turned around, he started shooting at me, and I ran
20    out the back.
21    Q.  Okay.  Now, do you recall that during Mr. Hunnefeld's
22    opening statement he said that Ciara Armbrister had been in the
23    apartment 15 minutes before the shooting; is that correct?
24    A.  Wait, is it correct that she said, or is it correct that he
25    said that?
```

```
 1   Q.   That he said -- well, he said that --

 2           MR. HUNNEFELD:  Objection, Your Honor, either point, as

 3   to what I said.  It was --

 4           THE COURT:  I think you can ask him what he knows.

 5           MR. KLOCK:  Right.

 6           THE COURT:  You continue to ask him to remember what

 7   Mr. Hunnefeld stated in opening statement.

 8   BY MR. KLOCK:

 9   Q.   Was she in the apartment 15 minutes before the shooting?

10   A.   No, sir.

11   Q.   Was she in the apartment 30 minutes before the shooting?

12   A.   No, sir.

13   Q.   Was she in the apartment 45 minutes before the shooting?

14   A.   No, sir.

15   Q.   Was she in the apartment an hour before the shooting?

16   A.   About an hour before.

17   Q.   When you ran out the back door, did you see her?

18   A.   No, sir.

19   Q.   Did you see anyone in the apartment that she lived in?

20   A.   No, sir.

21   Q.   Did you have to pass that apartment to reach the street?

22   A.   Yes, sir.

23   Q.   One moment, Judge.

24       Now, once that hearing is over with, you're in jail;

25   correct?
```

1    A.   Yes, sir.

2    Q.   Now, where in jail were you?

3    A.   Pretrial Detention Center.

4    Q.   Okay.  And how long were you there?

5    A.   About a week or two, if I'm not mistaken.

6    Q.   And then where did you go?

7    A.   I got transported to the Turner Guilford Knight Correction

8    Facility.

9    Q.   Okay.  You've claimed that the experience in jail was

10   traumatic for you; correct?

11        MR. HUNNEFELD:  Objection to the form of the question.

12   MR. KLOCK:

13   Q.   I'm sorry.  Could you explain what being in jail was like

14   to you?

15   A.   Being in jail, period?

16   Q.   No.  After the probable cause hearing.

17   A.   It's like you -- somebody tell you, you going to get life,

18   you are facing two life sentences, and plus 67 years, I thought

19   I was never going to get out.

20        And then I was in a cell with other people who had similar

21   charges, who was like bragging about the stuff they did.  It

22   was like -- it was a different environment.  I had never been

23   in an environment of that magnitude before.

24   Q.   Well, you were in jail before; weren't you?

25   A.   Yes, sir.

```
 1   Q.   Tell the jury about that.  What's the big deal?

 2   A.   That time I went to jail for a probation violation and --

 3            MR. HUNNEFELD:  Objection, Your Honor.  He was in jail

 4   for felony convictions --

 5            MR. KLOCK:  A probation violation, Your Honor.

 6            MR. HUNNEFELD:  -- violating probation relating to --

 7            THE COURT:  Approach.

 8            (Sidebar discussion held as follows:)

 9            THE COURT:  First, give him a chance to finish.  You

10   don't get in jail for a probation violation, unless you have

11   had a crime.

12            MR. HUNNEFELD:  Right.

13            THE COURT:  So you at least let him finish the next

14   question before he finds out whether or not --

15            MR. KLOCK:  That's a speaking objection.

16            THE COURT:  One at a time.

17            -- whether or not we have a situation where he's -- I

18   know what --

19            MR. HUNNEFELD:  Exactly.

20            THE COURT:  -- you want to make sure he's not

21   mischaracterizing his time in jail.

22            MR. HUNNEFELD:  Exactly.

23            THE COURT:  I don't know what the -- he's right, the

24   first time he went to jail on the probation violation.

25            MR. HUNNEFELD:  Actually, he went to jail before that,
```

```
 1    the 270 days.
 2          MR. KLOCK:  We need him to show he's not making the
 3    representation to the Court that he's been in jail many times
 4    before; put up or shut up.
 5          THE COURT:  It's never been in front of the jury.  Has
 6    he ever been -- my understanding was --
 7          MR. HUNNEFELD:  So many times.
 8          THE COURT:  -- there was a felony probation violation
 9    for which he was incarcerated on the violation.
10          MR. HUNNEFELD:  That's correct.
11          MR. BASCO:  That's correct --
12          THE COURT:  Am I incorrect?
13          MR. BASCO:  -- yes.
14          MR. HUNNEFELD:  He was arrested on the --
15          THE COURT:  I didn't say "arrested."  I said, "in
16    jail."  On his other arrests, were there ever times where he
17    was in jail for any significant period of time before?
18          MR. KLOCK:  He was in jail once for loitering, or
19    something like that, for 12 hours.
20          MR. HUNNEFELD:  He was in jail for the underlying
21    offenses.  He was arrested for the underlying offenses as well.
22          THE COURT:  But wait a minute.  Wait, wait, wait,
23    Mr. Hunnefeld.  Now we know what happens on these arrests, and
24    that's what I want to know.
25          Were these arrests:  Hello; booking; hi; fine;
```

```
 1    sayonara.

 2            MR. BASCO:  I have to look into that, Judge --

 3            MR. NAPOLEON:  Yes.

 4            MR. BASCO:  -- to see if it was misdemeanors or

 5    arrests.  So I have not pulled it.

 6            MR. HUNNEFELD:  I have it.  It's an eight-page rap

 7    sheet.

 8            THE COURT:  The arrests?

 9            MR. HUNNEFELD:  It's not the only reason.  I objected

10    to the probation.  You had it -- by the way, it was the

11    mischaracterization of what he was there for.

12            THE COURT:  We didn't know what he was there for.

13            MR. HUNNEFELD:  That's all I was saying; probation

14    violation relating to two felony trafficking cocaine --

15            MR. NAPOLEON:  That is what --

16            THE COURT:  That is a -- you cannot let it come.

17            MR. KLOCK:  Number one, he had a reason for why he was

18    in jail, was for violating probation.

19            THE COURT:  Right.  But why was he violating probation?

20    What was the charge?

21            MR. KLOCK:  The same charge.

22            THE COURT:  What was the charge?

23            MR. NAPOLEON:  Selling cocaine.

24            THE COURT:  Okay.  That better come out.

25            MR. HUNNEFELD:  The trafficking of cocaine.
```

1          MR. BASCO:  Sale of cocaine.

2          MR. HUNNEFELD:  Sale of cocaine.  The probation that is

3     given in lieu of putting someone in jail.  He violates that

4     term, he then ends up getting the sentence.

5          MR. BASCO:  So, it's not appropriate.  It's not

6     relating to the underlying offense.

7          THE COURT:  No, you don't get a probation violation

8     unless you do something connected with your underlying offense?

9          MR. HUNNEFELD:  When it's something wrong, exactly.

10         THE COURT:  Whether it's a dirty --

11         MR. KLOCK:  That's not in evidence, Judge.

12         MR. HUNNEFELD:  We're getting into issues so far

13    afield.

14         THE COURT:  You can't have it both ways.  You can't

15    have him say --

16         MR. HUNNEFELD:  Talk to probation, he has two criminal

17    offenses that he went to jail for.  He's trying to --

18         THE COURT:  I'm the only one having a problem here?

19         MR. KLOCK:  Judge, it's just that the entire --

20         MR. BASCO:  Judge, the entire area of criminal law --

21         MR. BASCO:  This comes into -- I'm a prosecutor.

22         MR. KLOCK:  You got to be kidding?

23         MR. BASCO:  Excuse me, Mr. Klock.

24         THE COURT:  Guys...

25         MR. BASCO:  This is the problem that we have.

```
 1    Your Honor's pretrial ruling, the possession of cocaine
 2    innocence could not be mentioned.  When he got into this, we
 3    objected to form; the probation aspect of why he violated, and
 4    it wasn't willful, whatever, that gets into the innocence of
 5    part of your pretrial order, the fact he was convicted of two
 6    counts, possession of cocaine is the most relevant.
 7         THE COURT:  He needs to tell us, I was in jail for
 8    probation violation.  What was the underlying cause on the
 9    probation violation, possession, distributing and you violate
10    the probation?  What is probation?  Probation is what they give
11    you to give you a chance that, hopefully, you're going to turn
12    your life around.
13         MR. KLOCK:  He can explain that.
14         THE COURT:  Hopefully, because I screwed it up.
15         MR. KLOCK:  Ask him why he violated probation.
16         MR. HUNNEFELD:  That's not --
17         MR. NAPOLEON:  This is -- the issue came up yesterday;
18    he violated because he didn't have anywhere to go.
19         MR. HUNNEFELD:  That's not evidence.  I would strike to
20    try the probation violation because if there was no willful --
21         THE COURT:  Wait a minute.  Wait a minute.
22         MR. HUNNEFELD:  Willful, he wouldn't have gone to jail.
23         THE COURT:  Because there's a point about willful.
24    He's talking about right now, how did you feel when you weren't
25    to jail?  This is how this all came about.
```

```
 1              And he's saying, "I felt traumatized."

