**FILED BY** *HH*

**Aug 21, 2018**

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. MIAMI

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 21, 2018

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  16-16740-EE
Case Style: Taiwan Smart v. City of Miami
District Court Docket No: 1:13-cv-24354-MGC

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

**UNITED STATES COURT OF APPEALS**
**For the Eleventh Circuit**
_____

No. 16-16740
_____

District Court Docket No.
1:13-cv-24354-MGC

TAIWAN SMART,

                                        Plaintiff - Appellee,

versus

CITY OF MIAMI,
An Incorporated Minicipality,

                                        Defendant - Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: June 28, 2018
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16740
_____

D.C. Docket No. 1:13-cv-24354-MGC

TAIWAN SMART,

Plaintiff - Appellee,

versus

CITY OF MIAMI,
An Incorporated Municipality,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 28, 2018)

Before JORDAN and JILL PRYOR, Circuit Judges, and DUFFEY, District Judge.[*]

PER CURIAM:

_____

[*] The Honorable William S. Duffey, Jr., United States District Court for the Northern District of Georgia, sitting by designation.

Taiwan Smart was imprisoned for 19 months following his arrest as a suspect in a double homicide in Miami.  After the charges against him were dismissed and he was released from custody, Mr. Smart sued the City of Miami for false arrest under state law, false imprisonment under state law, and deprivation of his Fourth Amendment rights under 42 U.S.C. § 1983.  The Fourth Amendment claims were based on the nonconsensual filming (in 2009) and broadcast (in 2010) by The First 48 of Mr. Smart's apartment, questioning, arrest, and interrogation. The First 48, a reality television program, had contracted with the City for the filming and broadcast of police investigations and activities.[1]

The district court granted summary judgment for the City on the state law false arrest claim.  The remaining claims went to trial.  At the close of the evidence, the district court granted judgment as a matter of law to Mr. Smart on his § 1983 Fourth Amendment claim based on the filming and broadcast of the murder scene in the apartment. It submitted that claim to the jury only to determine damages. *See* D.E. 101 at 17-18 (jury instructions).

The jury awarded Mr. Smart a total of $860,200 in damages: $403,450 on the state law false imprisonment claim, and $456,750 on the three § 1983 Fourth Amendment claims.  With respect to the § 1983 claim based on the filming and broadcast of the murder scene at the apartment, the jury awarded Mr. Smart

---

[1] The episode in question was entitled "Inside Job."

2

$152,250.  As to the other two § 1983 claims, the jury found that the City violated the Fourth Amendment by allowing The First 48 to film and broadcast Mr. Smart in handcuffs before and after his arrest, and awarded him $152,250.  It also found that the City violated the Fourth Amendment by allowing The First 48 to film and broadcast Mr. Smart's interrogation, and awarded him $152,250.

The City makes three main arguments on appeal.  First, it asserts that the district court erred in denying its renewed motion for judgment as a matter of law on the state law false imprisonment claim because Mr. Smart was held in custody pursuant to a valid judicial order.  Second, it argues that the district court erred in denying its renewed motion for judgment as a matter of law on Mr. Smart's § 1983 claims, and in granting judgment as a matter of law to Mr. Smart on the liability aspect of one of his § 1983 claims, because (a) there was insufficient evidence to show a policy, custom, or practice on the part of the City and (b) the filming by The First 48 did not violate any of Mr. Smart's constitutional rights.  Third, it contends that the district court should have granted its motion for a new trial due to the improper admission of evidence and a closing argument remark by Mr. Smart's counsel.  Based on a review of the record, and with the benefit of oral argument, we affirm in part and reverse in part.[2]

---

[2] We address only the arguments presented by the City on appeal.  As to issues not specifically addressed in this opinion, we affirm without further discussion.

## I

Most of the facts in this case are undisputed, but the inferences to be drawn from them, and the legal implications resulting from them, are hotly contested. We set out the basic facts below, but additional facts and relevant portions of the evidence at trial are detailed later, where appropriate, to explain our analysis of the issues on appeal.

## A

In 2004, The First 48—a popular reality television show based on the premise that homicide detectives need to get leads during the first 48 hours after a murder to have the best chance of solving the case—contracted with the City of Miami to feature the City and its Police Department in its broadcasts. In 2008, the City requested the addition of further terms to the contract. These additional terms specified, in part, that no stagings or reenactments were permitted, and that no film crew could enter upon private property without first obtaining consent from the property owner. Crews from The First 48 often were present at the offices of the homicide division. If they were not around when a call came in about a murder, detectives would call The First 48 so crewmembers could accompany the police to the scene.

By its tenth season in 2013, The First 48 had featured the City in 64 episodes documenting 76 cases handled by the homicide division of its Police Department.

The 2009 Annual Report of the City of Miami Police Department dedicated a page to The First 48, showing a group photo of the Miami homicide detectives who had appeared on the show alongside the film crews imbedded within the Police Department.  The caption accompanying that photo states:  "People have come from around the globe to meet the Miami Police stars of the 'The First 48,' the attention-grabbing series that has put the MPD in the limelight and captivated the television viewing audience."  D.E. 110 at 67.

## B

On November 14, 2009, 14-year-old Raynathan Ray and 18-year-old Jonathan Volcy were murdered during a drug deal in an apartment in Little Haiti, in the City of Miami.  Mr. Smart had lived in that apartment for several months, including at the time of the murders.  Both boys were shot at close range, one in the back of the neck and one in the top of the head.  When police officers arrived at the apartment to investigate the murders, The First 48 was with them and filmed the murder scene without Mr. Smart's consent.  *See, e.g.*, D.E. 105 at 174.