 2              MR. HUNNEFELD:  Right.

 3              THE COURT:  Why?  Because this is really the first time

 4    I've ever been to jail for any significant period of time.

 5              MR. HUNNEFELD:  No.  That's 270 days.

 6              THE COURT:  270 days; he's in jail for almost twice

 7    this that time.

 8              MR. HUNNEFELD:  But it's significant.

 9              THE COURT:  Wait, wait, wait, wait.  Wait, wait, wait,

10    wait.  And he says, "What was different this time?"

11              I'm assuming -- maybe I'm wrong, I don't know -- they

12    might section off the jail based upon the crimes that you

13    commit.  This time he's on the side with the big boys.

14              MR. KLOCK:  That's right.

15              THE COURT:  Because he's been charged with two counts

16    of murder, and he's saying I'm in the part of the prison where

17    I am with my companions who also have been put in detention for

18    having committed or alleged to have committed murder.

19              Where were you in when you were in on the probation?

20    I'm assuming -- I could be wrong -- he was in a different

21    portion?

22              MR. KLOCK:  In a different cell.

23              MR. HUNNEFELD:  Appropriate questions that would be

24    asked that weren't asked here first.  He was getting probation

25    why --
```

```
 1              THE COURT:  The issue is, how did he feel?  How is he

 2     damaged?  Am I the only one who's not getting this?  Excuse me.

 3              (Sidebar discussion concluded and the following was

 4     held in open court:)

 5              THE COURT:  Ladies and gentlemen, can you step in the

 6     jury room for me, please.  I just think that that noise is very

 7     annoying and for you to have to listen to it for more than a

 8     few moments...

 9              COURT SECURITY OFFICER:  All rise.

10              (Jury exited courtroom at 3:18 p.m.)

11              THE COURT:  Mr. Smart, could you step outside the

12     courtroom for a moment for me, please?

13              COURTROOM DEPUTY:  Yeah, just right outside.

14              (Witness steps down and exited courtroom.)

15              THE COURT:  I may be missing something here.  And I'm

16     not saying I'm the sharpest knife in the drawer, but I'm still

17     a knife.

18              The question is:  Mr. Smart, how did you -- you -- the

19     objection was sustained.

20              "Did you suffer any trauma?"

21              "Objection sustained."

22              I agree, he needs to describe the experience.

23              Whether or not he's traumatized and deserves damages is

24     a fact that the jury will have to determine.

25              He says, and starts to say, "It's really the first time
```

```
 1    I've been in jail."

 2              "Why were you in jail?"

 3              "Probation violation."

 4              "Objection."

 5         We go sidebar.

 6         Now, I think it is inappropriate for the jury to be

 7    under the impression that he was on probation because he didn't

 8    do his homework.  All right.

 9         They are going to hear that he was on probation -- I'm

10    assuming -- or now Mr. Klock is being directed to say, "Why

11    were you on probation?"

12         And he's, I assume, is going to say, "Because I had

13    these two underlying criminal offenses, and I was violated."

14         The next question, which I also believe is appropriate:

15    "Why were you violated?"

16         Now, you're objecting to the fact that he says, "I was

17    violated because I couldn't report a stable address?"

18         MR. HUNNEFELD:  Absolutely, Your Honor.  We would have

19    to -- if -- why didn't he make that argument at the hearing

20    where he was violated?  My understanding is --

21         THE COURT:  I'm not trying that.

22         MR. HUNNEFELD:  -- we shouldn't get into it.

23         THE COURT:  I'm talking about -- no, no.  We do get

24    into it.  Because he's saying, listen, I'm now on the drug

25    dealers' side of the prison.  I can deal with being on the drug
```

1    dealers' side of the prison, and I was there for 270-some days.

2          Now they've shipped me across the street and I'm on the

3    murderer side of the prison, and I don't know about you, but

4    the murderer side of the prison is just a little deep.

5          MR. HUNNEFELD:  Your Honor, I understand.

6          THE COURT:  And I know I'm in high cotton now, because

7    I don't know what these guys are.  They're telling me all the

8    things that they do and the people that they kill and --

9    at least to him, now you may ultimately believe he's going to

10   be prosecuted for murder -- but he is telling the jury, I think

11   I'm innocent, I didn't do anything -- my damages -- I am now in

12   prison with people who kill people, and I don't kill people.

13         MR. HUNNEFELD:  But to imply that there was no

14   underlying basis to what he was convicted of, there is judicial

15   estoppel.

16         THE COURT:  He is -- wait -- he was.  He's going to

17   say, yes, I was convicted of -- what is it?

18         MR. NAPOLEON:  Possession with intent to sell.

19         THE COURT:  -- possession with intent to sell.

20         "And what did you get?"

21         "I got probation."

22         "Why did you get probation?"

23         "Because I was supposed to go out, do good works, heal

24   the sick, raise the dead.  I didn't do that."

25         "Why didn't you do it?"

```
 1          "Because I didn't have a place to stay and I got

 2    violated."

 3          Why he got violated is of no moment.  It is the fact

 4    that the conditions of confinement this time are drastically

 5    different.

 6          MR. HUNNEFELD:  Your Honor, maybe we're on the same

 7    page.  I agree with everything with what you said in this last

 8    part.  The reason he got violated is of no moment.  We

 9    shouldn't allow him to talk about it and make an issue of why

10    he got violated.

11          THE COURT:  But that's the trauma.  He's saying when I

12    went in the last time --

13          MR. HUNNEFELD:  He's innocent?

14          THE COURT:  -- I know what -- no.

15          -- I know what I did was wrong.  When I was

16    incarcerated on the probation violation, I understood what was

17    happening to me.  I didn't have a place to stay.  I messed up.

18    I didn't report.

19          This time, I've got people telling me -- now, you

20    can -- this is just his theory, light most favorable to them --

21    people are telling me, I killed two people and I don't know why

22    they're telling me this.

23          So, in addition to being in big-boy prison with

24    murderers, I'm also dealing with the fact that people are

25    telling me I killed my best friend.
```

1          MR. HUNNEFELD:  I understand, Your Honor.

2          My only -- my issue is, getting into the merits of his

3     probation violation.

4          THE COURT:  I'm not getting into the merits.

5          MR. HUNNEFELD:  I don't want him to.

6          THE COURT:  He said, "I did, I went."

7          MR. HUNNEFELD:  But then to say, the only reason I did

8     it is because X, Y and Z.

9          THE COURT:  But that's the gloss you're putting on it.

10    The jury gets to make the factual finding of whether or not

11    they agree if he was traumatized or not.

12         MR. HUNNEFELD:  But that was --

13         THE COURT:  They may come back and say, sorry,

14    Mr. Smart, you don't get anything.

15         MR. HUNNEFELD:  But, Your Honor, I would have

16    brought -- if that was in the pleading at any point, I would

17    have brought the probation violation.

18         THE COURT:  There is no reason to re-litigate the

19    probation violation.

20         MR. HUNNEFELD:  But he gets a chance to put a spin on

21    that probation violation, which could be totally false, for all

22    we know.

23         THE COURT:  The spin is not on the probation violation

24    if you want to use -- quote/unquote -- spin, is that I am now

25    incarcerated with murderers.

```
1            MR. HUNNEFELD:  And that's --

2            THE COURT:  That's -- before I was incarcerated with

3    drug dealers.

4            MR. HUNNEFELD:  But we agree, that type of testimony's

5    appropriate.  All I'm saying --

6            THE COURT:  And he's saying, "The last time I was in, I

7    knew why I was in, I knew what I did wrong.

8            "This time, I don't think I know.  I don't think I

9    killed my best friend."

10           Now you may prove otherwise, that's your chance; but

11   that's his theory and he gets to present it.

12           I'll be back in five minutes.

13           COURT SECURITY OFFICER:  Remain standing.

14           (Recess taken from 3:22 p.m. to 3:32 p.m.)

15           COURTROOM DEPUTY:  All rise.  Court is back in session.

16   Please come to order.

17           MR. HUNNEFELD:  I have a witness that I just want to

18   let go.

19           THE COURT:  You may.  Whatever we finish today, we

20   finish today.

21           MR. HUNNEFELD:  Also, a motion relating to the

22   testimony of the plaintiff.  He interjected at the end of the

23   question by Mr. Klock that "they let me go because I was

24   innocent."  That is a very --

25           THE COURT:  And I did tell them to disregard the
```

```
 1    question and the answer.

 2          MR. NAPOLEON:  Judge, I'm sorry, one more thing.

 3          MR. HUNNEFELD:  We move for a mistrial.  I just wanted

 4    to --

 5          MR. NAPOLEON:  And this is important, the reason why;

 6    in light of Your Honor's ruling, we need to advise our client.

 7    We needed to talk to him, because the rule was invoked that you

 8    told us not to speak to him, but we want to --

 9          THE COURT:  You may tell him now -- I'll turn off the

10    microphones -- what the limits are, as he can talk about

11    concerning what his probation violation was for and the

12    underlying criminal offenses.  All right.

13          Do you need to explain that to him right now?  I'm

14    turning off the plaintiff's microphones while you explain.

15          MR. HUNNEFELD:  Your Honor, can we have a ruling on the

16    motion for mistrial relating to that statement that "because I

17    was not guilty."