Three days after the murders, Mr. Smart contacted the Miami Police Department.  He said that he was in the apartment when the shootings occurred, but ran away to hide because he feared that he too would be shot.  Mr. Smart later met Detective Fabio Sanchez, a homicide detective with the Police Department, at a convenience store.  Detective Sanchez frisked Mr. Smart and interviewed him.

A cameraman from The First 48 who had accompanied Detective Sanchez filmed the conversation between Mr. Smart and Detective Sanchez.  When Mr. Smart kept turning his head away to avoid being filmed, Detective Sanchez handcuffed Mr. Smart, ostensibly out of fear that he would run.  Then Detective Sanchez put Mr. Smart in the back of his vehicle to await transportation to the police station for further questioning.  Mr. Smart said he was afraid and did not want television cameras to show his face.  He was never asked for his consent to be filmed, and never gave his consent to be filmed.  Detective Sanchez, for his part, did nothing to stop the filming.  The First 48 filmed Mr. Smart being transferred from Detective Sanchez's car to a police cruiser, exiting the cruiser at the police station, entering the police station, riding up the elevator, and walking into an interrogation room.  Mr. Smart again did not consent to being filmed.  *See, e.g.*, D.E. 105 at 75-76; D.E. 107 at 188.

Over a period of 15 hours, Detective Sanchez and his partner interrogated Mr. Smart.  The entire interrogation was recorded.  It is unclear whether the City or The First 48 owned the video equipment which was used to record Mr. Smart's interrogation, but The First 48 obtained the interrogation videotape for use in its program.  Mr. Smart did not consent to being videotaped in the interrogation room or to having the videotape given to The First 48.  *See, e.g.*, D.E. 105 at 75-76.

Mr. Smart was arrested and charged with two counts of second-degree murder, two counts of drug possession, and one count of being a felon in possession of a firearm.  The First 48 again filmed Mr. Smart without his consent as he exited the interrogation room, was taken to the elevator, rode in the elevator, and was put in a police cruiser to be taken to jail.

## C

The following day, November 18, 2009, the state circuit court held a bond hearing for Mr. Smart.  It determined that the face of the arrest form did not demonstrate probable cause for the arrest.  The state circuit court held a probable cause hearing the following day, at which Detective Sanchez testified.  The federal district court later characterized his testimony as "at best, a gross misrepresentation of the facts" because Detective Sanchez "took gross liberties in misconstruing the facts known to him."  D.E. 66 at 12.

For example, Detective Sanchez misconstrued Mr. Smart's explanation of what had happened at the apartment, as well as the statement of Ciara Armbrister, who had been in the apartment before the shooting:

> A. She [Ms. Armbrister] was there prior -- he was prior -- yes, she was aware that he was there prior to the shooting, along with the two victims who are now deceased --  arguing over drugs and money.
>
> Q. So they were arguing? She could hear the argument?
>
> A. Yes, your Honor.

Q. Did anyone else -- was anyone else there besides the three males?

A. Well the defendant placed himself and shortly before the shooting he places somebody else in the apartment, but then that person subsequently leaves. So the defendant himself, only places himself and two deceased victims in the apartment at the time of the shooting.

D.E. 38-8 at 7.  Ms. Armbrister's testimony, however, was that two *other* people had been arguing over drugs and money, and that Mr. Smart was not part of the argument.  And although Mr. Smart said that only he and the two victims were inside the apartment at the time of the shooting, he *also* said that the shooter had been outside the window and had shot through the partially-open window.  Thus, Detective Sanchez did not accurately summarize the actual testimony of Ms. Armbrister and Mr. Smart.

Detective Sanchez also testified that the physical evidence was not consistent with Mr. Smart's version of events:

Q. And then I understand -- I read the A Form on page 2 that said that the physical evidence did not fit whatever it is that Mr. Smart's statement was. What was Mr. Smart's statement?

A. Mr. Smart's statement was that him -- he and the two deceased victims were in the apartment at the time of the shooting. Mr. Smart claims that he went to the window to serve some narcotics to a buyer. The buyer was pushed to the side by the alleged shooter, and the shooter shot through the window, killing both  victims. There's no evidence that the shooting occurred outside. The evidence that we have places the shooter inside the crime scene.

Q. What evidence is that?

8

A. Body placement, along with the casings and the actual window, where he claimed that the shooting happened through, was not shattered in any way. There's a curtain that was hanging over it. There's no evidence -- the absence of evidence was also very, very loud and clear.

*Id.* at 8-9.  But Mr. Smart had said that the window was open and that the shooter shot through the open part of the window, so Detective Sanchez's representation that the scene was inconsistent because of the window not having been shattered was, in the district court's view, another misleading statement to the state circuit court.

At the end of the probable cause hearing, Detective Sanchez reiterated his earlier incorrect description of Ms. Armbrister's testimony:

Q. What did that witness tell you she heard as far as any comments --

A. -- she overheard the defendants, and one of the victims that were in the living room, arguing over some money, over drugs and money. And she says that the defendant, I believe -- I believe it was the defendant, was asking for additional money. One of the deceased was claiming that he wasn't going to give any additional money.

Q. And that's contained -- that statement is contained in the sworn statement that you took?

A. That is correct.

*Id.* at 11.   Based on Detective Sanchez's testimony, the circuit court found probable cause for the two second-degree murder charges and denied Mr. Smart bond on those charges.  The circuit court also set a bond for Mr. Smart on the other charges.

9

Mr. Smart remained in jail for 19 months.  On June 15, 2011, the state *nolle prosed* all of the charges against Mr. Smart and he was released.  In her case closeout memo, the assistant state attorney provided several reasons for the decision to dismiss the charges:  the physical evidence did not completely contradict Mr. Smart's statement; one inmate had confessed to a second inmate about having committed the Ray and Volcy murders; and Mr. Smart was given a polygraph examination on June 6, 2011, which indicated he was truthful when he denied his involvement in the murders.[3]

After the criminal charges against him were dropped, Mr. Smart filed the suit which is the subject of this appeal.