18          THE COURT:  Denied.

19          MR. HUNNEFELD:  "Because I didn't do it," I think is

20    the exact phrase.

21          (Brief pause in proceedings.)

22          THE COURT:  Ready, Mr. Klock?

23          All right.  Jury, please.

24          Microphones are back on.

25          (Jury entered courtroom at 3:35 p.m.)
```

```
 1              THE COURT:  Welcome back, ladies and gentlemen.

 2          You may be seated.

 3          Mr. Smart, you may resume the stand.  I'll remind you

 4   sir, you remain under oath.

 5              (Witness resumes stand.)

 6          THE COURT:  Mr. Klock, you may resume your questioning

 7   of the witness, subject to the rulings when we were on the

 8   recess of the jury.  All right.

 9              MR. KLOCK:  Yes, ma'am.

10   BY MR. KLOCK:

11   Q.  Taiwan.

12   A.  Yes, sir.

13   Q.  Prior to being arrested for the murders of Volce and Ray

14   Nathan Ray, you were in jail before; correct?

15   A.  Yes, sir.

16   Q.  And what was the charge you were in jail for?

17   A.  Possession of Cocaine With Intent.

18   Q.  Okay.  And you took a plea to that?

19   A.  Yes.

20   Q.  And were put on probation; correct?

21   A.  Yes, sir.

22   Q.  And you violated probation; correct?

23   A.  Yes, sir.

24   Q.  Why did you violate probation?

25   A.  I never reported to my probation officer because I didn't
```

```
 1    have a steady address.

 2    Q.   Okay.  And then what choice were you given, any choice by

 3    the judge?

 4    A.   They gave me the option to be reinstated on probation for a

 5    longer period of time or to take a small jail sentence in order

 6    to clear up the probation; so I opted to take the jail time,

 7    because I couldn't be on probation.

 8    Q.   Why?

 9    A.   I didn't have nowhere to go.  I would have kept violating;

10    because if you don't have a permanent address, they'll violate

11    you.

12    Q.   Now, when you went to jail for the probation violation,

13    tell the jury where you went in jail.

14    A.   After two days in jail, I was sentenced to the 270-day

15    sentence, and I went to the trustees' cell.

16    Q.   What's the trustees' cell?

17    A.   It's, basically, like, where you work with the officers.

18    You're in a different cell with people who are sentenced to

19    short time with, like, minimal charges, and you're allowed to,

20    like, work in the kitchen, work outside, like groundskeeping

21    maintenance, things like that.

22    Q.   And when you went in there, how much did you weigh?

23    A.   I was like 173, 174.

24    Q.   And when you left there, after 270 days, how much did you

25    weigh?
```

```
 1    A.    209 pounds.

 2    Q.    Okay, fine.  So life was not tough?

 3    A.    No, sir.

 4    Q.    How did that differ from where you ended up after the

 5    probable cause hearing in front of Judge Cueto?

 6    A.    This time it was, like, unsure thing.  I didn't know if I

 7    would ever see the streets again.  I lost, like, 13 pounds like

 8    the first week I was in jail.  I was surrounded by a different

 9    group of inmates, like, a different environment.  It was like a

10    totally different situation.

11         It was like -- it was one of the those situations where

12    you're around people who were constantly talking about what

13    they do, what they will do, and it just makes you nervous and

14    scared.

15    Q.    During the time you were in the trustees' cell, was anyone

16    ever injured in the cell?

17    A.    No, sir.

18    Q.    When you were in the cell after the probable cause hearing,

19    did anyone get injured there?

20    A.    Several.  I seen several incidents when I did that time,

21    during that time of people getting injured.

22    Q.    What were those incidents?

23    A.    There was one time in particular where this guy in the

24    stockade was jumped so bad that they had to take a stretcher to

25    get him out.
```

1      There was another incident where this kid I knew got

2  stabbed in a fight.  I've seen several people jumped, like,

3  many times.

4  Q.  How often did you see someone stabbed?

5  A.  The whole time I was there for that, about at least three

6  or four times somebody got stabbed.

7  Q.  Now, tell the jury what you used to -- what your day was

8  like at jail after you were arrested for murder.

9  A.  Pretty much, I wouldn't sleep that much at night.  It was

10  like constantly being head-counted and just constantly

11  surrounded by people who were like real aggressive and in there

12  for, like, serious things, and having the correctional officers

13  say, like, disrespectful stuff to you regarding your case and

14  stuff like that.

15  Q.  Like what?

16  A.  Like, "Oh, weren't you that boy that did those murders of

17  those kids," or did this and that, stuff like that, like to

18  other inmates, though.

19  Q.  Okay.  And what else is different in that cell?

20  A.  You in there with no officers; you're in there by yourself,

21  like, all day.  It's just --

22  Q.  What do you mean, you're not in there with any officers?

23  A.  When I was in the trustees' cell, there was an officer

24  present in the cell with us at all times to make sure nothing

25  happens to no one.

1      And when I was in this time, I was like in those cells

2   where you -- it's every man for himself, basically.  I've seen

3   people get hurt badly, and officers don't come for hours.

4   Q.   Can you describe -- that's the cell in the stockade;

5   correct?

6   A.   Yes, sir.

7   Q.   Can you describe for the jury what a cell in the stockade

8   looks like?

9      First, what is the cell?  Most people think of a cell where

10   one people, two people stay.

11   A.   It's a housing element for anywhere between 25 to 32

12   inmates.

13   Q.   Okay.  And describe how it's laid out.

14   A.   There's a door.  And once you walk in the door, there's

15   like a -- after, like, maybe three feet, there's a set of bars

16   that keeps up from the door; and then there's like a TV on the

17   wall, and it's just a bunch of bunk beds in rows in lines, and

18   like one, like, cement brick table and four telephones.

19   Q.   Okay.  Now, if something goes wrong in the cell, you pick

20   up the phone and call somebody?

21   A.   No, sir.

22   Q.   How do you get a guard?

23   A.   You have to get the bowl and try to squeeze your hand

24   through the bars and try to knock on the door.

25   Q.   And how long does an officer come, how long does it take

1    you?

2    A.   Sometimes they don't come until they do their rounds.

3    Q.   How often do they do their rounds?

4    A.   Every three or four hours.  I'm not exactly sure, though.

5    Q.   What kind of contact did you have with your family while

6    you were in jail this time?

7    A.   I didn't speak or see my mom, my brother, my sister, or

8    anyone, for that matter, like, the whole time I was there.

9    Q.   Why?

10   A.   No one would come see me.  No one would put money on the

11   phone for me to speak to them.  I never found out why because I

12   never got in contact with anybody.

13   Q.   What do you mean, put money on the phone, what's that mean?

14   A.   Like, in order for you to reach out to a family member or

15   friend, they would have to put a couple of dollars of collect

16   calls on the phone for you, but nobody really wanted to

17   associate with me enough to even put a dollar on the phone for

18   me.

19   Q.   How about food?

20   A.   I didn't get no commissary the whole time I was there.

21   Q.   What does "commissary" mean?

22   A.   It's when your family puts money in your account, so you'll

23   have enough food to eat because of the small portions of food

24   that you receive in jail.

25   Q.   How was the menu different then and when you were in the

1    trustees' cell?

2    A.   When I was in the trustees' cell, sometimes we got three or

3    four or five trays.  I worked in the kitchen, so we had access

4    to a lot of extra food all the time and the C.O.'s would give

5    us extra food.

6    Q.   And what was the relationship, any different in the

7    relationship between you as inmate in the trustee cell and the

8    relationship with correction officers, who you refer to as

9    C.O.'s?

10   A.   When you are in the trustee cell, the corrections officers,

11   they know you'll be home in no time, and they treat you -- I

12   wouldn't say with all due respect -- but they give you a little

13   more credit because, you're like, to them, a model inmate,

14   who's doing the right thing.  So, you know, they know your

15   sentence, you'll be home soon, and you have more dignity that

16   way.

17   Q.   How about things, like, how often do they have

18   strip-searches and that kind of thing in the cells?

19   A.   Most of the trustees' cells, they trust us to, like -- most

20   of the inmates got short time, we wouldn't really try to have

21   contraband like that, so there was really no strip-searches

22   like that, unless something happened, which was rare.

23   Q.   And how about the cell you were in in the stockade?

24   A.   It was always every once in awhile shake down and when

25   there's a shakedown, 33 men have to get naked in front of other

```
 1   men, like every time, no discretion; if they say you have to do

 2   it, you have to comply.

 3   Q.   Did that bother you?

 4   A.   Yes, sir.

 5   Q.   Why?

 6   A.   Because some things are private, no matter where you at,

 7   some things are just private.

 8   Q.   Did you speak to your son while you were in jail?

 9   A.   No, sir, I didn't speak to him the entirety of the time I

10   was there.

11   Q.   Was your son able to speak to you?

12   A.   No, sir.

13   Q.   Were you able to write to him?

14   A.   No, sir, I didn't have address for someone.

15   Q.   If you had an address, did you have stamp to mail the

16   letters?

17   A.   No, sir.

18   Q.   Who was the only person from the outside that you had

19   contact with when you were in jail?