## II

The City of Miami first argues that the district court erred in denying its renewed motion for judgment as a matter of law, *see* Fed. R. Civ. P. 50(a)-(b), on Mr. Smart's state law false imprisonment claim.

## A

In its post-trial Rule 50(b) motion and on appeal, the City argues that, despite Detective Sanchez's misleading testimony at the probable cause hearing, the state law false imprisonment claim fails as a matter of law because Mr. Smart's detention was based on a "valid court order."  Br. of Appellant at 21; D.E. 115 at 6.

---

[3] The results of the polygraph were not presented as evidence at trial.  These background facts come from the district court's order on summary judgment.

As noted above, two days after his arrest, the state circuit court found that probable cause existed to detain Mr. Smart on two counts of second-degree murder.  The City contends that the only issue before us is whether the probable cause hearing on November 19, 2009, was a "valid judicial proceeding, resulting in a facially valid judicial order" allowing the continued detention of Mr. Smart.   *See* Br. of Appellant at 22.  If we find that judicial proceeding facially valid, the City argues, Mr. Smart was not falsely imprisoned under Florida law, and the City is entitled to judgment as a matter of law on that claim.  *See, e.g.*, *Harder v. Edwards*, 174 So. 3d 524, 532 (Fla. 4th DCA 2015) ("The general rule is that arrest and imprisonment, if based upon a facially valid process, cannot be false.").[4]

Mr. Smart responds, and the district court ruled, that the City did not assert this "judicial process" argument in its Rule 50(a) motion at trial.  Because it raised the "judicial process" argument for the first time in its post-trial Rule 50(b) motion, the district court ruled that the argument was therefore waived. We agree with the district court and Mr. Smart.

## B

Federal Rule of Civil Procedure 50(a)(2) provides that a party may move for judgment as a matter of law "before the case is submitted to the jury."  The motion

---

[4] Under federal law, the Fourth Amendment permits a claim for unlawful pretrial detention if the court's probable cause order was based solely on fabricated evidence.  *See Manuel v. City of Joliet*, 137 S. Ct. 911, 918-19 (2017).

"must specify the judgment sought and the law and facts that entitle the movant to the judgment." If the district court does not grant the motion, the movant may file a "renewed motion" under Rule 50(b) after trial.

In a Rule 50(b) motion, "a party cannot assert grounds . . . that it did not raise in the earlier motion." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1245 (11th Cir. 2001). *See also* Fed. R. Civ. P. 50, advisory committee note to 2006 amendment ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion. The earlier motion informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available."). Stated differently, "any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury." *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 813 (11th Cir. 2015).

This requirement is intended to "avoid making a trap" and to prevent opposing counsel from being "ambushed" or "sandbagged" regarding the sufficiency of the evidence when it is too late to correct the problem. *See Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004). We traditionally accept arguments in a Rule 50(b) motion that are "closely related" to those made in

a Rule 50(a) motion, because "setting aside a jury's verdict is no surprise to the non-movant" in that context. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1261 (11th Cir. 2016).

The City's post-trial Rule 50(b) motion focused on false imprisonment being "detention without color of legal authority," which occurs "when there is an improper restraint which is not the result of a judicial proceeding." *See Card v. Miami-Dade Cnty.*, 147 F. Supp. 2d 1334, 1347 (S.D. Fla. 2001). To support its Rule 50(b) motion, the City argued that Mr. Smart's false imprisonment claim failed as a matter of law because "false imprisonment ends once the victim becomes held *pursuant to [legal] process*—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace v. Kato*, 549 U.S. 384, 389 (2007). According to the City, Mr. Smart's false imprisonment ended when the circuit court found probable cause to detain him on two counts of second-degree murder. From that point on, Mr. Smart's continued detention "was pursuant to the court's order, not the initial determination of probable cause to arrest by the officers." D.E. 115 at 7. And because the probable cause hearing resulted in a "facially valid judicial order," it did not matter whether Detective Sanchez had testified untruthfully during that hearing. *Id. See also Jackson v. Navarro*, 665 So. 2d 340, 342 (Fla. 4th DCA 1995) (holding that imprisonment under regular process and issued by lawful authority is not false, even if it was maliciously instituted).

13

Mr. Smart's recourse, said the City in its Rule 50(b) motion, would be a claim against Detective Sanchez individually for malicious prosecution.

The City made its Rule 50(a) motion orally, after the close of the evidence. The City argued at the Rule 50(a) hearing that "it is clear that probable cause never dissipated throughout this *entire* process." D.E. 110 at 238 (emphasis added). In support of its position, the City's counsel read into the record portions of the sworn statement from the state attorney's information against Mr. Smart, which was filed on December 9, 2009:

> 'Personally known to me and appearing before me the State -- Assistant State Attorney of the 11th Judicial Circuit of Florida whose signature appears below, being first duly sworn, says that the allegations set forth in this information are based upon facts which have been sworn to as true by a material witness or witnesses; and which, if true, would constitute the offenses therein charged. *And that this prosecution is instituted in good faith this 9th day of December, 2009,' long after the bond -- the probable cause hearing, long after the arrest. And from that point forward*, this is a court case with a person in county custody under the supervision of the Department of Corrections, with the State Attorney being able to take positions, but the Police Department not.

*Id.* at 245 (emphasis added). The City's counsel summarized: "I stand on the fact that probable cause existed *at the time of the arrest* for multiple offenses. *Probable cause never dissipated throughout the entire course of the litigation* on all of those offenses." *Id.* at 247 (emphasis added). Then he immediately repeated: "Probable cause never dissipated in this case. We had it from the beginning, from the time of the arrest, and never dissipated." *Id.* at 247.