20   A.   My lawyer at the time, my defense attorney at the time.

21   Q.   Ms. Montaner?

22   A.   Yes.

23   Q.   Okay, fine.  What difference does it make, nine months is

24   nine months, isn't it, nine months in one place, nine months in

25   another place?
```

```
1    A.   I wasn't in jail for nine months.  The first time, by

2    trustee, by you working everyday, they take five days a month

3    off your time, so it's substantially shorter than whatever

4    you're sentenced to.

5    Q.   And how about the other cell?

6    A.   Every day is day for day.

7    Q.   Every day is what?

8    A.   Every day is day for day, every day you do is just another

9    day you do.

10   Q.   And what did you think about it?

11   A.   Honestly, like, I was -- I didn't want to really live, like

12   I used to hope -- I used to wish that I would have died with my

13   friends, like that, I wouldn't have to go through it, because

14   it's easier to be dead than in that situation.

15   Q.   Did you get to go to their funerals?

16   A.   No, sir.

17   Q.   So the cell that you're in, did you ever get out of the

18   cell?

19   A.   At the stockade?

20   Q.   Yes.

21   A.   When I was released.

22   Q.   But, I mean, is there exercise a couple times a day or --

23   A.   Once a week, they let us go to rec.  But most of the time

24   they don't even let us go because so many inmates in there do

25   so much stuff, like, the C.O. just take so much from you --
```

1   they take that little hour from you, easily.

2   Q.   So it's an hour a week, otherwise?

3   A.   Yeah.  But usually, we don't even go, 'cause something

4   happen, and they would just be like no rec for the week or two

5   months.  Sometimes rec cancel for three, four months.

6   Q.   Did you know any of the people in that cell?

7   A.   Not from the streets.

8   Q.   And did any of them know about the First 48 show?

9   A.   A couple of them.

10   Q.   And what did they say to you?

11   A.   Different reactions.  Some people was more trying to find

12   out what really happened, or how did it happen, just trying to

13   get information.

14   Q.   Okay.  Now, after awhile you're in there being held, no

15   bond, right, and after awhile your brought out for a hearing

16   with Ms. Montaner; correct?

17   A.   Yes, sir.

18   Q.   A so-called Arthur hearing?

19   A.   Yes, sir.

20   Q.   Could you tell the jury what you understand an Arthur

21   hearing is?

22        MR. HUNNEFELD:  Objection, Your Honor, calls for a

23   legal conclusion.

24        THE COURT:  What he understands an Arthur hearing is?

25        MR. KLOCK:  Yes, Your Honor.

```
 1              THE WITNESS:  From my understanding --

 2              THE COURT:  Objection overruled.  You may answer what

 3    you -- what happened at the hearing that you observed.

 4              THE WITNESS:  From my understanding, the Arthur hearing

 5    is when the evidence is presented to a judge or magistrate and

 6    they decide if there's enough evidence to keep you in jail or

 7    if you have to have a bond or stated on sometime of condition

 8    or release.

 9    BY MR. KLOCK:

10    Q.  So finally, you got to have an Arthur hearing; correct?

11    A.  Yes, sir.

12    Q.  And that was when?

13    A.  April 30th, if I'm not mistaken.

14    Q.  And what happened at the Arthur hearing?

15    A.  It was ruled that the proof of guilt was not evident and

16    the presumption was not great, and I was given a bond on every

17    offense.

18    Q.  Okay.  And so the murder bonds, what were the murder bonds?

19    A.  75,000 each count.

20    Q.  Okay.  So why didn't you just write a check and get out?

21              MR. HUNNEFELD:  Objection.

22    Q.  Pardon me?

23              THE COURT:  There was an objection.  Overruled.

24    A.  The bond equals well over $150,000, and they also put a

25    Nebbia hold.
```

1    Q.   What does that mean?

2    A.   It means that even if by some chance somebody was to put up

3    the money, that it would have to have some type of proof of

4    every penny where this money came from in order for me to even

5    be considered to be released.

6    Q.   So how much money would you have to come up for $150,000

7    bond?

8    A.   150, three others, $16,500 with a Nebbia hold.

9    Q.   Okay.  And so why didn't you just get the money?

10   A.   I had a regional counsel.  I didn't have an attorney.  I

11   had an attorney the State provided for me.  I was indigent.

12   Q.   So you weren't able to come up with the $16,500?

13   A.   No, sir.

14   Q.   Well, was that all you would have had to come up with, if

15   you know?

16   A.   I would have had to also -- or not me, whoever would have

17   been kind enough to put the bond would have had to also give

18   some type of collateral, I guess, in the amount of 150,000.

19   Q.   Okay.

20       MR. HUNNEFELD:  Objection, Your Honor, to this whole

21   line of questioning.  Your Honor, what people would have to be

22   doing in order to get him out.

23       THE COURT:  Counsel, approach for a moment, please.

24       (Sidebar discussion held as follows:)

25       MR. BASCO:  Judge, the argument, he had to put

1   collateral for a bondsman.  There's no testimony this needs to

2   happen.  The bondsman accepts IOU letters.

3         MR. KLOCK:  For $150,000?

4         MR. BASCO:  I have seen --

5         THE COURT:  Wait, wait.  Let's back up for a minute.

6   First of all, the question is his understanding.  Certainly --

7   I am certain that there are bondsman that might take some sort

8   of IOU letter from people that might have the "I" or the "U" to

9   owe.  But he's already said that his mom and he prior to

10  this -- which is how he said he ended up in the -- living

11  with -- wherever it was -- that he had no place to stay.  He

12  said he couldn't stay with his mom, unless --

13        MR. BASCO:  There has to be a foundation, Judge, of his

14  basis for that knowledge.  There's no foundation, had he gone

15  to a bondsman before or knows anything like that.  We have this

16  place --

17        MR. HUNNEFELD:  My objection was that he testified

18  about the legal process of obtaining bonds, and so forth.  His

19  own experience would be one thing, but he hasn't been

20  testifying from his own experience.  He's testifying about some

21  general knowledge he obtained.

22        THE COURT:  Okay.  All right.  Thank you.

23        (Sidebar concluded and the following proceedings were

24  held in open court:)

25        THE COURT:  Ladies and gentlemen, Mr. Smart is

```
 1    testifying from what his experience is concerning the bonds and

 2    conditions of release.

 3           Please do not take this as to what an attorney or

 4    someone experienced in this area of the law would give an

 5    opinion as to what the conditions of release could or would be.

 6           Counsel, you may continue.

 7           MR. KLOCK:  Thank you.

 8    BY MR. KLOCK:

 9    Q.  Now, $150,000 surely, you asked your lawyer to see if it

10    could be reduced; right?

11           MR. HUNNEFELD:  Judge --

12           THE COURT:  Objection, whether or not he could ask his

13    lawyer if it could be reduced.

14           MR. HUNNEFELD:  Again, it's clearly hearsay.

15           THE COURT:  Wait a minute.  If "he," meaning Mr. Smart,

16    could ask his attorney to have his bond reduced?

17           The answer to that is, if he could, and the yes or no.

18    There's no statement as of yet.

19           THE WITNESS:  Would you repeat the question?

20    BY MR. KLOCK:

21    Q.  Yes.  Did you ask your lawyer whether or not the bond could

22    be reduced from $150,000 to something you could afford?

23           THE COURT:  And that's a yes or no answer, Mr. Smart.

24    A.  Yes, sir.

25    Q.  And did you get an answer from your lawyer?
```

```
 1   A.   Yes, sir.

 2   Q.   And was it your understanding that your lawyer could do

 3   something at that point in time to get your bond reduced?

 4             MR. HUNNEFELD:   Objection, inferential here.

 5             THE COURT:   Ladies and gentlemen, once again, it's not

 6   offered for the truth, but what Mr. Smart understood his

 7   conditions of release could or would be.

 8             You may continue, Mr. Klock.

 9   BY MR. KLOCK:

10   Q.   You can answer.

11   A.   What was the question again?

12   Q.   The question was:   Did you have an understanding as to

13   whether or not you could ask to have your bond reduced at that

14   point?

15   A.   Yes, sir.

16   Q.   And what was your understanding based on the conversations

17   you had?

18   A.   My understanding was that to have a bond mitigated or

19   reduced there would have to be new circumstances in the case,

20   other than what originally got you the bond.

21   Q.   Okay.   And is it your understanding that the $75,000 for

22   each murder was a standard bond in Dade County?

23             MR. HUNNEFELD:   Objection, Your Honor.

24             THE COURT:   Sustained.

25   BY MR. KLOCK:
```

```
 1    Q.   Do you have any understanding of what standard bonds were

 2    in Dade County for --

 3               THE COURT:   He may talk about as to him, but not what

 4    the standards are as to any other individual, Mr. Klock.

 5               MR. KLOCK:   I'm referring to the schedule, Judge,

 6    not --

 7               THE COURT:   He's not an attorney, I don't know if you

 8    know that.

 9               MR. KLOCK:   Okay.

10    BY MR. KLOCK:

11    Q.   You're not an attorney?

12    A.   No, sir.

13    Q.   Okay.  Did you have any other understanding as to what the

14    bond would be normally if you're able to to be bonded for

15    murder?

16    A.   No, sir.

17               MR. HUNNEFELD:   Objection.

18               MR. KLOCK:   Okay.  Okay.

19    BY MR. KLOCK:

20    Q.   Now, when you came back from the Arthur hearing, things

21    were better; right?