14

This Rule 50(a) argument clearly focused on probable cause "exist[ing] all the way through," *id.* at 249, but did not touch at all on the idea of "valid judicial process."  Nowhere in the Rule 50(a) argument did the City's counsel assert that the state circuit court's probable cause finding cut off Mr. Smart's claim of false imprisonment as a matter of law.  In fact, the City's counsel did not mention the probable cause hearing at all.  Counsel also did not contend that Mr. Smart should instead pursue a claim of malicious prosecution against Detective Sanchez.  Counsel did not cite or refer to *Wallace*, 549 U.S. at 389, which was a central feature of the City's Rule 50(b) motion.   Counsel focused only on the reasonableness of the investigations by Detective Sanchez and the charging decision of the prosecutor, and whether their actions established the probable cause needed to arrest and prosecute Mr. Smart.

Indeed, during the Rule 50(a) hearing, it was the district court and Mr. Smart's attorney who briefly discussed the probable cause hearing and Detective Sanchez's misrepresentations to the state circuit court.  Mr. Smart's counsel began his argument by stating:

> [T]he most important part or the most important issue that we're overlooking is that you cannot develop probable cause on an unreasonable investigation and just overlook facts and, more importantly, make misrepresentations to the bond hearing judge. Had they not made those misrepresentations, it would have been a totally different case. . . . But since they did misrepresent it to Judge Cueto, they don't get this whole probable cause staying.

D.E. 110 at 253-54.  The district court responded:

> Well, their theory is to me that, once [Detective] Sanchez had
> objective probable cause under any circumstances, I should not look
> at the misrepresentation to Judge Cueto. *I should look at what he knew
> when he filled out the A-form, for lack of a better time frame.*

*Id.* at 254 (emphasis added).  Despite this discussion between the district court and

Mr. Smart's attorney, no one on the City's behalf mentioned "judicial process" or

the theory that a probable cause finding by the state circuit court precluded the

false imprisonment claim.  Instead, both parties and the district court continued to

focus on whether Detective Sanchez had objective probable cause to arrest Mr.

Smart.  The district court ultimately concluded that "there [was] a question of fact

of whether or not [Detective] Sanchez had objective probable cause because of the

nature of the investigation."  *Id.* at 257.

Although both of the City's Rule 50 motions discussed probable cause, they

did so in different legal contexts, and with different legal goals.  The Rule 50(a)

argument focused on Detective Sanchez's investigation and the prosecutor's

charging decision, and contained no reference to valid judicial process foreclosing

the possibility of a false imprisonment claim.  The Rule 50(b) motion, in contrast,

focused entirely on the facial validity of the judicial process, despite any

misstatements by Detective Sanchez at the probable cause hearing, and on the

probable cause finding by the state circuit court cutting off Mr. Smart's false imprisonment claim.

In keeping with Rule 50's underlying purposes of promoting fairness and preventing "sandbagging," we agree with the district court and Mr. Smart that the City failed to preserve its Rule 50(b) judicial process argument. The City's Rule 50(a) and Rule 50(b) motions were not based on "closely related" arguments, but were instead made on factually different and legally independent bases relating to probable cause. The City, we hold, has not preserved its Rule 50(b) legal process argument. *See, e.g.*, *Big Apple Consulting*, 783 F.3d at 813 (defendant who moved for judgment as a matter of law under Rule 50(a) on only one element of applicable claim did not preserve Rule 50(b) argument as to other elements of that same claim). The jury's award of $403,450 to Mr. Smart for false imprisonment under Florida law therefore stands.

### III

As noted earlier, Mr. Smart asserted three Fourth Amendment claims under § 1983, all based on filming and broadcast by The First 48 without his consent. In chronological order, the first concerned the filming of the murder scene at his apartment; the second concerned the filming of Mr. Smart in handcuffs before and after his arrest; and the third concerned the filming of Mr. Smart's interrogation.

The City argues that the district court erred in denying its renewed motion for judgment as a matter of law on all of Mr. Smart's § 1983 claims, and in granting judgment as a matter of law in favor of Mr. Smart on the liability aspect of one of those claims (the one based on the filming of the murder scene in the apartment).  The City asserts that there were no Fourth Amendment violations and that Mr. Smart did not present sufficient evidence of a policy, custom, or practice on its part.  Mr. Smart defends the district court's rulings.

"We review *de novo* a district court's denial of a defendant's renewed motion for judgment as a matter of law, applying the same standards as the district court."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).  *See also Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998).  We construe all of the evidence and inferences in the light most favorable to the nonmoving party.  *See Sherrin v. Nw. Nat'l Life Ins. Co.*, 2 F.3d 373, 377 (11th Cir. 1993).

"If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted."  *Id.*  On the other hand, "if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied."  *Id.*

We agree with the City that the district court should not have granted judgment as a matter of law to Mr. Smart on liability for the § 1983 claim relating to the filming of the apartment, but conclude that it correctly denied the City's motion for judgment as a matter of law on all of the § 1983 claims.

## A

A municipality cannot be held liable under § 1983 for a constitutional violation based on the doctrine of respondeat superior.  Liability attaches only if the constitutional violation resulted from a policy, custom, or practice of the municipality which was the moving force behind the violation.  *See generally Los Angeles Cnty. v. Humphries,* 562 U.S. 29, 36 (2010); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

To hold the City liable under § 1983, Mr. Smart had to prove "either (1) an officially promulgated [City] policy or (2) an unofficial custom or practice of the [City] shown through the repeated acts of a final policymaker for the [City]." *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).  As to the latter, Mr. Smart could show that the City's final policymakers acquiesced in a longstanding practice or custom which constituted the "standard operating procedure" of the City, or that a "longstanding and widespread practice [was] deemed authorized by the policymaking officials because they must have known about it but failed to stop it."  *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474,

1481, 1481 n.11 (11th Cir. 1991).  He also could show that the City's final policymakers adopted or ratified the unconstitutional conduct or decision made by a subordinate official.  *See Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002).