22    A.   No, sir.

23    Q.   Why?

24    A.   Because it was this -- nothing changed, the $150,000 was as

25    good as no bond for me in my situation.
```

1    Q.   Okay.  So now, this is April of 2010, these boys were

2    killed in November of 2009.  What's the next thing

3    significantly that happens in your case?

4    A.   Was January of 2011.

5    Q.   What happened in January of 2011?

6    A.   A young man came into the cell --

7            MR. HUNNEFELD:  Objection, Your Honor.

8            THE COURT:  He can say that a young man came into.

9    Let's go one step at a time.  Okay.  Let's start with the young

10   man coming into the cell.

11           THE WITNESS:  A young man came into the cell, and

12   approached me one -- his first day in the cell, and at which

13   time he started asking me questions like about my case and like

14   probing me for information.

15           But I was apprehensive about his extensive knowledge of

16   what was going on, so at that time, I didn't -- I separated

17   myself from him, like, I didn't want to speak to him anymore.

18   Q.   Okay.  Then what next happened?

19   A.   Over the course of, maybe, two to three weeks, we was -- we

20   coexisted in a cell together without incident.

21           Up until one night, particularly.

22   Q.   What happened then?

23   A.   The gentleman who came into the cell got into an argument

24   with another gentleman who was in the cell, and they had, like,

25   exchange of words, at which time a fight broke out.

1    Q.   Okay.  And?

2    A.   And during the course of that fight, like, after the fight

3    was over, I walked up to another inmate to tell him sorry for

4    all the commotion that was going on during the fight, because

5    he got hit with all of them trying to break it up, all the

6    fighting going on.

7        And when I approached him, a third inmate approached him

8    and said, "When did you tell him?  Did you tell him already?"

9    Q.   Tell him what?

10            MR. HUNNEFELD:  Objection, Your Honor.

11            THE COURT:  Counsel, would you approach?

12            (Sidebar discussion held as follows:)

13            THE COURT:  You got to wait for the City.

14            He's going to say what, Mr. Klock?

15            MR. KLOCK:  He's going to say he was approached by

16   someone who told that the other person had told him he didn't

17   kill two people.

18            THE COURT:  I hope you don't play poker.

19            MR. HUNNEFELD:  I show my cards.

20            THE COURT:  Exactly.  Exactly.

21            MR. HUNNEFELD:  Bad card player.

22            MR. KLOCK:  Judge, here's the point.  I love him.  His

23   objections help me with the jury.

24            THE COURT:  Here he's going to say somebody told him

25   that somebody told him that something else happened.

```
 1              MR. KLOCK:  Wait.  Let's pause for a second.  The night

 2  of the murder and afterwards there were all sorts of somebody

 3  tells somebody tells someone.

 4              THE COURT:  And he's testified to that, and I've

 5  allowed it based upon how he felt.

 6              MR. KLOCK:  But, Judge, different point.  Different

 7  point.

 8              THE COURT:  Okay.

 9              MR. KLOCK:  We're talking about an investigation.  The

10  police --

11              THE COURT:  No.  I'm talking about the cell, the young

12  man that he's talking to in the cell.  Let's talk about that

13  and why that should be admissible.

14              MR. KLOCK:  The information that he came up with he

15  relayed to his attorney; his attorney relayed that information

16  to the State.

17              THE COURT:  Now, if you want to say you had a

18  conversation with that inmate and what did you do; I had a

19  conversation with my attorney.

20              MR. KLOCK:  And told her --

21              THE COURT:  No, not "tell her" anything.

22              What happened after you had the conversation with the

23  attorney?

24              MR. KLOCK:  Okay.  I got it.

25              THE COURT:  Sanchez came and got me.
```

1        But you can't keep talking about -- 'cause that is way

2    downstream hearsay.  At least the other hearsay there are

3    people close in time, they're people around him.

4        I don't even know when this other inmate -- I mean, I

5    know the streets talk; but as of yet we cannot cross-examine

6    them, which is the basis for of the hearsay rule.

7        MR. HUNNEFELD:  Thank you, Your Honor.

8        MR. KLOCK:  If somebody admits to a crime.  My

9    understanding is that that falls under a special category

10   because --

11       THE COURT:  If you're saying that this falls into the

12   beyond-the-penal interest category, penal -- are you saying, is

13   this person going to admit to the crime?

14       MR. KLOCK:  He did to someone else, surely.

15       MR. HUNNEFELD:  No.

16       THE COURT:  See, remember -- the inmate he's talking

17   to, remember, you got to have an exception on both levels.

18       MR. KLOCK:  Right.

19       THE COURT:  You got the first exception.  So I tell

20   Mr. Hunnefeld, listen, I'm letting you know --

21       MR. KLOCK:  I do.

22       THE COURT:  -- I killed Jimmy Hoffa.  I know people on

23   that side of the room -- there's only three of you here who

24   know who Jimmy Hoffa was -- I killed Jimmy Hoffa.

25       MR. HUNNEFELD:  Right.

```
 1              THE COURT:  He can now come in, testify Marcia Cooke
 2    told me she killed Jimmy Hoffa.
 3              If he tells me he killed three people and that fourth
 4    person wants to come in and say Marcia Cooke said she killed
 5    Jimmy Hoffa, they're -- you're beyond the exception of the
 6    rule.
 7              MR. KLOCK:  Except, Judge, the exception for the State
 8    Attorney or --
 9              THE COURT:  I said that you can ask based upon this
10    conversation.  You had a conversation with your lawyer, and
11    then what happened?
12              Sanchez comes to pick me up, and I go and we do stuff;
13    that he can say.
14              But the idea that this other inmate, somebody told him
15    that somebody told him, no.
16              MR. HUNNEFELD:  I understand.
17              MR. KLOCK:  Hold on one second.
18              MR. HUNNEFELD:  He doesn't blurt it out.
19              THE COURT:  He's not the lawyer.
20              MR. KLOCK:  Judge, we have the deposition of the guy
21    who has confessed to it, who he says is dead.
22              THE COURT:  Well, then you can try to use that under
23    the rules of which you would have somebody read the deposition.
24    You may be able to do that.
25              MR. KLOCK:  Okay.
```

```
 1              THE COURT:  But I've been very flexible by this
 2     witness.  But right now, we are way beyond.
 3              MR. KLOCK:  Got it.
 4              THE COURT:  And you can tell him right now, when we go
 5     back, Mr. Smart, the Judge has ruled you can't talk about the
 6     conversation you had with whoever, Jimmy, John; but please tell
 7     me as a result of that result of that conversation what
 8     happened.
 9              MR. KLOCK:  Okay.  Thanks, Judge.
10              (Sidebar discussion concluded and the following
11     proceedings were held in open court:)
12              THE COURT:  For the record, Mr. Hunnefeld, your
13     objection is sustained.
14     BY MR. KLOCK:
15     Q.  Taiwan, you cannot testify as to what the conversations
16     between inmates in the cell and you were, do you understand,
17     you can testify what you said, but not what they said; got it?
18     A.  Yes, sir.
19     Q.  As a result of the conversation that you had with this
20     young man, what did you do?
21     A.  Called my lawyer.
22     Q.  Did you do anything else before you called your lawyer?
23     A.  I got in a fight.
24     Q.  With who?
25     A.  With --
```

1    Q.   One of the inmates?

2    A.   Yes, sir.

3    Q.   Okay, fine.  So you got in a fight with one of the inmates,

4    what happened to that inmate?

5    A.   He got moved to another cell.  They separated us.

6    Q.   Why was that?

7    A.   Because he got into a fight.

8              MR. HUNNEFELD:  (Gesturing.)

9              THE COURT:  Objection is sustained.  Move on,

10   Mr. Klock.

11   BY MR. KLOCK:

12   Q.   So then you call your lawyer.

13        As a result of your conversation with your lawyer, what

14   happened next?

15   A.   I was given a polygraph.

16   Q.   Why?

17             MR. HUNNEFELD:  Objection, Your Honor.

18             THE COURT:  Sustained.

19   BY MR. KLOCK:

20   Q.   You have a conversation with your lawyer.

21        Did anything happen before you got the polygraph?

22   A.   Yes, she came out to see me.

23   Q.   Okay.  Was anything else done with anyone else in the cell

24   that you know of?

25   A.   Yes, sir.

```
 1   Q.   What happened with the other people in the cell?

 2   A.   They deposed several of the inmates in my cell.

 3             MR. HUNNEFELD:  Objection, Your Honor.

 4             MR. KLOCK:  So he can observe, Judge.

 5             MR. HUNNEFELD:  Can we take this --

 6             THE COURT:  Mr. Smart, how do you know they deposed the

 7   other people in the cell?

 8             THE WITNESS:  I witnessed them get into, like, going to

 9   be deposed and coming back.

10             THE COURT:  Mr. Hunnefeld, at this time, your objection

11   is sustained.

12   BY MR. KLOCK:

13   Q.   Okay.  Mr. Smart, so after this activity occurs in the

14   cell, who tells you that you're supposed to have a polygraph

15   test?

16   A.   My defense attorney at the time.

17   Q.   Okay.  And how did you -- without identifying who took you,

18   how did you get to the polygraph location?