## B

We start with the filming of the murder scene inside the apartment in 2009 by The First 48.  That filming was done without Mr. Smart's consent, and we conclude that there was sufficient evidence to show a Fourth Amendment violation under the Supreme Court's decision in *Wilson v. Layne*, 526 U.S. 603, 611-14 (1999) (holding that the filming of a family and its private home by reporters without consent during the execution of an arrest warrant violated the Fourth Amendment because the reporters were not aiding the police in their work, and rejecting arguments that the filming was permissible because (a) the reporters helped the police in their general law enforcement mission, (b) the filming helped publicize police efforts to combat crime, and (c) the filming could help minimize police abuses and protect innocent suspects).  *See also United States v. Hendrixson*, 234 F.3d 494, 496 (11th Cir. 2000) (applying *Wilson* to find that the district court erred in holding that media presence during the search of a residence was not a Fourth Amendment violation).

20

The justifications put forth by the City were addressed and rejected in *Wilson*, and are not justifications here. We further reject the City's argument that, as a matter of law, Mr. Smart abandoned his privacy interests when he fled the apartment for fear of being shot, leaving behind his wallet, phone, and other belongings. On the evidence presented, whether Mr. Smart's Fourth Amendment rights were violated by the media presence and filming at the apartment was a matter for the jury to decide. *See generally Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990); *Jones v. United States*, 362 U.S. 257, 259 (1960).

We agree with the City, however, that the district court should not have granted judgment as a matter of law in favor of Mr. Smart on the municipal liability aspect of this claim. When Mr. Smart moved for judgment as a matter of law, the evidence as to policy, custom, or practice had to be viewed in the light most favorable to the City. *See, e.g.*, *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000). The question, therefore, was whether—despite what the agreement between the City and The First 48 stated—there was a dispute in the evidence as to whether the City had a custom or practice to allow The First 48 to film places and people without obtaining the required consent.

The district court found as a matter of law that the City had a custom of not obtaining consent before allowing The First 48 to film inside homes and residences. *See* D.E. 111 at 4. But the evidence on this point conflicted, and, as a

result, the district court erred in granting judgment as a matter of law to Mr. Smart on the § 1983 claim based on the filming of the murder scene in the apartment. For example, Sergeant Altarr Williams, who was in the homicide division, was asked whether The First 48 "ask[ed] permission of people [who] were suspects to tape them[.]" He answered "Pretty much." D.E. 110 at 110. He also testified that the crew from The First 48 kept a pad of "waivers for [everyone] they spoke to, except for arrestees that were charged. They would generally ask them to read and sign." *Id.* at 110-11. In addition, Commander Eunice Cooper, who at the time of trial was in charge of the homicide division, told the jury that "from time to time" she had seen the crew of The First 48 "get consent from people." *Id.* at 76-77. This testimony, if believed, would have permitted a jury to find that there was no custom or practice by the City to allow The First 48 to do its filming inside homes and residences without obtaining the necessary consent. It therefore precluded the district court from granting judgment as a matter of law in favor of Mr. Smart.

We therefore vacate the jury's award of $152,250 in damages to Mr. Smart based on the non-consensual filming of the murder scene at the apartment, and remand this claim for a new trial.

## C

The two other § 1983 claims are based on the filming and broadcast of Mr. Smart in handcuffs before and after his arrest and the filming and broadcast of Mr.

Smart's interrogation.  We first address the City's arguments that there were no constitutional violations, and then turn to whether the jury could find municipal liability.

1

The evidence, viewed in the light most favorable to Mr. Smart, allowed the jury to find that the filming and broadcast of Mr. Smart in handcuffs before and after his arrest constituted a seizure of Mr. Smart's image and implicated Mr. Smart's privacy rights under the Fourth Amendment.  "The Fourth Amendment seizure has long encompassed the seizure of intangibles as well as tangibles[,]" which, according to a number of courts around the country, include a person's image.  *Caldarola v. Cnty. of Westchester*, 343 F.3d 570, 574-75 (2d Cir. 2003) (holding that a Fourth Amendment seizure occurred when the county videotaped an arrestee being escorted through the department of corrections parking lot and into a car for transport to the police station).

We recognize that in *Caldarola* the Second Circuit ultimately held that the county's videotaping did not violate the Fourth Amendment because it served a legitimate purpose (to inform the public about its efforts to stop the abuse of disability benefits by its employees), *see id.* at 576-77, but here the City argues only that walking Mr. Smart down a police station hallway was a valid law enforcement activity.  It does not argue that videotaping Mr. Smart during the walk

23

and allowing the images to be broadcast served any legitimate purpose.  *See* Br. of
Appellant at 39-40.  So the ultimate conclusion in *Caldarola* does not help the City
here.

That leaves for consideration the filming and broadcast of Mr. Smart's
interrogation while the murder case was ongoing.  *Cf. Demery v. Arpaio*, 378 F.3d
1020, 1031-33 (9th Cir. 2004) (holding that pretrial detainees would likely prevail
on their claim that round-the-clock webcam filming and internet broadcasting of
them in areas of a jail which were not open to the public, including the men's
holding cell bunkbeds, the booking area, and the pat-down search area, violated
their substantive Fourteenth Amendment Due Process rights because the filming
was not related to a non-punitive purpose and "turn[ed] pretrial detainees into the
unwilling objects of the latest reality show").  The City makes only one argument
in support of its contention that the filming and broadcast of Mr. Smart's
interrogation did not violate his constitutional rights.  The City asserts that there
was no constitutional violation because it "exercised its discretion to waive the
active criminal investigation and intelligence information exemption contained in
[Fla. Stat.] § 119.07(1) . . . and produced [Mr. Smart's] videotaped interrogation to
[The First 48]."  Br. of Appellant at 42.  There are two problems with this
argument, and we therefore reject it.