19   A.   I was transported by a police officer.

20   Q.   Okay, fine.  And where were you taken?

21   A.   To the -- I meant to the Doral Police Station.

22   Q.   So that's not the City of Miami; that's Metro-Dade,

23   correct, their headquarters?

24   A.   Yes, sir.

25   Q.   Okay, fine.  And you took the polygraph test there;
```

```
 1    correct?
 2    A.   Yes, sir.
 3         MR. HUNNEFELD:   Objection to this whole line of
 4    questions.  I just don't want to jump up every time.
 5         THE COURT:   As previously noted, objection overruled.
 6         MR. HUNNEFELD:   I remember Your Honor's rulings.
 7         THE COURT:   I know, but he just wants to make sure for
 8    the record his objection is contemporaneous with the testimony.
 9         MR. KLOCK:   No problem, Your Honor.
10    BY MR. KLOCK:
11    Q.   And after -- what date did you take the polygraph test?
12    A.   June 6th, 2011.
13    Q.   And what happened next, as far as your charges were
14    concerned?
15    A.   They were nolle-prossed.
16    Q.   Did anyone tell you -- did the judge tell you whether they
17    were nolle-prossed?
18         MR. HUNNEFELD:   Objection, Your Honor.
19         THE COURT:   Sustained.
20    BY MR. KLOCK:
21    Q.   So your charges were nolle-prossed, you leave jail that
22    day; correct?
23    A.   Yes, sir.
24    Q.   Now, from the time you left jail, okay, to the present,
25    everything's fine now, right?  I mean, you no longer have to
```

1   think about spending the rest of your life in jail everyday;

2   right, you're out.  So what's the beef?

3           MR. HUNNEFELD:  Object to the form of that question.

4           THE COURT:  Overruled.

5   A.  Now I have to think about spending the rest of my life in

6   the streets.

7   BY MR. KLOCK:

8   Q.  Well, what do you mean?

9   A.  Before this incident, if you ever had to be careful walking

10  to a gas station or a store for fear of being hurt, you have to

11  go through something like that to understand where I'm coming

12  from.

13  Q.  Well have you changed your pattern of life at all as a

14  result of this?

15  A.  Very much so.

16  Q.  How?

17  A.  I don't really socialize with anyone, because -- for fear

18  of criticism or not wanting to re-live that day.  Every time I

19  think about it, it makes me like internally very, very, very

20  upset and sad.

21  Q.  Well, do you go to clubs?

22  A.  That's dangerous places to be at.

23  Q.  Do you go to clubs?

24  A.  No, sir.

25  Q.  How about, do you go to the store?

```
 1   A.   If someone takes me or if I drive to the store, but I
 2   wouldn't walk to any store, no matter how close it is to my
 3   house.
 4   Q.   Any other differences of what you do and not do?
 5   A.   I boarded up the windows in my room.
 6   Q.   In what room?
 7   A.   At my mom's house.
 8   Q.   In your bedroom?
 9   A.   Yes, sir.
10   Q.   Why are your windows boarded up?
11   A.   I can't be around an open window or window with a curtain
12   open, it makes me nervous, like, it makes me panic.
13   Q.   So any place you sleep you board up the windows?
14   A.   If I can't board it up, I won't sleep in that room, or I'll
15   cover it with a sheet or something.
16   Q.   And you're saying if you walk into any other room in like a
17   home or something like that, that if the window's open, you'll
18   close the window?
19   A.   Yes.
20        MR. HUNNEFELD:  Objection, Your Honor.  This isn't
21   relevant to our claim.
22        THE COURT:  Objection, overruled.
23   BY MR. KLOCK:
24   Q.   Well, did you feel that way about boarding up windows and
25   pulling curtains down before you were charged with murder?
```

1    A.   No, sir.

2    Q.   Okay.  Now, I forgot to ask you one or two questions about

3    the cell.  Have you ever heard the expression "Nobody comes

4    home from here?"

5    A.   Yes, sir.

6    Q.   Where did you hear that expression?

7    A.   In jail.

8    Q.   Where?

9    A.   At the stockade.

10   Q.   Where in the stockade?

11   A.   In cell B2.

12   Q.   And cell B2 is where you were in?

13   A.   Yes, sir.

14   Q.   And that cell is reserved for?

15   A.   Like -- I think it was a maximum cell at the time, I'm not

16   sure, high custody level.

17   Q.   Okay.  And were you in the cell when people would come back

18   from court?

19   A.   Yes, sir.

20   Q.   What kinds of sentences did you hear people getting?

21   A.   If you got a sentence of anything over like a high amount

22   of years, they didn't bring you back, you went to the Pretrial

23   Detention Center.

24   Q.   So what was the maximum number of years somebody would come

25   back?

1          MR. HUNNEFELD:  Objection, Your Honor, relevance.

2          THE COURT:  Overruled.

3    A.  35, 40.

4    Q.  So 35 or 40 years they come back to the cell; but if they

5    got a sentence longer than that, they went to the Pretrial

6    Detention Center?

7    A.  Yes, sir.

8    Q.  Do you know why?

9    A.  I guess for safety issues.

10          MR. HUNNEFELD:  Objection.

11          THE COURT:  Objection sustained, speculation.  The

12   jury's to disregard.

13          MR. KLOCK:  Okay.

14   BY MR. KLOCK:

15   Q.  Now, let me ask you this question, if I can.

16          How about your relationship with your son, any changes?

17   A.  Well, we on good terms, we okay with each other, but it's

18   pretty hard to explain to an eight-year-old that what he's

19   seeing on TV does not accurately describe what happened.

20   Q.  What do you mean?

21   A.  When asked what was I in jail for, he was saying my dad was

22   in jail for killing people, he would say that to random people

23   because he saw the First 48 episode.

24   Q.  How about friends you had before you went in jail, do you

25   still have those friends?

```
 1   A.   I don't have any friends aside from, like, two people who I
 2   associate with now.
 3   Q.   And who are they?
 4   A.   One of them is a long-time friend of me and Jonathan
 5   Volce's -- his name is Pierre -- and my girlfriend.
 6   Q.   Otherwise you don't associate with anybody that you knew
 7   from before?
 8   A.   No, sir.
 9   Q.   Do you go out of your home at night?
10   A.   Not after a certain time.
11   Q.   Okay.  Now, you indicated that people would make comments
12   to you on the street and that kind of thing?
13   A.   Yes, sir.
14        MR. HUNNEFELD:  Objection.
15        MR. BASCO:  I'm sorry, Judge, if we're going to address
16   the exhibit next, I would like to go sidebar before we do that.
17        THE COURT:  Exhibit --
18        MR. BASCO:  Yes, Judge, I've been handed an exhibit.
19   If there's a question about the exhibit, we need to go to
20   sidebar first.
21        THE COURT:  All right.  Let's see what it is.
22        Excuse me, ladies and gentlemen.
23        (Sidebar discussion held as follows:)
24        THE COURT:  May I steal your copy?
25        MR. BASCO:  Exhibit page 249.  It's a Facebook
```

```
 1   administration apparently from account of Mr. Smart sent to him
 2   from Latoya --
 3           THE COURT:  Latoya Nixon.
 4           MR. BASCO:  I want Your Honor to read it first and then
 5   we'll discuss it.
 6           MR. KLOCK:  The last page is the full printout, Judge.
 7           MR. BASCO:  Bits and pieces copied over it, but the
 8   last page is the totality of it.
 9           THE COURT:  I'm assuming your client is Yves Saint
10   Laurent?
11           MR. BASCO:  Judge --
12           MR. KLOCK:  Yes.
13           THE COURT:  -- I wanted to make sure that Latoya had a
14   relationship with Yves Saint.
15           MR. BASCO:  Judge, we have, in this situation, is what
16   they're introducing this for is show the effect of what the
17   arrest and incarceration had upon him.  That's the exact line
18   we have.
19           MR. KLOCK:  Right.
20           MR. BASCO:  However, this is different.  What was not
21   addressed and vehemently addressed to Mr. Smart and First 48,
22   which the story for the first time --
23           MR. KLOCK:  We stipulate, Your Honor.
24           MR. BASCO:  Let me finish my argument.
25           THE COURT:  You argue with them, and they don't let him
```

1    finish.

2           MR. BASCO:  What's in the "First 48" is an

3    identification that someone else is involved in the shooting;

4    that's the first that was mentioned, not addressing his

5    incarceration, is addressing snitching on somebody.

6           THE COURT:  Well, let me ask this question.  Come on,

7    you're the state prosecutor, you know this better than I do.

8           MR. BASCO:  That's true.

9           THE COURT:  Once again, the streets talk and that is

10   people just don't get out of jail to get out of jail.  You get

11   out of jail because you usually did something, and the thing

12   that you usually do means that you talked on somebody else.

13          MR. BASCO:  And that's a huge --

14          THE COURT:  Because we're --

15          MR. BASCO:  That's huge at this particular --

16          THE COURT:  -- I shouldn't say that because of our

17   cultural competence that is a difference reference than we

18   have.  You or I know that there are many reasons that people

19   get out of jail.  They get nolle-prossed, they get found

20   innocent.  There's a whole boat load of reasons.

21          She's saying:  The streets are saying you're a snitch.

22          MR. HUNNEFELD:  Your Honor, I can make this much

23   simpler.  In addition to that, this is a printout from his web

24   page.  I could have sent it to myself.  He could have sent it

25   to himself; just bothering somebody else's to make it.