First, the 2008 version of the agreement provides that The First 48 "shall not knowingly use, publish, or broadcast any materials or images that are of a confidential nature pursuant to applicable laws and statutes." Plaintiff's Ex. 2 at ¶ 6. This provision indicates that if The First 48 wanted to use investigative materials (such as an interrogation videotape) while a murder case was ongoing, it would have needed the City's permission.

Second, statements by counsel in the City's brief about the waiver of exemptions under Florida's Public Records Act do not constitute evidence, *see Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1270 (11th Cir. 2013), and as far as we can tell there was no evidence whatsoever at trial that The First 48 ever requested a copy of Mr. Smart's interrogation videotape from the City pursuant to the Public Records Act, or that the City chose to waive exemptions under that Act and provide a copy of the videotape to The First 48. Notably, the City does not cite any portion of the trial record to support its factual argument. There was a discussion of Florida's Public Records Act, but the assertion about the City's authority (both hypothetical and actual) to waive exemptions in favor of The First 48 was made by the City's counsel during the Rule 50(a) arguments. *See* D.E. 110 at 225-30. As we have said many times before, the factual assertions made by an attorney on a contested issue are not a substitute for proper evidence. *See, e.g.*, *United States v. Washington*, 714 F.3d 1358, 1361-62 (11th Cir. 2013).

**2**

Having concluded that the evidence allowed the jury to find violations of Mr. Smart's Fourth Amendment rights in these two circumstances, we address whether the evidence—viewed in the light most favorable to Mr. Smart—also permitted the jury to find a custom or practice on the part of the City to allow The First 48 to film individuals without obtaining consent, and whether this custom or practice was the moving force behind the constitutional violations.  We answer those questions affirmatively.

As an initial matter, the City seems to be arguing that, without direct evidence of a custom or practice, it was entitled to judgment as a matter of law.  As an evidentiary matter, we disagree.  The "test for evaluating circumstantial evidence is the same as in evaluating direct evidence." *United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982).  Indeed, circumstantial evidence can be just as probative as direct evidence. *See, e.g.*, *United States v. Cook*, 842 F.3d 597, 602 (8th Cir. 2016); *United States v. Kruse*, 606 F.3d 404, 409 (7th Cir. 2010); *Gierbolini-Colon v. Aponte-Roque*, 848 F.2d 331, 335 (1st Cir. 1988).  And in the § 1983 context we have held that circumstantial evidence, in the form of the unconstitutional nature of many prior police encounters, can help demonstrate a municipal custom or practice due to city officials choosing not to take corrective action. *See Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1556 (11th Cir. 1989).

26

With this matter resolved, we turn to the evidence presented at trial, which we find

sufficient for a reasonable jury to find that the City had a custom or practice of

allowing The First 48 to film individuals without their consent.

First, the 2008 version of the agreement between the City and The First 48

allowed the program to film at police headquarters without any apparent

limitations (though the participation of individual police officers was voluntary).

*See* Plaintiff's Ex. 2 at ¶¶ 1-3, 4.  Such filming would, therefore, necessarily

include the transport and interrogation of all or most arrestees like Mr. Smart.

Second, for suspects who were arrested (like Mr. Smart), Sergeant Williams

testified that The First 48 would "generally" ask for consent to film.  D.E. 110 at

111.  But, significantly, if the arrestee refused consent (or if no consent was

requested), the crew would then obtain the video from the police interrogation

room.  That is what happened with Mr. Smart.  *See* D.E. 107 at 187-88; D.E. 110 at

110-11.

Third, the testimony of Commander Cooper (who was the City's designated

representative at trial), Sergeant Williams, and Detective Sanchez (as well as the

reasonable inferences drawn from their testimony) indicated that the City did not

promulgate any policies for interacting with The First 48; that police officers were

told to cooperate with The First 48 (but not to do reenactments); that the agreement

between the City and The First 48 was not given to officers or team supervisors

(who therefore would not have known that it was the contractual responsibility of
The First 48 to obtain consent); that the only directive the homicide detectives
received regarding The First 48 was not to allow the show to compromise crime
scenes or interfere with investigative work; and that there were no policies in place
to ensure that the appropriate consent was obtained.  *See* D.E. 107 at 178-79, 181;
D.E. 110 at 52-53, 58, 60-61, 76, 79-80, 107-09, 111-13.

      Fourth, the jury was not required to accept the testimony of Sergeant
Williams and Commander Cooper as set out in Part III.B of this opinion.  The jury
apparently disbelieved both witnesses as to whether The First 48 generally
obtained consents, and having rejected their testimony, was entitled to find that
"the truth [was] the opposite of [their] story," i.e., that The First 48 generally did
not secure consents.  *See NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962)
(quoting *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952)).  *See also NLRB
v. Dixie Gas Co.*, 323 F.2d 433, 435-36 (5th Cir. 1963) (same).  Significantly, the
2008 version of the agreement between the City and The First 48 required the
program to send to Lieutenant John Buhrmaster (or his designee) a video tape of
each proposed episode before airing (at the "fine cut" stage) showing the work of
the City's police officers so that he could notify The First 48 of any factual
inaccuracies and provide written comments.  *See* Plaintiff's Ex. 2 at ¶ 6.  The jury

could have found that Lieutenant Buhrmaster knew about the systematic failure of The First 48 to obtain consents and did nothing about it.