```
 1              THE COURT:  It sounds like a very effective

 2    cross-examination.

 3              MR. HUNNEFELD:  But authentication is key.

 4              THE COURT:  No.  He's going to at least authenticate

 5    that he is known on the internet as "Yves Saint Laurent" and

 6    this is his communication.

 7              MR. HUNNEFELD:  So he gets to introduce a statement

 8    that appears to say bad things to him so he feels bad, but

 9    there's no -- usually, you have to bring someone from a web

10    provider in order to ensure that that was --

11              THE COURT:  How is it different than a letter?

12              MR. NAPOLEON:  Or an e-mail?

13              THE COURT:  I mean, if I send a letter to you and for

14    some reason I only have the copy in my file, you don't have

15    yours, you don't bring yours, you don't produce yours in

16    discovery, but I still have my copy, am I not allowed under the

17    rules of evidence to introduce mine and say, this is the letter

18    I sent Mr. Hunnefeld?

19              MR. HUNNEFELD:  Again, it goes to authentication.

20              THE COURT:  Yes or no?

21              MR. HUNNEFELD:  A letter from --

22              THE COURT:  My letter -- I have my letter.  It says at

23    the top "Marcia Cooke," blah, blah, blah.  They have what I've

24    sent to Mr. Hunnefeld.

25              MR. HUNNEFELD:  Then what would be -- that letter --
```

1          THE COURT:  Wait, wait, wait.  I would say this is the

2    letter I sent to Mr. Hunnefeld; right?  We're just getting a

3    little bit above, beyond the carriage of days of yore.

4          MR. HUNNEFELD:  Right.

5          THE COURT:  You would then have an opportunity -- you

6    or your attorney -- to say, well, Ms. Cooke, this is the letter

7    that you say you sent, and you get to have the full-fledged

8    cross-examination.

9          MR. HUNNEFELD:  But this is many steps removed, because

10   this is the intimate; anybody can provide anything.  The

11   authentication requires proper predicate, and this is just a

12   printout from a website.

13         There's one other thing that has to be said, because it

14   will be coming up a lot from this point forward.  Rule 26

15   requires a disclosure of all documents, Your Honor.

16         THE COURT:  And so your objection was you never seen

17   this before?

18         MR. HUNNEFELD:  I never saw it before.  It was listed

19   on their trial witness exhibit list, and so -- okay, we --

20         THE COURT:  So at some point in time, as you know,

21   Rule 26 requires a continuation obligation; I've got something

22   new, hello, other attorney, I've got something new.

23         MR. KLOCK:  We e-mailed this.

24         THE COURT:  You e-mailed this and said, listen, this is

25   something you don't have in discovery, I'm now going to let you

 1   know they did do this in trial.

 2           MR. BASCO:  I think, on Monday.

 3           MR. HUNNEFELD:  17th.

 4           THE COURT:  This is only dated May 18th.

 5           MR. NAPOLEON:  This year, two weeks ago.

 6           MR. HUNNEFELD:  This is something that was asked at

 7   discovery cut-off.  It's in the deposition.

 8           THE COURT:  I know, that's his point, that's his thing

 9   for damages that you can attack the jury; that this is

10   auspicious, he's not damaged at all, he's happy as whatever.

11           His argument is I continually live in fear.  That's his

12   argument.

13           MR. HUNNEFELD:  Couldn't find anything that was sent to

14   him during the discovery period, so I could go ask him about it

15   so he would produce to me.

16           THE COURT:  I guess if everything in life was

17   convenient.

18           MR. HUNNEFELD:  This is just litigation needs to be

19   fair.

20           THE COURT:  So you're going to say, I assume, nothing;

21   that you're a skilled examiner, that, you know, you've had this

22   suit for how long, you've been talking about this for how long?

23           And this just two weeks ago that you and Latoya started

24   having this conversation?

25           MR. HUNNEFELD:  If I have to, Your Honor, I will.

```
 1             THE COURT:  You'll have to.

 2             MR. HUNNEFELD:  That may not get in, that's the

 3   objection.  It shouldn't be -- Rule 26, disclosure

 4   authentication.

 5             THE COURT:  He said once he had it.

 6             MR. HUNNEFELD:  Still you just can't treat documents

 7   that I don't have a chance to have any discovery about.  I

 8   couldn't go into -- say we got it on Monday; Monday of three

 9   days before trial, we're at the beginning of the trial, we

10   don't have it.

11             THE COURT:  What if Latoya sent him a letter -- would

12   that be any different? -- I went to my mailbox and this was

13   there.

14             MR. HUNNEFELD:  This incident --

15             THE COURT:  What if he went to his mailbox --

16             MR. HUNNEFELD:  I think it would --

17             THE COURT:  -- on May 18th and this letter was there?

18             MR. HUNNEFELD:  I'd say if the incident occurred in

19   November of 2009, when he got out of jail in 2011 and he

20   doesn't have any.

21             THE COURT:  On his mailbox on May 18th, and somebody

22   says to him in his mailbox, there's a note that says,

23   basically, you're a snitch, we know where you live, we know

24   where your son lives, that's in his mailbox, and it's signed

25   Latoya; that would not be admissible?
```

1          I went to my mailbox and this was here.

2          MR. HUNNEFELD:  Your Honor, Rule 26.

3          THE COURT:  No, that's not what I'm asking you.

4          And once he did, he gets it from his mailbox.

5          MR. HUNNEFELD:  Disclosure.

6          THE COURT:  Wait.  He gets it in his mailbox.  He

7   says -- he calls, you know, Mr. Klock:  I just want you to

8   know, I went to the mailbox today and guess what's in my

9   mailbox.

10          And Mr. Napoleon, his partner:  Hello, Mr. Hunnefeld, I

11  just want you to know we're adding something to our list; our

12  client just got this, we're sending you over a copy.  We're

13  faxing you over, courier, we're giving it to you.

14          How is it different?

15          MR. HUNNEFELD:  Because documents need to be vetted by

16  counsel during the discovery process.  When it comes after the

17  discovery process and I don't have an opportunity to challenge

18  its authenticity by going out and doing the investigation of

19  it, getting it on Monday is not a realistic time frame.

20          THE COURT:  He just -- I mean, it's not hidden.

21          MR. HUNNEFELD:  It's gibberish.

22          THE COURT:  Let me tell you what happened.  If I looked

23  at -- and this was from January, I would have said, do you know

24  what, Mr. Hunnefeld, you got a point:

25          Mr. Klock had it, his client had it, and he should have

1    turned it over to Mr. Hunnefeld way before now.

2              MR. BASCO:  Judge -- I'm sorry.

3              THE COURT:  This date says May 18th.

4              MR. HUNNEFELD:  Your Honor, May 18th, when we -- the

5    exhibits were --

6              THE COURT:  So there's no such thing in discovery for

7    newly discovered evidence?

8              MR. HUNNEFELD:  Would I be allowed to take a deposition

9    regarding this --

10             THE COURT:  Who do you want to take -- of him?

11             MR. HUNNEFELD:  -- or bring the person to trial?

12             THE COURT:  I'm going to allow it in.  We're going to

13   stop his testimony and you have all weekend to look for Latoya;

14   then what do you want?

15             MR. HUNNEFELD:  I would hire somebody to track it down

16   to see if there's any link to from -- between Latoya and him.

17   First of all, what website did it come from?  I have no idea.

18             THE COURT:  This says "Facebook."

19             MR. HUNNEFELD:  So what was the source -- no, I don't

20   mean that.  I'm sorry.  It seems ridiculous, but I didn't mean

21   where did he get it from.

22             What was the Facebook sender?  I would do some research

23   on the Facebook sender, Latoya.

24             THE COURT:  You want to do research on Latoya?

25             MR. HUNNEFELD:  On the weekend in the middle of trial.

```
 1          THE COURT:  When did you let him know?

 2          MR. KLOCK:  The fact of the matter is, Judge, we would

 3   love to have him do that, if he could spend city money and city

 4   connections to find out where that came from, for the police,

 5   we would be delighted.  He is frightened.

 6          THE COURT:  Once again, I believe it goes to weight,

 7   not admissibility, and I'm going to allow it in.  Counsel how

 8   much longer?  You're not going to finish with him today; are

 9   you?

10          MR. KLOCK:  Yeah, I'm almost done.

11          THE COURT:  We will go until finished and break and

12   start cross with him on Monday morning.  Okay?

13          MR. KLOCK:  All right.

14          THE COURT:  Here is Exhibit Number 249.

15          MR. KLOCK:  Thank you.

16          (Sidebar discussion concluded and the following

17   proceedings were held in open court:)

18          THE COURT:  Counsel, Exhibit 249 is received.

19          MR. KLOCK:  Thank you, Your Honor.

20          THE COURT:  Monitors are on.

21          (Plaintiff's Exhibit 249 received into evidence.)