Fifth, as to whether the City's custom or practice was the moving force behind the constitutional violations, Detective Sanchez testified that the crew of The First 48 had been riding around with him, that he did not ask Mr. Smart for consent to be filmed by The First 48, and that he was not concerned about asking for consent because the police department's policy was to cooperate with The First 48 and permit them to film. *See* D.E. 107 at 180-81. Moreover, the testimony summarized above indicates that, as a matter of course, The First 48 would obtain interrogation videotapes even if the arrestees or suspects did not consent.

As a result, we affirm the jury's award of $152,250 to Mr. Smart for the § 1983 claim based on the non-consensual filming and broadcast of him in handcuffs before and after his arrest, and the award of $152,250 to Mr. Smart for the filming and broadcast of his interrogation.

## IV

Finally, the City argues that the district court should have granted its motion for a new trial because it was unfairly prejudiced by the introduction of certain evidence and by a closing argument comment. The City sets forth three grounds for why it deserves a new trial: Mr. Smart should not have been permitted to introduce testimony regarding (1) the polygraph exam he took or (2) the confession

of a fellow inmate, and (3) Mr. Smart's counsel should not have stated that the City "pimped" for The First 48.[5]

## A

We review a district court's denial of a motion to grant a new trial for an abuse of discretion. *See Williams v. City of Valdosta*, 689 F.2d 964, 974 (11th Cir. 1982). A new trial is only warranted if an evidentiary error affected "substantial rights" or caused "substantial prejudice." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004). As we explained in *Peat*, "the inquiry is always directed to the same central question—how much of an effect did the improperly admitted or excluded evidence have on the verdict?" *Id.*

## B

The City first argues for a new trial based on the district court's admission of evidence that Mr. Smart offered to take, and actually took, a polygraph. The City believes this evidence was unfairly prejudicial because it bolstered his credibility, and because the jury could only reasonably conclude that Mr. Smart's case was

---

[5] We discuss only the evidence concerning Mr. Smart's polygraph. As to the City's two other arguments, we conclude that the testimony concerning an inmate's confession to the double murder of Mr. Ray and Mr. Volcy was not hearsay because it was not introduced for the truth of the matter asserted (i.e., that the inmate actually committed the murders) but rather to show the effect of that confession on the murder investigation. *See* Fed. R. Evid. 801(c); *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015); *United States v. Parry*, 649 F.2d 292, 295 (5th Cir. 1981). And we conclude that the comment by Mr. Smart's counsel in closing argument that the City "pimped" for The First 48 did not constitute reversible error even though likely inappropriate. *See Peterson v. Willie*, 81 F.3d 1033, 1039-40 (11th Cir. 1996); *Vineyard v. Cnty. of Murray*, 990 F.2d 1207, 1214 (11th Cir. 1993).

dismissed because he passed the polygraph test.   Compounding the problem, according to the City, was testimony by Mr. Smart that he "was going home because [he] didn't do it," D.E. 105 at 164, and by his criminal defense attorney, who said, "I know that I have an innocent client," D.E. 109 at 135-36.   Finally, the City argues that Detective Sanchez's credibility was undermined by Mr. Smart's argument that Detective Sanchez did not administer a polygraph because he did not want to know the truth.   The City contends the prejudicial effect of the polygraph evidence, related testimony, and argument about Mr. Smart's innocence was incapable of being cured by the district court's instruction.

Mr. Smart counters that the City opened the door to evidence of the polygraph and its results by "attempting to try a criminal case against [Mr.] Smart and casting him as a lying thug and a murderer."   Br. of Appellee at 47.   In addition, Mr. Smart argues that the testimony regarding the detectives' refusal of his many requests for a polygraph, after they had originally offered one, was intended to show the detectives' willful indifference towards conducting a proper murder investigation.   Mr. Smart further contends that even if the district court erred by admitting evidence of his multiple requests for a polygraph, the error would not warrant a new trial given the court's specific jury instructions regarding the evidence's use (which we discuss later).

The City cites a number of cases dealing with the inadmissibility and unreliability of polygraph evidence. Several of these cases, however, were decided when the Eleventh Circuit had a per *se rule* of exclusion, and are thus distinguishable. Additionally, many are criminal cases, and others are from other federal circuits and other states, which apply different rules. For example, in support of its statement that "[i]t is well-established that polygraph examination results are inadmissible because they are not reliable," Br. of Appellant at 44, the City cites *United States v. Scheffer*, 523 U.S. 303, 313-15 (1998). But *Scheffer* dealt with Military Rule of Evidence 707, which completely bans all references to polygraphs. *Id.* at 306-07. The Supreme Court addressed whether making polygraph evidence completely inadmissible in courts-martial unconstitutionally abridges the right of the accused to present a defense. *Id.* at 305. The Supreme Court held that "[b]ecause litigation over the admissibility of polygraph evidence is by its very nature collateral, a *per se* rule prohibiting its admission is not an arbitrary or disproportionate means of avoiding it," and concluded that the rule was not unreasonable. *Id.* at 314-15. *Scheffer* does not govern here because the Eleventh Circuit no longer has a rule of *per se* inadmissibility of polygraphs.