22          MR. KLOCK:  Your Honor, may we publish the exhibit?

23          THE COURT:  You may.

24   BY MR. KLOCK:

25   Q.   This is Plaintiff's 249.
```

```
 1        And, Taiwan, have you seen this before?
 2   A.   Yes, sir.
 3   Q.   As opposed to either being Latoya or Yves Saint Laurent,
 4   which one are you?
 5   A.   Yves Saint Laurent.
 6   Q.   And when did this thing appear?
 7   A.   A few -- like a week ago or so, two.
 8   Q.   Okay.  And is there anything about it that was disturbing
 9   to you?
10   A.   Several things about it was disturbing to me.
11   Q.   Okay.  Could you tell the jury what's disturbing to you
12   about it?
13   A.   The fact that I don't know who this person is, and that in
14   the messages they're calling me a snitch, saying I'm a snitch,
15   I'm going to die, I'm a rat, and that they're going to kill me
16   and my son, and they know where my son live.
17   Q.   And where is that about your son on this document?
18   A.   It's on the bottom.
19   Q.   It's probably page three.
20        MR. HUNNEFELD:  Your Honor, clearly, I have a
21   continuing line of objections.  I didn't want to interrupt the
22   flow, but then I also don't want to waive all my objections to
23   all those objections related to those.
24        THE COURT:  Your objection is noted for the record.
25        Counsel, you may proceed.
```

```
 1    BY MR. KLOCK:

 2    Q.   So going to page three, what on that page is disturbing to

 3    you?

 4    A.   It says, "duh, that's why you're going to be gone soon."

 5         And then it says, "I know where your son stay."

 6         And then, it says, "I know exactly where you stay, too."

 7    Q.   And when you got this, what did you do with it?

 8    A.   I immediately showed it to you.

 9    Q.   Okay.  And did you attempt to report it to the police?

10    A.   Yes, sir.

11    Q.   And you're in the process of getting that done?

12    A.   Yes, sir.  They said that you have to --

13         MR. HUNNEFELD:  Objection, Your Honor, hearsay,

14    out-of-court statements regarding this document.  That was a

15    week, a few days ago.

16         MR. KLOCK:  That's fine, Judge, I don't care.

17         THE COURT:  Okay.  I'm going to sustain the objection.

18         MR. KLOCK:  Okay.

19    BY MR. KLOCK:

20    Q.   Have you done anything as a result of getting this

21    document?

22    A.   As far as going to the police?

23    Q.   No, as far as your personal safety or personal life, your

24    son?

25    A.   I'm trying to move from the house I'm staying in now
```

 1   because, obviously, somebody knows I live there.

 2   Q.   Okay.

 3   A.   My mom and my sister is there, too.  But I don't go outside

 4   at night, and I'm always cautious before I leave my house,

 5   always look out the front door, the window, always check my

 6   surroundings before I leave my residence any time.

 7        MR. KLOCK:  Okay.  One second, please.

 8        (Brief pause.)

 9        MR. KLOCK:  Thank you, Your Honor.  That's it, ma'am.

10        THE COURT:  Do you have any further questions of this

11   witness?

12        MR. KLOCK:  Not on behalf of the plaintiff at this

13   time, Your Honor.

14        THE COURT:  All right.  Ladies and gentlemen, I

15   anticipate the cross-examination of Mr. Smart would go past

16   5:00 p.m., so I'm going to release you at this time and allow

17   the City to come back in fresh and rested on Monday morning,

18   at least all of us will be.

19        All right.  Here are your watch words for the weekend.

20        South Florida, be around the dinner table and people

21   are going to start to talk to you about what are you doing in

22   Federal Court all week.  Other than saying that you have jury

23   duty, you do not have my permission to discuss this case.

24        And when I say discuss it, I don't just mean your

25   friends and family, I mean all those good things that we know

1    as "social media":  Facebook, twitter, Tumbler, SnapChat,

2    Instagram and -- like I said yesterday -- things that some

3    12-year-old genius is in their basement in Silicon Valley right

4    now as we speak -- you cannot use those to communicate anything

5    about this case.

6         I'm going to ask once again that you be in the jury

7    room at 9:15 Monday morning.  You all have been great about

8    being on time, and I'm trying to see if we can keep a better

9    job of doing this on Monday.  On behalf of both sides, thank

10   you very much for your appearance.  I will see you again on

11   Monday morning.

12         All rise for ladies and gentlemen of the jury.

13         COURT SECURITY OFFICER:  All rise.

14         THE COURT:  You can leave your notebooks.  No one else

15   is going to come in the court.  If you want to put it on your

16   chair, it's fine, just make sure you take your own personal

17   belongings with you.

18         (Jury exited courtroom at 4:22 p.m.)

19         THE COURT:  Thank you, Mr. Smart.  You're excused for

20   this afternoon.  You can step outside.  I have something I need

21   to talk to the lawyers about.

22         MR. HUNNEFELD:  And, Your Honor, can we just ensure

23   that the witness shouldn't be speaking.

24         THE COURT:  Once again, sir, you cannot discuss the

25   substance of your testimony with anyone until you return on

```
 1   Monday morning.  I just ask that you be outside the courtroom
 2   ready to start around 9:15.
 3              THE WITNESS:  Yes, ma'am.
 4              THE COURT:  Thank you.
 5              (Witness steps down and exited courtroom.)
 6              THE COURT:  Okay.  In preparation for Mr. Smart's
 7   testimony, Mr. Hunnefeld, are you anticipating showing him any
 8   of the crime scene photos, including the bodies or any of the
 9   autopsy photos or anything of that nature?
10              MR. HUNNEFELD:  Your Honor, I hadn't intended to, no,
11   that is not my plan, and I can't see how it can come up.
12              THE COURT:  All right.  I can hold off on whether or
13   not that's relevant to another witness at another time.  I just
14   wanted to see if they were going to be used with this witness.
15              MR. HUNNEFELD:  But, Your Honor, I think it would be
16   more likely that I would use them through Detective Fabio
17   Sanchez when we go through the crime scene and show the
18   placement of the bodies, and so forth, and the trajectories, if
19   not --
20              THE COURT:  It may well be relevant during
21   Detective Sanchez's testimony.
22              MR. HUNNEFELD:  I had not anticipated doing that with
23   Mr. Smart.  But, you know, you never can say never.
24              THE COURT:  Well, would you think about it for sure and
25   let me know first thing Monday morning?
```

1          MR. HUNNEFELD:  Absolutely.

2          THE COURT:  As it stands right now, I don't see why

3    that would be relevant.

4          One, he has at least testified here in court that he

5    was not in the apartment when the individuals were shot.  I

6    know the police department has a different theory, but he said

7    I don't know anything about what the apartment looked like

8    after I left that night, so...

9          MR. HUNNEFELD:  We're talking exclusively about the

10   bodies themselves; right, if that's the question?

11         THE COURT:  Well, I mean, if you want to show a window,

12   how did a window look.

13         MR. HUNNEFELD:  Right, exactly.

14         THE COURT:  Because he says, you know, the gun, the

15   first part came through a window and things happened related to

16   the window; there's the back door that he says he went out of

17   the back door, he undid the latch.

18         Those would be appropriate photographs for him on

19   cross-examination.

20         I'm talking specifically about the bodies, the layout

21   of the bodies.  If we get to Sanchez, that may be another

22   discussion but for him.  That's where we are.

23         MR. KLOCK:  And, Judge, what I was going to say is that

24   we have been very careful in the office to keep all that stuff

25   away from him.  But one thing we did with a couple of photos

1    because we needed to have information was to basically put

2    paper over where the bodies were and then photocopy the

3    pictures.

4           THE COURT:  Well, we don't need to do it today, he says

5    he's not showing them except for general crime scene layout,

6    the window, the door, the front door, the back door.

7           MR. KLOCK:  And, Judge, the other point that I raised

8    before, and I think it needs to be dealt with.  I mean, there

9    was a shooting.  There was a relatively long period of time, as

10   the neighbors apparently were taking an inventory of the

11   premises before anyone else arrived.

12          Then the paramedics arrived.  There's no way of knowing

13   if the bodies are in the same location they were when they were

14   shot.

15          THE COURT:  I understand that, and as I've been telling

16   your opposing counsel, that may well be your cross-examination

17   when you get to Sanchez.  All right.

18          MR. KLOCK:  Okay.

19          THE COURT:  All right.  Everyone, there will be no one

20   in the courtroom over the weekend, anything that you don't --

21   at least I don't think we'll be doing any weekend court -- if

22   there's anything that you need, take it with you now, if not

23   you're free to leave it on the table until Monday morning.

24          MR. KLOCK:  Thank you, Judge.

25          MR. HUNNEFELD:  Thank you, Your Honor.

1     (Proceedings adjourned at 4:28 p.m.)

2     (Continued in Volume 3.)

3

4                 C E R T I F I C A T E

5

6      I hereby certify that the foregoing is an

7    accurate transcription of the proceedings in the

8    above-entitled matter.

9    August 7th, 2015     /s/Glenda M. Powers
     DATE                 GLENDA M. POWERS, RPR, CRR, FPR
10                        Official Federal Court Reporter
                          United States District Court
11                        400 North Miami Avenue, 08S33
                          Miami, Florida 33128
12

13

14

15

16

17

18

19

20

21

22

23

24

25