In the Eleventh Circuit, evidence regarding polygraph examinations is not *per se* inadmissible. *See United States v. Piccinonna*, 885 F.2d 1529, 1535 (11th Cir. 1989) (en banc). In *Piccinonna*, we reviewed the history of polygraphs and

the judiciary's initial concerns about polygraphs' reliability and general acceptance under Federal Rule of Evidence 702 and the *Frye* standard for admitting expert scientific evidence. *See id.* at 1531. We then explained that increased acceptance of polygraphs by the scientific community and improvements in polygraph techniques had led us to reevaluate the *per se* exclusionary rule and "institute a rule more in keeping with the progress made in the polygraph field." *Id.* at 1532. We concluded that expert polygraph evidence may be admitted at trial in two instances: (1) when both parties stipulate to the circumstances of the test and the scope of its use; and (2) to impeach or corroborate a witness's testimony. *See id.* at 1536. Additionally, evidence that a witness passed a polygraph examination, when used to corroborate in-court testimony, is not permitted under Rule 608 unless the witness's credibility was first attacked. *See id.* Even within these above described situations, though, the "admission of polygraph evidence for impeachment or corroboration purposes is left entirely to the discretion of the trial judge." *Id.*

Here, the district court allowed Mr. Smart to introduce testimony and evidence indicating he had asked at least 85 times to take a polygraph exam. Mr. Smart also introduced evidence that his case was dismissed shortly after he took a polygraph. The City contends that the probative value of this polygraph evidence was substantially outweighed by its prejudicial effect, and that the district court's curative instruction confused and misled the jury.

Unlike many of the cases cited in the briefs, and unlike in *Piccinonna*, no expert testimony regarding a polygraph is at issue here. Neither side tried to present expert testimony related to the result of the polygraph taken by Mr. Smart. So the focus of the debate is whether testimony illustrating Mr. Smart's requests to submit to a polygraph was unduly prejudicial to the City in this civil trial.

The district court dealt with the issue of the polygraph numerous times throughout the litigation. Before trial, the district court's order on motions in limine addressed the City's motion to exclude any evidence that a polygraph was offered to or taken by Mr. Smart. The district court ruled:

> The fact that [Mr.] Smart requested a polygraph numerous times is relevant to the reasonableness of the officers' investigation of the murders and would not implicate issues relating to the reliability of polygraph results. The results of the polygraph given to [Mr. Smart] may not be admitted in evidence, unless the proper factual predicate is laid that the City required [Mr. Smart] to take the polygraph prior to releasing him and dropping the charges against him.

D.E. 68 at 4. It appears to us that the district court weighed the probative value of the evidence against possible prejudicial effect in arriving at this compromise.

In the middle of the City's opening statement, the district court called a sidebar to warn the City's counsel that his choice of argument might open the door to admission of more evidence about the polygraph:

> You just said [Mr. Smart] told a story that "can't be true." He must be guilty of the murder . . . [W]e haven't talked about anybody else who's actually prosecuted, and you're basically retrying the murder case.

D.E. 104 at 163.  At the close of the first day of trial, after dismissing the jury, the

district court again cautioned:

> I don't want you all characterizing if something Mr. Smart said was
> true or untrue . . . If that theme continues to run on the City's side of
> the aisle, I'm just letting you know that I may view that as opening the
> door to the results of the polygraph. What I have allowed so far is
> only the fact that Mr. Smart asked for one. I have not allowed any
> results.

*Id.* at 201-02.  These explanations by the district court are in keeping with the

standard set forth in *Piccinonna*, where the bolstering of a witness' testimony

through polygraph expert testimony is allowed once opposing counsel calls into

question that witness' credibility.  The difference here is that any bolstering was

not performed by an expert's analysis of polygraph results, but merely by Mr.

Smart himself, through the interrogation video clip in which he pleaded for the

opportunity to take a polygraph.

In addition to giving clear guidance to counsel regarding allowable

parameters for the limited use of polygraph evidence, on several occasions

throughout the trial and in response to the City's many objections and repeated

motions for mistrial, the district court gave the following instruction to the jury:

> Evidence has been received regarding the plaintiff's request to take a
> polygraph. A polygraph examination is not required in a criminal
> case. This evidence is for your consideration of the officers'
> investigation only in this case. You should not assume that a
> polygraph is scientifically reliable method, as . . . the results of a

polygraph . . . would be inadmissible in court for a criminal prosecution for homicide.

D.E. 105 at 162.  Again the following day, the district court reiterated:

> Ladies and gentlemen, as I previously told you, evidence has been received regarding the plaintiff's request to take a polygraph. This evidence is for consideration of the officer's investigation only. You should not assume that a polygraph is a scientifically reliable method, as a polygraph would be inadmissible in court for a criminal prosecution for homicide.

D.E. 106 at 156-57.  On the sixth day of trial, the district court again reminded the jury:

> Ladies and gentlemen, as I've said to you repeatedly throughout this trial, a polygraph is not an investigative tool in a homicide investigation. The State is [ ] not required to give one. It's not admissible in court, and the police officers in this case were not required to give one.

D.E. 109 at 181.

We normally presume that juries follow the instructions given to them, *see, e.g.*, *United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011), and we see no reason to conclude otherwise here given the number of times the district court provided the jury with instructions.  Based on the foregoing—our circuit precedent regarding expert testimony on polygraphs, the district court's limitations on Mr. Smart's admission of polygraph evidence (i.e., that he requested a polygraph, that he ultimately took one, and that the charges were dropped after he did so), the fact that there was no expert testimony concerning the results of the polygraph, and the

district court's frequent instructions to the jury—we find no abuse of discretion in the district court admitting evidence related to Mr. Smart's request for and taking of a polygraph.

**V**

We affirm the jury's verdicts in favor of Mr. Smart on the state law false imprisonment claim, the § 1983 Fourth Amendment claim based on the nonconsensual filming and broadcast of Mr. Smart in handcuffs before and after his arrest, and the § 1983 Fourth Amendment claim based on the non-consensual filming and broadcast of Mr. Smart's interrogation.  We reverse the district court's grant of judgment as a matter of law in favor of Mr. Smart on the liability aspect of the § 1983 claim based on the non-consensual filming of the murder scene in the apartment because the evidence, viewed in the light most favorable to the City, presented an issue for the jury on municipal custom and practice.  We therefore vacate the jury's award of damages to Mr. Smart on that particular claim and remand for a new trial on that claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**